IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHEN ALBERT GRECO, individually, and SPOTLIGHT ASSET GROUP, INC., | |
| Plaintiffs, | |
| | CASE NO. _____ |
| v. | |
| PETER MALLOUK, individually, CREATIVE PLANNING, LLC, CPI HOLDCO A, LLC, CPI HOLDCO B, LLC, CREATIVE PLANNING HOLDCO, LLC, GENERAL ATLANTIC SERVICE COMPANY LP, GENERAL ATLANTIC (CP) COLLECTIONS, LP, FMR LLC D/B/A FIDELITY INVESTMENTS INC., NATIONAL FINANCIAL SERVICES LLC TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE, INC, THE CHARLES SCHWAB CORPORATION, and CHARLES SCHWAB & CO, INC, | JURY TRIAL DEMANDED |
| Defendants. | |

<u>COMPLAINT</u>

**TABLE OF CONTENTS**

I.   **NATURE OF THE CASE** ................................................................5
   A.  *Defendants' Unfair and Anti-Competitive Agreements and Schemes* ...................6
   B.  *Plaintiff Greco's Reports to SEC and DOJ* ...................................9
   C.  *Defendants' Attempts to Silence and Retaliate Against Greco* ...................10
   D.  *Plaintiffs' Claims for Relief and Damages* ...................................11
II.   **JURISDICTION & VENUE** ................................................................13
III. **PARTIES** ................................................................14
   A.  *Plaintiffs* ................................................................14
   Stephen A. Greco ................................................................14
   Spotlight Asset Group ................................................................14
   B.  *Defendants* ................................................................15
   Fidelity ................................................................15
   TD Ameritrade ................................................................18
   Charles Schwab ................................................................20
   Creative Planning ................................................................22
   Peter Mallouk ................................................................23
   General Atlantic ................................................................23
   Defendants, Agents, and Co-Conspirators ................................................................24
IV.   **INTERSTATE TRADE AND COMMERCE** ................................................................25
V.   **FACTUAL ALLEGATIONS** ................................................................25
   A.  *Overview of RIA Industry and Impact of Defendants' Collusion* ...................25
   Fiduciary Duties of Investment Advisers ................................................................28
   Investment Advisory Services Provided by RIAs ................................................................29
   B.  *Relevant Markets* ................................................................33
   Investment Advisory Services Market ................................................................33
   RIA Custodial Services Market ................................................................34
   Impact of Schwab Acquisition of AMTD ................................................................35
   IAR Labor Market ................................................................37
   C.  *RIA Services Scheme* ................................................................38
   Referral Programs ................................................................43
   Referral Program Incentives and Disincentives ................................................................49
   RIA Custodial Service Programs ................................................................51
   Group Boycott/Refusal to Deal ................................................................53

2

Barriers to Entry ................................................................................................ 54

Investment Advisory Services Market Consolidation ....................................... 58

Broker-Custodian Defendants' SIP Programs ................................................... 63

Creative Planning's Roll-Up Consolidation Plan .............................................. 69

Defendants' False and Misleading Advertising of Advisory Services ............... 76

RIA Services Scheme –Mail and Wire Fraud ................................................... 80

Factors Suggesting Conspiracy ......................................................................... 83

*D.    Antitrust Injury, Impact and Harm* .......................................................... 88

*E.    Greco RIA Industry Background and Work at Creative Planning* ............ 89

Greco's Concerns About Creative Planning's Business Practices ..................... 90

SEC Sanctions & Censure of Creative Planning & Mallouk ........................... 101

Greco Shares His Concerns with Mallouk ...................................................... 102

Creative Planning's SEC Audit ........................................................................ 103

Greco Forms Spotlight and Resigns from Creative Planning .......................... 106

*F.    Greco's 2017 Sec Whistleblower Action* ............................................... 107

*G.    Defendant's Silencing and Retaliation Scheme* .................................... 114

Spring- Summer 2017 Silencing and Retaliation ........................................... 115

Creative Planning Targets Other SEC Whistleblowers ................................... 125

AMTD's Participation in Silencing and Retaliation Scheme .......................... 129

Schwab's Participation in Silencing and Retaliation Scheme ......................... 138

Greco's 2020 DOJ Complaint ......................................................................... 143

Creative Planning's 2020 Silencing and Retaliation ...................................... 144

Fidelity Joins the Silencing and Retaliation ................................................... 147

*H.    RICO Factual Allegations* ..................................................................... 156

Defendants' Schemes ...................................................................................... 157

RICO Enterprises ............................................................................................ 158

Predicate Acts and Pattern of Racketeering Activity ..................................... 161

VI.    **LEGAL CLAIMS** ................................................................................... 164

COUNT ONE ................................................................................................... 164

COUNT TWO ................................................................................................... 167

COUNT THREE ............................................................................................... 172

COUNT FOUR ................................................................................................. 173

COUNT FIVE ................................................................................................... 174

COUNT SIX ..................................................................................................... 175

COUNT SEVEN ................................................................................................. 175

COUNT EIGHT ................................................................................................. 178

COUNT NINE .................................................................................................... 179

COUNT TEN ...................................................................................................... 182

COUNT ELEVEN ............................................................................................... 185

COUNT TWELVE .............................................................................................. 186

COUNT THIRTEEN .......................................................................................... 187

COUNT FOURTEEN ......................................................................................... 194

COUNT FIFTEEN .............................................................................................. 195

VII.   **PRAYER FOR RELIEF** ........................................................................... 197

Plaintiffs, Stephen Albert Greco ("Greco") and Spotlight Asset Group, Inc. ("Spotlight")(collectively, "Plaintiffs"), by and through their undersigned counsel of record, complain, upon information and belief, except as to allegations particularly pertaining to themselves, which are based on personal knowledge, against Peter Mallouk ("Mallouk"); General Atlantic Service Company, L.P., General Atlantic (CP) Collections, L.P. ("collectively "General Atlantic"); Creative Planning Inc., Creative Planning Holdco, LLC, Creative Planning Holdco A, LLC, CPI Holdco B, LLC, Creative Planning LLC (collectively "Creative Planning"); FMR LLC d/b/a Fidelity Investments Inc., National Financial Services LLC (collectively "Fidelity"); TD Ameritrade Holding Corporation and TD Ameritrade, INC., and ("AMTD"); The Charles Schwab Corporation and Charles Schwab & Co., Inc. (collectively "Schwab"). Fidelity, AMTD, and Schwab are collectively referred to herein as "Broker-Custodian Defendants," while all Defendants are collectively referred to herein as "Defendants."

## I.      NATURE OF THE CASE

1.      "*Here is the bottom line: Compensation drives behavior*." Defendant Mallouk made that statement to the New York Times in an article published in June 2017. Ironically, nearly five years later, his statement succinctly identifies the motive that fueled Defendants' collusive agreements and the corrupt and malicious lengths they are willing to go to keep their illicit profit mill churning and silence any employees who dare to report their improper practices to federal law enforcement, which have ultimately led to this lawsuit. This case is about massive-scale collusion in the Investment Adviser Industry, an industry subject to the rare federal fiduciary standard, and long-recognized to be of paramount importance to our national economy.

2.      Defendants are horizontal competitors who share a common desire to maximize their "*compensation*" by circumventing federal laws that were designed to protect investors and

promote competitive markets. As such, Defendants collude, conspire, and agree to accomplish together what they cannot accomplish alone, as competitors in a competitive market ("RIA Services Scheme"). Plaintiffs have suffered harm as a direct and proximate result of Defendants' collusion, both the collusion involved in the RIA Services Scheme and their further collusion to conceal the RIA Services Scheme, silence Plaintiff Greco, and retaliate against Plaintiffs because Greco reported misconduct by Defendants to the United States Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ").

3.     Collusion among competitors is "*the supreme evil of antitrust*,"[1] and the brand of evil Plaintiffs seek to remediate through this litigation. The central message of the Sherman Act is that business entities must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors.

4.     Defendants are horizontal competitors who "arranged treaties," instead of competing, to "win together by cheating together" in the registered investment adviser ("RIA") [2] industry, an industry subject to the rare "federal fiduciary standard,"[3] the Investment Adviser Act of 1940, 15 U.S.C. § 80b ("Adviser Act"), and regulatory oversight of the United States Securities and Exchange Commission ("SEC").

   *A.  Defendants' Unfair and Anti-Competitive Agreements and Schemes*

5.      Defendants are market dominators in the RIA Industry, and among the largest suppliers of  investment advisory services, RIA Custodial Services, and related investment

---

[1] *U. S. v. Citizens and Southern Nat. Bank*, 95 S.Ct. 2099, 2116, 422 U.S. 86, 116 (U.S.Ga. 1975)

[2] "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.   15 U.S.C.§ 80b-2

[3] *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11 (1979)

products and services (collectively referred to herein as "RIA Services") collusive agreements were, in part, influenced by the federal laws and SEC regulation of the RIA Industry, which Defendants found ridiculously burdensome and restrictive, as explained by Mallouk, "*The burden of compliance is borderline ridiculous; it is just completely out of control. The rules are fairly arbitrary, and you have to dedicate a lot of time, resources and money to it.*"[4]

6.      Defendants decided to eschew competition and burdensome, profit-hindering SEC compliance, and instead combine, conspire, and agree to carry out the "RIA Services Scheme," and otherwise engage in per se illegal restraints, in order to: (1) circumvent SEC regulation and federal law  and covertly align their collective interests in revenue-maximizing sales, transactions, and related conduct ("Inflated Revenue Transactions"), which would be otherwise unachievable in a competitive market providing transparent, legal, and SEC-compliant services that are not antagonistic to the interests of their advisory clients;  and (2) to maintain their market power, eliminate competitors, eliminate competition, protect and increase profit margins, and otherwise restrain trade in the relevant markets and accomplish their anti-competitive ambitions. Defendants have been engaging in the RIA Services Scheme for nearly a decade.

7.      Plaintiff Greco is an SEC-registered Investment Advisor Representative ("IAR")[5], with two decades of experience in the RIA Industry, including employment by Creative Planning, AMTD, and Schwab. Greco understands the fiduciary duties RIAs owe their advisory clients and, during his employment as Creative Planning's National Director of Wealth Management, he

---

[4] Going organic: Peter Mallouk bought a $100 million RIA in 2004. Today, Creative Planning is a $34 billion leviathan, and all that growth came without raiding wirehouses or making acquisitions | Institutional Real Estate, Inc. (irei.com)

[5] IARs are the investment advisers who work for investment advisory firms, which are referred to as RIAs. IARs must submit separate applications to the SEC, with the IAR submitting a Form U4 and the RIA submitting Form ADV.   Both are fiduciaries to advisory clients.

acquired first-hand knowledge and information about the RIA Services Scheme, as well as other improper and illegal practices by Creative Planning ("Creative Planning Fraudulent Growth Scheme").

8.      In the three years preceding his 2017 SEC Whistleblower Complaint, Greco was employed by Creative Planning and worked closely with Mallouk, witnessing first-hand the disturbing details of the RIA Services Scheme and collusion between AMTD and Creative Planning.

9.      Mallouk's Machiavellian leadership of Creative Planning compounded Greco's concerns, in particular Mallouk's insistence Creative Planning ratchet up its misconduct in order to achieve otherwise unattainable levels of new client growth using the  "Creative Planning Fraudulent Growth Scheme," involving: inflating its AUM and advancing a false growth narrative; using the AdvisorDirect® Commercial Bribery Scheme to "win" nearly 50% of all AMTD advisory client referrals, nationwide, from the program; misleading practices in advertising, marketing, soliciting, and paying referral fees for new advisory clients with celebrity-influencer Tony Robbins ("Robbins/Creative Planning Relationship"); engaging in collusive revenue-sharing, kickbacks, incentives and disincentives with Broker-Custodian Defendants which advanced its own interests over its advisory client interests; and other related transactions that, based on his substantial industry experience, Greco deemed in violation of federal law, SEC rules and regulations.

10.      Greco complained to Mallouk, who was intransigent in his insistence that Creative Planning continue its misconduct and participation in both the RIA Services Scheme and Creative Planning Fraudulent Growth Scheme. Mallouk demanded Greco instruct other Creative Planning IARs to use the AdvisorDirect® Commercial Bribery Scheme, and to further do "whatever it

takes" to maintain or increase Creative Planning's percentage of total nationwide referrals from Defendant AMTD's AdvisorDirect® Program. Based on years of industry experience, Greco knew that maintaining or increasing the AdvisorDirect® Program referral rates was simply not achievable through legal, SEC compliant means.

11.     On March 1, 2017, faced with Mallouk's Hobson's Choice, Greco decided his conscience required him to "follow the law" instead of "play by the rules," so he resigned from his position as Creative Planning's national Director of Wealth Management. That choice led to this complaint. The path between confirms the ongoing necessity of the Adviser Act's investor protections, as well as vigilance in spotting modern twists on the financial industry's enduring greed and self-dealing. Here, Defendants' scheme involved a public campaign to garner unearned trust by conflating their own "fiduciary" branding of RIAs with the Adviser Act's requirement that RIAs' conduct comport with the federal fiduciary standard. It is not the label, but the conduct that matters. Defendants have been masquerading behind labels while covertly serving a different master - their own economic self-interests.

## B.   *Plaintiff Greco's Reports to SEC and DOJ*

12.     On or about March 7, 2017, Greco filed a Form TCR and a disclosure statement containing original information, documentary evidence, pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, and analysis pertaining to potential violations of federal securities laws by AMTD and Creative Planning ("2017 SEC Whistleblower Complaint")[6] and provided additional supplemental information disclosures, data, documents, sworn testimony, cooperation and information to the SEC throughout the Spring and Summer of 2017 (collectively

---

[6] CPI-TD Ameritrade Complaint and Disclosure, Mar. 7, 2017, TCR 1488944294967

9

referred to herein as "2017 SEC Whistleblower Action"). Greco is an SEC "whistleblower" as defined by 15 USCA § 78u-6.

13.    Greco has a good faith belief that the 2017 SEC Whistleblower Action, TCR 1488944294967, remains open.

14.    In February 2020, Greco filed a complaint with the Department of Justice concerning collusive agreements and concerted unfair and anti-competitive conduct by AMTD, Schwab, and Creative Planning, including concerted action in furtherance of their RIA Services Scheme ("2020 DOJ Complaint").

15.    Greco's first-hand knowledge, work experience with three (3) of the Defendants, and extensive industry knowledge and experience, renders him uniquely able to connect-the-dots and color the picture of Defendants' RIA Services Scheme and related illegal activities.

    *C. Defendants' Attempts to Silence and Retaliate Against Greco*

16.    Beginning shortly after Greco's March submission of the 2017 SEC Whistleblower Complaint, and continuing through the present, Greco has been caught in Defendants' vindictive and retaliatory crosshairs and subjected to egregious harassment, intimidation, threats, punishment, and retaliation by Defendants related to his 2017 SEC Whistleblower Action and 2020 DOJ Complaint ("Silencing and Retaliation Scheme"). The timeline below highlights some of the key events since Greco's 2017 SEC Whistleblower Complaint was filed:



17.     Mallouk is spearheading the "*scorched earth campaign*" against Greco because he is painfully aware that his own misconduct, as well as his role in directing Creative Planning's misconduct, is how Greco came to understand the nature and extent of the collusive agreements, the RIA Services Scheme, and the particularly egregious misconduct by Creative Planning, which ultimately prompted Greco to file the 2017 SEC Whistleblower Complaint.

18.     The RIA Services Scheme, Creative Planning Fraudulent Growth Scheme, and Silencing and Retaliation Scheme involve nearly a decade of interconnected misconduct by Defendants, in violation of a host of state and federal laws, and causing harm to many, including Plaintiffs, advisory clients, competitors, the relevant markets, and the general public.

*D. Plaintiffs' Claims for Relief and Damages*

19.     Plaintiffs' claims for relief are limited to violations of federal and state laws that directly and proximately caused injuries and harm to Greco and/or Spotlight. Nevertheless, the outcome of this litigation reaches far beyond Plaintiffs, as Defendants' misconduct offends public

policies favoring competitive markets, encouraging whistleblowers to report violations of federal law, and protecting whistleblowers from harassment, intimidation, threats, and retaliation.

20. Plaintiffs bring this civil action seeking declaratory relief, injunctive relief, and monetary damages to rectify Defendants' violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (a),(c), and (d) and §1964 (c); §§ 1 and 2 of the Sherman Act, as amended, and §§ 4,7, and 16 of the Clayton Act, 15 U.S.C. §§15,18 and 26; Uniform Deceptive Trade Practices Act, 815 ILCS §510/1, et. seq.; Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 et seq.; Unfair Competition, Cal. Bus. & Prof. Code §§ 17200 et seq; the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; tortious interference with contract; tortious interference with business expectancies; breach of contract; defamation; and unjust enrichment.

21. Defendants' unlawful conduct has caused Plaintiffs substantial injury and damage to their business, property, personal and professional reputations, economic expectancies, livelihood, and ability to operate as an Independent RIA and continue providing Investment Advisory Services. The chart below illustrates Spotlight's approximate AUM in millions of dollars, as of December 31st of each annual year:



See attached Declaration of Bethany Riesenberg, April 18, 2022, incorporated herein and referenced as "Exhibit A."

22.     Spotlight has also lost employees and annual management fees. As of December 31, 2019, Spotlight had 17 employees, compared to just 7 employees as of December 31, 2021. Management fees as of December 31, 2020 were approximately $2.7 million, and for 2022 are projected to be approximately $1.2 million. Exhibit A.

## II.     JURISDICTION & VENUE

23.     This Court has subject matter jurisdiction over Plaintiffs' federal claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; RICO, 18 U.S.C. §1964, 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. §1332 (diversity); and 28 U.S.C. §1337(a) (antitrust). This Court has supplemental jurisdiction over the state statutory claims as well as common law claims presented in this action under 28 U.S.C. § 1367. This Court likewise may issue declaratory relief under 28 U.S.C. § 2201.

24.     This Court has personal jurisdiction over Defendants subject to service under Section 12 of the Clayton Act, 15 U.S.C. §22 and pursuant to 18 U.S.C. § 1965 and Personal jurisdiction is further appropriate in this forum as Defendants directed their activities giving rise to this litigation at Plaintiffs, citizens of Illinois, and their business operations in Illinois, and this Court's exercise of jurisdiction would comport with traditional notions of fair play and substantial justice.

25.     Venue is proper in this judicial district under Section 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; under 28 U.S.C. § 1391(b)(2), (c)(2), (d); and RICO, 18 U.S.C. § 1965(a). Defendants transact or have transacted business in this district and have agents in this

district. Defendants all have sufficient contacts with this district to subject them to personal jurisdiction.

## III. PARTIES

*A. Plaintiffs*

Stephen A. Greco

26.     Plaintiff Stephen Albert Greco ("Greco") is an individual and a resident of DuPage County, Illinois. Greco has resided continuously in Illinois since 2004.

27.     Greco is an Investment Adviser Representative ("IAR") CRD# 4519638, with 19 years of experience in the industry. He is currently employed as the Chief Executive Officer of Spotlight.   His previous industry experience includes being employed by Creative Planning, AMTD, and Schwab. Greco is currently registered and licensed, as an Investment Adviser Representative ("IAR") in four jurisdictions: California, Florida, Illinois, and Texas.

28.     Greco has passed the following industry exams: General Securities Principal Examination (S24) -Series 24; General Securities Sales supervisor- General Module (S10) -Series-10; General Securities Sales Supervisor- Options Module Examination (S9); General Securities Representative Examination (S7) Series 7; and Uniform Investment Adviser Law Examination (S65); Uniform Combined State Law Examination (S66).

Spotlight Asset Group

29.     Plaintiff Spotlight Asset Group, Inc., ("Spotlight") is an Illinois corporation with its principal place of business in Oakbrook Terrace, DuPage County, Illinois. Spotlight is domiciled in and a resident of the State of Illinois. See Exhibit A.

30.     Spotlight is a Registered Investment Adviser ("RIA") that has been registered with the Securities and Exchange Commission ("SEC") since May 8, 2017, with CRD #288076;

SEC#801-110415. Spotlight offers financial services including, investment management, retirement planning, estate planning, tax planning and corporate retirements solutions to clients throughout the United States.

B. *Defendants*

Fidelity

31.     FMR LLC d/b/a Fidelity Investments Inc. ("FMR") is a Delaware limited liability company with its principal place of business in Boston, Massachusetts, together with its affiliates and subsidiaries, is generally known to the public as Fidelity Investments and are collectively referred to herein as "Fidelity."  Fidelity is a financial services firm, duly registered with the Financial Industry Regulatory Authority ("FINRA"). Fidelity's CRD # is 7784. Fidelity is also an RIA registered with SEC #8-23292.

32.     Fidelity Global Brokerage Group, Inc., ("FGBG") is a Massachusetts company with its principal place of business/headquarters located at 245 Summer Street, Boston, MA 02210. It is a wholly owned subsidiary of FMR and, through its wholly owned subsidiaries below, supplies RIA Custodial Services.

33.     National Financial Services, LLC., ("NFS"), is a Delaware limited liability company, with its principal place of business/headquarters located at 245 Summer Street, Boston, MA 02210. It is a wholly owned subsidiary of FGBG.

34.     Fidelity Brokerage Services, LLC., ("FBS") is a Delaware limited liability company, with its principal place of business/headquarters located at 245 Summer Street, Boston, MA 02210. It is a wholly owned subsidiary of FGBG.

35.     Fidelity Institutional® a/k/a/ Fidelity Clearing and Custody, is Fidelity's RIA Custodial Services program, through which NFS and FBS supply RIA Custodial Services to RIAs.

36.     Fidelity is a market participant in the RIA Custodial Services Market, supplying RIA Custodial Services to Independent RIAs, including Creative Planning, and their advisory clients.  Fidelity formerly supplied RIA Custodial Services to Spotlight and its advisory clients. Fidelity is a horizontal competitor of Schwab and AMTD[7], in the RIA Custodial Services Market. Fidelity has monopoly power in the RIA Custodial Services Market.

37.     Fidelity is also a supplier of investment advisory services in the Investment Advisory Services Market, providing independent advisory services to advisory clients through its wholly owned RIA subsidiaries. Fidelity is a horizontal competitor, in the Investment Advisory Services Market, of Creative Planning, Schwab, AMTD, Spotlight, and other RIAs. Fidelity has market power in the Investment Advisory Services Market.

38.     Fidelity Advisory Holdings, LLC., ("FAH") is a Delaware limited liability company. It is a wholly owned subsidiary of FMR. FAH provides Fidelity's Independent RIA Services through its wholly owned subsidiary RIAs.

39.     Fidelity Personal and Workplace Advisors, LLC., ("FPWA"), CRD # 288590/SEC#:801-112027, is a Delaware limited liability company, with its principal place of business/headquarters located at 245 Summer Street, V2a, Boston, MA 02210. It is a wholly owned subsidiary of FAH and an SEC registered investment adviser. FPWA was formed in 2017 and offers a number of investment advisory programs, including Fidelity's advisory client referral program, Fidelity Wealth Advisor Solutions®. As of December 31, 2021, FPWA had $726,706,488,861 in discretionary assets under management.[8]

---

[7] After October 2020, the combined Schwab/AMTD entity.

[8] Fidelity Personal and Workplace Advisors LLC, Fidelity Wealth Advisor Solutions® Program Fundamentals, Form ADV Part 2A, dated March 28, 2022, page 4.

40. Fidelity Institutional Wealth Adviser LLC ("FIWA"), CRD #301896; SEC #:801-116860, is a Delaware limited liability company with its principal place of business/headquarters located at 245 Summer Street, Boston, MA 02210. It is a wholly owned subsidiary of FMR. It is a registered investment adviser under the Advisers Act. FIWA provides non-discretionary investment management services and sponsors the Fidelity Managed Account Xchange® ("FMAX") program.

41. Fidelity's direct and indirect subsidiaries and affiliates have material business relationships, enter into intercompany agreements to share operating resources, promotional, administrative, analytical, and technical services, employees, management, and governance. For example, the principal officers of subsidiaries serve as officers and/or employees of other subsidiaries and affiliated companies that are engaged in various aspects of the financial services industry.

42. Fidelity uses its interconnected web of subsidiaries and affiliates to carry out the RIA Services Scheme detailed herein, including distributing the ill-gotten gains and revenue-share through a system of debits and credits applied throughout its subsidiaries and programs. For example, Fidelity provides a fee discount or waiver on fees for fees owed to FPWA based on meeting or exceeding performance and revenue metrics for RIA Custodial Services through FGBG. In that example, the Participating RIA's fees owed to FPWA, arising from participation in Fidelity Wealth Advisor Solutions®, are discounted or forgiven based on the revenue generated for Fidelity, and paid to FBS, by Participating RIA's advisor clients on Fidelity's RIA Custodial Services platform.

TD Ameritrade

43.     TD Ameritrade Holding Corporation ("TDAHC") is a Delaware corporation with its principal place of business in Omaha, Nebraska and, together with its subsidiaries and affiliates (collectively "AMTD"), is a financial services firm offering brokerage, banking, financial advisory, custodial and related products and services.  On October 6, 2020, AMTD became a wholly owned subsidiary of The Charles Schwab Corporation ("Schwab") and as a result, after that date, AMTD is affiliated with Schwab and its subsidiaries.

44.     TD Ameritrade, Inc. ("TD Ameritrade), CRD #7870; SEC#:801-60469,8-23395 is a New York corporation with its principal place of business/headquarters located at 200 South 108th Ave., Omaha, Nebraska 68154. It is a wholly owned subsidiary of TD Ameritrade Online Holdings, Corp., which is a wholly owned subsidiary of TDAHC. TD Ameritrade is a registered broker-dealer under the Securities and Exchange Act of 1934 and an SEC-registered investment adviser under the Investment Adviser Act of 1940.

45.     TD Ameritrade provides RIA Custodial Services, in its capacity as a broker-dealer, through TD Ameritrade Institutional, Division of TD Ameritrade and TD Ameritrade Clearing, Inc. and as an RIA for purposes of operating its AdvisorDirect® Program. TD Ameritrade is an introducing broker/dealer that clears through its affiliate, TD Ameritrade Clearing, Inc.

46.     TD Ameritrade Clearing, Inc. is a Nebraska corporation with its principal place of business/headquarters located at 200 South 108th Ave., Omaha, NE 68154.  It is a wholly owned subsidiary of the TD Ameritrade Online Holdings Corp. Together with TD Ameritrade, it provides RIA Custodial Services, through TD Ameritrade Institutional. It is a qualified custodian as defined in Rule 206(4)-2 of the Advisers Act.

47.     AMTD is a market participant in the RIA Custodial Services Market, supplying RIA Custodial Services to Independent RIAs, including Creative Planning, and their advisory clients. AMTD formerly supplied RIA Custodial Services to Spotlight and its advisory clients. Prior to October 6, 2020, AMTD was a horizontal competitor of Fidelity and Schwab in the RIA Custodial Services Market and had market power.

48.     AMTD is also a participant in the Investment Advisory Services Market. Until its October 2020 acquisition by Schwab, AMTD was a horizontal competitor in the Investment Advisory Services Market of Creative Planning, Schwab, Fidelity, Spotlight and other RIAs.

49.     AMTD's direct and indirect subsidiaries and affiliates have material business relationships, share operating resources, employees, management, and governance.  For example, the principal officers of subsidiaries serve as officers and/or employees of other subsidiaries and affiliated companies that are engaged in various aspects of the financial services industry.

50.     AMTD subsidiaries enter into intercompany agreements to share operational, promotional, administrative, analytical, and technical services, and the personnel necessary to supply investment advisory services and RIA Custodial Services.

51.     AMTD uses its interconnected web of subsidiaries and affiliates to carry out the RIA Services Scheme, and related misconduct referred to herein, including distributing the ill-gotten gains and revenue-share through a system of debits and credits applied throughout its subsidiaries and programs. Post-Schwab acquisition of AMTD, similar intercompany agreements, including resource and revenue sharing, were entered into between Schwab subsidiaries and AMTD subsidiaries. Schwab integration of AMTD and Schwab is ongoing.

Charles Schwab

52.     The Charles Schwab Corporation is a Delaware corporation with its principal place of business in Westlake, Texas. Schwab provides a full range of wealth management, securities brokerage, custody, clearing, execution, banking, and financial advisory services through its subsidiaries and affiliates[9], Schwab, together with its affiliates and subsidiaries, are collectively referred to herein as "Schwab." Schwab is a financial services firm, duly registered with FINRA, CRD # 5393 and it is also an SEC registered RIA, SEC# 801-29938,8-16514.[10]

53.     Charles Schwab & Co., Inc. is a Delaware Corporation with its principal place of business located at 211 Main Street, San Francisco, California. It is a wholly owned subsidiary of CS Corp.  Schwab has been registered as an investment advisor under the Investment Advisers Act of 1940, as amended, since July 24, 1987. Schwab is dual- registered with the SEC as both a broker-dealer and an investment advisor. Charles Schwab's CRD # is 5393.

54.     Schwab uses intra-company agreements between its subsidiaries and affiliates that set forth the terms and conditions for resource and revenue sharing with the objective of increasing revenue, net profit, and leveraging the collective resources of all Schwab entities.

55.     Schwab's RIA Custodial Services are offered to Independent RIAs through its Schwab Advisory Services™ Division. In its capacity as an RIA, Schwab operates the Schwab Advisor Network®.

---

[9]  Including AMTD post-October 2020.

[10] Information for Charles Schwab & Co., Inc.: https://adviserinfo.sec.gov/firm/summary/5393 .

56.     As of January 31, 2022, Schwab reported 33.3 million active brokerage accounts, 2.2 million corporate retirement plan participants, 1.6 million banking accounts, and $7.80 trillion in client assets.

57.     At all relevant times, Schwab has been a market participant, with market power, in the RIA Custodial Services Market, supplying RIA Custodial Services to Independent RIAs, including Creative Planning and their advisory clients.

58.     Schwab has monopoly power in the RIA Custodial Services Market.

59.     Schwab is also a participant in the Investment Advisory Services, with market power, providing investment advisory services to advisory clients. Schwab is a horizontal competitor of Creative Planning, Fidelity, AMTD [11], Spotlight and other RIAs providing investment advisory services to advisory clients in the Investment Advisory Services Market.

60.     Schwab's direct and indirect subsidiaries and affiliates have material business relationships, share operating resources, employees, management, and governance.  For example, the principal officers of subsidiaries serve as officers and/or employees of other subsidiaries and affiliated companies that are engaged in various aspects of the financial services industry.

61.     Schwab uses its interconnected web of divisions, programs, subsidiaries, and affiliates to carry out the RIA Services Scheme, and related misconduct referred to herein, including distributing the ill-gotten gains and revenue-share through a system of debits and credits applied throughout its subsidiaries and programs.

---

[11] Pre-October 2020 Acquisition of AMTD by Schwab.

Creative Planning

62.     Creative Planning LLC is a Missouri limited liability company operating throughout various locations throughout the United States, with its principal place of business at 5454 W. 110th Street, Overland Park, Kansas, 66211. It was previously known as "Creative Planning, Inc," and converted to a limited liability company in January 2020. Creative Planning provides Advisory services to clients in all 50 states.

63.     Creative Planning is an RIA, duly registered with the SEC (SEC#801-18564). Creative Planning's CRD # is 105348. Creative Planning, LLC is wholly owned by CPI Holdco B, LLC, whose sole member is CPI Holdco A, LLC, whose sole member is Creative Planning HoldCo LLC, whose members include Creative Planning (CPI) HoldCo, Inc. and General Atlantic (CP) Collections, L.P. (collectively "Creative Planning").

64.     Mallouk's majority ownership interest in Creative Planning is maintained through the following ownership structure: CPI HoldCo B, LLC; CPI HoldCo A, LLC; Creative Planning Holdco LLC; Creative Planning (CPI) HoldCo, Inc, Peter Mallouk Trust, and the MJG Irrevocable Trust.

65.     Creative Planning HoldCo LLC, CPI Holdco A, LLC and CPI Holdco B, LLC are Delaware limited liability companies whose principal places of business are in the State of Kansas.

66.     Creative Planning (CPI) HoldCo, Inc. is a Delaware Corporation with its principal place of business located in Overland Park, Kansas.

67.     Creative Planning has at least four offices located in Illinois, including an office located at: (1) 6845 Weaver Road, Suite 200 Rockford, Illinois 61114; (2) 630 Dundee 60523

Road, Suite 215 Northbrook, Illinois 60062; (3)1520 Kensington Road Oak Brook, Illinois; and (4) 184 Shuman Blvd. Naperville, Illinois 60563. It also has at least three (3) offices in California.

Peter Mallouk

68.     Peter Mallouk, JD, MBA, ("Mallouk") is the President and CEO of Creative Planning and a SEC-registered investment adviser representative ("IAR"), CRD#4508063. Mallouk is a licensed attorney in Kansas (Kansas Registration Number: 17859) and has resided in Overland Park, Johnson County, Kansas on a continuous basis for more than a decade.

General Atlantic

69.     General Atlantic Service Company L.P. and General Atlantic Service Company, L.P., collectively referred to herein as "General Atlantic," maintain a partnership interest in Creative Planning.

70.     General Atlantic Service Company L.P., is a Delaware limited partnership registered with the SEC (CRD # 133536/SEC#:801-63864),[12] and has its principal place of business at Park Avenue Plaza, 55 East 52nd Street, 33rd Floor, New York, NY 10055

71.     General Atlantic (CP) Collections, L.P. is a Delaware limited partnership whose principal place of business is in the State of New York. General Atlantic (CP) Collections, L.P., is a member of Creative Planning Holdco, LLC.

72.     General Atlantic is a global growth equity investor that partners with leading entrepreneurs and innovative growth companies to deliver value for its partners.[13]   General Atlantic purchased a partnership interest in Creative Planning on January 10, 2020. General Atlantic is active in Creative Planning leadership and its Managing Director, Co-Head of Financial Services, Paul Stamas, serves on Creative Planning's Board of Directors and participates in

---

[12] https://reports.adviserinfo.sec.gov/reports/ADV/133536/PDF/133536.pdf (last accessed 4.27.2022).

[13] https://www.generalatlantic.com/ (last accessed 4.27.2022).

Creative Planning's corporate governance, key decision-making, and competitor acquisition strategy ("Roll-Up Consolidation Plan") set forth herein.

<u>Defendants, Agents, and Co-Conspirators</u>

73.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, the named Defendants' predecessors, including companies that merged with or were acquired by the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that sold RIA Services in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

74.     To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed RIA Services to RIAs or advisory clients, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the supply and prices paid for such RIA Services would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing, and collecting monies from Plaintiffs and was known to and approved by their respective corporate parent named as a Defendant in this Complaint.

75.     Various other persons, firms and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and each of the schemes set forth herein. The Defendants are jointly and severally liable for the acts of their co-conspirators whether named as Defendants in this Complaint.

76.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs. Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

77.     Defendants are jointly and severally liable for all damages suffered by Plaintiffs.

## IV.     INTERSTATE TRADE AND COMMERCE

78.     At all relevant times, each Defendant, directly or through its subsidiaries or other affiliates, sold Investment Advisory Services and/or RIA Custodial Services, in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district. Defendants' business activities substantially affected interstate trade and commerce in the United States. The interstate nature of the RIA industry was expressly recognized by Congress in enacting the Adviser Act.

## V.     FACTUAL ALLEGATIONS

### A.   *Overview of RIA Industry and Impact of Defendants' Collusion*

79.     The RIA Industry is facing a critical reckoning as Defendants' collusive RIA Services Scheme is accelerating market concentration and power in Defendants, and a handful of Participating RIAs, who unapologetically violate the fundamental purpose of "investor protection" at the core of federal securities laws governing the RIA Industry. Defendants have become so emboldened in their disregard of federal law that they excuse the inexcusable dereliction of fiduciary duties: "*There are a lot of extremely ethical, highly competent investment advisers in this industry, but they are the minority. It is just the reality… there is a lot of financial incentive to do*

25

*things that are not in the best interest of the client. It is just the reality of how the industry is set up*." [14]

80.     Pervasive, widespread, unethical self-dealing cannot be dismissed as "*just the reality of how the industry is set-up,*" because Congress "set-up" the adviser industry to protect investors, imposing the rare "federal fiduciary standard" [15] and demanding "high ethical standards," in enacting the Advisers Act as well as the stringent rules, regulations, and oversight of the United States Securities and Exchange Commission ("SEC"). [16]

81.     Congress enacted the Adviser Act to protect investors from the "*dangers of fraud, deception, or overreaching*" [17] by investment advisers and "*eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's*" and to fundamentally "*substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.*"[18]

82.     In order to protect advisory clients and their AUM "fr*om being lost, misused, misappropriated, or subject to RIAs financial reverse*s"[19] the SEC "Custody Rule" prohibits[20] RIAs from having custody of their advisory clients' AUM  unless a "qualified custodian," as

---

[14] Going organic: Peter Mallouk bought a $100 million RIA in 2004. Today, Creative Planning is a $34 billion leviathan, and all that growth came without raiding wirehouses or making acquisitions | Institutional Real Estate, Inc. (irei.com) (last accessed 4.26.2022).

[15] *Transamerica Mortg. Advisors, Inc. (TAMA) v.* Lewis, 100 S.Ct. 242, 246, 444 U.S. 11, 17–18 (U.S.Cal.,1979).

[16] H.R.Rep. No. 85, 73d Cong., 1st Sess. 2.

[17] *Lowe v. S.E.C.,* 472 U.S. 181, 210 (U.S.,1985)
[18] *S.E.C.  v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 186 (U.S.N.Y. 1963)

[19] *Adoption of Rule 206(4)-2 Under the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 123 (Feb. 27, 1962).
[20] An RIAs failure to comply with the Custody Rule is a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the Adviser Act.

defined by the SEC regulations, maintains the advisory client AUM in either (1) a separate account for each client under that advisory client's name; or (2) an account that contains only the RIAs clients' AUM, under the RIAs name as agent or trustee for the advisory clients. 17 C.F.R. § 275.206(4)–2.

83. As a result, there are two distinct service markets in the RIA industry: (1) "Investment Advisory Services" are provided by RIAs and consist of ongoing, regular, fee-based, "fiduciary" investment advice and services, including financial planning, the advisability of investing in, purchasing, or selling securities and other investments, investment strategies, and broad investment portfolio monitoring and management; and (2) "RIA Custodial Services" which are provided by a "Qualified Custodian" and include custody, clearing, execution, brokerage and related services, collectively "RIA Services."

84. Investment Advisor Representatives ("IARs") are the licensed investment advisors who work for RIAs. IARs provide investment recommendations and advice, monitor and manage investment portfolios, and otherwise provide investment advisory services to RIAs advisory clients, and as such must be licensed and registered through the SEC and the Financial Industry Regulatory Authority ("FINRA"). An IAR must register through the Investment Adviser Registration Depository ("IARD") and obtain a central registration depository (CRD) number from FINRA.

85. IARs must pass certain licensing exams, register with an RIA, and file a Form U-4 with the SEC. IARs are essential labor for RIAs.

86. RIA Custodial Services, Investment Advisory Services, and IAR markets are nationwide, as the accounts, wire transfers, purchase and sale of securities, brokerage services, and other relevant transactions are conducted largely via wire on electronic platforms and involve the

national securities exchanges, over the counter exchanges, national banking system, and otherwise occur in a systemic and coordinated fashion throughout the United States.

Fiduciary Duties of Investment Advisers

87.     The RIA Industry is distinguished from other financial advice and consulting, such as brokers, by its designation as a "fiduciary" to advisory clients. The fiduciary obligation is a significant distinction that makes Investment Advisory Services unique compared to, and not interchangeable with, other service markets which provide non-fiduciary investment recommendations, advice, and consulting. A fiduciary must be sensitive to the conscious and unconscious possibility of providing less than disinterested advice, and it may be faulted even when it does not intend to injure a client and even if the client does not suffer monetary loss.[21]

88.     For example, pursuant to federal securities laws, SEC regulations, and rules, Investment Advisers' duties include that of loyalty an as well as duties to disclose their conflicts of interest, act in their clients' best interest, and seek best execution for their clients' transactions.[22]

89.     It is more than "*sound public policy*" that requires RIAs from assuming antagonistic positions to their advisory clients, as the Supreme Court has explained: "***no man can serve two masters***; and considering that human nature must be dealt with, ***the rule does not stop with actual violations of such trust relations but includes within its purpose the removal of any temptation to violate them.***" (emphasis added)[23]

90.     Defendants have done precisely the *opposite* of what is required of federal fiduciaries, by deliberately entering into agreements aligning their collective economic self-interests against the interests of their advisory clients.  Instead of acting in compliance with their

---

[21] *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 191-92 (U.S.N.Y. 1963)

[22] *SEC v. Ambassador Advisors, LLC*, 2021 WL 5998456, at *3 (E.D.Pa., 2021)

[23] *Id.*

fiduciary duties requiring the "*removal of any temptation,*" Defendants' agreements amplify the temptation with incentives for engaging in undisclosed self-dealing and express enforcement provisions and penalties for any deviations from the collective interests of Defendants, as set forth herein.

91.     The SEC requires certain public reporting by RIAs, such as the Client Relationship Summaries ("CRS") and the Uniform Application for Investment Adviser Registration ("Form ADV"), which are intended to be relied upon by their clients.

92.     In explaining the importance of the Form ADV, the SEC explains: "[i]nvestors have the responsibility, based on disclosure they receive, for selecting their own advisers, negotiating their own fee arrangements, and evaluating their advisers' conflicts." [24]

93.     RIAs have an affirmative obligation of utmost good faith and fair disclosure, including a duty not to mislead clients, of all facts and circumstances material to the clients' engagement of the adviser, including: conflicts of interest associated with their business dealings and advice services, a duty to provide only suitable investment advice, reasonable independent basis for recommendations, and seek best execution.

Investment Advisory Services Provided by RIAs

94.     Investment advisors must register with the SEC if they have assets under management ("AUM") of at least $100,000,000.00. There are limited exceptions to registration requirements. 17 C.F.R. § 275.203A–1.

---

[24] See https://www.federalregister.gov/documents/2015/07/02/C1-2015-12778/amendments-to-form-adv-and-investment-advisers-act-rules (last accessed 4.25.2022).

95.     All applications for registration as an adviser with the SEC must be submitted electronically through an Internet-based filing system called the Investment Adviser Registration Depository ("IARD").

96.     Assets under management ("AUM") means advisory client assets which an RIA provides continuous and regular supervisory or management services. 15 USCA § 80b-3a. AUM is an important metric which RIAs are required to report to the SEC. The RIA industry uses the amount of AUM to rank RIAs, with the largest and most successful RIAs being those with the most AUM.

97.     Pursuant to Rule 206(4)-2 of the Act, an investment adviser registered or required to be registered under section 203 of the Act, 15 U.S.C. 80b–3, is subject to the "Custody Rule" which requires RIAs to custody their investment advisory client assets (AUM) with a "Qualified Custodian," as defined by the regulations. 17 C.F.R. § 275.206(4)–2.

98.     According to the Investment Advisor Association's annual report, Investment Adviser Industry Snapshot 2021, in 2020 there were 13,880 SEC-registered investment advisers.

99.     There are different types of RIA s providing Independent RIA Services,

including: independent RIAs, hybrids, asset managers, hedge funds, turnkey asset management programs ("TAMPS"), broker/dealers, family offices, and others as defined by the Investment Adviser Act.

100.    The RIA industry is growing, with total client AUM steadily increasing over the past 20 years. As the chart below indicates, total client AUM hit a record amount of $110 trillion, increasing by approximately 13.2% over 2019.



Investment_Adviser_Industry_Snapshot_2021.pdf

101.    The majority of RIAs have under $1 billion in AUM, yet in 2020, 92.0% of the total RIA Market AUM was managed by RIAs with more than $5 billion in AUM. Over 65% of the RIA Market AUM is further concentrated and managed by just 1% of the largest RIAs.



Investment_Adviser_Industry_Snapshot_2021.pdf

102.    Growth, measured in terms of percentage of total RIA Market AUM, also demonstrates increasing market concentration and consolidation.  As illustrated in the chart below, less than 2.5% of total RIA Market AUM is managed by RIAs with less than $1 billion in AUM and only about 8% of total RIA Market AUM is managed by RIAs with less than $5 billion in AUM.



Investment_Adviser_Industry_Snapshot_2021.pdf

103.    The industry data suggests AUM increases at higher rates for larger RIAs, and small RIAs are actually experiencing an annual decrease in AUM.  The data is consistent with a highly concentrated market with high barriers to entry.



Investment_Adviser_Industry_Snapshot_2021.pdf

104.    The Broker-Custodian Defendants are horizontal competitors in the RIA Custodial Services Market. Broker-Custodian Defendants, Creative Planning, and Spotlight are horizontal competitors in the Independent RIA Services Market.

105.    The RIA Custodial Service Market is highly concentrated, controlled by Broker-Custodian Defendants, and lacking in innovation and pricing competition.

*B. Relevant Markets*

106.    The relevant markets, for purposes of this case, are: (1) the Investment Advisory Services Market, (2) the RIA Custodial Services Market, and (3) the IAR Labor Market. The relevant geographic market for each is the United States nationwide market.

Investment Advisory Services Market

107.    Investment Advisory Services are provided by RIAs with the following characteristics: they are SEC registered fiduciaries that are engaged in the business of providing fee-based investment advice, they typically provide investment advisory services to high net worth individuals (more than $1 million in AUM) and institutions; are exclusively registered with the SEC, as opposed to dually-registered with the SEC and the Financial Industry Regulatory Authority ("FINRA") such as broker-dealers and hybrid RIAs; do not recommend or sell their own proprietary branded investment products to advisory clients; and are required by the SEC, pursuant to the SEC Custody Rule, to custody their advisory client AUM with a Qualified Custodian.

108.    "Investment Advisory Services" consist of comprehensive wealth services, including financial planning and investment advice, asset monitoring and management, management due diligence, portfolio allocation and monitoring, and related services provided by a fiduciary registered with the SEC pursuant to U.S. Investment Advisers Act of 1940 ("Investment Advisers Act") section 203A(a)(2)(B) of the Act (15 U.S.C. 80b–3a(a)(2)(B)).

109.    The Investment Advisory Services Market is a substantial and growing national market with $5 trillion in total market AUM[25].  It is rapidly becoming more consolidated, and is

---

[25] Main Street Stories: The RIA Industry: No one is staying in their lane, and that's a good thing (aboutschwab.com)

swiftly losing mid-sized Independent RIAs, which typically have advisory client AUM between $250 million to $5 billion, as well as small Independent RIAs with less than $250 million in AUM.

110.     Compliance with the SEC Custody Rule is required by Spotlight, Creative Planning, and other Independent RIAs, to provide Independent RIA Services. The relevant services provided in the RIA Custodial Services Market must be provided by Qualified Custodians, 17 C.F.R. § 275.206(4)–2 and include: custody, clearing, trading, brokerage and related support services to RIAs and their advisory clients pursuant to Rule 206(4)-2 of the Act, applicable SEC rules and regulations (collectively referred to herein as "RIA Custodial Services").

111.     The Investment Advisory Services Market is inextricably connected to the RIA Custodial Services Market because RIA Custodial Services are essential inputs that are required by RIAs, under federal law, and SEC rules and regulations, to supply Investment Advisory Services to advisory clients and otherwise operate their RIA businesses.

112.     The IAR labor market is also inextricably intertwined with the Investment Advisory Services Market because RIAs must obtain essential labor from licensed IARs. There is no substitute for IAR labor.

RIA Custodial Services Market

113.     The Broker-Custodian Defendants are each a "Qualified Custodian" selling RIA Custodial Services to RIAs and their advisory clients in the RIA Custodial Services Market.

114.     The RIA Custodial Services Market has historically been highly concentrated. Prior to Schwab's October 2020 acquisition of AMTD, Schwab had an estimated 50% share, AMTD

had approximately a 20% share, and Fidelity had approximately a 25% share of the RIA Custodial Services Market in the United States.[26]

115.     Since the Schwab Acquisition of AMTD in approximately October 2020, the highly consolidated market has become even more concentrated and anti-competitive, with high barriers to entry and no innovation or pricing competition.

116.     As of the date of filing of this Complaint, Schwab is the market dominator with more than a 75% share of the total RIA Custodial Services Market, as illustrated in the chart below.



117.     Fidelity does not report the total amount of AUM in its RIA Custodial Services program, but analysis of SEC filings by RIAs (i.e., ADV Form) suggests it maintains approximately a 20% share of the RIA Custodial Services Market.

Impact of Schwab Acquisition of AMTD

118.     Schwab's market share and dominance in the RIA Custodial Services Market soared after it acquired AMTD in October 2020.  It is currently the undisputed market dominator, with a market share estimated at over 75%, and monopoly power in the RIA Custodial Services Market.

---

[26] See https://www.thinkadvisor.com/2020/03/03/fidelity-posts-latest-results-in-midst-of-merger-madness/ (last accessed 4.18.2022).

119. Since Schwab's acquisition of AMTD, there "*are really only two options for Independent RIAs,*" as explained by Mallouk: "*But ... 18 months ago, [Schwab and Fidelity were] competing with TD Ameritrade ... and E-Trade, and now essentially all of that's gone...a lot of the power has shifted back towards the custodians.*"[27]

120. Mallouk explained that Independent RIAs only "*really got Schwab and Fidelity, and a lot of places would like to have a third bucket,*" while speculating that such a third formidable Qualified Custodian could emerge, Mallouk explained the adverse market conditions for RIAs that will result from decreased competition in the RIA Custodial Services Market, explaining in pertinent part: "*And it just naturally seems like if there's only two major players, you'll probably see them raise the minimums, so they can encourage consolidation and have less firms to keep track of.*"[28]

121. The United States Supreme Court has long considered much smaller percentages of market share to threaten undue concentration: "[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364, 83 S. Ct. 1715, 1742 (1963).

122. Schwab's acquisition of AMTD presumptively violated Section 7 of the Clayton Act. It presumptively increased its market power, according to the Department of Justice's ("DOJ") Horizontal Merger Guidelines, the RIA Custodial Services Market is considered highly concentrated, having a Herfindahl-Hirschman Index (HHI) of approximately 3,500 – 1,000 points above the "highly concentrated" threshold.

---

[27] https://www.thinkadvisor.com/2020/11/03/what-the-schwab-td-ameritrade-deal-means-for-advisors-mallouk/ (last accessed 4/25/2022).
[28] *Id.*

123.    Schwab's acquisition of AMTD increased the market's HHI by more than 280 points, significantly more than the 200-point increase needed to trigger the presumption of increased market power.

124.    At the time it announced its intended acquisition of AMTD in November 2019, Schwab maintained custody of a total of $1.5 trillion in AUM and AMTD maintained custody of a total of $600 billion in AUM.

125.    As of March 31, 2022, Schwab reported custodial AUM of ~$3.6 trillion, its own retail AUM was $4.2 trillion, with overall AUM reported at $7.86 trillion.[29]

IAR Labor Market

126.    The IAR labor market is nationwide and is comprised of licensed and registered investment advisers. IARs must be registered with both FINRA and the SEC. The majority of IARs are also licensed brokers, as indicated in the FINRA Chart below: - registered investment advisers:



127.     The total number of financial advisors has been declining over the past 5 years, according to FINRA:



128.     Defendants' no-poach agreements and other IAR labor market manipulation has diminished mobility, with only a small percentage of FINRA-Registered Representatives transferring between firms in the industry.

129.     Defendants' labor market manipulation has also diminished the quality and experience level of the IAR Labor Market.

*C. RIA Services Scheme*

130.     Defendants are horizontal competitors who consciously combine, associate together, conspire, and agree to carry out the RIA Services Scheme for the shared common purpose of dominating the RIA Industry, allocating advisory clients and services sold to them, collusively circumventing SEC compliance and federal laws, and covertly engaging in unfair and deceptive concerted actions designed to achieve inflated sales, pricing, and profits that would otherwise be unattainable but for their collusive agreements, combinations, and concerted action in furtherance of the RIA Services Scheme.

131. In furtherance of their shared interests, and in carrying out the RIA Services Scheme, Defendants each engage in unfair and anti-competitive market allocation, price-fixing, group boycott and refusals to deal, collusive exclusivity and enforcement agreements, incentive and disincentive agreements, restrictive covenants, labor market manipulation, and other anti-competitive conduct in furtherance of their shared interests in attempting to acquire, acquire, and maintain monopoly power, eliminate competitors and new market entrants, diminish competition in the relevant markets, and other conduct in violation of the Sherman Act, 15 U.S.C. §§1-2. Defendants use the RIA Services Scheme to circumvent SEC rules and regulations requiring a "separation of services" in the RIA Industry, align their collective financial interests, engage in profit-maximizing transactions that are antagonistic to their advisory clients, the fiduciary and other duties owed advisory clients, SEC reporting requirements, and other important federal securities laws and regulations intended to protect investors, the national economy, and public confidence in the investment industry.

132. Defendants' RIA Services Scheme has been ongoing and continuous for nearly a decade, and is carried out through a series of interrelated collusive agreements and combinations designed to align Defendants' interests and coordinate their business operations to:

   a. allocate advisory clients, Investment Advisory Services, and RIA custodial services between and amongst themselves;

   b. establish, maintain, and fix pricing of Investment Advisory Services, RIA Custodial Services and certain investment products and services, including using preferential pricing, coordinated pricing scales and discounts, price floors and ceilings, and other agreements related to pricing;

c.      restrict head-on competition among themselves through tacit and express non-competition and non-solicitation agreements, of the type and kind not typically entered into between horizontal competitors;

d.      maximize sales, pricing, and profits on all services and investment products sold to advisory clients, including making conflicted recommendations, referrals, and sales to advisory clients which are profit-maximizing and otherwise beneficial to the collective interests of Defendants but are antagonistic to and in derogation of duties owed to advisory clients ("Inflated Revenue Transactions");

e.      engage in "Revenue- Sharing," including agreeing to kickbacks and incentives related to from Inflated Revenue Transactions;

f.      conceal their Revenue-Sharing by using a system of debits and credits across programs and subsidiaries to distribute financial proceeds, including combinations of fees, penalties, fee discounts, fee waivers, bonuses, cash grants, transfer assistance, administrative assistance, expense reimbursements, free products and services, penalties, and other exchanges of value;

g.      engage in group boycott, refusal to supply, and other collusive refusal to deal for anti-competitive purposes, such as driving competitors out of business and punishing RIAs who do not "play by the rules" Defendants have set-up for the RIA industry;

h.      eliminate competitors and diminish competition in the Independent RIA Services Market through coordinated consolidation efforts, including manufacturing adverse market pressure on Independent RIAs by manipulating pricing and supply of RIA Custodial Services, IAR labor, access to technology and innovations, and other unfair

conduct; aggregating and consolidating small Independent RIAs (less than $250M AUM) into SIPs programs and using roll-up consolidation carried out by the largest Participating RIAs, such as Creative Planning, to aggregate and consolidate mid-large RIAs;

i. share sensitive, non-public, competitive information and data concerning business operations, advisory clients and AUM, employees, expenses, pricing, revenue sources, business affiliates, details related to RIA Industry business dealings, and other such information not generally shared by competitors in a competitive market ("Competitive Information Sharing");

j. keep their collusive dealings confidential and conceal the nature and extent of their relationships and collusive services;

k. use of enforcement provisions in agreements intended to induce compliance with the RIA Services Scheme, such as financial incentives and disincentives, as well as continued participation in advisory client referral programs, favorable terms or access to RIA Custodial Services, and access to or use of valuable products, services, entertainment perks, and other value;

l. no-poach agreements and other restrictive covenants used to intentionally manipulate the IAR labor market through, among other things, conduct designed to limit mobility of IARs reduce the labor pool of IARs, adversely impact the quality of available IARs, and increase the costs associated with obtaining qualified IARs;

m. agreements to take concerted and coordinated adverse action against individuals and entities that do not "*play by the rules*" and provide information or cooperation with federal law enforcement related to violations of federal law by any of Defendants related to conduct involved in the RIA Services Scheme;

n.      circumvent SEC reporting and compliance requirements using coordinated statements and representations about their relationships, conflicts of interest, and business dealings, which are false, misleading, and/or contain material omissions;

o.      intentionally market and sell Independent RIA Services and RIA Custodial Services using false and misleading advertisements and representations, which they intend RIAs and advisory clients to rely upon in selecting Defendants' services, such as misleading descriptions of their services, relationships, incentives, collusive agreements, revenue-sharing, pricing, and collective efforts to increase pricing, revenues, and profits from the sale of Independent RIA Services and RIA Custodial Services; and

p.      otherwise communicate, conspire, combine, and coordinate their actions in furtherance of their shared interests, RIA Services Scheme, and related unfair and anti-competitive objectives.

133.    The RIA Services Scheme is carried out using Broker-Custodian Defendants' advisory client referral programs ("Referral Programs"). The Referral Programs are the primary vehicle providing structure, organization, and accountability for their illicit combinations, agreements, and coordinated actions in furtherance of the RIA Services Scheme.

134.    Through the Referral Programs, Defendants and Participating RIAs enter into formal written agreements which define their relationships, respective obligations and responsibilities, scope and details of business dealing and operations to be used to carry out the RIA Services Scheme, and incentives and penalties used to encourage compliance, as well as monitoring and enforcement mechanisms to identify and penalize any breaches, inconsistencies, and conduct adverse to their collective interests/RIA Services Scheme ("Referral Agreements").

135.    The Referral Agreements incorporate agreements related to the provision of RIA
Custodial Services. Each Broker-Custodian Defendant maintains a Referral Program and RIA
Custodial Services programs as set forth in the table below. [30]

| Defendant | Referral Program | RIA Custodial Services |
|-----------|------------------|------------------------|
| AMTD | AdvisorDirect® Program, | TD Ameritrade Institutional, Division of TD Ameritrade & TD Ameritrade Clearing, Inc. |
| Schwab | Schwab Advisor Network® | Schwab Advisor Services™, Charles Schwab & Co., Inc. |
| Fidelity | Fidelity Wealth Advisor Solutions® | Fidelity Institutional® Strategic Advisers LLC Fidelity Investments Institutional Services Company, Inc. |

Referral Programs

136.    The Referral Programs masquerade as a simple referral service, while in fact being
the "*Den of Thieves*" of the RIA Industry, through which Defendants and Participating RIAs
(horizontal competitors) combine, conspire, and agree to carry out the RIA Services Scheme. As
such, the Referral Programs are *per se* illegal.

137.    For example, Fidelity represents to advisory clients that the Fidelity Wealth
Advisor Solutions® is simply "*a referral service designed for existing and prospective clients of
Fidelity who seek to receive referrals to third-party independent investment advisory firms*"[31]
when it is actually "designed" and used as the primary vehicle to facilitate and carry out the RIA
Services Scheme, and related anti-competitive conduct.

138.    While each Broker-Custodian Defendant ostensibly maintains a separate Referral
Program, they all operate in the same way and for the same anti-competitive purposes, with overlap
in membership by the largest Participating RIAs, and the following features:

---

[30] Schwab is integrating AMTD's AdvisorDirect® program into Schwab Advisor Network®, which will have approximately 175 total participating RIAs.
[31] See https://www.fidelity.com/wealth-management/private-wealth-management-advisors (last accessed 4.27.22).

a.      exclusive invite-only program offered to a limited number of Participating RIAs;

b.      enter into confidential written Referral Program Agreements, and related and incorporated agreements in furtherance of the RIA Services Scheme allocate advisory clients, Investment Advisory Services, RIA Custodial Services and certain investment products and services;

c.      establish, maintain, and otherwise agree to pricing of Investment Advisory Services and RIA Custodial Services;

d.      agree not to invest advisory client assets in certain types of investments, such as specific securities or classes of securities;

e.      agree to portfolio asset allocation, including defined percentages to be invested in particular classes of securities, ETFs, mutual funds, cash, and other investments;

f.      align collective interests and act in furtherance of the RIA Services Scheme by, among other things, engaging in self-interested economic transactions and Inflated Revenue Transactions, in furtherance of their shared interests and antagonistic to the interests of their advisory clients ("Conflicted Transactions");

g.      agree to share revenue generated from providing Investment Advisory Services and RIA Custodial Services based on formulas and Performance Metrics from distinct programs and subsidiaries ("Revenue-Sharing Agreements");

h.      agree to conceal their Revenue-Sharing Agreements using an opaque system of debits and credits applied across various programs and subsidiaries and distributed in multiple forms, such as through: cash payments, grants, expense reimbursements, reduced-cost or free products and services, administrative reimbursements transfer assistance, loan repayment or forgiveness, resource sharing, fee waivers, fee discounts and forgiveness,

44

access to exclusive products and services, and other value, not falling within any SEC safe-harbor provisions, and penalties ("Revenue Distribution System");

i.      agree not to fully or adequately disclose, to their advisory clients and the SEC, the nature and realities of their collusive business dealings, agreements, and concerted action;

j.      enter into agreements indefinitely tying Referred Advisory Clients to Broker-Custodian Defendants' RIA Custodial Services program, including express and explicit restrictions on solicitation, recommendation, or transfer of Referred Advisory Clients to alternative qualified custodians for so long as Creative Planning and other Participating RIAs maintain the advisory client relationship ("Client Transfer Restrictions");

k.      agree to substantial penalties for violating Client Transfer Restrictions, such as Transfer Fees, a penalty fee calculated as a percentage of transferred AUM, payment of ongoing referral fees on a transferred Referred Advisory Client, even after transfer and other such penalties and disincentives;

l.      agree to non-competition, non-solicitation, no-poach, exclusive dealing, and other restrictive covenants;

m.      agree to Confidential Information Sharing; and

n.      otherwise communicate, combine, conspire, and agree in furtherance of the RIA Services Scheme and Defendants' common interests and objectives.

139.    Over the past decade, Fidelity has consistently had approximately 85 Participating RIAs in its advisory referral program, while Schwab and AMTD each had approximately 175 participating RIAs in their advisory client referral programs. The combined Schwab-AMTD Referral Program will have less than 200 Participating RIAs.

140.    Broker-Custodian Defendants intentionally make misleading public statements about the qualifications for participation in the advisory referral programs, identifying sham eligibility criteria followed by subsequent disclaimers and qualifications rendering the criteria meaningless.

141.    The primary factors used by Broker-Custodian Defendants to determine whether an RIA is invited to participate in the Referral Programs, and RIA Scheme, are "Performance Metrics," which include: total number of advisory clients and household accounts ("Total Advisory Clients"); total dollar value of the RIAs AUM ("Total AUM"); percentage of total advisory clients and advisory client AUM using, or committed to use, Broker-Custodian Defendants' RIA Custodial Services ("AUM in Custody"); total revenue generated, or agreed to be generated, from provision of RIA Custodial Services Provided to the RIAs advisory clients ("Gross AUM Revenue"); revenue generated from cash sweep accounts, margin accounts, and other account types ("Account Revenue"); revenue from other brokerage related services, such as trading fees, transaction fees, and payment for order flow, and other such revenue-generating arrangements ("Transaction Revenue"); and revenue generated from the sale of investment products and services ("Investment Revenue").

142.    For example, Buckingham discloses in its March 2022 Form ADV Part B, that AMTD will most likely refer clients through their AdvisorDirect® Program to Participating RIAs that encourage their advisory clients to custody with AMTD and "*whose client accounts are profitable*" to AMTD, resulting in an incentive to Participating RIAs to "*place transactions for client accounts*" with AMTD.[32]

---

[32] *Buckingham Strategic Wealth, March 31, 2022 ADV Part B, page 30.*

143. A Participating RIA in Fidelity's Referral Program, Hightower Advisors, provides the following description of the Referral Program and agreements in its March 2022 ADV:

> To receive referrals from the WAS Program, Hightower must meet certain minimum participation criteria, but Hightower may have been selected for participation in the WAS Program as a result of its other business relationships with FPWA and its affiliates, including Fidelity Brokerage Services, LLC ("FBS"). As a result of its participation in the WAS Program, Hightower may have a potential conflict of interest with respect to its decision to use certain affiliates of FPWA, including FBS, for execution, custody and clearing for certain client accounts, and Advisor may have a potential incentive to suggest the use of FBS and its affiliates to its advisory clients, whether or not those clients were referred to Hightower as part of the WAS Program. Under an agreement with FPWA, Hightower has agreed that Advisor will not charge clients more than the standard range of advisory fees disclosed in Item 5 Fees and Compensation of this Brochure to cover solicitation fees paid to FPWA as part of the WAS Program. Pursuant to these arrangements, Hightower has agreed not to solicit clients to transfer their brokerage accounts from affiliates of FPWA or establish brokerage accounts at other custodians for referred clients other than when Hightower's fiduciary duties would so require, and Advisor has agreed to pay FPWA a one-time fee equal to 0.75% of the assets in a client account that is transferred from FPWA's affiliates to another custodian; therefore, Hightower may have an incentive to suggest that referred clients and their household members maintain custody of their accounts with affiliates of FPWA. However, participation in the WAS Program does not limit Hightower's duty to select brokers on the basis of best execution. Please see Item 12 of this brochure above for further information regarding our brokerage practices.

144. Participating RIAs vaguely reference in their Form ADV that their participation in a Referral Program may be the result of its "*other business relationships with Broker-Custodian Defendaries*.[33]

145. Broker-Custodian Defendants similarly admit they consider their "*business relationships*" with Participating RIAs in determining whether to admit them into the advisory client referral program. For example, Schwab explains that it considers its business relationship outside of its advisory client referral program in deciding to admit RIAs to the program." [34]

146. Participating RIAs, in Schwab's Advisor Network® depends upon, as explained by Schwab, in its disclosure brochure: "*the amount and profitability to Schwab of the assets in, and trades placed for, the Advisor's Clients' accounts maintained at Schwab. An Advisor's participation may also be contingent upon the Advisor directing to Schwab for custody a specified*

---

[33] Buckingham Strategic Wealth is an Independent RIA who reports in its Form ADV that it is a Participating RIA in Schwab, AMTD, and Fidelity's advisory client referral program advisory client referral programs. *Buckingham Strategic Wealth, March 31, 2022 ADV Part B, page 29-30.*

[34] *Schwab Advisor Network® Disclosure Brochure, March 31, 2022, Pages 1-2.*

*amount of assets in its Clients' accounts not referred through the Service within a specified time period.*"[35]

147.    Schwab goes so far as to characterize its RIA entering into collusive agreements with the largest competitor RIAs as: "*The Schwab Advisor Network® is just one way that Schwab is committed to helping independent advisors grow and compete.*" [36]

148.    The composition of Participating RIAs in the Schwab Advisor Network® reveals the absurdity of Schwab's claim that its Referral Program is "*helping independent advisors grow and compete*":

| RIA | AUM | | ADV Date | Schwab Program | Fidelity Program |
|---|---|---|---|---|---|
| Captrust | $ | 655,054,291,754.00 | 4/1/2022 | YES | Yes |
| Creative Planning | $ | 133,830,630,372.00 | 3/9/2022 | Yes | No |
| Hightower Advisors | $ | 103,620,351,000.00 | 5/9/2022 | Yes | Yes |
| CIBC Private Wealth | $ | 73,775,455,095.00 | 3/31/2022 | Yes | Yes |
| Mariner Wealth Advisors | $ | 55,432,642,278.00 | 4/26/2022 | Yes | Yes |
| Wealth Enhancement Advisory Services | $ | 52,608,705,200.00 | 3/31/2022 | Yes | Yes |
| Cerity Partners | $ | 44,670,528,622.00 | 4/29/2022 | Yes | Yes |
| Mercer Advisors | $ | 34,011,524,251.00 | 4/5/2022 | Yes | Yes |
| Moneta | $ | 32,888,762,887.00 | 3/31/2022 | Yes | No |
| Silvercrest Asset Management Group | $ | 32,319,678,854.00 | 3/31/2022 | Yes | No |
| Buckingham Strategic Wealth | $ | 22,636,094,667.00 | 5/2/2022 | Yes | Yes |

149.    Creative Planning and the other Participating RIAs do not need Schwab's help to "*grow and compete*" in the Investment Advisory Services Market.  The table above also reflects the overlapping memberships in Schwab and Fidelity Referral Programs by the largest Independent RIAs.

150.    Defendants and Participating RIAs do, however, need each other to carry out their RIA Services Scheme. The Referral Program is one of the primary vehicles to do just that.

---

[35] *Id.* at page 5.

[36] Main Street Stories: Introducing the new Schwab Advisor Network (aboutschwab.com)

151.    Defendants, and Participating RIAs, would not enter into the Referral Programs Agreements or otherwise carry out the RIA Services Scheme in isolation, and if the others were not also participating.

Referral Program Incentives and Disincentives

152.    The Referral Program Agreements create a "carrot and stick" to increase the likelihood Participating RIAs will act in accordance with their collusive agreements.

153.    Broker-Custodian Defendants each charge "Participation Fees" (i.e., annual fee, minimum participation fees, etc.) to Participating RIAs, as well as a fee based on the value of the referred advisory client AUM the Participating RIA manages through the advisory client referral program.

154.    Broker-Custodian Defendants each use Participation Fee waivers and discounts to "kickback" a portion of, and otherwise share, revenue received by Broker-Custodian Defendants from provision of RIA Custodial Services to Participating RIAs advisory clients, including advisory clients not referred through the Referral Program.

164.    For example, Fidelity reported in its March 2022 Form ADV Part 2A that it charges the following Participation Fees for participation in its advisory client referral program:

> Advisors pay solicitation fees to FPWA for each client referral pursuant to the agreement between FPWA and each Advisor ("Participation Agreement"). The Participation Agreement provides that the Advisor will pay an annual $50,000 program fee ("Program Fee") to participate in the Service and an asset-based fee based on the value of a referred client's accounts opened or maintained with FBS, and custodied at NFS, that are managed or advised pursuant to an investment advisory agreement between that Advisor and a client or that client's household members, which includes persons/entities sharing the same residence address as the Advisor's client (collectively, "Client Accounts"). The Program Fee is prorated based on the number of completed quarters in which the Participation Agreement was in effect for such year, but the Advisor's obligations to pay asset-based fee will remain in effect.[37]

---

[37] Fidelity Personal and Workplace Advisors LLC Form ADV Part 2A, March 28, 2022, page 6.

165. However, Participation Fees are often discounted, waived, or forgiven ("Fee Forgiveness"), as admitted by Participating RIA, Hightower, in its March 2022 ADV,

> Hightower pays Schwab a Participation Fee on all referred Clients' accounts that are maintained in custody at Schwab, and a non-Schwab Custody Fee on all accounts that are maintained at, or transferred to, another custodian. The Participation Fee paid by Hightower is a percentage of the fees the Client owes to Hightower, or a percentage of the value of the assets in the Client's account, subject to a minimum Participation Fee. Hightower pays Schwab the Participation Fee for as long as the referred Client's account remains in custody at Schwab. The Participation Fee is billed to Hightower quarterly and is increased, decreased, or waived by Schwab from time to time. The Participation Fee is paid by Hightower and not the Client. Hightower has agreed not to charge Clients referred through the Service fees or costs greater than the fees or costs Hightower charges Clients with similar portfolios who were not referred through the Service.

166. Fee Forgiveness is typically determined using Performance Metrics, which are continuously monitored and considered, including on Referral Program advisory clients and AUM ("Referral Clients"), non-Referral Program advisory clients and AUM ("Non-Referral Clients"), as well as monitoring of Total Advisory Clients and Total AUM. Monitoring is done to ensure compliance with the collusive Referral Programs Agreements, as well as overall cooperation in carrying out the RIA Services Scheme.

167. Performance Metrics are used to identify Participating RIAs who fail to perform under the agreements, which can result in termination from the Referral Programs, loss of access to products and services, and assessments of fines and penalties ("Enforcement Provisions").

168. Referral Program Agreements also provide for substantial cash payments, grants, expense reimbursements, reduced-cost or free products and services, administrative reimbursements transfer assistance, loan repayment or forgiveness, resource sharing, fee waivers, fee discounts and forgiveness, access to exclusive products and services, and other value, not falling within any SEC safe-harbor provisions, to Creative Planning and Participating RIAs who meet or exceed the minimum Performance Metrics.

169.    Creative Planning participates in AMTD's and Schwab's Referral Programs. Spotlight has not participated in any of the Broker-Custodian Defendants' Programs.

170.    The anti-competitive impact of the collusive Referral Programs is magnified by their tie to the Broker-Custodian Defendants' RIA Custodial Service programs.

RIA Custodial Service Programs

171.    Broker-Custodian Defendants dominate and control the RIA Custodial Services Market and have abused their market power in furtherance of the RIA Services Scheme, to maintain their monopoly power in the RIA Custodial Services Market, and to increase their market share and power in the Investment Advisory Services Market.

172.    Broker-Custodian Defendants actively solicit Independent RIAs, promising to support their business operations and even promising not to compete with them, for example AMTD, states on its website:



173.    Independent RIAs enter into written agreements with Broker-Custodian Defendants to be supplied RIA Custodial Services ("RIA Custodial Services Agreement"). Participating RIAs also enter into RIA Custodial Services Agreements which are incorporated into their Referral Program Agreements.

174.     Broker-Custodian Defendants use the RIA Custodial Services Agreements in furtherance of the RIA Services Scheme, and particularly to maintain their monopoly power. Their agreements are substantially similar, sharing the following key common features, such as:

a.     RIAs must commit to minimum volume and performance metrics, such as the value of initial advisory client AUM that will be transferred to Broker-Custodian Defendants, the total number of advisory client accounts that will be established, and increased volume and value thresholds within specified time intervals;

b.     agree to an investment discipline mix, which establishes the percentages of total advisory client AUM which will be maintained in various categories of investments, such as equities, ETFs, mutual funds, and cash;

c.     agree to share Competitive Information; and

d.     agree to confidentiality of the RIA Custodial Services Agreement, including its terms, conditions, minimum threshold metrics, pricing, fees, incentives, disincentives, etc.

175.     Broker-Custodian Defendants charge different prices for RIA Custodial Services, including flat fees and minimum fees, as well as utilize a range of performance incentives and disincentives. Broker-Custodian Defendants provide preferential pricing and terms for RIA Custodial Services to Creative Planning, Participating RIAs, and selected non-Participating RIAs.

176.     Broker-Custodian Defendants manipulate supply and pricing of RIA Custodial Services for purposes of diminishing competition in the Investment Advisory Market, eliminating competitor RIAs, and in furtherance of the RIA Services Scheme.

177.    Spotlight entered into RIA Custodial Services Agreements with each Broker-Custodian Defendant, however each terminated their respective agreements and refuse to supply RIA Custodial Services to Spotlight, as set forth herein.

Group Boycott/Refusal to Deal

178.    In furtherance of the RIA Services Scheme, Defendants utilize group boycotts, refusals to supply, and other such refusals to deal against their competitors.

179.    A group boycott by horizontal competitors is per se illegal under §1 of the Sherman Act. A boycott consists of "*pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target*." [38]

180.    The Broker-Custodian Defendants understand and intend that their refusing to deal with an Independent RIA, with respect to RIA Custodial Services, will effectively prevent the RIA from being able to acquire competitive RIA Custodial Services.

181.    Defendants conspire and agree to not only participate in group boycotts/refusals to deal, but to also use their collective market power and dominance to coerce and induce others in the relevant markets to participate in group boycotts/refusals to deal, as more fully set forth herein.

182.    Defendants routinely use group boycotts/refusals to deal to eliminate competitors and enforce conformity with unfair and anti-competitive "*rules of play*" which they have established for participants in the relevant markets, such as violating tacit no-poach agreements.

183.    Defendants can only achieve the group boycotts/refusals to deal because of their collusive agreements and RIA Services Scheme, which guarantees they will all participate.

---

[38] *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541, (1978)

184.    Defendants conspired and agreed, and rely upon, Broker-Custodian Defendants' use of their monopoly power and threats of refusal to deal, in coercing other Independent RIAs and IARs to participate in group boycotts/refusals to deal.

185.    Defendants have boycotted and refused to deal with Spotlight, including refusing to sell RIA Custodial Services to Spotlight, Greco, and Spotlight advisory clients. Defendants have also communicated their group boycott/refusal to deal to Independent RIAs and elicited and coerced their participation, as set forth herein.

Barriers to Entry

186.    Thousands of other entities could meet the SEC definition of Qualified Custodian, such as banks and other large broker-dealers, but are unable to enter and compete in the RIA Custodial Services Market, because of Defendants' anticompetitive agreements.

187.    The barriers to entry in the RIA Custodial Services Market include technology, innovations, and the lack of demand caused by the enormous percentage of advisory client AUM which is indefinitely tethered/tied in to Broker-Custodian Defendants, as a result of Defendants' collusive agreements, including exclusive dealing, non-competition and non-solicitation, and cost-prohibitive disincentives and penalties which make it economically infeasible for RIAs to recommend or transfer  their advisory clients to an alternative qualified custodian.

188.    Broker-Custodian Defendants use their Referral Programs to maintain their monopoly power in the RIA Custodial Services Market by, among other things requiring Participating RIAs to agree to minimum participation thresholds as a percentage of their total advisory client AUM, using incentives and disincentives to control prevent unbiased decision-making by Participating RIAs related to RIA Custodial Services, requiring Competitive

Information Sharing, monitoring, and enforcement provisions to maintain and increase their proportionate share of Participating RIAs total advisory clients and AUM.

189.    The Broker-Custodian Defendants use disincentives and penalties, including termination of provision of RIA Custodial Services, to maintain their monopoly power in the RIA Custodial Services market, by essentially making it economically infeasible for Participating RIAs to transfer advisory clients and AUM to an alternative qualified custodian.

190.    For example, by virtue of its collusive agreements with Schwab, Creative Planning would incur large, cost-prohibitive financial penalties if it were to move existing advisory clients from Schwab to another Qualified Custodian or fail to use Schwab for a minimum threshold percentage of new advisory client business.

191.    Financial penalties are not the only risk Creative Planning would face if it did not meet minimum thresholds or moved existing accounts for RIA Custodial Services with Schwab. Creative Planning could altogether lose its ability access Schwab's RIA Custodial Services platform, lose the ability to do business with Schwab, lose its ability to participate in advisory client referral programs, and lose its allocated share of advisory clients, services, and revenue in the relevant markets.

192.    Broker-Custodian Defendants use the threat of group boycott, refusal to supply, and refusal to deal to deter Independent RIAs from procuring RIA Custodial Services from alternative qualified custodians.

193.    The difficulty Goldman Sachs has had attempting to enter the RIA Custodial Services Market is just one example of the high barriers to entry, with it announcing in March 2022 that it was delaying entering the RIA Custodial Services Market indefinitely due to "technical

issues" in part stating: "We have been in the process of building an expanded custody offering to fill a gap we see in the market, especially given some of the recent consolidation."[39]

194.    In April 2022, Goldman Sachs confirmed it no longer intends to broadly offer RIA Custodial Services, rather will be developing a much more limited offering.

195.    Schwab and Fidelity have brand recognition, existing technologies, size, scale, and market power that has largely been built through a decade of mergers and collusive dealings.

196.    Quite possibly the most significant barrier to entry, however, is the collusive agreements which restrict transfer of existing AUM to alternative custodians and further operate to maintain or increase Broker-Custodian Defendants' market share *ad infinitum*, such as the contractual restrictions on mobility of advisory clients and AUM (transfer restrictions); substantial financial penalties for transferring of existing advisory clients and AUM; penalties for adding an additional custodian, or not meeting minimum Performance Metrics; non-competition and non-solicitation agreements; Enforcement Provisions and Confidential Information Sharing.

197.    The collusive agreements make it too expensive for Creative Planning and RIAs to transfer advisory clients and AUM to a new custodian. Moreover, the collusive agreements provide for penalties that include loss of participation in Referral Programs, reduction in Referred Clients, being subjected to group boycott/refusal to deal, and other adverse consequences for doing business with alternative custodians.

198.    The illicit Revenue-Sharing Agreements, kickbacks, and other incentives to Independent RIAs are yet another barrier to new market entrants in the RIA Custodial Services

---

[39]    *See*    https://riabiz.com/a/2022/3/16/goldman-sachs-ria-custodian-delayed-indefinitely-as-technical-details-bedevil-launch-date#:~:text=Privacy%20Policy ,Goldman%20Sachs%20RIA%20custodian%20delayed%20indefinitely%2C%20as,technical%20details' %20bedevil%20launch%20date&text=Maeve%20DuVally%3A%20We%20are%20working,that%20thes e%20new%20services%20align. (last accessed 4.20.2022).

Market, because new market entrants cannot offer competitive RIA Custodial Services with similar terms and pricing.

199. Independent RIAs are so heavily restricted in their choice of RIA Custodial Services that less than 10% of the Independent RIAs' advisory clients and AUM is actually free and available to obtain RIA Custodial Services from a custodian other than one of the Broker-Custodian Defendants.

200. For example, in its Form ADV filed with the SEC on August 3, 2021 and March 9, 2022, Creative Planning disclosed that it procures RIA Custodial Services from the Broker-Custodian Defendants as follows:

| Custodian | AUM 8/3/2021 | AUM 3/9/2022 |
|---|---|---|
| SCHWAB | $20,456,589,516 | $ 41,403,340,958 |
| AMTD *Schwab subsidiary | $33,496,721,892 | $ 39,725,538,997 |
| FIDELITY | $7,501,143,292 | $10,407,028,722 |

201. Creative Planning's distribution of AUM closely mirrors Schwab and Fidelity's market share of the RIA Custodial Services Market

202. The proportionate increases in AUM reported in Creative Planning's Form ADV for August 2021 and Creative Planning's Form ADV for March 2022, reflects the collusive agreements by Creative Planning to guarantee minimum percentages of its total client AUM is custodied with each Broker-Custodian Defendant.

Investment Advisory Services Market Consolidation

203.    "*We're in the beginning stages of the squeeze, and … people don't realize they're about to be squeezed.*"[40]  Mallouk delivered his ominous industry forecast in an article published just a month after Schwab's 2020 acquisition of AMTD- on November 3, 2020.  Mallouk's "*great squeeze in the RIA space"* previewed Defendants' road map to consolidation, explaining how:

a.    escalating operating costs and pressures on middle-market RIAs "*become a burden that forces consolidation,"* into the largest RIAs, with Mallouk noting that 50 of the largest RIAs (including Creative Planning) "*out of thousands and thousands control the majority of assets,*" and the RIA consolidation "*is going to change even more … at an accelerated pace,*" which is happening through Creative Planning and a handful of other large Participating RIAs roll-up consolidation of the middle market; and

b.    small RIAs and break-away advisors will be aggregated by Broker-Custodian Defendants into their proprietary platforms designed to capture those small RIAs and "*have them in their own RIA-type model,*" which is precisely what is occurring with Broker-Custodian Defendants' SIPs programs.

204.    Mallouk's forecasting in the November 3, 2020 journal article was not forecasting at all, it was his inadvertent disclosure of Defendants' conspiracy and concerted efforts that were underway to consolidate the Investment Advisory Market, eliminate their competitors, diminish competition, increase their collective market share and power, and otherwise attempt monopolization of the Investment Advisory Services Market.

---

[40] What the Schwab-TD Ameritrade Deal Means for Advisors: Mallouk | ThinkAdvisor.

205.    Defendants are dangerously close to obtaining monopoly power in the Investment Advisory Services Market, as a result of their coordinated consolidation plans, done in concert, and facilitated by their collusive agreements, communications, and ongoing RIA Services Scheme.

206.    Defendants conspired and agreed to "accelerate" consolidation by intensifying adverse market conditions and causing "the great RIA squeeze," making it too costly for small and middle size RIAs to operate and supply competitive Investment Advisory Market Services, in part by manipulating the supplies and costs of the two essential operating inputs for RIAs: (1) RIA Custodial Services; and (2) IAR labor.

207.    Defendants have agreed to consolidate and divide the Investment Advisory Services Market into essentially two business models, as described by Mallouk in November 2020, both of which are controlled by Defendants and Participating RIAs: (a) large nationally branded Participating RIAs with over $5 Billion in AUM, and (b) small RIAs (often break-away advisors) aggregated under and affiliated with one of Broker-Custodian Defendants' supported independence program ("SIPs").

208.    Creative Planning and Participating RIAs are aggressively engaged in roll-up consolidation of middle market Independent RIAs, facilitated by collusive agreements with the Broker-Custodian Defendants and their coordinated and concerted action in furtherance of the RIA Service Scheme.

209.    Broker-Custodian Defendants are aggressively soliciting and aggregating small RIAs and break-away advisors into their SIPs programs, facilitated by collusive agreements with Creative Planning and other Participating RIAs and their coordinated and concerted action in furtherance of the RIA Services Scheme.

*RIA Custodial Services Market Manipulation*

210.    Broker-Custodian Defendants have monopoly power in the RIA Custodial Services Market and abuse that power to maintain their monopoly power, as well as to attempt to obtain monopoly power in the Investment Advisory Services Market.

211.    To drive consolidation of the Investment Advisory Services Market, Broker-Custodian Defendants refuse to supply RIA Custodial Services, as well as supply lesser quality RIA Custodial Services, at inflated prices, to non-Participating RIAs Participating RIAs are spared the adverse market pressures. Creative Planning and Participating-RIAs, pursuant to their collusive agreements and RIA Services Scheme, are guaranteed preferential pricing and supply of high quality RIA Custodial Services ("RIA Custodial Services Market Manipulation").

212.    Since Broker-Custodian Defendants supply more than 90% of the RIA Custodial Services to Independent RIAs, the RIA Custodial Services Market Manipulation has a substantial anti-competitive impact on Independent RIAs and the Investment Advisory Services Market.

213.    Broker-Custodian Defendants' RIA Custodial Services Market Manipulation would be against their individual economic interests and would not be feasible in a competitive market for RIA Custodial Services.

214.    Absent collusion and their horizontal agreements to carry out the RIA Custodial Services Market Manipulation, Broker-Custodian Defendants would not engage in the conduct. In a competitive market, or if any Broker-Custodian Defendant was not complicit in the RIA Custodial Services Market Manipulation, it would cause substantial harm to the other in carrying out the scheme.

215.    Broker-Custodian Defendants agree to sustain short-term losses and carry out the RIA Custodial Services Market Manipulation because it is driving consolidation of the Investment

Advisory Services Market into the control of Defendants and Participating RIAs, who have conspired and agreed to the RIA Services Scheme.

*Manipulation of the IAR Labor Market*

216.     Defendants manipulate the IAR labor market to diminish the pool of qualified IARs, resulting in increased pressures on non-Participating RIAs who depend upon employing qualified and competent IARs to their advisory clients.

217.     Broker-Custodian Defendants' SIPs are one way they reduce the pool of qualified and competent IARs, The SIPs target break-away advisors and solo-advisor RIAs, who historically sought employment by Independent RIAs. The SIPs operate to retain and aggregate IARs under Defendants' control and economic umbrella, making them unavailable for hire by non-Participating IARs.

218.     Break-away advisors are typically more qualified, experienced, and successful. They often have and established book of advisory clients and substantial AUM, much of which voluntarily elects to follow the advisor due to the highly personalized relationships inherent in Investment Advisory Services.

219.     As such, break-away advisors are widely regarded as more valuable to RIAs than inexperienced IARs. The ability to hire and retain qualified IARs is critical to the success of RIAs, as explained by Mallouk: *"Getting the right group of talented and experienced advisers together under one roof is extremely important for long-term success in this industry... In reality, it's a pretty small pool of practitioners who are experts in this field, so talent acquisition is every bit as important as scale, from our point of view."*[41]

---

[41] http://https//www.planadviser.com/creative-planning-ceo-peter-mallouk-lockton-partnership/

220.     Defendants understand and intend for their labor market manipulation to injure competitor Independent RIAs, such as Spotlight, by diminishing the pool of available qualified and experienced IARs, lowering the overall quality of available IAR labor, and increasing the costs to RIAs of hiring and retaining IARs.

221.     In order to avoid break-away advisor attrition, Defendants conspired and agreed to limit their mobility and desirability by: (1) express and tacit no-poach agreements among themselves, as well as in agreements with non-Participating RIAs; (2) using overly restrictive non-competition, non-solicitation, confidentiality, trade secrets, and other restrictive covenants which hyperextend  and purport to be valid and applicable for years, or even indefinitely; (2) using aggressive enforcement mechanisms against former IARs, including interfering with their new employment, falsely accusing the IARs of breaching post-employment obligations; and instituting frivolous, but costly and time-consuming, legal actions against the IARs and their new employer RIAs ; and (3) using their combined market power to impose a tacit no-poach agreement throughout the RIA Industry and using group boycott/refusal to deal to enforce compliance therewith.

222.     Defendants and Participating RIAs are insulated from the labor market manipulation because their collusive agreements allow them to approve/make exceptions to the no-poach agreements, and further allow active Broker-Custodian Defendants to actively market their SIPs to break-away IARs and IARs at risk of break-away.

223.     As detailed herein, Defendants used the labor manipulation tactics against former IARs employed by Spotlight, as well as against Spotlight.

224.     Spotlight has found it nearly impossible to hire and retain qualified IARs as a direct and proximate result Defendants' intentional labor market manipulation.

Broker-Custodian Defendants' SIP Programs

225.    As Mallouk explained, in the November 3, 2020 ThinkAdvisor article, "*They're eventually just going to all have their own platforms to capture those [breakaway advisors] and have them in their own RIA-type model.*"



**What the Schwab-TD Ameritrade Deal Means for Advisors: Mallouk**
Lines separating the broker-dealer and RIA business models "are going to continue to be blurred," the head of Creative Planning says.
By Janet Levaux | November 03, 2020

Creative Planning President & CEO Peter Mallouk

"*Eventually*" is now and the "*RIA-type model*" is Broker-Custodian Defendants' SIPs.

226.    Broker-Custodian Defendants' SIPs are used to aggregate and control small horizontal competitor RIAs, capture a share of the advisory fees charged by the small competitor RIAs, provide RIA Custodial Services to their advisory clients, sell Broker-Custodian Defendants' own proprietary investment products, and maximize the revenue Broker-Custodian Defendants make on providing brokerage and other RIA Custodial Services; and obtain and use competitor pricing and operations information not available that would otherwise not be available in a competitive market.

227.    Broker-Custodian Defendants' SIPs  are tied to participation in the Broker-Custodian Defendants' RIA Custodial Services programs, both provide: (1) practice management oversight and benchmarking services to control and manipulate small RIAs business operations, from the prices charged for services to the compensation paid to IARs; (2) require RIAs to enter

into written agreements that tie use of Broker-Custodian Defendants' RIA Custodial Services, establishes pricing and performance goals, revenue-sharing, access to valuable technologies and services, and incentives and disincentives; (3) Competitive Information Sharing, however only in one direction, from RIA to Broker-Custodian Defendants; and (4) encourages small RIAs to use automated portfolio management and investment tools; (5) steers RIAs to recommend investments and otherwise manage their advisory client assets that promote Broker-Custodian Defendants' economic self-interest and is antagonistic to advisory clients interests; and otherwise foster dependence on Broker-Custodian Defendants for all aspects of the RIA's business operations and in a manner consistent with Defendants' "*rules of play*" for the RIA Industry.

228.    Schwab's SIP is through Schwab Advisor Services™ program, and is offered to IARs (break-away advisors) and small Independent RIAs through a division of Charles Schwab & Co., Inc.

229.    Schwab's SIP solicits potential break-away investors with taglines such as "*Going Independent. This is your moment. We can help you seize*."[42] Fidelity similarly targets break away IARs with the following taglines: "*Going Independent is a Bold Move. We can help you take the right steps*." [43]

230.    Fidelity's SIP is offered by Fidelity Institutional [SM] and is a division of Fidelity Investments. Fidelity channels many small RIAs into Fidelity Managed Account Xchange® program ("FMAX"), which is offered by its RIA subsidiary, Fidelity Institutional Wealth Adviser LLC.

---

[42] https://advisorservices.schwab.com/going-independent

[43] Advisors on the Move | Fidelity Institutional

231.    Fidelity describes FMAX as, "*a comprehensive wealth management platform consisting of advisory tools, programs and services, and investment products from Fidelity and other leading asset managers. Some services are provided by affiliated and unaffiliated 3rd parties. FMAX offers robust Fidelity service & support and a simplified client experience.*" Through FMAX, Fidelity controls the RIA's provision of investment advisory services and steers the advisory client AUM into transactions that serve the economic self-interest of Fidelity.[44] The following are key features:



232.    Through its SIPs program, Schwab similarly offers a host of products designed to keep participating Independent RIAs under Schwab's umbrella of control, including encouraging currently affiliated investment advisers to "Take the first step toward the RIA model" by contacting Schwab and having a "completely confidential conversation" with a Schwab Business Development Officer.

---

[44] Fidelity Managed Account XchangeSM (FMAX) Fact Sheet | Fidelity Institutional

233. In March 2021, shortly before it received Schwab's group boycott notification against Spotlight, as set forth more fully herein, Fidelity approached Spotlight to transition it onto the FMAX platform.

234. Schwab's SIP is actively marketed as an alternative to full-independence- a "turn-key" solution - which will help small RIAs by associating them with the Broker-Custodian Defendants, who will provide transition support and decision-making tools, practice management services, investment research and trading technologies, structured investment products, RIA Custodial Services, automated investment advice, compliance assistance, Schwab Managed Account Services™, Managed Account Select® program, Managed Account Access® program, and other products and services that are intended to keep small RIAs consolidated and under the control of Defendants.

235. Schwab conducts an annual RIA Benchmarking Study through which it collects even more detailed competitive information from RIAs, inducing them to participate by promising a "45-page customized Peer Benchmarking Report that includes your results and a detailed analysis of how your firm compares with those of a similar size and business model" and further includes information such as: financial performance, services and prices, technology spending and other key metrics.

236. In exchange for completing the compensation section of the RIA Benchmarking Study, the RIA gets a "personalized Compensation Report showing how your salaries and benefits stack up against those of other advisory firms, as well as access to a dynamic online Compensation Benchmarking Tool."

237. Schwab offers the following snapshot summary[45] of its RIA Benchmarking Study, and other means by which it obtains non-public, competitive, strategic information from Independent RIAs:



238. Schwab uses the information obtained from Independent RIAs to shape, influence, and otherwise manipulate the relevant markets, and control the operations of Independent RIAs, in furtherance of Defendants' RIA Services Scheme and shared anti-competitive ambitions

239. Schwab also uses its SIPs program to funnel some qualified IARs to Creative Planning and Participating RIAs, including through the "The Charles Schwab Advisor Services RIA Economic Discovery Tool."[46]

240. Fidelity offers a nearly identical SIP, gathers and utilizes similar "benchmarking data," and promises IARs and small RIAs that it is "*Focused on your success*" and will "*examine your distinct situation*" providing experienced and dedicated personnel and tools to evaluate the best business model, and further identifying four options:

---

[45] SWB296 Flagship Brochure.indd (schwab.com)

[46] RIAEconomicModelingTool_TermsConditionsAssumptions.pdf (wallst.com)



241.    Fidelity, like Schwab, uses RIA consulting and business development tools and services to channel IARs and small RIAs into joining/consolidating into their SIP, or into an existing Participating RIA, such as Creative Planning. Either way, they remain under the control of Defendants.

242.    Broker-Custodial Defendants offer financial incentives to IARs and small RIAs, such as valuable "transition packages," and low-rate and forgivable loans to induce participation in the SIPs.

243.    For example, Schwab offers forgivable loans with an "up-front" payment paid when switching firms or when the RIA accepts a transition package, and a "Back-End Payment" paid to the RIA if it reaches certain goals set forth in the contract. Fidelity similarly offers forgivable loans and transition packages in connection with its SIP.

244.    The forgivable loans and transition packages are paid from revenues Broker-Custodian Defendants generate from revenue generated from RIA Services, and contain Performance Metrics, restrictive covenants, and Competitive Information Sharing used to control the relevant markets.

245.     Fidelity and Schwab offer nearly identical SIPs, including incorporated RIA business consulting services. The remarkable similarity in all key features exists for a reason, they are part of their collusive agreements made in furtherance of the RIA Services Scheme, including Defendants' shared goal of attaining monopoly power in the Investment Advisory Services Market, as well as maintaining their monopoly power in the RIA Custodial Services Market.

Creative Planning's Roll-Up Consolidation Plan

246.     As set forth herein, after Greco's 2017 SEC Whistleblower Filing, Creative Planning's undeserved gravy train of advisory client referrals, derived through its AdvisorDirect® Commercial Bribery Scheme, collusive dealings with AMTD, and Robbins/Creative Planning Relationship, came to a screeching halt. Mallouk and Creative Planning needed a new plan to keep growing.

247.     In 2018, Creative Planning had approximately $35 billion in advisory client AUM and its historical sources of new client AUM were stagnant. In an interview published in May 2018, Mallouk denied having any interest in acquisitions, responding:

> I don't want to acquire firms. When you buy a firm, you buy complications. I don't know what the point is. We have the scale now to handle the technology and the compliance…I have no desire to go public, and I have no desire to be the biggest firm on earth. I do have a very intense desire to work with the best people possible and provide the best value possible to the client. That usually isn't accomplished through acquisitions.[47]

248.     Just months after disavowing any interest in acquisitions, in February 2019, Mallouk flipped the script and dramatically changed Creative Planning's growth strategy, announcing its first acquisition of a competitor Independent RIA.

---

[47]     https://irei.com/publications/article/going-organic-peter-mallouk-bought-100-million-ria-2004-today-creative-planning-34-billion-leviathan-growth-came-without-raiding-wirehouses-making-acquisitions/ (last accessed 4.20.2022).

249.     Creative Planning's change in course did not happen overnight. Rather, despite his misleading representations disavowing any interest in acquisitions, Mallouk had already begun (during 2018) eyeing "*buying his growth*" through acquisitions and had commenced active partnership discussions with a global leader in growth equity, General Atlantic, about transforming Creative Planning's business model into a leading large, nationally branded, Independent RIA using a "Roll-Up Consolidation" plan focused on acquisitions of its competitor Independent RIAs.

250.     Since 2019, Creative Planning has acquired nearly 30 competitor Independent RIAs in furtherance of its Roll-Up Consolidation Plan, and its acquisition plan is not nearly concluded, as Mallouk confirms in an interview in February 2022: "*If 100 good fits came along, it could be 100. If 50 firms call us this month and they're all a great fit, Creative Planning has the financial capability to do all those deals. I suspect we're sitting on more dry powder than any other major RIA.*"[48]

251.     In a February 2022 interview, Mallouk boasts: "*In terms of where we're sitting in terms of purchasing power, I suspect we're sitting in an excellent spot relative to our peer group, in that we have a huge amount of dry powder.*"[49]

252.     Mallouk further described how Creative Planning's growing size is accelerating its business opportunities:

> *We're getting bigger, and everything we're doing has accelerated. More opportunities are presenting themselves. More people are looking to sell their practice or merge with a practice or become more capable of competing in whatever the world [turns out to] look like five or 10 years from now....if you had told me two years ago, when we had just barely touched $50 billion [in AUM],* **that today we'd be responsible for over $200 billion. I didn't foresee that even 20 months ago.** *But opportunities present themselves, and we're in a position to win those opportunities.* (emphasis added*)*[50]

[48] See https://www.thinkadvisor.com/2022/01/21/creative-plannings-huge-step-into-401ks/ (last accessed 4.20.2022).
[49] *See* https://citywireusa.com/registered-investment-advisor/news/creative-planning-buys-735m-dentist-focused-ria/a2379662 (last accessed 4.20.2022).
[50] *Id.*

253.    The biggest problem with Mallouk's false claim that he "*didn't forsee*" being responsible for over $200 billion dollars, is not that, in fact, he did; rather, the an even more insidious problem lies in *why* Mallouk didn't need to "*forsee*" anything—Defendants' RIA Services Scheme and the fact his "Roll-Up Consolidation Plan" is being facilitated by and coordinated with Broker-Custodian Defendants and Participating RIAs.

254.    Mallouk has known since at least 2018 that the combination of his collusive agreements with Defendants, participation in Referral Programs, participation in the RIA Services Scheme, Defendants' collusive agreements to consolidate the Investment Advisory Services Market, and a partnership with global growth equity leader, General Atlantic, would catapult Creative Planning into the top three largest Independent RIAs.

255.    In 2018, Mallouk began partnership discussions with General Atlantic. Since Mallouk was the sole owner of Creative Planning, the partnership deal would involve him personally selling a minority interest in Creative Planning to General Atlantic.

256.    Mallouk sought the partnership deal with General Atlantic because Creative Planning needed more than just a growth equity capital infusion. It also needed General Atlantic's widely regarded expertise in guiding companies in successful growth through mergers and acquisitions, an aptitude and expertise Mallouk simply lacked.

257.    General Atlantic is a recognized leader in growth equity capital and uses a partnership approach to collaborate with their portfolio companies, such as Creative Planning.[51]

---

[51] https://www.generalatlantic.com/aboutus/#:~:text=General%20Atlantic%20seeks%20to%20identify,one%2Dthird%20in%20emerging%20markets.

258.     General Atlantic's valuation of Creative Planning during the two-year period of partnership negotiations increased as Creative Planning added more advisory client AUM.

259.     Since AUM was a primary factor in determining Creative Planning's valuation, and what General Atlantic would pay Mallouk for a partnership share from his 100% equity ownership, Mallouk could not "risk" General Atlantic discovering his practices of inflating AUM or the existence and substance of Greco's 2017 SEC Whistleblower Action.

260.     Mallouk made disparaging and defamatory representations about Greco to General Atlantic, prior to the General Atlantic Partnership Transaction.

261.     Mallouk made false, defamatory, and misleading statements about Greco to General Atlantic in connection with his sale of a minority partnership interest in Creative Planning.

262.     While disparaging, defaming, and discrediting Greco to General Atlantic, Mallouk did not tell General Atlantic that Greco had filed the 2017 SEC Whistleblower Complaint, or that it reported conduct involved in the Creative Planning Fraudulent Growth Scheme and RIA Services Scheme.

263.     Mallouk intentionally mislead General Atlantic about Greco and the existence of the 2017 SEC Whistleblower Action. Mallouk intentionally provided General Atlantic false, disparaging, defamatory, and misleading information about Greco because Mallouk was afraid General Atlantic might discover Greco's 2017 SEC Whistleblower Complaint and the misconduct alleged therein.

264.     Mallouk acted in his own pecuniary interest in making false, defamatory, misleading, and disparaging representations to General Atlantic in 2018 and 2019, as Mallouk was the sole financial beneficiary of the sale of a partnership interest in General Atlantic to Creative Planning in January 2020.

265.    In public statements about the partnership transaction, Mallouk has the sum paid to him by General Atlantic as enough that "*no matter what in the world happens*" Creative Planning could continue to operate "*with every single person that's here today for seven years*."[52]

266.    At all relevant times, Mallouk knew that the amount General Atlantic would pay him for a partnership interest in Creative Planning would be largely determined by the amount of and source of Creative Planning's AUM.

267.    Mallouk concealed the truth about Greco, and the truth about the improper and illegal methods of growing Creative Planning's advisory clients and AUM from General Atlantic because Mallouk was attempting to personally secure a very large financial pay-out in connection with the minority partnership transaction.

268.    Mallouk has been able to conceal much of his wrongdoing by operating Creative Planning as a closely held private company that is structured using limited liability companies, partnerships, and trusts.

269.    In the alternative, Mallouk did make full disclosures to General Atlantic and it ratified and approved of the conduct of Mallouk and Creative Planning in the Silencing and Retaliation Scheme.

270.    In announcing Creative Planning's strategic partnership with General Atlantic, Mallouk confirmed their aligned focus to emerge as the "*industry leader*," stating: "*We are excited to partner with an investor who shares our vision and is committed to continuing on the Creative Planning path, which is to focus on a long-term plan to emerge as the leader in the industry*."

---

[52]    https://www.financial-planning.com/news/creative-planning-sells-10-to-20-stake-to-private-equity-firm-general-atlantic (last accessed 4.26.2022).

271.    General Atlantic, through Paul Stamas, expressed it is "*energized to be partnering with the Company [Creative Planning] as it continues its expansion*," and its belief that Creative Planning *"stands well-positioned as an industry leader to capture the significant opportunity that exists in the registered investment advisor space.*"

272.    Stamas and Mallouk have worked together to launch Creative Planning into RIA industry leadership. Stamas is on Creative Planning's Board of Directors and participates in the strategic planning and growth strategy. The important role that Stamas and General Atlantic are playing in achieving Creative Planning's growth is evidenced by rapid acceleration of its acquisitions and meteoric rise in AUM since the January 2020 General Atlantic partnership.

273.    General Atlantic's partnership investment in Creative Planning is based upon Creative Planning's commitment to aggressive acquisitions, the Roll-up Consolidation Plan.

274.    From February 2019 through January 2020 (consummation of Mallouk's partnership with General Atlantic), Creative Planning only acquired 4 competitor RIAs with $2.2 billion in AUM. Since January 2020, Creative Planning has acquired at least 25 competitor RIAs and, according to Mallouk in February 2022, it is "*responsible for over $200 billion*" in AUM, with no end date in sight. The impact of General Atlantic's brain trust and growth equity is readily apparent. In the first 4 months of 2022, Creative Planning acquired almost $9 billion in AUM, approximately 400% more than it was able to acquire during the year prior to the January 2020 General Atlantic Partnership. The table below summarizes its acquisitions since February 2019:

|   | Approx. Date | Target RIA | AUM of Target |
|---|---|---|---|
| 1 | 2/25/2019 | The Johnston Group | $ 500,000,000.00 |
| 2 | 9/24/2019 | America's Best 401K | $ 1,000,000,000.00 |
| 3 | 11/12/2019 | OptiFour | $ 400,000,000.00 |
| 4 | 12/3/2019 | Hogan Financial | $ 300,000,000.00 |
| 5 | 1/22/2020 | Stratford Consulting | $ 618,000,000.00 |
| 6 | 4/9/2020 | Coe Financial Services | $ 126,000,000.00 |
| 7 | 7/14/2020 | Thun Financial Advisors | $ 600,000,000.00 |

| | Approx. Date | Target RIA | AUM of Target |
|---|---|---|---|
| 8 | 6/23/2020 | Sunrise Advisors | $ 700,000,000.00 |
| 9 | 6/30/2020 | Starfire Investment Advisors | $ 530,000,000.00 |
| 10 | 8/11/2020 | Lenox Wealth Management | $ 600,000,000.00 |
| 11 | 8/18/2020 | Miller Financial Management | $ 150,000,000.00 |
| 12 | 9/1/2020 | TrueWealth | $ 1,600,000,000.00 |
| 13 | 2/4/2021 | IRON Financial | $ 6,000,000,000.00 |
| 14 | 4/27/2021 | Castle Wealth Advisors | $ 320,000,000.00 |
| 15 | 5/4/2021 | SBSB | $ 5,000,000,000.00 |
| 16 | 11/11/2021 | Lockton Retirement Services | $ 110,000,000,000.00 |
| 17 | 11/30/2021 | Dashboard Wealth Advisors | $ 800,000,000.00 |
| 18 | 11/30/2021 | Paradigm Financial Advisors | $ 600,000,000.00 |
| 19 | 12/31/2021 | Hatton Consulting | $ 440,000,000.00 |
| 20 | 12/31/2021 | Resource Management LLC | $1,900,000,000.00 |
| 21 | 12/31/2021 | Heritage Way Advisors | $ 450,000,000.00 |
| 22 | 1/4/2022 | Berno Financial Management | $ 300,000,000.00 |
| 23 | 1/18/2022 | Reilly Financial Advisors | $ 2,000,000,000.00 |
| 24 | 2/14/2022 | JBJ Invest | > $ 735,000,000.00 |
| 25 | 3/1/2022 | The Doman Group | $ 400,000,000.00 |
| 26 | 3/29/2022 | Emery Howard | $1,800,000,000.00 |
| 27 | 4/5/2022 | Resource Management LLC | $1,900,000,000.00 |
| 28 | 4/6/2022 | Hatton Consulting | $ 440,000,000.00 |
| 29 | 4/12/2022 | Keystone Wealth Partners | $ 644,000,000.00 |

275. Creative Planning obtains Broker-Custodian Defendants' approval of acquisitions, in advance of finalizing, but it is essentially a rubber-stamp approval, because of Creative Planning's acquisitions are in furtherance of their collective interests and conspiracy to consolidate the Investment Advisory Services Market, and because the terms and conditions governing their collusive relationships and agreements guarantee a "win-win," because Creative Planning has existing obligations to use Fidelity and Schwab's RIA Custodial Services for established percentages of its total advisory clients and AUM. As Creative Planning increases its AUM, Broker-Custodian Defendants' benefit from their proportionate increases in RIA Custodial Services.

276.    For example, Creative Planning acquired an Independent RIA with approximately $1billion in AUM custody with a much smaller qualified custodian, LPL Financial. Creative Planning required the AUM to be transferred from LPL Financial to Schwab, pursuant to its collusive agreements and RIA Services Scheme.

277.    Mergers and Acquisitions in the RIA Industry have been breaking records since 2020, and industry experts predict 2022 to be another record-breaking year. As Defendants' collusive consolidation efforts snowball, the supply of available RIAs seeking an acquirer rapidly accelerating, as well.

278.    Creative Planning has boasted that it has sufficient "*dry gunpowder"* to intensify its Roll-Up Consolidation Plan, and other Participating RIAs are acquiring RIAs in lockstep with Creative Planning.

279.    As Defendants and Participating RIAs accelerate their collusive consolidation efforts, smaller alternative qualified custodians will suffer loss of advisory clients and AUM, further diminishing the last vestiges of competition in the RIA Custodial Services Market and making it impossible for Independent RIAs, such as Spotlight, to procure competitive RIA Custodial Services except from Schwab and Fidelity.

280.    Defendants are already dangerously close to acquiring monopoly power in the Investment Advisory Services Market and continued collusive consolidation of Independent RIAs will ensure their success.

Defendants' False and Misleading Advertising of Advisory Services

281.    Defendants make intentionally false and misleading representations and omissions in their SEC Reports, and in other representations to clients, about: their participation in the Referral Programs and other collusive arrangements and agreements; the details of how Revenue-

Sharing, kickbacks, incentives, and disincentives impact the investment advice, recommendations, portfolio composition, monitoring, and management, and the actual services and products purchased and actual costs.

282.    Broker-Custodian Defendants' receipt of Participation Fees in their Referral Programs and in connection with investment products and RIA Custodial Services to advisory client accounts managed by Creative Planning and other Independent RIAs, creates conflicts of interest that are not adequately disclosed to advisory clients and have resulted in Defendants engaging in transactions that promote their own economic interests at the expense of their advisory clients' interests.

283.    During all relevant times, Defendants have failed to adequately identify and delineate the revenue, fees, commissions, and costs associated with each advisory clients' accounts and AUM. For example, each advisory client is entitled to disclosure of the amount of revenue generated by Broker-Custodian Defendants on their cash sweep accounts, margin accounts, payment for order flow, sale of investment products and all other revenue generated related to their AUM. The advisory client is also entitled to disclosure of any revenue-sharing, and also the details of Defendants' system of credits and debits in which any of its AUM was considered in the performance metrics.

284.    Defendants make broad and vague disclosures of potential areas where a conflict of interest may arise, without providing information related to the actual occurrence of the conflict of interest or the context, scope, and actual financial impact on advisory clients.

285.    Creative Planning does not disclose to its advisory clients the actual value it receives from Broker-Custodian Defendants in the form of kickbacks and incentives from, in part, achieving Performance Metrics related to the specific advisory client's accounts, AUM, and

transactions related thereto. For example, adequate disclosure requires Creative Planning to disclose to an advisory client the specific amount, or at least a pro rata assessment of the value received, of a fee reduction, discounts, waiver or forgiveness of its Referral Program Participation Fees which would otherwise be owed to Schwab but for Creative Planning achieving a "goal" or Performance Metric that was measured, in part, by including the advisory client's accounts, AUM, and/or transactions related in anyway thereto.

286.     As recent as its March 8, 2022, ADV Part 2 Disclosure Brochure, publicly available and filed with the SEC, Creative Planning made intentionally false and misleading representations regarding its revenue sharing with AMTD (and other custodians), stating in pertinent part: "*Brokerage fees and/or transaction ticket fees charged by the custodian will be charged directly to each client's account. We do not receive any portion of such commissions or fees from the custodian or from clients.*" (emphasis added)[53]

287.     In fact, Creative Planning does receive a portion of brokerage fee and transaction ticket fees through the system of debits and credits, and other such incentives and disincentives, set forth in the RIA Services Scheme and the related Revenue-Sharing Agreements, Referral Program Agreements, RIA Custodial Service Agreement, and other collusive arrangements and agreements between Defendants.

288.     In AMTD's Advisor Direct Disclosure and Acknowledgement Form, revised 3/2021, AMTD explains one of the methods of revenue sharing, as follows:

> In certain circumstances, TD Ameritrade **may waive or reduce fees** paid by the Advisor. TD Ameritrade may waive these fees **based on**, among other things, **the amount of the Advisor's client assets held in custody** with TD Ameritrade **and the securities trading activity** of the Advisor's **clients that are not referred to the Advisor through the AdvisorDirect.** Consequently, in order to obtain fee waives or reductions from TD Ameritrade, the Advisor may have an incentive to recommend to you that the assets under

---

[53] *See* Creative Planning March 8, 2022 ADV Part 2 Disclosure Brochure, page 8.

management by the Advisor by held in custody with TD Ameritrade and to place transactions in your accounts with TD Ameritrade. (emphasis added)

289.    Fee waivers and reductions obtained by Creative Planning for satisfying Performance Metric related to its total advisory clients and AUM held in custody by AMTD and the placement of transactions in its advisory client accounts, is fee sharing on brokerage fees between AMTD and Creative Planning.

290.    Defendants' failure to adequately disclose their relationships, fees, and costs, are material omissions and false and misleading representations about the products and services sold to advisory clients. Defendants know that the undisclosed and misleading information is material and of the type Defendants knew, or should have known, would be relied upon by an advisory client in deciding whether to hire Defendants, as well as purchase and pay the associated prices charged for the investment advisory services, RIA Custodial Services, and related investments, products, and services.

291.    Defendants' RIA Services Scheme has resulted in lower quality investment advisory services that: are not provided consistent with the fiduciary standard or other SEC-imposed duties; circumvent important state and federal investor-protections, federal laws, and SEC rules and regulations; utilize robo-advisors and other automated investment selection, financial planning, portfolio allocation, and portfolio monitoring and management; recommend the same or substantially the same investments, investment mixes, strategies, and portfolio options to all advisory clients, without individualized advice and consideration of suitability to the particular investment advisor. Due to Defendants' conduct concealing their RIA Services Scheme, advisory clients are unaware of the nature, extent of use, and consequences of RIAs use of robo-advising and other automated investment advice, recommendations, asset allocation, portfolio management, and portfolio monitoring.

292.     Defendants' RIA Services Scheme provides advisory clients with false, misleading, inaccurate, and inadequate information about the identity, necessity, prices, costs, and characteristics of RIA Services sold to advisory clients. Defendants use opaque RIA Custodial Services fees, Revenue-Sharing Agreements, kickbacks, incentives, and disincentives that are not disclosed to advisory clients and materially impact the pricing, costs, and quality of RIA Services sold by Defendants.

293.     The material misrepresentations and deceptive practices are unfair trade practices which have injured advisory clients, as well as competitor RIAs, such as Spotlight.

RIA Services Scheme –Mail and Wire Fraud

294.     Defendants have engaged in thousands of predicate acts of mail and wire fraud in carrying out their fraudulent and deceptive RIA Services Scheme. Defendants use the wires and mails in interstate commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of their fraudulent and deceptive practices in furtherance of the RIA Services Scheme, such as knowingly making false, deceptive, and misleading representations of material facts, intended to defraud and deceive small and mid-size RIAs (such as Spotlight), advisory clients, the SEC, and the general public, including:

         a.     Defendants' collusive relationships, revenue-sharing, improper activities in the Referral Programs, and the terms, conditions, and pricing of investment advisory services, RIA Custodial Services, and related investment products and services;

         b.     misleading representations about the nature, purpose of, and terms and conditions of participation in Broker-Custodian Defendants' SIPs and other programs and services targeting non-Participating RIAs;

      c.      Broker-Custodian Defendants' insincere and misleading promises to help Independent RIAs "*grow and compete*" and other misleading statements about their commitment to Independent RIAs, including that they will not compete with Independent RIAs, and other such blatantly false statements;

      d.      making false and misleading representations about costs and specifications of RIA Custodial Services, and inducing non-Participating Independent RIAs to enter into RIA Custodial Services Agreements in reliance thereon, then using mail and wire to provide, charge, and collect supra-inflated prices for lower quality RIA Custodial Services and investment products;

      e.      false and misleading representations to advisory clients the characteristics, specifications, and suitability of its investment advisory services, RIA Custodial Services, and other investment products and transactions, resulting in unfair competition in the Investment Advisory Services Market;

      f.      disseminating brochures, proposals, podcasts, YouTube videos, social media postings, website postings, online interviews, incorporating false, fraudulent, and otherwise misleading representations about market conditions in the Investment Advisory Services Market, increasing operating costs to Independent RIAs, pricing and compensation data, industry statistics and other information that is intended to control and manipulate behaviors by Independent RIAs, eliminate competitor RIAs by "discouraging" them into SIPs, out of business, or acquisition by Creative Planning or another large Participating RIA;

      g.      using e-mails, website, web-based applications, website tools, and mail and wire to gather non-pubic, confidential, and competitive information from their horizontal

competitors, under the misleading characterization of the "information mining operations" as industry studies, annual benchmarking studies, and good faith applications to help Independent RIAs compete. Defendants even offer customized reports on pricing, compensation, and other key operating metrics, distilled by Defendants for purposes of controlling and manipulating the relevant markets, in exchange for participation. Defendants then share the information amongst themselves and use it in furtherance of the RIA Services Scheme;

h.      using web-based applications, chat services, text messages, and telephone to participate in forums, panels, and meetings where Defendants share confidential competitive information about Independent RIAs and otherwise share competitive business information, not shared by horizontal competitors in competitive markets;

i.      using mail and wire to communicate among Defendants regarding the RIA Services Scheme;

j.      using mail and wire to coordinate and agree upon language and disclosures to the SEC intended to minimize risk of exposing their collusive agreements and RIA Services Scheme;

k.      transmitting and filing online, the registrations, disclosures, and other forms and documents (i.e., Form ADV) with the SEC and FINRA, containing inaccurate, incomplete and intentionally misleading information about Defendants' relationships, products, business dealing, volume of AUM, referral relationships, revenue-sharing and other material information; and

l.      other use of mail and wire in furtherance of their fraudulent and misleading

business operations, RIA Services Scheme, and in attempting to conceal their RIA Services

Scheme and other such collusive agreements and arrangements.

295.    Defendants also engage in thousands of predicate acts of mail and wire fraud in

carrying out their covert and deceptive revenue-sharing, system of debits and credits, distribution

of financial proceeds, and other such sharing of their ill-gotten gains.  Defendants use the wires

and mails in interstate commerce to the promotion, management, establishment, or carrying on, of

their unfair, anti-competitive, fraudulent, and deceptive practices, including the misconduct in

furtherance of the RIA Services Scheme.

Factors Suggesting Conspiracy

296.    Defendants' conduct is comprised of factors suggesting conspiracy or illegal

agreement. There are numerous "plus factors" in the RIA Industry during the Class Period

including, but not limited to, the following: (a) extensive information sharing through Referral

Programs, SIPs, and membership and participation in collusive panels, committees, and forums

comprised of RIAs , (b)  a coordinated changes to the terms and conditions of RIA Custodial

Services, Referral Programs, and pricing of investment products and services; (d)coordinated

refusals to deal and group boycotts that are against independent self-interest, and (e) multiple

industry characteristics which facilitate collusion, such as high barriers to entry, high industry

consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for

RIA Custodial Services, and a history of government regulation, investigations and collusive

conducts.

297.    Therefore, Defendants knew and intended that their coordinated limitation and

reduction in IAR labor and RIA Custodial Services would artificially increase the pricing- above

the level they would have been absent the conduct alleged herein – of those essential services and operating inputs. Spotlight, paid artificially inflated prices, suffered losses from diminished access, and losses from diminished quality of RIA Custodial Services and IAR labor during the relevant time-period. Prices paid by Spotlight exceeded the amount they would have paid if the price for RIA Custodial Services and IAR labor had been determined by a competitive market. Thus, Spotlight was injured by Defendants' conduct.

298.    Defendants' discriminatory pricings, manipulation of supply of RIA Custodial Services, referral and allocation of advisory clients, and other collusive actions done in furtherance of the RIA Services Scheme were actions against their economic and unilateral self-interests, which would not have been done in a competitive market or otherwise undertaken by a Defendant alone.

*Information Sharing*

299.    Competition may be harmed when competitors with market power in concentrated markets, such as the RIA Services markets at issue, directly exchange strategic, non-public information about current and forward-looking business operations, plans, costs, prices, supply, customers, and other competitive data and information. The strategic information exchanged between the Defendants is competitively sensitive and includes high-level information, was disaggregated, company specific, forward-looking, confidential, and related to a core characteristic of competition between them. ("Strategic Information")

300.    The information exchange among Defendants involves their own sharing of Competitive Information through the Referral Programs and participation on private, exclusive panels, committees, and working groups which facilitates confidential exchanges of non-public information.

301. Defendants also collect and utilize sensitive, competitive, non-public information from thousands of IARs and RIAs through their SIPs, market research, benchmarking studies, and other deceptive means used to induce IARs and small RIAs to share information, under the ruse of being used to help IARs and small RIAs compete, but in fact being used by Defendants to manipulate the Investment Advisory Services Market , carry out their RIA Services Scheme, and for related anti-competitive purposes ("RIA Market Surveys and Reports").

302. Defendants' exchanges of and use of RIA Market Surveys and Reports and Strategic Information ("Strategic Information Sharing") diminishes competition in the relevant markets because it gives certainty about pricing and services and reduces incentives to lower price or improve technologies or compete on any other aspect.

303. In furtherance of the RIA Services Scheme, Schwab and Fidelity provide loans to small Independent RIAs participating in their SIPs. In connection with the Independent RIAs participation in the SIPs and RIA loans, Broker-Custodian Defendants obtain unusually detailed access to their non-public operational information, including advisory client data, pricing information, investment strategies and portfolio mixes, technology, operating costs, and other Strategic Information. The SIPs and RIA Loans provide another opportunity for Defendants to gain Strategic Information to share amongst each other and for use in the RIA Services Scheme.

304. Defendants use Strategic Information Sharing, and their knowledge derived therefrom, in carrying out the RIA Services Scheme, including setting prices, manipulation supply, allocating advisory clients and services, and other decisions that should have been independent decisions about the supply and price of RIA Custodial Services and Investment Advisory Services.

305. Defendants' unlawful Strategic Information Sharing is not reasonably necessary to further any procompetitive purpose.

*Conferences and Opportunities to Meet*

306.    Defendants' CEOs and senior executives participate in numerous industry conferences, educational summits, and other forum events providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis.

307.    Defendants utilize the Referral Programs as a means of communicating and carrying-out the RIA Services Scheme, and further use common participation in other organizations and panels, such as the collusive TD Ameritrade Institutional Operations Panel and/or Institutional Advisor Panel, which Participating RIA, Mercer Advisors™ , explains as follows in its April 4, 2022 Form ADV Part 2A:

> Mercer Advisors employees may serve on the TD Ameritrade Institutional Operations Panel and/or the Institutional Advisor Panel. The Panels each consist of approximately twenty-four investment advisors who advise TD Ameritrade Institutional ("TDA Institutional") on issues relevant to the independent advisor and his/her experience with TD Ameritrade's service, technology, products, and independent advisor community-at-large. The Panels meet in person on an average of three to four times per year and conduct periodic conference calls on an as-needed basis. Investment advisors are appointed by TD Institutional sale, service, and/or senior management to serve on the Panels for a three-year term. An investment advisor may serve longer than three years if appointed to additional terms by TDA Institutional senior management. At times, Panel members are provided with confidential information regarding TD Ameritrade Institutional initiatives. Panel members are required to sign a confidentiality agreement. TD Ameritrade, Inc. ("TD Ameritrade") does not compensate Panel members. However, TD Ameritrade pays or reimburses Mercer Advisors' personnel for travel, lodging, and meal expenses incurred while attending Panel meetings. The benefits received by Mercer Advisors or its personnel by serving on the Panel are not

Mercer explains how the panel is comprised of horizontal competitor Independent RIAs who meet in person "three to four times per year" and conduct "as-needed" periodic conference calls, where they share information "on issues relevant to independent advisor" and AMTD specific issues related to "technology, products, and the independent advisor community-at-large." Mercer goes on to explain how its member employees are provided with "confidential information regarding TD Ameritrade Institutional initiatives" and how panel members are required "to sign a confidentiality agreement." Mercer is a Participating RIA in all Broker-Custodian Defendants' Referral Programs, and it is through panels such as AMTD's that Defendants communicate, share information, conspire, and agree to the RIA Services Scheme and related anti-competitive conduct.

*Mergers and Acquisitions*

308.    Senior executives from Defendants had numerous opportunities to directly communicate with one another regarding various mergers and acquisitions, such as Schwab acquisition of AMTD and Creative Planning's 30 + acquisitions of competitor RIAs since 2019. These merger and acquisition discussions include both completed transactions, as well as proposed transactions that were never completed.

309.    In connection with mergers and acquisition discussions, due diligence materials regarding confidential business information is shared with Defendants, who in turn share it amongst each other in furtherance of the RIA Services Scheme.

*Parallel Conduct*

310.    Broker-Custodian Defendants use their RIA subsidiaries to host nearly identical (in structure, operations, and membership) Referral Programs where an exclusive (less than 200) Participating RIAs, all horizontal competitors, enter into agreements which allocate advisory clients and RIA Services as well as other restrictive and collusive agreements intended to eliminate competition in the relevant market, as set forth herein.

311.    Similarly, Broker-Custodian Defendants maintain nearly identical RIA Custodial Services programs, use nearly identical RIA Custodial Services Agreements, and maintain nearly identical SIPs and related programs targeting IARs and small RIAs, as set forth herein.

312.    Broker-Custodian Defendants' Referral Programs have overlapping memberships of Participating RIAs, for example Creative Planning participates in AMTD and Schwab's advisor referral programs and other Participating RIAs are in all three programs, as set forth herein. The overlapping Referral Program membership facilitates collusion and coordination.

313. Referral Program Performance Metrics required by the Broker-Custodian Defendants for each Participating RIA varies and is determined based on existing commitments the Participating RIAs have to the other Broker-Custodian Defendants, which is further evidence of collusion and cooperation in furtherance of the RIA Services Scheme.

314. Broker-Custodian Defendants engage in price fixing and coordinate changes to pricing of RIA Custodial Services, such as the historically unprecedented pricing change on October 2, 2019, when Schwab announced it would no longer charge commissions on trades of stocks, exchange-traded funds and options, to which AMTD just happened to publicly announce it was matching, within a matter of hours,[54] and then followed by Fidelity about a week later.

315. Broker-Custodian Defendants use substantially similar overly restrictive employment and post-employment covenants with their advisors, and maintain no-poach agreements for IARs, and work together to enforce compliance by other RIAs with written and tacit no-poach agreements, as evidenced by their coordinated adverse actions against Spotlight following its hiring of former AMTD and Schwab IARs as well as dozens of arbitrations and lawsuits filed across the United States, in both state and federal court, by Broker-Custodian Defendants against IARs and the Independent RIAs that hire them.

D. *Antitrust Injury, Impact and Harm*

316. Defendants' RIA Services Scheme and related unfair, anti-competitive, fraudulent, deceptive, and misleading conduct has, and continues to, cause injury and harm to Plaintiffs, IARs, advisory clients, and competition in the relevant markets, including: (1) diminishing innovation and pricing competition in the Investment Advisory Services Market and RIA Custodial Services Market; (2) diminishing the supply and quality of Investment Advisory Services and RIA

---

[54] TD Ameritrade Fires Back, Cuts Commissions to $0 (investopedia.com)

Custodial Services; (3)causing consolidation and elimination of Independent RIAs, resulting in less product and service selection; (4) supra competitive pricing increased pricing and costs of Investment Advisory Services and RIA Custodial Services;(5) increased barriers to entry into RIA Custodial Services Market and Investment Advisory Market; and (6) diminished mobility of IARs and diminished selection and quality of IAR.

317.    By reason of the alleged violations of the antitrust laws, Plaintiffs suffered injury to their businesses or properties, as set forth herein. Plaintiffs' injuries are antitrust injuries of the type that the antitrust laws were meant to punish and prevent.

*E. Greco RIA Industry Background and Work at Creative Planning*

318.    From 2004 to April 2011, Greco worked for AMTD, with six of the seven years serving in the position of Branch Manager of the downtown Chicago office. Through his employment with AMTD, Greco obtained substantial experience, and first-hand knowledge about the operations of AMTD's branch offices, as well as its AdvisorDirect® Program.

319.    From September 2013 through March 2017, Greco was employed by Creative Planning in a senior management position, as Creative Planning's National Director of Wealth Management. Mallouk personally interviewed and hired Greco, at a time when Creative Planning had approximately 35- 40 employees and $7 Billion in AUM.

320.    In his capacity as Director of Wealth Management, Greco was one of just a handful of upper management employees who worked very closely with Mallouk. Greco acquired direct and detailed first-hand knowledge of Creative Planning's business dealings, agreements, practices, revenue-sharing arrangements, and other operations and conduct during the period September 2013 through March 2017, including: the sources of Creative Planning's new advisory clients; the commissions and referral payment structures with AMTD, Tony Robbins, and other partners and

associates; the total amount of AUM that Creative Planning reported to the SEC on its Form ADV and other public disclosures; Creative Planning's inclusion of unmanaged client assets in the AUM reported on its Form ADV; inadequacies and deficiencies in Creative Planning's software and technology; Creative Planning's lack of functional operating capacity to handle the volume of advisory client referrals it was receiving as a result of its AdvisorDirect® Commercial Bribery Scheme; Creative Planning's practice of not segregating and monitoring unmanaged assets; Creative Planning's illegal conduct in the AdvisorDirect® Program; and other practices and policies that he believed constituted violations of federal law, SEC rules, and regulations.

321.    Greco's direct interactions with Mallouk, first-hand knowledge and information he was exposed to through his work as Creative Planning's Director of Wealth Management, and his extensive industry experience and knowledge gained through years of work experience in the RIA industry, in particular as a management employee of AMTD, formed the basis for his belief that there were serious SEC compliance issues and Creative Planning's business operations violated federal law.

Greco's Concerns About Creative Planning's Business Practices

322.    As National Director of Wealth Management for Creative Planning, Greco was responsible for overseeing the performance and productivity of IARs, in relation to fulfilling expectations Mallouk had set for the AdvisorDirect® Program and related collusive agreements between AMTD and Creative Planning. Greco became concerned that the collusive agreements, and related business practices by Creative Planning, created a direct conflict of interest and breach of their fiduciary duty to advisory clients, and were in violation of federal law, SEC rules, and regulations. Declaration of Stephen Greco, dated April 25, 2022, incorporated herein and referenced as "Exhibit B."

323.    Greco's concerns about Creative Planning involved misconduct anchored in Mallouk's obsessive "win-at-all-costs" approach to achieving growth during September 2013 through March 2017, which conduct is collectively referred to as the "Creative Planning Fraudulent Growth Scheme" and included: Creative Planning's AdvisorDirect® Program Commercial Bribery Scheme; collusive agreements with AMTD; misrepresentations and material omissions to SEC auditors; violations of Creative Planning's fiduciary and other duties to advisory clients; false, misleading, and fraudulent representations about Creative Planning's source of growth in advisory clients and AUM; routine business practices involving acceptance of unmanaged assets and inflating advisory client AUM; improper handling of advisory client AUM, investment recommendations, portfolio monitoring and management; and intentional efforts to conceal its misconduct and circumvent disclosure of conflicts of interest and improper revenue-sharing.

324.    During his tenure at Creative Planning, Greco observed and was concerned that:

a.      it lacked the infrastructure, technology, and other operational capacity to handle the volume of client referrals from AMTD;

b.      it was routinely accepting unmanaged assets from advisory clients referred through AMTD, but was not segregating, monitoring, or supervising those unmanaged assets;

c.      it lacked resources and technology to sufficiently identify, track, monitor, make recommendations, and otherwise protect its advisory clients' unmanaged assets (such as monitoring positions in securities);

d.  it was churning trades and engaging in other intentional practices to increase the costs paid by its advisory clients related to investments and RIA Custodial Services, pursuant to collusive agreements with Broker-Custodian Defendants;

e.  IARs had little to no discretion in placing advisory clients' AUM into specific investments and using pre-determined portfolios and investment mixes, which were approved by Mallouk and made pursuant to collusive agreements with Broker-Custodian Defendants;

f.  it was routinely manipulating advisory client billings, such as reducing billing rates, but charging on both managed and unmanaged assets, as part of the AdvisorDirect® Program Commercial Bribery Scheme, and other collusive agreements with Broker-Custodian Defendants;

g.  it was operating out of AMTD branch offices and using AMTDs operating resources in furtherance of its collusive agreements with AMTD, as well as delaying execution of client trades due to policies requiring all trades be placed from Creative Planning's headquarters in Kansas, even when designed by employees in other geographic regions, such as Chicago; and

h.  IARs being required to make brokerage and trading decisions, portfolio allocation and management decisions, and recommendations to advisory clients based upon Mallouk's direction and Creative Planning's collusive agreements with Broker-Custodian Defendants, including: specific investment recommendations and investment mixes; frequency and necessity of trading;  cash allocations and use of cash sweep accounts;  portfolio rebalancing activities; use of margin and margin balances; and other investment advice and portfolio management based which was based on maximizing

92

revenue generated from agreements with Broker-Custodian Defendants; and other improper practices that were antagonistic to their advisory client interests.

See Exhibit B.

*Robbins/Creative Planning Relationship Concerns*

325.    During his employment with Creative Planning, Greco developed serious concerns about Creative Planning's business dealings and referral relationship with celebrity influencer, Tony Robbins ("Robbins/Creative Planning Relationship").

326.    Since about 2014, Tony Robbins and Mallouk had become personally acquainted and financially associated, through Ajay Gupta, and were using Tony Robbins's established communication channels (i.e., self-help seminars, books, etc.) to market to and otherwise solicit new advisory service clients for Creative Planning.

327.    The Robbins/Creative Planning Relationship involved marketing of Creative Planning's advisory services and solicitation of advisory clients through methods, means, and misleading representations that Greco believed were not compliant with SEC rules and regulations regarding RIA advertising, marketing, solicitation, referrals, and mandatory duties and disclosures.

328.    Robbins was very publicly and enthusiastically promoting Creative Planning using a marketing shtick focused on the perils of FINRA broker-dealer self-dealing and personal anecdotes about the importance of having an SEC fiduciary providing Independent RIA Services, even touting AdvisorDirect® Program Commercial Bribery Scheme Creative Planning as the only "*true fiduciary*" RIA during nationwide broadcasts in major media outlets, such as Good Morning America, the Today Show, The Street and Bloomberg LP.[55]

---

[55]  *See*  https://riabiz.com/a/2016/4/5/what-to-make-of-peter-mallouks-sweeping-deal-with-tony-robbins-and-where-the-unlikely-pairing-goes-from-here (last accessed 4.22.2022).

329.    Instead of acting diligently and consistent with its SEC obligations and "fiduciary duties," Mallouk instead devised a plan to obscure the nature and scope of Creative Planning's referral relationship with, participation in marketing and solicitation of, payment of solicitation fees and other compensation to Robbins. Mallouk created a new position for Tony Robbins as Creative Planning's "Director of Psychology" for purposes of refusing to disclose details of the Creative Planning/Tony Robbins relationship and solicitation fees on the basis Robbins was an employee of Creative Planning.

330.    For example, in an e-mail sent by Mallouk to RIABiz, a wealth industry trade publication, he argues Tony Robbins's compensation was protected from disclosure in Creative Planning's ADV, stating in pertinent part: "*Tony is also not an outside firm referring business to us…That's materially different from the referral relationship with Schwab that you cite as an example. The ADV isn't used to provide a precise explanation of the compensation structure for employees and board members of the firm.*"[56]

*Creative Planning AMTD Concerns*

331.    As a former employee of AMTD, having served as the Branch Manager of Chicago AMTD Branch for approximately seven years, Greco recognized Creative Planning's conduct in AdvisorDirect® Program constituted commercial bribery, how the bribery scheme worked, and the ill-gotten gains Creative Planning achieved through the "AdvisorDirect® Program Commercial Bribery Scheme." For example, Greco recognized and understood precisely how:

---

[56] See https://riabiz.com/a/2017/3/1/peter-mallouk-tony-robbins-partnership-set-to-soar-on-new-book-but-quid-pro-quo-details-of-pact-between-23-billion-ria-and-super-salesman-are-still-murky (last accessed 4.18.2022).

a.     the AdvisorDirect® Program Commercial Bribery Scheme incentivized AMTD branch employees/financial consultants to send the majority of AdvisorDirect® Program referrals to Creative Planning;

b.     Creative Planning used unmanaged assets in the AdvisorDirect® Program Commercial Bribery Scheme for the purpose of improperly increasing/artificially inflating the commission payments AMTD branch employees/financial consultants would receive for referring an AdvisorDirect® Program advisory client to Creative Planning, as opposed to referring it to another RIA participating in the AdvisorDirect® Program;

c.     Creative Planning's acceptance of large amounts of unmanaged assets, and its failure to segregate and monitor those unmanaged assets, exposed advisory clients to a substantial risk of asset diminution and loss;

d.     Creative Planning's failure to segregate unmanaged assets was resulting in advisory clients being charged advisory fees on the unmanaged assets;

e.     Creative Planning's failure to segregate unmanaged assets was resulting in the inclusion of unmanaged assets in the AUM reported by Creative Planning in its Form ADV;

f.     Creative Planning's use of fee reductions in furtherance of AdvisorDirect® Program Commercial Bribery Scheme; and

g.     how the magnitude of the bribery and improper incentives used in the AdvisorDirect® Program Commercial Bribery Scheme enabled a relatively unremarkable RIA, which lacked the expertise and operational capacity necessary to adequately provide the advisory services to its ill-gotten windfall of new advisory clients, to dominate AMTD's national AdvisorDirect® Program, gobbling up as much as 50% of total

nationwide advisory client referrals through the program and out-performing substantially

larger and more established RIAs participating in the AdvisorDirect® Program. Exhibit B.

332.    Greco's concern about Creative Planning's operations and conduct related to the

AdvisorDirect®  Program  also  included  the  fact,  Mallouk  had  personally  contrived

AdvisorDirect® Program Commercial Bribery Scheme and explicitly instructed Greco, and other

Creative Planning employees, on how to "pull off" the deception. For example, Mallouk instructed

Creative  Planning  employees  to  inform  AMTD  branch  employees/financial  consultants  that

Creative Planning would:

      a.      accept unmanaged assets, even when the prospective advisory client

was clear that it only wanted a portion of their assets managed (large portfolios with

substantial unmanaged assets), and Creative Planning was willing to hold those

unmanaged assets for at least two quarters, long enough that the AMTD branch

consultant would earn the commission on conversion of the total client portfolio

(both manage and unmanaged assets);

      b.      retain  unmanaged  assets  and  charge  reduced  fees  on  those

AdvisorDirect® Program advisory client referrals, in order to accomplish the same

effect as not billing on the unmanaged portion of assets, while incentivizing the

AMTD investment consultant who would continue getting paid commission on the

whole conversion amount (managed and unmanaged assets);

      c.      Creative Planning would claim to be providing a free individualized

and custom financial plan on the whole portfolio, which was actually just consisted

of using a "portfolio generator" that selected the same pre-determined investments

for virtually all advisory clients;

d.      Creative Planning did not segregate, track, or monitor the unmanaged assets;

e.      Creative Planning would send specifically worded (by Mallouk) misleading e-mails to the referring AMTD branch employees that Creative Planning explained could be used as "cover" by the AMTD branch employees and Creative Planning if the transactions were flagged and questioned by AMTD, or an advisory client claimed a loss on the unmanaged assets.[57]

333.    At the time of Greco's concerns, there were over 100 RIAs participating in AMTD's AdvisorDirect® Program ("Participating RIAs"), many of whom were much better suited than Creative Planning to meet a referred advisory client's particular needs and interests. Greco witnessed first-hand Creative Planning's struggle to handle the volume of advisory clients it was being referred because of the AdvisorDirect® Program Commercial Bribery Scheme, and the failings and omissions of Creative Planning in managing and providing Independent RIA Services to its advisory clients.

334.    Objectively, there was no legitimate business purpose for the absurdly disproportionate share of AdvisorDirect® Program referrals Creative Planning received, many of whom had needs and interests better served by a different Participating RIA in the AdvisorDirect® Program. There was, however, an obvious illegitimate reason- the AdvisorDirect® Program Commercial Bribery Scheme.

335.    Greco not only understood the AdvisorDirect® Program Commercial Bribery Scheme, his job duties required him to analyze and report on Creative Planning's metrics in the program, which metrics revealed that during Greco's tenure at Creative Planning, the

---

[57] Refer to Exhibit B for paragraph 332 (a)-(e).

AdvisorDirect® Program was the single largest source of Creative Planning's new client growth. See Exhibit B.

336.    Creative Planning's AdvisorDirect® Program Commercial Bribery Scheme resulted in it getting the majority of referrals from AMTD, despite its threadbare infrastructure and limited resources compared to other Participating RIAs in the AdvisorDirect® Program, and even in geographic locations where Creative Planning did not have offices or advisors, including in AMTD branches where Creative Planning actually set up operations for free.

337.    Greco's knowledge about the source of Creative Planning's new client growth caused him concern about another "elephant–sized" lie Mallouk was propagating, and which was gaining nationwide attention, that Creative Planning was achieving unfathomable growth "organically," through the word-of-mouth referrals from its satisfied advisory clients.  See Exhibit B.

*Creative Planning False Growth Narrative*

338.    During his tenure at Creative Planning, Greco became acutely aware of, and increasingly concerned about, Mallouk's marketing of Creative Planning using blatantly false and misleading representations about the source of Creative Planning's advisory clients and growth in AUM. Greco was particularly concerned about Mallouk's misleading campaign to educate the public about the importance of having a "fiduciary," like Creative Planning, because Greco was simultaneously witnessing Creative Planning's real-time intentional violations of its fiduciary duties to advisory clients through conduct in AMTD's AdvisorDirect® Program and other collusive dealings and agreements.

339.    Greco watched as Mallouk scripted, and then peddled, Creative Planning's fictitious growth narrative, spinning a starring role for himself in a "David and Goliath" like tale

in which a tiny, small town, middle-America "fiduciary" miraculously catapults past its long-established competitor RIAs. True to the nature of such fairy tales, Mallouk's version of Creative Planning's growth was far more fantasy than fact. Creative Planning did not achieve it business growth "organically," from word-of-mouth referrals from existing clients. Exhibit B.

340.    Creative Planning grew from paid referral sources, such as Referral Programs and celebrity/influencers fueled by the misconduct of the AdvisorDirect® Commercial Bribery Scheme and RIA Services Scheme.

341.    Mallouk regularly made statements to national media outlets that seeded fear and distrust for others in the financial services industry.  For example, he explained to the New York Times, that commissions received by broker-dealers incentivize them to act against the best interests of their clients, in pertinent part stating: *"It's horrible — people don't even know that they are paying someone to sell them something."*[58]

342.    Mallouk identified Creative Planning as providing "conflict-free advice," while not disclosing the conflict-laden collusive agreements entered into with Broker-Custodian Defendants, as set forth herein. For example, in an article published in June 2015, Mallouk stated: "*I think the shift in the marketplace is toward conflict-free advice, and that has really benefited firms like ours*." [59]

343.    Mallouk's deliberate and calculated misrepresentations were made by mail and wire, and  are ongoing and continuing long past Greco's resignation from Creative Planning.

---

[58]    See    https://www.nytimes.com/2017/06/21/business/dealbook/a-kansas-investment-firm-spurring-change-on-wall-street.html

[59] Creative Planning's latest No. 1 comes with a whiff of controversy - Kansas City Business Journal (bizjournals.com)

344.    For example, Mallouk misrepresented in a public interview, published on May 1, 2018, *"Today we manage around $34 billion in assets, and about $33 billion of it is organic. Our emphasis is organic."* [60]

345.    In August 2018, Mallouk again denied AMTD's AdvisorDirect® Program was the leading contributor to Creative Planning's growth. [61]

346.    Mallouk also continues using false and misleading "*fiduciary*" marketing, for example in that same May 1, 2018 publication, in pertinent part, provided:

**Q: How could industry regulations be made rational?**

**A (Mallouk):** One, everyone has to be a fiduciary when handling investments. Two, advisers are forbidden from receiving commissions on investment products, so the inherent conflict of interest is eliminated. Three, an adviser cannot be paid to recommend their own funds because that is an inherent conflict. You eliminate those three things and you solve 95 percent of the problems, and the industry wouldn't have the economic burden we have today with a huge series of rules that don't really benefit the end consumer.

**Q: Has the industry put forth a regimen similar to what you're talking about?**

**A (Mallouk):** No. The industry doesn't want that because it makes much more money operating with conflicts of interest. The reason brokerage houses fight the fiduciary rule is because if the fiduciary rule were in place, they would have to act in the best interest of the client, which means they would have to disclose all their fees. They wouldn't be able to sell their own proprietary funds unless they can demonstrate it is the best option. These are very big profit centers for the overwhelming majority of the industry, so the industry is not interested in these rules, so they lobby Congress and prevent the rules from passing.

347.    In January 2019, Mallouk announced he was taking Creative Planning's story "*directly to the consumer by launching a year long, multimillion-dollar, national information campaign*" that was focused on educating consumers about fiduciary standards and the difference between Creative Planning and financial consultants that are not subject to the same SEC-imposed fiduciary standards, explaining that: "*The brokerage houses don't want a fiduciary standard. If*

---

[60] *Id.*

[61] Peter Mallouk has diamond as big as The Ritz, a flashy new Kansas City headquarters, complete with Silicon Valley perks; Now his new goal--top $40 billion in assets | RIABiz

*you're held to that standard, you can't chare a higher fee for something you can get elsewhere for a substantially lower fee. Its hard to justify charging commission for something people can get from someone else without paying commission. It's harder to just sell your own products, when a product from someone else might be better.*"[62]

348.    For years, Creative Planning has masqueraded behind the term "fiduciary" while engaging in transactions in contravention of those duties. By doing so, he has injured competitor RIAs and obtained advisory clients through false and misleading advertising to the detriment of Spotlight and other competitors.

349.    During his employment with Creative Planning, Greco was personally aware Mallouk did not respect SEC rules and regulations, actively sought ways to circumvent those rules, and did not even have a single full-time compliance employee.

350.    Greco was concerned Mallouk and Creative Planning were violating SEC rules related to marketing and solicitation of advisory clients, including SEC Rule 206(4)-1, the "Advertising Rule." Greco's concerns were not unfounded, as demonstrated by Creative Planning's 2018 censure and sanction by the SEC involving violations of the Advertising Rule, in connection with improper radio ads with client testimonials/ endorsements, which occurred during Greco's tenure at Creative Planning.

SEC Sanctions & Censure of Creative Planning & Mallouk

351.    On or about September 18, 2018, Creative Planning and Mallouk consented to the entry of an Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, Making Findings, and

---

[62]    *See*        https://www.bizjournals.com/kansascity/news/2019/01/22/creative-planning-fiduciary-standard-mallouk.html.

Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order") resolving violations of the Advisers Act and certain rules thereunder by Creative Planning, a registered investment adviser, that: (i) distributed hundreds of radio advertisements that contained prohibited client testimonials; (ii) failed to enforce the firm's code of ethics ("Code of Ethics") with regard to the radio advertisements and the reporting and review of certain securities accounts in which the firm's president had a beneficial interest; (iii) failed to keep true and accurate books and records; and (iv) failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act ("September 2018 SEC Censure & Sanctions").

352.    The SEC Consent Order explicitly noted, "Mallouk, the firm's president and majority owner, caused certain of CPI's [Creative Planning] Code of Ethics violations." SEC Consent Order, Page 2 ¶1.

353.    Among the relief ordered in the SEC Consent Order, Creative Planning was censured, both Creative Planning and Mallouk were ordered to pay monetary fines and Creative Planning was ordered to cease and desist from "*committing or causing any violations and any future violations of Sections 204, 204A, and 206(4) of the Advisers Act and Rules 204-2(a)(11), 204A-1, 206(4)-1(a)(1), and 206(4)-7 thereunder*;" and Mallouk was ordered to "cease and desist from committing or causing any violations and any future violations.

Greco Shares His Concerns with Mallouk

354.    On multiple occasions during his employment with Creative Planning, Greco went directly to Mallouk to discuss the concerns he had about Creative Planning's business operations, as set forth herein.

355.    Mallouk flatly dismissed Greco's complaints and, in demanding Greco continue business as usual, he also cavalierly reminded Greco that his job was to "*do whatever was*

*necessary to maintain at least a 30% market share of the AdvisorDirect® referrals in every branch."* Declaration of Stephen Greco, April 25. 2022, Exhibit B.

356.    Mallouk intentionally made Greco's compensation by Creative Planning based upon Creative Planning maintaining at least a 30% market share of AdvisorDirect® Program and further required Greco to track the market share quarterly and report it to Mallouk and the Creative Planning wealth managers. See Exhibit B.

357.    Greco was further directed by Mallouk to work with advisors at Creative Planning who were underperforming in the AdvisorDirect® Program and use every tool necessary, including discounting fees and bringing on unmanaged assets, to increase their performance and maintain or increase Creative Planning's overall market share of the program. See Exhibit B.

358.    Greco was also required to report to Mallouk whether underperforming advisors could be "*coached up*" to increase their referral results from the AdvisorDirect® Program, or if they should be replaced by another advisor who could be more successful.  See Exhibit B.

Creative Planning's SEC Audit

359.    Throughout 2016, Mallouk began sending, and Greco receiving, regular company-wide e-mails providing updates and directions about issues related to an ongoing audit of Creative Planning that was being conducted by the SEC's Office of Compliance Inspections and Examinations ("SEC Audit").

360.    On several occasions throughout 2016, Greco discussed his concerns with Mallouk that the SEC audit could uncover Creative Planning's improper dealings with AMTD, and once again objected to Creative Planning continuing the practices. See Exhibit B.

361.    Mallouk was unapologetic about his choice to engage in the challenged practices because it resulted in Creative Planning being the number one RIA in the program and preferential

treatment of Creative Planning by AMTD. For example, during the relevant time period, Creative Planning garnered close to 50% percent of total nationwide referrals from the AdvisorDirect® Program, accounting for over 65% of Creative Planning's overall new advisory client and growth in AUM.

362.    Mallouk deliberately concealed Greco from the SEC Auditors because Greco knew the source and reason for Creative's large amount of unmanaged assets, and Mallouk was concerned Greco would reveal to the SEC that Mallouk knowingly and intentionally directs the very practices that resulted in the comingling of managed and unmanaged assets, because those practices were gaining Creative Planning unprecedented growth in new advisory clients and making Creative Planning look more successful than it actually was by inflating its advisory client AUM, leading to new industry partners and higher industry rankings. See Exhibit B.

363.    On or about October 7, 2016, Greco learned that the SEC was specifically asking Creative Planning about the company's unmanaged assets, from a company-wide email Mallouk sent on October 7, 2016. In that email, Mallouk wrote that *"[o]ne of the SEC's primary concerns and deficiencies they found during our audit revolved around our policies to handle assets marked as unmanaged, no bill or on a negotiated fee schedule."*

364.    Greco knew that if Creative Planning's unmanaged assets were carefully audited, the SEC would find that most of those assets were referred to Creative Planning from AMTD's AdvisorDirect® Program. See Exhibit B.

365.    Greco also knew that such a detailed audit of Creative Planning's unmanaged assets risked revealing they were not segregated or monitored, rather they were simply used as a carrot in the AdvisorDirect® Commercial Bribery Scheme to the SEC. See Exhibit B.

366.    Immediately after receiving the October 7, 2016 e-mail, Greco again raised his concerns and objections with Mallouk and other management level employees of Creative Planning. See Exhibit B.

367.    Mallouk again flatly dismissed Greco's concerns and then engaged in efforts to thwart Greco from communicating with SEC auditors, or otherwise interacting with the SEC, despite the fact that Greco was one of the most knowledgeable management level employees of Creative Planning with first-hand information about the source, amount, and oversight by Creative Planning of the unmanaged assets of which the SEC was inquiring. See Exhibit B.

368.    The other Creative Planning employees to whom Greco complained were unable to address Greco's concerns because Mallouk wholly-controlled every aspect of Creative Planning's operations and wielded sole decision-making authority, during that time period.

369.    Mallouk scripted Creative Planning's response to the SEC Audit, directed cooperation by Creative Planning employees, and controlled the access to information and data SEC was given.

370.    In approximately November 2016, Mallouk misrepresented to Greco that the SEC Audit was over and Creative Planning had only received an SEC deficiency letter. See Exhibit B.

371.    Shortly after Mallouk lied about the SEC Audit being concluded, Greco learned from Katie Nave ("Nave"), Creative Planning's Director of Trading, that the SEC Audit was not concluded, and that Creative Planning was referred to SEC's Enforcement Division. See Exhibit B.

372.    After learning Mallouk had outright lied to him about the SEC audit being concluded, and considering Mallouk's continued resolute refusal to change course and discontinue

the illegal practices and deceptions, Greco realized he would need to resign from his employment and report Creative Planning's violations of federal law to the SEC.

### Greco Forms Spotlight and Resigns from Creative Planning

373.    On December 23, 2016, Greco founded Spotlight in anticipation he would need to depart from Creative Planning due to the ongoing deceptions, deliberate misleading of the SEC auditors, attempts to circumvent SEC compliance, and Mallouk's intransigent insistence that Creative Planning pursue growth in AUM and profits, even if it requires illegal or improper means. See Exhibit B.

374.    Greco hoped to depart on reasonably amicable terms, file his SEC complaints, and move forward building his own RIA. See Exhibit B.

375.    In early-January 2017, Greco informed Mallouk he intended to resign from his employment with Creative Planning and offered to do so immediately. Mallouk asked Greco to remain employed and continue actively designing complex options trades until Mallouk was able to find a replacement for Greco. See Exhibit B.

376.    Since Creative Planning did not have an adequate replacement for Greco, or the capacity to take on designing the complex option strategies, Greco and Mallouk engaged in discussions about possible arrangements where Greco and his new RIA, Spotlight, would continue advising for Creative Planning advisory clients interested in complex options strategies.

377.    Greco and Mallouk were unable to reach an agreement on terms for a continuing relationship after Greco's departure, so Mallouk continued his efforts to secure a competent replacement for Greco, so Greco could resign and move forward with Spotlight.

378.     Mallouk was unable to find a suitable replacement for Greco, and instead decided on a replacement plan which Greco believed did not adequately protect the interests of Creative Planning's advisory clients.

379.     Greco rejected Mallouk's efforts to have him endorse his replacements to advisory clients, explaining to Mallouk, in an e-mail dated March 1, 2017: "*You basically are putting me in a position where I have to lie to Wealth Managers and Clients about what is going on and then tell them that you are able to do something that you have no capabilities to do right now. I told you when we met that I came to you up front because I felt that it was important to work with you as long as things were done fairly, reasonably, and in the right way for all involved…That isn't the case right now. Because of that I believe it is in my best interest to resign immediately.*" Greco attached a formal resignation letter to his e-mail dated March 1, 2017.

380.     Greco believed Mallouk's request that he misrepresent the competence and qualifications of his replacement would require Greco to violate his fiduciary duties to those advisory clients. Mallouk insisted that Greco nevertheless make the representations, and trust Mallouk to "*figure out*" a way to provide competent options advice. See Exhibit B.

381.     Greco informed other Creative Planning Directors and employees that he was resigning, had consulted attorneys, and would be reporting Creative Planning's violations of federal law, rules, and regulations to the SEC. See Exhibit B.

*F.  Greco's 2017 Sec Whistleblower Action*

382.     In late 2016, Greco sought the advice of experienced SEC whistleblower attorneys to explore the process for filing a confidential complaint with the SEC about Creative Planning and AMTDs violations of federal law, as well as Mallouk's intentional provision of misleading information, and material omissions, to the SEC investigators in connection with the SEC Audit.

383.    On or about March 7, 2017, Greco filed his 2017 SEC Whistleblower Complaint.

384.    On June 7, 2017, Greco filed his "First Supplement to Disclosure Statement Containing Information and Analysis Relating to Securities Violations of TD Ameritrade Holding Corporation and Creative Planning Incorporated" ("June 2017 SEC Supplement") containing, among other things, additional specific allegations against Mallouk and Creative Planning involving misrepresentations, deceit, omissions, and other breaches of duty to specific customers of Creative Planning.

385.    Throughout the Spring and Summer of 2017, Greco continued providing original information, data, documents, supplemental disclosures, analysis, recommendations, sworn testimony, and other communications and cooperation with the SEC.

386.    The 2017 SEC Whistleblower Action detailed Greco's concerns and identified specific wrongdoers, transactions, impacted advisory clients, and other original information, including:

        a.    Unmanaged Assets: Practices by Creative Planning that resulted in Creative Planning accepting large amounts of unmanaged assets in connection with advisory client referrals through AMTD's AdvisorDirect® Program, failing to segregate and monitor the unmanaged client assets, inclusion of unmanaged assets in the AUM reported by Creative Planning in its Form ADV and other public filings, and the reasons Creative Planning was holding such a large inventory of unmanaged assets.

        b.    AdvisorDirect® Program Commercial Bribery Scheme: Creative Planning used unfair, illegal, and anti-competitive practices, including a commercial bribery scheme, in its business operations related to AMTD's AdvisorDirect® Program. The AdvisorDirect® Program Commercial Bribery Scheme was used by Creative Planning to

improperly incentivize AMTD branch advisors by improperly inflating the commissions the AMTD branch advisors received when referring advisory clients to Creative Planning, as opposed to another RIA participating in the AdvisorDirect® Program, for example explaining that:

     i.     Greco reported in his 2017 SEC Whistleblower Complaint that Creative Planning concealed from the SEC that it uses unmanaged assets as a vehicle to incentivize AMTD's branch employees/ investment consultants to refer business to Creative Planning.

     ii.     Most Creative Planning's growth came from its participation in the AMTD AdvisorDirect® Program, estimating that, "before 2017, the TD Ameritrade AdvisorDirect® Program accounted for about 60% of all new business and that, post 2017, TD's referral program will account for about 30% to 40%." *Id*. at 8.

     c.     <u>Creative Planning Growth Attributable to AdvisorDirect® Program:</u> Greco provided the SEC with specific sales information and data demonstrating that approximately 78% of Creative Planning's advisory clients came from AMTD referrals through the AdvisorDirect® Program. The information Greco provided to the SEC included the following chart showing the amount of AMTD AdvisorDirect® Program referrals as compared to the total amount of new net assets:

| Quarter | TD Total | Net Assets | TD% of Total | Creative TD Share |
|---|---|---|---|---|
| Q1 2016 | $ 458,167,886 | $ 746,844,360 | 61.35% | 37.92% |
| Q4 2015 | $ 633,321,780 | $ 734,904,675 | 86.18% | 39.18% |
| Q3 2015 | $ 684,193,404 | $ 904,371,491 | 75.65% | 41.45% |
| Q2 2015 | $ 711,593,965 | $867,067,080 | 82.07% | 41.42% |
| Q1 2015 | $ 690,700,993 | $ 904,411,808 | 76.37% | 39.88% |
| Q4 2014 | $802,171,946 | $ 1,076,739,318 | 74.50% | 45.93% |
| Q3 2014 | $703,767,476 | $ 1,019,961,999 | 69.00% | 39.54% |
| Q2 2014 | $776,726,137 | $ 849,355,585 | 91.45% | 40.63% |
| Q1 2014 | $629,745,130 | $ 668,589,044 | 94.19% | 36.27% |
| TOTALS | $6,090,388,717 | $7,772,245,360 | 78.36% | 40.25% |

        d.      <u>Collusion and Improper Practices by Creative Planning and AMTD:</u> Greco reported to the SEC how, during 2013-2017, Creative Planning and AMTD intentionally used the AdvisorDirect® Program and other collusive practices to maximize revenues, circumvent SEC compliance, affirmatively mislead and conceal their collusive conduct, and otherwise act in concert for their collective pecuniary gain, such as: Creative Planning operating out of AMTD Branch offices, Creative Planning bringing on AMTD employees and managers as RIA clients, and Creative Planning intentionally recommending and engaging in transactions which increased fees and commissions Creative Planning's advisory clients paid AMTD for RIA Custodial Services and investment products. A few examples of collusion that Greco reported are:

        i.      AMTD allowing Creative Planning to operate from AMTD branches in an estimated 20 different locations throughout country. *Id.* at 10; and

        ii.      AMTD managers were clients of Creative Planning, creating a massive conflict of interest. *Id*. at 10.

        e.      <u>Misconduct related to Robbins/Creative Planning Relationship</u>: alleging improper conduct and disclosures by Creative Planning including: "(i*) Mr. Robbins's role as CP's Chief of Investor Psychology; (ii) representations made by Mr. Robbins in his books and during his seminars and speeches where he promotes CP to his followers; and (iii) what disclosures Mr. Robbins makes to his followers about his compensation and referral fees when he pushes them to use CP, with a particular emphasis on what representations he makes during his Business Mastery and Wealth Mastery seminars…CP President Mallouk has hired master motivational speaker and self-help guru Tony Robbins to be CP's "Chief of Investor Psychology." CP pays Guru Robbins to send his legion of*

*followers to CP for wealth management. To date, the IP estimates that Robbins has already referred hundreds of millions in client assets to CP for management and that, in 2017, Robbins' CP referrals will easily exceed $1 billion. The IP estimates that, in 2017, Robbins will be responsible for 15 to 25 percent of CP's new client business." Id.*

365.     Greco also reported to the SEC that Mallouk controlled and directed Creative Planning's provision of information and cooperation with the SEC Audit and interfered with Greco's ability to communicate with and provide the SEC with relevant material related to the ongoing SEC Audit. He reported to the SEC that Mallouk and Creative Planning made material misrepresentations and omissions during the audit investigation, including:

    a.     In a company-wide e-mail, dated October 7, 2016, Mallouk explained that "[o]*ne of the SEC's primary concerns and deficiencies they found during our audit revolved around our policies to handle assets marked as unmanaged, no bill or on a negotiated fee schedule.*" Id.

    b.     Creative Planning likely "*concealed the true reason CP has such a huge amount of unmanaged assets on its books and how that relates to its highly questionable and incestuous relationship with TD.*" Id.

366.     Greco' 2017 SEC Whistleblower Action further informed the SEC that Creative Planning: (i) false and misleading representations about the extent of customization it uses in its advisory client portfolios, explaining, in part that Creative Planning does very limited customization of individual client portfolios, uses a "portfolio generator" to create client portfolios and purchase "the same equities and bonds for virtually every client;" (ii) used Improper billing practices, handling of margin accounts and advisory activities, disclosures and misconduct in the recommendation of investment products and provision of services, pre-approved and misleading

fee concession policies, and other affirmative misconduct constituting violations of federal law, regulations, and rules; (3) was operating out of multiple offices and required Greco and other Chicago employees to design trades out of the Chicago office and send the trades to Kansas for later execution, causing significant client losses due to delays in trade execution. Greco provided specific client information and examples, *Id*. at 11-12; and (iv)was not serious about SEC compliance and intentionally circumvents SEC compliance and rules, providing examples of disregard, circumvention efforts, and specific Creative Planning executives involved. *Id.* at 13-15.

367.    Greco identified to the SEC specific examples of collusive agreements and business dealings between Creative Planning and AMTD, particularly focused on the AdvisorDirect® Program and collusive agreements therein, and also provided recommendations and analysis regarding how certain collusive agreements and practices could be remediated.

368.    After Greco filed his 2017 SEC Whistleblower Complaint, AMTD made material changes in certain business practices and policies, consistent with Greco's recommendations to the SEC, which significantly diminished Creative Planning's ability to achieve its ill-gotten gains.

369.    For example, in or around October 2018, AMTD made changes to its AdvisorDirect® Program, restricting the number of branch referrals, which was a change that was directly responsive to Greco's 2017 SEC Whistleblower Complaint.

370.    The October 2018 AMTD changes resulted in Creative Planning losing hundreds of millions of dollars in new client AUM that Mallouk believed it otherwise have received from AdvisorDirect® Program client referrals.

371.    As a result of Greco's 2017 SEC Whistleblower Action, and the information and SEC whistleblower complaints by other former employee-whistleblowers (i.e., Paul Miguel), the

112

SEC conducted investigatory proceedings into the Robbins/Creative Planning relationship and associated business dealings.

372.     As a result of the SEC investigatory proceedings, Tony Robbins, Mallouk, and Creative Planning terminated their referral arrangements and other business dealings. In a May 2019 statement in an interview in RIABiz, Mallouk explained the reason for Creative Planning and Tony Robbins contract termination as follows: "*Tony got a taste of the world of regulation, and he didn't like being a supervised person," . . . "For six months we've been negotiating an exit. This (contract termination) was culminating this month, regardless.*"[63]

373.     The "*taste of the world of regulation*," that lead to the termination of the Robbins/Creative Relationship, was the taste they got from the SEC because of Greco's 2017 SEC Whistleblower Complaint.

374.     Mallouk blames Greco and his 2017 SEC Whistleblower Action for the SEC's ongoing and onerous scrutiny of Creative Planning, termination of the Robbins/Creative Planning Relationship, changes in the AdvisorDirect® Program, and September 2018 SEC Censure & Sanction. Mallouk is concerned Greco is continuing to communicate, provide information and analysis, and otherwise cooperate with federal law enforcement, including the SEC and DOJ.

375.     Mallouk has aggressively sought to silence Greco, interfere with his communications and cooperation with federal law enforcement, and seek revenge and retribution against Greco for the 2017 SEC Whistleblower Action and 2020 DOJ Complaint. In furtherance thereof, Mallouk and Creative Planning have targeted and caused substantial harm to Greco and Spotlight.

---

[63]   See   https://riabiz.com/a/2019/5/24/exclusive-creative-plannings-split-with-tony-robbins-was-in-the-works-well-before-self-help-gurus-sexual-misconduct-allegations-says-peter-mallouk   (last   accessed 4.18.2022).

### G. *Defendant's Silencing and Retaliation Scheme*

376.    The Silencing and Retaliation Scheme involves Defendants' agreements and concerted action against Plaintiffs for the shared common purposes of: (1) concealing their RIA Services Scheme and related misconduct; (2) in attempting to silence, intimidate, threaten, interfere with, and otherwise deter and impede Greco from reporting, complaining, providing information, participating in, and other cooperating with the SEC, DOJ, or any other federal law enforcement agency or officials,  related to any violations of federal law by all or any of the Defendants ("Silencing"); and also to punish and retaliate against Plaintiffs for Greco's 2017 SEC Whistleblower Action and 2020 DOJ Complaint ("Retaliation").

377.    As set forth more fully herein, Mallouk initiated the Silencing and Retaliation Scheme, in mid-March 2017, committing his own acts in furtherance thereof, as well as using his control of Creative Planning to direct its conduct in furtherance of the scheme. Mallouk and Creative Planning encouraged and elicited the other Defendants' participation in the scheme and conspired with and assisted in coordinating commission of their conduct in carrying out the Silencing and Retaliation Scheme.

378.    The Silencing and Retaliation Scheme is interconnected with the RIA Services Scheme and Creative Fraudulent Growth Scheme, because it is Greco's reports to federal law enforcement of Defendants' conduct involved in those schemes that caused Defendants to carry-out the Silencing and Retaliation Scheme.

379.    Defendants have acted, and are continuing to act, in furtherance of their shared goals of silencing, intimidating, deterring, impeding, delaying, and otherwise interfering with Greco's reporting of their violations of federal law and misconduct in furtherance of the RIA Services Scheme, as well as providing assistance, sworn testimony, information, analysis, and

cooperation with the SEC and DOJ ("Silencing"). Defendants are also acting in furtherance of their shared goals of punishing and retaliating against Plaintiffs for Greco's 2017 SEC Whistleblower Action and 2020 DOJ Complain ("Retaliating").

Spring- Summer 2017 Silencing and Retaliation

380.    Within weeks of Greco's March 2017 filing of the 2017 SEC Whistleblower Complaint, while Greco was actively providing information to, and cooperating with, the SEC, Mallouk was scrambling to silence, deter, and interfere with Greco's 2017 SEC Whistleblower Action, and his ongoing provision of information to and cooperation with the SEC. Mallouk knew Greco intended to file a complaint with the SEC, because Greco was transparent and had informed Mallouk and others at Creative Planning of his intentions to report the misconduct to the SEC.

381.    In mid-March 2017, Mallouk began surveying and questioning other Creative Planning employees about the circumstances of Greco's resignation, whether he complained to them about any violations of federal law or SEC violations, whether he had told them if he was going to file an SEC complaint, and any other such details they remembered.

382.    Mallouk also began defaming and disparaging Greco to Creative Planning employees, advisory clients, and others by claiming Greco was a disgruntled former employee, lies about Creative Planning, is lying about filing the 2017 SEC Whistleblower Action, is "upset" and seeking to hurt Creative Planning because Mallouk replaced him, and other false and misleading statements intended to discredit and harm Greco.

383.    During the Spring -Summer of 2017, Mallouk and Creative Planning aggressively sought to Silence Greco, as set forth in part in the timeline below:



384.    For example, Mallouk used mail/wire to transmit defamatory and disparaging statements to Ed Brownstein that Greco was "*lying*" about reporting Creative Planning to the SEC and was pretending to be a whistleblower so he could steal Creative Planning's advisory clients. Mallouk further told Brownstein that he "*knew*" Greco was not an SEC whistleblower because he was scared to go under oath because he is lying.

385.    On or about July 6, 2017, Mallouk sent Greco a text message claiming he was "*getting calls from wealth managers that say you (Greco) are soliciting clients*."  Greco denied the allegations and also affirmed he had sought advice of counsel and offered to have Spotlight's in-house counsel provide a detailed response to Mallouk's inquiries, as set forth below:



461.    At the time Mallouk sent the text messages, he knew Greco had not violated any post-employment obligations and he also knew Greco had just filed the 2017 June SEC Supplement, had just given lengthy and detailed sworn testimony to the SEC on June 14th, 2017 and was continuing to provide ongoing cooperation and assistance to the SEC. Mallouk sent the text messages and false allegations to attempt to silence Greco and intimidate, threaten, and otherwise deter him from continuing to provide information to the SEC about Creative Planning's violations of federal law.

462.    Mallouk retained outside counsel and directed the law firm to use threats of legal action and make false and factually unfounded accusations against Greco, and another former employee of Creative Planning that was employed by Spotlight, Michael Mitchell.

463.    On July 17, 2017, Creative Planning and Mallouk's attorneys sent. via mail/wire, a cease-and-desist letter to Mitchell, demanding he and Spotlight cease and desist solicitation of

Creative Planning's clients, and further demanding return of identification and return of all Creative Planning information and property in his possession, demanding in pertinent part:

> Our law firm represents Peter Mallouk and Creative Planning, Inc. ("Creative"). By way of this letter, we demand that you, and those in concert with you, including Spotlight Asset Group ("Spotlight") and Spotlight's employees, representatives, and agents immediately cease and desist from any and all activity (1) intended to solicit or contact Creative's clients for any purpose, (2) that you provide a full disclosure of current and former Creative clients you have contacted or attempted to contact since your departure from Creative (3) *that you disclose and identify in writing all information, lists, files, client lists, client contact information or other property of Creative that contains its confidential and proprietary information and/or trade secrets and is in your possession or control, and (4) that you immediately return any such information to Creative*.(emphasis added)

464.    The correspondence also demanded Mitchell and Spotlight preserve all evidence, enclosed a copy of a  non-competition and confidentiality agreement Creative Planning alleged gave rise to post-employment obligations, and threatened liquidated damages in an amount of *"seven (7) times the gross annual revenue that would have otherwise been generated by the assets no longer managed by the Company because of the breach"* as well as *"other damages Creative may prove during litigation, such as defamation and damage to Creative's reputation."*

465.    Mallouk and Creative Planning demanded the identification and return of Creative Planning information and property, in part, to discover information in Mitchell's possession and to attempt to Silence Greco and interfere with Greco's disclosure of the information to the SEC.

466.    Mallouk and Creative Planning did not have a good faith basis for demanding Mitchell cease-and-desist any conduct, and they did not send the July 17th correspondence because they believed he had committed any violations of his post-employment obligations. Rather, it was sent to Mitchell and Spotlight because of their relationship to Greco, and in furtherance of the Silencing and Retaliation Scheme.

467.    On July 18, 2017, Mallouk's and Creative Planning's attorneys sent via mail/wire

to Greco a similar, intimidating and threatening, cease-and-desist letter, demanding in pertinent

part:

> *Our law firm represents Peter Mallouk and Creative Planning, Inc. ("Creative") to initiate litigation against you in the event you fail to immediately comply with this cease and desist. By way of this letter, we demand that you, and those in concert with you, including Spotlight Asset Group ("Spotlight") and Spotlight's employees, representatives, and agents (1) immediately cease and desist from any and all activity intended to solicit or contact Creative's clients for any purpose, (2) that you provide a full disclosure of former or current Creative clients you have contacted or attempted to contact since your departure from Creative**, (3) that you disclose and identify in writing all information, lists, files, client lists, client contact information or other property of Creative that contains its confidential and proprietary information and/or trade secrets and is in your possession or control, (4) that you immediately return any such information to Creative, (5) that you preserve all evidence related to the breaches of your Agreement,** and (6) that you contact me, or have your counsel contact me, regarding the above on or before July 21, 2017.* (emphasis added)

468.    The July 18, 2017 correspondence threatened litigation and made false and

factually unfounded accusations that Greco was in "*material breach of your Employment*

*Agreement and Non-Solicitation Agreement*"; was causing "*significant financial and false*

*reputational damage and harm to Creative" under the pretext or guise of "notify[ing] these clients*

*of the items that could be negatively effecting them . . . [and] that it was my ethical obligation and*

*fiduciary duty to do so;"* and other was making other communications to Creative Planning clients

intended to solicit them with *"scare tactics falsely representing that Creative had compliance*

*issues with their accounts."*

469.    Creative Planning and Mallouk knew the representations made in their July 18th

correspondence to Greco were false and further intended to mislead Greco into believing they were

going to institute meritless and costly litigation if he continued to provide information and

cooperation to the SEC, in particular his providing sworn testimony in an upcoming August

interview scheduled with the SEC. The July 18th correspondence to Greco was sent in bad faith and in furtherance of the Silencing and Retaliation Scheme.

470.    The July 18, 2017 threat of litigation came just a month after Greco's June 2017 SEC Supplemental Disclosure to the SEC and June 14th provision of sworn testimony to the SEC, in which Greco informed the SEC of specific incidents of continuing misconduct and violations of federal law by Mallouk and Creative Planning, including particularized information related to specific advisory clients and transactions.

*471.*    The July 18th letter ominously warns Greco against exercising his fiduciary duties owed to advisory clients by making further complaints or disclosures about Creative Planning's improper handling of clients, providing in pertinent part:

> Where you have gone far astray is attempting to justify the solicitation of Creative's clients under the false pretense of complying with your alleged fiduciary duties owed to a Creative client.  You cannot escape the legal consequences of dishonorably violating the terms and provisions of the Agreement by claiming you were only acting honorably in contacting Creative's clients to inform them of practices you unilaterally believe are non-compliant. No court in the land has found that former employees are free to violate their non-solicitation provisions so long as they are advising that client of a practice the former employee believes is wrongful. Otherwise, every former employee could solicit employees under this exception.

472.    Spotlight's in-house counsel responded to both the July 17th and 18th letters, denying the unfounded accusations, and requesting Creative Planning supply factual support thereof.

473.    In a responsive e-mail from Mallouk/Creative Planning's attorneys, dated July 28, 2017, they confirmed Mallouk had no factual basis to send the cease-and-desist letter to Mitchell, admitting: "As an aside, Mr. Mallouk wanted me to convey that we did not and *have not accused Mitchell of breaching his contractual obligations. The letter was intended to bring to his attention the restrictive covenants and terms and conditions of his post-employment responsibilities."*

474.    On July 30, 2017, despite having retained legal counsel to handle the matter, Mallouk attempted to contact, via telephone, Spotlight's in-house counsel directly.

475.    On July 31, 2017, Creative Planning and Spotlight participated in a conference call where Creative Planning threatened to bring suit to collect damages, including sevenfold liquidated damages, if Greco did not cease–and-desist all communications with former advisory clients and agree to enter a settlement involving confidentiality and a referral fee payment to Creative Planning for any advisory client that follows Greco to Spotlight.

476.    In an e-mail dated August 1, 2017, from Spotlight to Creative Planning, Spotlight conveyed that while Greco continues to deny any violations of any post-employment obligations, he nevertheless "*is willing to continue discussing a resolution*" and appreciates the "*inherent benefit of resolving this matter without wasting further time and expense.*" Spotlight was a newly formed RIA wanting to concentrate its limited start-up resources on building its RIA business, not on defending trumped up accusations against its CEO, Greco.

477.    The August 1, 2017 e-mail directly addressed Greco's 2017 SEC Whistleblower Action, explaining in pertinent part:

> To understand my client's [Greco's] position, it is important to understand why he became an SEC whistleblower to begin with. Greco did not become a whistleblower as part of some convoluted scheme to take a small handful of client. Rather, Greco first sought the counsel of experienced whistleblower attorneys months before resigning because of his reasonable belief that Mr. Mallouk and Creative Planning had violated, and continued to violate, the federal securities laws. Specifically, Greco strongly believes that Mr. Mallouk put his own interests, and those of Creative Planning's, ahead of the interests of Creative's clients by taking actions that prioritized amassing assets under management over his ethical obligations, proper risk management, and his fiduciary duties to clients. ***By the end of the next week, Greco will have made three submissions to the SEC consisting of nearly 100 pages, including supporting documentation that detail his beliefs.*** The catalyst for these submissions was the same as the catalyst for Greco's contact with certain clients, to uphold his fiduciary duties and ethical obligations. As I have stated previously, Greco contacted many clients not to "solicit or induce" them to "cease, diminish, or not commence doing business" with Creative, but to inform them of his departure and, in some cases, apprise them of the

121

fact that he had discussed their situations in submissions he made to the SEC. For that reason, any proposal involving Greco paying a referral fee is a non-starter. (emphasis added)

478.     Greco felt he was being coerced to enter into a settlement agreement with Creative Planning. Creative Planning made it clear that the only way he could stop its deluge of harassment, intimidation, and threats was through a settlement on Creative Planning's terms. Greco remained constant in his commitment to advisory clients and refused to enter into any settlement that included him sharing advisory fees, whether through referral or otherwise, with Creative Planning because of the misconduct Creative Planning had engaged in related to advisory clients. See Exhibit B.

479.     The August 1, 2017 e-mail further demanded Creative Planning cease certain collusive information sharing related to advisory clients (memorializing a phone conversation between Spotlight Creative Planning) that could harm clients, providing: *"Specifically, it is our understanding Creative moved some customer accounts out of active management and to TD Ameritrade retail accounts without informing the clients. It is also our understanding that there may have been some sort of collusion between Creative personnel and TD Ameritrade personnel by which confidential customer information, of TD Ameritrade customers, was related to Creative. Regardless of the result of any negotiations …Greco would like all such activity to cease."*

*480.*     In a responsive e-mail sent via wire on August 1, 2017, Mallouk and Creative Planning's attorney demanded a settlement involving revenue-sharing on fees from advisory clients, and threatened immediate legal action, stating in pertinent part: *"The revenue share option was reasonable and this is how we get this done without litigation. I am surprised at Greco's response and it really does not give me much to go over with Peter. Will you accept service of a complaint and Motion for TRO on behalf of Greco and Spotlight?"*

481.    Mallouk and Creative Planning knew Greco had reported their breach of fiduciary duties and other misconduct, including toward specific advisory clients, to the SEC in June 2017. They also knew it would be improper for Greco to pay any referral fees to Creative Planning in connection with any advisory fees Spotlight might collect from those advisory clients in the future.

482.    Mallouk directed their attorney to fraudulently threaten, in bad faith, to file a TRO, apparently in a last-ditch effort to silence Greco. It was solely intended to impede and deter Greco's upcoming provision of information, sworn testimony, and other August cooperation on matters involving Creative Planning's violations of federal law being investigated by the SEC.

483.    Mallouk is a licensed Kansas attorney and knows Creative Planning had no basis upon which a court could grant the extraordinary relief he was threatening with a TRO. Mallouk maliciously timed his threat against Greco, just a week before Greco was scheduled to give additional sworn testimony to the SEC, intending Greco rely upon the sham threat in furtherance of the Silencing and Retaliation Scheme. Not surprisingly, when Greco did not cave to Mallouk's demands, Creative Planning did not file a TRO.

484.    On or around August 9, 2017, Greco provided sworn testimony related to Creative Planning's violations of federal law and 2017 SEC Whistleblower Action, to the SEC, in an interview lasting more than ninety (90) minutes.

485.    By September 2017, the combination of providing information and cooperation to the SEC while simultaneously defending against Mallouk and Creative Planning's deluge of accusations, threats, intimidation, coercion, attempts at silencing, and retaliation, became all-consuming of Greco's time and attention, making it difficult for him to find enough time to dedicate to growing his new business, Spotlight. See Exhibit B.

486.    After standing firm for months, and making it very clear that he would not share advisory fees with Mallouk/Creative Planning, Greco was finally able to negotiate a settlement with Creative Planning that involved Greco paying a nominal lump sum payment of $6,000.00 to Creative Planning, as well as a mutual non-disparagement agreement that Greco hoped would finally end all disputes between himself and Creative Planning/Mallouk, and more importantly, end their ongoing malicious Silencing and Retaliation directed at Greco and Spotlight.

487.    On September 5, 2017, Greco and Creative Planning entered into a "Settlement Agreement" containing mutual releases of claims, payment by Greco to Creative Planning of a nominal settlement amount of six thousand dollars ($6,000.00) and a mutual non-disparagement agreement which provided:

> 10. Non-Disparagement.
>
> Employee covenants and agrees that he will not make any disparaging or defamatory remarks against or concerning the Company or any of the Company Releasees. ***The Company covenants and agrees that neither it, nor any of its employees, will make any disparaging or defamatory remarks against or concerning Employee.*** Nothing in this Paragraph is intended or should be construed to broaden the Parties' obligations for actions taken by employees outside the scope of their employment or for which the Parties would not otherwise be responsible under principles of vicarious liability. Employee represents that as of the Effective Date of this Agreement, he has not made any defamatory or disparaging comments concerning the Company or any of the Company Releasees on any social media or other internet communications platform. (emphasis added)

488.    Mallouk was a party to the negotiations giving rise to the Settlement Agreement, participated in the drafting and approval of the Settlement Agreement, was aware that the non-disparagement provision was a material provision being relied upon by Greco in entering into the Settlement Agreement, and personally represented to Greco that he was executing the Settlement Agreement in "good faith" and with the intent and authority to ensure Creative Planning performed its obligations pursuant to the Settlement Agreement.

489.     Greco has now come to learn that Mallouk was not acting in good faith when he entered into the Settlement Agreement. Instead, Mallouk intentionally induced Greco to enter into the Settlement Agreement with false representations about his and Creative Planning's intentions, deceptively feigning agreement to be bound by the terms of the Settlement Agreement, while fully intending not to abide by his or Creative Planning's obligations.

490.     Mallouk induced Greco to enter into the Settlement Agreement under false pretenses and in furtherance of the Silencing and Retaliation Scheme.

<u>Creative Planning Targets Other SEC Whistleblowers</u>

491.     Greco is not the only SEC whistleblower Mallouk and Creative Planning have maliciously targeted, attempted to silence, and retaliated against.

492.     In May 2017, Creative Planning's former wealth adviser, Paul Miguel, reported to the SEC that Creative Planning was engaging in specific misconduct he believed was in violation federal law, SEC rules and regulations, including conduct involving the Robbins/Creative Planning Relationship and misconduct in handling advisory client 401Ks.

493.     After Creative Planning learned that Paul Miguel had complained to the SEC, it terminated Paul Miguel and widely disparaged Paul Miguel using a fabricated story that he was terminated for unethical conduct, violations of company policies, and other such wrongdoing.

494.     Paul Miguel complained to Mallouk, but he refused to address Paul Miguel's concerns and instead referred him to Creative Planning's part-time compliance officer.

*495.*     Paul Miguel explains to Creative Planning's De Witt, in a May 2017 e-mail, why he cannot meaningfully complain to Creative Planning's compliance officer, stating in pertinent part: "*I understand that you and Peter may not be happy about me going to the SEC, but I don't believe you can single me out and look for excuses to terminate me as a result of my*

*whistleblowing. What is ironic is that I do not have anyone at the company to report this securities retaliation to because Creative Planning's very own Chief Compliance officer is actually the one spearheading this particular violation."*

*496.* In or around June 2017, Creative Planning attempted to "buy" Miguel's silence and deter him from providing additional information to and cooperation with the SEC by paying Paul Miguel a substantial sum of money, reported by Paul Miguel to be an amount over $250,000.00. See Exhibit B.

497. After paying Miguel, Creative Planning discovered Miguel was nonetheless still providing information and cooperating with the SEC. See Exhibit B.

498. For example, the SEC flew Miguel to its Denver office to provide sworn testimony and information about Creative Planning, in or around October 2017. See Exhibit B.

499. In response to Miguel's continued cooperation and provision of information to the SEC, Creative Planning maliciously accused Miguel of violating his post-employment obligations and filed a frivolous arbitration action against him to silence and retaliate against him and demonstrate to Miguel, Greco, and other current and former employees of Creative Planning that Mallouk will waste Creative Planning's financial resources to deliver a scorched earth, no stone left unturned, barrage of punishment and harm against SEC whistleblowers.

500. Throughout 2018, Creative Planning and Mallouk used multiple methods to harass and intimidate Miguel, including surveillance by private detectives and 3rd parties. Mallouk knew Miguel was suffering from serious health issues that impaired his functioning, unemployed, and without financial means. Mallouk intentionally pressed those weaknesses by directing Creative Planning's abusive discovery practices in the frivolous arbitration against Miguel and its relentless pursuit of the arbitration even after Miguel's condition and financial resources had deteriorated

such that he could no longer afford legal counsel and was unable to provide his own defense in the arbitration.

501.     Creative Planning exploited Miguel's deteriorating health and attempted to use the arbitration discovery process to obtain unrelated information about Greco, Greco's 2017 SEC Whistleblower Action, and communications between Mallouk and Greco related to the information they provided and cooperation with the SEC.

502.     Mallouk and Creative Planning did not file or pursue the arbitration against Miguel for any legitimate reason. They did it to silence and retaliate against him, knowing he was in poor health and without financial resources. Creative Planning spent tens of thousands of dollars punishing Miguel through the frivolous arbitration, knowing it could never recover from Miguel on any arbitration award.

503.     In Fall 2018, Miguel testified in a deposition Creative Planning took to coerce him to provide communications and information related to Greco and the 2017 SEC Whistleblower Action. Mallouk refused to produce text messages and other information, testifying he was refusing to produce on the basis that Greco was also an SEC Whistleblower, against Creative Planning and AMTD, and he would therefore not disclose any communications or information related to Greco, their SEC whistleblower complaints, and related cooperation in the SEC investigations. See Exhibit B.

504.     In less than 60 days after Paul Miguel's deposition, Mallouk had begun disparaging and defaming Greco to AMTD and industry reporters, such as reporters for the Wall Street Journal.

505.     In or around November 2018 and throughout January 2019, Mallouk and Creative Planning used mail/wire to communicate with AMTD about Miguel's Fall 2018 deposition testimony, Greco's 2017 SEC Whistleblower Action, and a fabricated story by Mallouk, that

consisted of false, disparaging, misleading and selective disclosure of the 2017 SEC Whistleblower Action and about Greco. For example, Mallouk focused on the portions of the 2017 SEC Whistleblower Action involving the RIA Services Scheme and Defendants' collusive action, while minimizing and omitting portions related to the AdvisorDirect® Program Commercial Bribery Scheme and other specific misconduct by Mallouk and Creative Planning.

506.    In or about late 2018 to early-January 2019, AMTD affirmatively agreed to join Mallouk and Creative Planning in carrying out the Silencing and Retaliation Scheme. AMTD and Creative Planning worked together to come up with a coordinated response to Silence Greco and deter Greco from making any further reports to the SEC or providing it any further information and cooperation related to his 2017 SEC Whistleblower Action, deter Greco from making any disclosures of information of public concern, and retaliate against Greco for the 2017 SEC Whistleblower Action.

507.    Mallouk directed numerous employees of Creative Planning, and agents of Creative Planning, to disparage and defame Greco and Spotlight to AMTD branch employees and others at AMTD, as part of his efforts to discredit Greco and otherwise in furtherance of the Silencing and Retaliation Scheme.

508.    For example, in or around November –December 2018, Mallouk directed Creative Planning's Managing Director in Chicago, Michael Moleski, to disparage Spotlight and Greco to AMTD branch employees in Chicago.

509.    Shortly thereafter, in December 2018, Moleski attempted to interfere with and deter an experienced and qualified former AMTD financial advisor from pursuing an open position at Spotlight by disparaging and defaming Greco, misrepresenting that Greco was dishonest, misrepresenting that Greco had lied to the SEC about Creative Planning and AMTD, and that

Greco had done so to get people in trouble and steal clients. Notably, Moleski was one of the bad actors reported to the SEC in Greco's 2017 SEC Whistleblower Action.

510.     On multiple occasions during the period March 2017 through the present, Mallouk and used mail and wire to disparage, defame and discredit Greco to Industry reporters and journalists.

511.     For example, in an e-mail dated February 9, 2020 from Ian Wenik, a reporter for *CityWire*, sought comment from Mallouk on a story he was working on which examined the relationship between Creative Planning and AMTD.

512.     On February 10, 2020, Mallouk responds to Ian Wenik, via email and in pertinent part: "*I'm looking forward to responding to this. It's unfortunate that you built a story around someone like Steve Greco without looking into what is going on in his own firm to get some context.*"

513.     In an e-mail dated February 11, 2020, Ian Wenik explains to Mallouk, in pertinent part: *If you want to argue on the record that Steve Greco is not a credible witness, then we can publish that. But he is only one of several sources of information (both human and documentary) we are using in this article and the story will be far more comprehensive if you respond in substance to the questions we have sent as well. We want to publish a fair and accurate story but ultimately it is up to you to decide what you want to say in it.*

AMTD's Participation in Silencing and Retaliation Scheme

514.     By 2019, Spotlight had established a robust client base, with hundreds of millions of advisory client AUM,  through its development of proprietary investment models (Dynamic ETFs, Individual Stocks and Tactical Strategies) and its unparalleled ability to apply combinations of its proprietary investment models, as well as custom-built client-specific investment models, to

achieve impressive outcomes and provide its clients with effective in-depth financial planning and investment recommendations.

515. In early January 2019, Greco was told by his AMTD institutional contact, Alisa Kolodizner (Vice President of Institutional Sales), that AMTD had begun contacting AMTD employees and asking probing questions about Greco and Spotlight's business.

516. On January 20, 2019, Kolodizner advised Spotlight that the head of AMTD's AdvisorDirect® Program, Jay Keller (identified and implicated in Greco's 2017 SEC Whistleblower Action), was alleging Spotlight was soliciting AMTD clients and telling others that he was going to "*dig into things*." Kolodizner told Greco that she believed Keller was trying to dig up dirt on Spotlight, because his reason for the call didn't make much sense.



517. In January 2019, Spotlight hired a former financial advisor of AMTD ("Former AMTD Adviser 1"), who had resigned from AMTD in late 2018, before seeking employment with Spotlight.

518.    On January 18, 2019 AMTD sent Former AMTD Adviser 1 a letter alleging violations of post-employment obligations and threatening legal/enforcement action. AMTD did not provide a single specific example or detail substantiating its vague accusations.

519.    Former AMTD Adviser 1 denied any activities in violation of post-employment obligations to AMTD, and immediately disclosed the threatening letter to Spotlight.

520.    On January 24, 2019, Spotlight responded to AMTD's correspondence to Former AMTD Adviser 1, denying the allegations and further clarifying Spotlight's commitment to ensuring Former AMTD Adviser 1 adheres to all post-employment obligations owed AMTD. Spotlight further affirmed that it values its relationship with AMTD "*as one of its primary custodians*" and is committed to resolving the issue. Spotlight explicitly requested that AMTD provide it with "*any evidence" or examples of actions taken by the financial advisor that violate the post-employment obligations.*

521.    AMTD did not respond to Spotlight or Former AMTD Adviser 1. AMTD did not provide Spotlight with any evidence, information, or examples of specific actions that it considered violations of Former AMTD Adviser 1's post-employment obligations.

522.    AMTD sent the January correspondence to Former AMTD Adviser 1 because it had learned of Greco's identity and Whistleblower Allegations from Mallouk and Spotlight and in furtherance of the Silencing and Retaliation Scheme.

523.    On February 7, 2019, Barry Harlow, one of the DVP's at AMTD, and another individual identified in Greco's 2017 SEC Whistleblower Complaint, told Spotlight's former national director Tony Schmitt ("Schmitt"), in person at their LINC advisor conference, that Greco better be careful because AMTD was going to take a hard stance against Spotlight because of

Greco's prior actions. Immediately thereafter, Schmitt reported the threats made by Barry Harlow to Greco and Spotlight.

524.    Greco was very concerned about AMTD's communications in January 2019 and early –February 2019, so he requested a meeting with institutional leadership for AMTD in Chicago, Gary Ausman ("Ausman") (Managing Director of AMTD Institutional) and Kolodizner.

525.    On February 22, 2019, Greco met with Ausman and Kolodizner to discuss the relationship between Spotlight and AMTD. During the meeting, Greco disclosed the recent correspondence to Former AMTD Adviser 1, as well as the ominous warning Harlow had conveyed to Schmitt on February 2, 2019.

526.    Greco explained that Spotlight valued its relationship with AMTD and, as one of Spotlight's "primary custodians," Spotlight was committed to directly addressing any concerns AMTD had about Greco or Spotlight's conduct.

527.    Greco specifically asked Ausman and Kolodizner whether AMTD objected to Spotlight's hiring of Former AMTD Adviser 1, or any other former AMTD financial advisers, and both denied AMTD had any objections. Ausman promised Greco he would "*look into*" everything discussed and confirm there was no objection to the hiring of Former AMTD Adviser 1.

528.    Ausman and Kolodizner both assured Spotlight that AMTD was not objecting to, and would not retaliate against Spotlight for, its hiring of AMTD financial advisers now or in the future.

529.    On February 26, 2019, AMTD once again sent Former AMTD Adviser 1 another letter about post-employment obligations. AMTD had no factual basis to warrant sending another reminder letter, rather it did so to interfere with Former AMTD Adviser 1 's employment with

Greco and Spotlight, and to threaten, harass, and retaliate in furtherance of the Silencing and Retaliation Scheme.

530.    On March 7, 2019, Greco received a message from Ausman that he had "*looked into things*" and the letters that were sent to Former AMTD Adviser 1 were just "*standard procedure*" and he was told that Spotlight and Former AMTD Adviser 1 had done nothing wrong. Ausman confirmed that AMTD had no objections to Spotlight hiring its former employees and stated that if Greco "*continued to play by the rules*," there would be no issues.  See Exhibit B.

531.    Spotlight responded to AMTD, on March 11, 2019, denying any solicitation or other post-employment violations by Former AMTD Adviser 1 and again specifically requested: *"To the extent AMTD has any evidence that suggests [redacted name] has taken specific actions that violate her employment agreement, please let me know."* Again, AMTD failed to respond to Spotlight's correspondence.

532.    On April 1, 2019, relying upon the assurances from Ausman that AMTD did not object to Spotlight hiring former AMTD wealth advisors, Greco hired Former AMTD Adviser 2. See Exhibit B.

533.    On April 3, 2019, AMTD sent Former AMTD Adviser 2 the same standard form letter, reminding him of his post-employment obligations, that it had sent Spotlight's previous hire.

534.    On April 5, 2019, Spotlight responded to AMTD's letter, on behalf of Former AMTD Adviser 2, and in so doing, it again reiterated the importance of its relationship with AMTD and assured AMTD that it is committed to all of its financial advisors adhering to post-employment obligations to former employers. AMTD did not respond to Spotlight.

535.    On April 17, 2019, AMTD called Spotlight and advised Mitchell that AMTD was refusing to perform under its existing agreement for RIA Custodial Services, was terminating its

business dealings and RIA Custodial Services Agreement with Spotlight, that Spotlight was being removed from AMTD's custody platform, and that Spotlight had 60 days to move 400 advisory clients to an alternative custodian ("AMTD Termination"). See Exhibit B.

536.    During that call, AMTD told Mitchell that AMTD's decision was made because two AMTD employees had resigned from AMTD and were subsequently hired by Spotlight. See Exhibit B.

537.    AMTD sent a confirmatory letter memorializing the call and the AMTD Termination. The letter contained no reason for the AMTD Termination and refusal to deal with Spotlight.

538.    On April 25, 2019, Spotlight sent AMTD a written request for an explanation for the AMTD Termination. Spotlight explicitly sought clarification of whether AMTD's decision was based on Spotlight's hiring of AMTD's former wealth advisers.

539.    Spotlight provided AMTD with evidence of its timely responses to all cease-and-desist letters, its repeated commitment to ensuring Spotlight employees honor post-employment obligations, AMTD's assurances to Spotlight that hiring former AMTD employees was permissible, and Spotlight's repeated requests that AMTD provide them with any information suggesting the former AMTD employees had violated any of their post-employment obligations. See Exhibit B.

540.    AMTD refused to provide Spotlight with any reason for its actions or other substantiating information.

541.    AMTD knew that the AMTD Termination was causing substantial harm to Spotlight and intended Spotlight to suffer harm, lose advisory clients, sustain financial losses, lose IARs, and lose prospective business as a direct result of AMTD's refusal to deal with Plaintiffs.

542.     AMTD understands that Spotlight would be asked by its advisory clients to explain the inexplicable—why AMTD had abruptly terminated its agreement to provide RIA Custodial Services to Spotlight and refused to deal with Spotlight. AMTD knew its actions would damage Spotlight's goodwill and reputation in the industry.

543.     AMTD acted against its own economic and business interests in abruptly terminating its RIA Custodial Services agreement with Spotlight and refusing to engage in financially lucrative business dealings with Spotlight and its advisory clients. There was no good faith, legitimate business reason for the AMTD Termination and refusal to deal with Plaintiffs.

544.     Spotlight justifiably relied on the terms of its RIA Custodial Services agreement with AMTD, and trusted AMTD would uphold their end of the bargain, act in good faith and deal fairly with Spotlight and its clients.

545.     Spotlight fulfilled its performance obligations to AMTD under the RIA Custodial Services agreement and did nothing to excuse AMTD's performance of its contractual obligations to Spotlight, or otherwise justify AMTD's refusal to deal with Spotlight.

546.     AMTD terminated its existing agreement to provide RIA Custodial Services to Spotlight and then engaged in "blacklisting" Spotlight and refusing to deal with Spotlight, in furtherance of the Silencing and Retaliation Scheme.

547.     On May 17, 2019, AMTD sent AMTD Adviser 2 another form letter reminding him of his post-employment obligations. The letter was nearly identical to the prior letters AMTD had sent both former AMTD advisers. Conspicuously missing from the correspondence was any factual allegations that would substantiate AMTD claims of solicitation or give rise to violations of his post-employment obligations.

548.     On May 21, 2019, Spotlight responded on behalf of AMTD Adviser 2 and denied any solicitation or other violations of post-employment obligations. Again, Spotlight invited AMTD to share any specific information or concerns. AMTD did not respond to Spotlight.

549.     AMTD sent the letters to AMTD Adviser 2 for the purpose of interfering with his relationship with Plaintiffs, as well as in furtherance of the Silencing and Retaliation Scheme.

550.     On July 3, 2019, AMTD filed a FINRA Arbitration Action against the former wealth advisers, as well as Greco even though FINRA has no jurisdiction as to Greco ("AMTD Arbitration"). AMTD used wire to file and serve the AMTD Arbitration through FINRA's electronic portal.

551.     The AMTD Arbitration was legally and factually baseless and brought in furtherance of AMTDs participation in the Silencing and Retaliation Scheme.

552.     AMTD's actions in filing the FINRA arbitration caused Spotlight and Greco to suffer injury and damage, including interference with employee relationships, interruption of business operations, loss of clients and revenue, interference with existing contract, and expenses and attorney's fees directly related to the FINRA arbitration.

553.     The frivolous FINRA arbitration was resolved and dismissed on or around December 20, 2019.

554.     On September 30, 2019, AMTD locked Spotlight out of its platform and denied it access to Spotlight's customer accounts that were still in custody with AMTD ("AMTD Lock-out").

555.     The AMTD Lock-out prevented Spotlight advisory clients from accessing their own accounts, as well as prevented Spotlight from accessing those accounts. The AMTD-Lockout

effectively rendered the Spotlight advisory client accounts at AMTD "unmanaged" and susceptible to harm and losses during the pendency of the AMTD Lock-Out. See Exhibit B.

556.    AMTD violated its duties as a custodian to Spotlight's advisory clients, and otherwise acted against its own business interests by engaging in the AMTD Lock-Out.

557.    Spotlight immediately communicated with AMTD, objected to the AMTD Lock-Out, explained the harm to Spotlight advisory clients, and demanded and received temporary access to the remaining Spotlight advisory client accounts at AMTD, pending the transfer of the accounts to Spotlight's new Qualified Custodian. See Exhibit B.

558.    The AMTD-Lockout was extreme, unnecessary, unjustified, in utter disregard of advisory client interests and, done by AMTD in furtherance of the Silencing and Retaliation Scheme.  AMTD used mail and wire to carry-out the AMTD Termination.

559.    At all relevant times, AMTD used mail and wire to charge and collect supra-inflated prices for lower quality RIA Custodial Services to Spotlight and its advisory clients, as compared to Creative Planning and Participating RIAs.

560.    AMTD has used mail and wire to make countless false and disparaging statements about Greco and Spotlight to other industry professionals, Spotlight's advisory clients, and Spotlight's prospective employees and advisory clients. AMTD has done so on multiple occasions, and on a consistent basis since at least January 2019 in furtherance of the Silencing and Retaliation Scheme.

561.    In or around February or March 2019, AMTD advised Schwab of Greco's 2017 SEC Whistleblower Action and AMTD, Mallouk, and Creative Planning's Silencing and Retaliation Scheme.  Schwab joined the Silencing and Retaliation Scheme.

Schwab's Participation in Silencing and Retaliation Scheme

562.    In response to AMTD's early 2019 conduct toward Spotlight, Greco engaged in discussions with Schwab to provide Spotlight with RIA Custodial Services. Greco believed it would be in Spotlight's best interests to have another qualified custodian to work with, in light of the threatening communications he was receiving from AMTD in early 2019.

563.    In March 2019, Spotlight and Schwab negotiated terms under which Schwab would provide RIA Custodial Services to Spotlight, including Spotlight committing to transferring at least $50-100 million of its existing advisory client AUM to Schwab.

564.    On April 1, 2019, Schwab used mail/wire to send Spotlight a proposal and application summarizing the terms of participation in its RIA Custodial Services program.

565.    On April 8, 2019, Spotlight hired a former Schwab financial consultant ("Former Schwab Advisor"), who had left his employment with Schwab in December 2018, almost 8 weeks before pro-actively reaching out to a recruiter who was working on Spotlight's behalf. See Exhibit B.

566.    On or about the same date of hiring Former Schwab Advisor, Greco advised Schwab of the new hire. Schwab did not object.

567.    On April 17, 2019, Spotlight received approval from Schwab and executed the RIA Custodial Services Agreement with Schwab. Shortly thereafter, Spotlight began transferring advisory clients to Schwab, in reliance upon its good faith representations made during its solicitation of Spotlight, as well as in reliance upon Schwab's good faith performance of its obligations pursuant to the RIA Custodial Services Agreement.

568.    At all relevant times, Schwab was dealing with Spotlight in bad faith and pursuant to the Silencing and Retaliation Scheme. It made fraudulent and misleading representations to

138

Spotlight, via mail and wire, on multiple occasions during March and April 2019 to induce Spotlight to enter into an RIA Custodial Services Agreement and transfer its advisory clients from AMTD to Schwab, for purposes of compounding the damage to Spotlight, as set forth herein.

569.    On April 22, 2019, Spotlight and Former Schwab Advisor received notification that a branch communication went out to all employees of his old office regarding his new employment at Spotlight. See Exhibit B.

570.    Also, on April 22, 2019, Schwab sent a letter to Former Schwab Advisor, which was received on April 23, 2019, and immediately shared with Spotlight. See Exhibit B.

571.    The letter threatened litigation if any Schwab advisory clients followed Former Schwab Advisor to Spotlight. See Exhibit B.

572.    On May 8, 2019, Spotlight was introduced to its new Schwab institutional contact, Chris Reidy. Instead of working to help Spotlight on-board new clients to its RIA Custodial Services program, as Schwab represented to Spotlight that its institutional contact would do, Reidy threatened Spotlight that if any clients followed Former Schwab Adviser, Schwab would terminate its RIA Custodial Services Agreement with Spotlight. See Exhibit B.

573.    Greco asked whether the Former Schwab Adviser had engaged in any improper conduct. Reidy could not identify a single instance of improper conduct or any post-employment violations by Former Schwab Advisor. See Exhibit B.

574.    Schwab did not have any good faith basis to assert that Former Schwab Advisor had engaged in any conduct that violated his post-employment obligations, rather Schwab was making the intimidating, harassing, and accusatory threats in furtherance of its participation in the Silencing and Retaliation Scheme.

575.    Schwab's conduct was nearly identical to AMTD's actions against Spotlight.

576. On May 10, 2019, Spotlight received a voice-mail message from Reidy at 4:30 PM central time. The message was to inform Spotlight that Schwab had become aware that Former Schwab Advisor was having lunch with a Schwab advisory client. See Exhibit B.

577. On May 13, 2019, Spotlight sent a letter to Schwab memorializing their prior conversation in which Reidy threatened to terminate the RIA Custodial Services Agreement with Spotlight and refuse to deal with Spotlight.

578. On May 29, 2019, Schwab filed a FINRA Arbitration action against the Former Schwab Advisor.

579. The FINRA arbitration was frivolous and was filed by Schwab in furtherance of the Silencing and Retaliation Scheme.

580. Schwab used the FINRA arbitration as pretext to communicate with Defendants about Plaintiffs and conspire and coordinate their actions in furtherance of the Silencing and Retaliation Scheme. For example, Schwab used the FINRA arbitration to seek discovery from Spotlight, a non-party to the matter, about its relationship and communications with Fidelity and other unrelated and irrelevant matters.

581. Schwab's actions in filing the FINRA arbitration caused Spotlight and Greco to suffer injury and damage, including interference with employee relationships, interruption of business operations, loss of clients and revenue, interference with existing contracts, and expenses and attorney's fees directly related to the FINRA arbitration. The frivolous FINRA arbitration was resolved and dismissed on December 6, 2021.

582. At all relevant times, Schwab knew that AMTD had terminated its RIA Custodial Services Agreement with Spotlight and Spotlight was transferring its advisory clients to Schwab.

583.     Despite knowing and intending, in furtherance of the Silencing and Retaliation Scheme, that it was going to participate in a group boycott and refusal to deal with Spotlight, Schwab nevertheless solicited and encouraged Spotlight to enter into a business relationship with it and execute the RIA Custodial Services Agreement with it in April 2019.

584.     Schwab further elicited and encouraged Spotlight to transfer its advisory clients from AMTD to Schwab, deliberately delaying any notification or suggestion that Schwab was considering bad faith breach of the RIA Custodial Services Agreement, refusing to supply Spotlight RIA Custodial Services, and related participation in the group boycott.

585.     Schwab and AMTD timed and coordinated their collusive and deceptive plans to cause Spotlight to rely in good faith on Schwab's continued performance of its obligations under their RIA Custodial Services Agreement and encourage Spotlight to transfer as many advisory client accounts as possible to Schwab.

586.     Schwab and AMTD knew and intended the devastating reputational harm, costs, loss of time, interruption of business operations, and other damages Spotlight would sustain from two consecutive terminations of RIA Custodial Services Agreements, by two of the largest qualified custodians, and the related transfer of the very same advisory clients, once again in less than a 3-month period of time, to another qualified custodian.

587.     On July 1, 2019, Schwab notified Spotlight that it was refusing to perform under the existing agreement for RIA Custodial Services, terminated its business dealing with Spotlight, was removing Spotlight from its RIA Custodial Services platform, was requiring Spotlight to transfer its advisory client accounts within 90 days, and would be locking Spotlight out of access to Schwab's custodial platform regardless of whether all advisory clients were transferred by expiration of the ninety day period ("Schwab Termination").

588. Schwab continued to send mail/wire communications and use mail/wire in connection with its termination of business dealings with Spotlight and transfer of Spotlight's advisory client accounts to the new custodian.

589. At all relevant times, Schwab used mail and wire to charge and collect supra-inflated pricing for lower quality RIA Custodial Services to Spotlight and its advisory clients, as compared to Creative Planning and Participating RIAs.

*Schwab Acquisition of AMTD*

590. During 2019 and 2020, Schwab and AMTD were in negotiations for Schwab to acquire AMTD. As part of that process, Schwab and AMTD were sharing detailed information and strategies, including potential exposure for violations being investigated by the SEC as a result Greco's 2017 SEC Whistleblower Action.

591. Schwab and AMTD knew they would face DOJ scrutiny and knew Greco was in possession of information that, combined with his expertise, could prove fatal to their efforts, especially in light of Mallouk's representations about the scope of information Greco possessed, the intentions of Greco, the Miguel Arbitration, and the 2017 SEC Whistleblower Action.

592. During 2019 and 2020, Schwab, AMTD, Mallouk and Creative Planning actively conspired to Silence and Retaliate, and set out to do so by, among other things by using mail and wire to: intentionally causing Spotlight substantial business interruptions; interfere with Spotlight's existing contracts and access to essential inputs, such as RIA Custodial Services and IAR labor; deliberately and in bad faith inducing Spotlight to enter into an RIA Custodial Services Agreement with Schwab, transfer advisory clients from AMTD to Schwab, and then have Schwab summarily breach the RIA Custodial Services Agreement, refuse to provide RIA Custodial Services to Spotlight, impose onerous post-termination transfer conditions, and engage in related

conduct designed to injure Spotlight; make the malicious AMTD Termination and Schwab Termination; file and serve the frivolous and bad faith AMTD Arbitration and Schwab Arbitration; and disparage, defame, and discredit Greco and Spotlight.

593.    AMTD and Schwab have a pattern of retaliating against individuals and RIAs that do not "*play by their rules,*" which is what they did to Spotlight and Greco through their calculated actions in furtherance of the Silencing and Retaliation Scheme. AMTD and Schwab have filed scores of arbitration actions, as well as state and federal lawsuits, against RIAs and IARs to Silence and Retaliate.

Greco's 2020 DOJ Complaint

594.    On or about February 12, 2020, Spotlight, through Greco, filed a complaint with the United States Department of Justice relating misconduct by Creative Planning, AMTD, and Schwab, such as:

> Material aspects of Greco's 2017 SEC Whistleblower Complaint, such as collusive practices engaged in between AMTD and Creative Planning; the AdvisorDirect® Commercial Bribery Scheme, improper incentives, material omissions, false and misleading representations made by Creative Planning to SEC auditors, and changes in AMTD programs occurring after the filing of the Greco's 2017 SEC Whistleblower Complaint;

> a.    Efforts by Mallouk and Creative Planning to confirm Greco's identity as the Whistleblower, discover the scope of Greco's reports and information provided to the SEC, and Silence and Retaliate against Greco for the 2017 SEC Whistleblower Action;

b.      Schwab and AMTD's bad faith and retaliatory termination of existing contractual relationships with Spotlight and refusal to deal with Spotlight, including refusal to supply Spotlight RIA Custodial Services; and

c.      Schwab and AMTD's collusive, anti-competitive, and unfair conduct causing harm to the Independent RIA Market, including manipulation of the IAR Labor Market.

595.    The DOJ immediately began investigation of Greco's complaint, contacting him on February 13, 2020, and conducting an extensive interview on February 20, 2020. Greco was interviewed by the DOJ on February 20, 2022. See Exhibit B.

Creative Planning's 2020 Silencing and Retaliation

596.    In February 2020, Mallouk had just sold a minority interest in Creative Planning to General Atlantic, without informing it of the 2017 SEC Whistleblower Action, Creative Planning's ongoing RIA Services Scheme, and the Silencing and Retaliation Scheme. Within days of Greco's February 13th submission to DOJ, Mallouk learned of its existence, as well as the general substance of the 2020 DOJ Complaint.

597.    On February 20, 2020, Creative Planning directed its attorneys to send a letter to Spotlight, and five individual shareholders of Spotlight, via mail/wire, which identified the law firm as "*litigation counsel*" and then accused Greco, "*presumably on behalf of Spotlight*," of making disparaging and inaccurate statements about Creative Planning. Creative Planning alleged the statements had been made to third parties "*affiliated with the financial/investment industry*" and reporters of trade/financial publications, in violation of Greco's post-employment obligations (confidentiality and non-disparagement) to Creative Planning.

598. While Greco is a former employee of Creative Planning, Spotlight has no relationship with or contractual obligations to Creative Planning and the letter failed to identify any actual statement made by Greco or why Greco was acting "*presumably on behalf of Spotlight*." The correspondence was devoid of any substantiating facts and was sent in bad faith to Silence Greco.

599. The February 20th letter threatened Spotlight and its "*owners*" with legal action, in part, warning: "In addition*, Greco's public disparaging statements regarding CPI [Creative Planning] constitute tortious interference with CPI's contractual and business relationships with clients and third parties **for which Spotlight and its owners will be liable.** As a result of the tortious and malicious conduct of Greco, individually and for the benefit of Spotlight, CPI has suffered the loss of business opportunities and damage to its refutation, which damages may **easily exceed tens of millions of dollars**.*" (emphasis added)

600. Creative Planning and Mallouk sent the February 20, 2020 letter in bad faith, knowing the accusations and threats against the owners were wholly unfounded, but intending the owners to believe the representations and rely upon the threats of legal action, and in so doing cause the owners to act to Silence Greco, and otherwise deter his communications and cooperation with federal law enforcement, in particular the DOJ and SEC.

601. On February 21, 2020, Spotlight and Greco responded to Creative Planning by denying the allegations made in the February 20, 2020 correspondence and requesting factual support for the unfounded and malicious threats and accusations.

602. Creative Planning refused to provide any information other than the name of two trade publications (but not the names of any reporters, content of communications, dates of

communications, etc.) and a further threat that it would be "*prepared to submit compelling evidence to the court*."

603. On April 9, 2020, just two months after Greco filed his 2020 DOJ Complaint, Creative Planning used wire to file suit in the United States District Court for the District of Kansas, making vague allegations of disparagement and breach of contract without providing any of the necessary details concerning the time, place, manner, motivation, content, or recipients of Greco's challenged speech. Notably, it did not name any of the owners as threatened in its February 20th correspondence.

604. Creative Planning amended its federal complaint on April 16, 2020, but the amended complaint was equally factually and legally deficient. Plaintiffs filed a motion to dismiss the federal case. Creative Planning did not even attempt a response, rather voluntarily dismissed the federal action on June 11, 2020.

605. In a very transparent attempt to dodge accountability for its specious pleadings in federal court, Creative Planning filed a similarly factually deficient single count complaint against Greco in state court in Johnson County, Kansas on June 11, 2020. *Creative Planning, LLC f/k/a Creative Planning, Inc. v. Stephen A. Greco, et. al.,* 20 CV 02465 ("Kansas Case").

606. Shortly thereafter, Creative Planning filed yet another "4th bite at the apple," and amended its original complaint filed in the Kansas Case, adding Spotlight, but still failing to add any factual specificity.

607. General Atlantic participated in Creative Planning's decision to file the Kansas Case, as well as the prior federal litigation. Mallouk contrived the plan to file the Kansas Case and directed Creative Planning's filing of the federal and state litigation against Spotlight and Greco.

608.    Spotlight and Greco were served by Defendants in October 2020 and immediately filed a Motion to Strike on November 23, 2020, pursuant to Kansas "Anti-SLAPP Act," K.S.A. 60-5320, as Greco's communications regarding Creative Planning, since his departure in 2017, have been limited to facts and information about his 2017 SEC Whistleblower Action and Greco's role as Whistleblower. See Exhibit B.

609.    Mallouk uses wire to communicate with General Atlantic, Schwab, and AMTD about the Kansas Case. Mallouk and Creative Planning filed the Kansas Case in bad faith and in furtherance of the Silencing and Retaliation Scheme.

610.    On November 23, 2020, Greco and Spotlight include portions of its 2017 SEC Whistleblower Complaint in a filing in the Kansas Case.

611.    On November 24, 2020, Schwab's outside counsel, Arnold & Porter, filed a request with the county clerk, for documents in the Kansas Case and begins monitoring the Kansas Case.

612.    Creative Planning regularly provides AMTD and Schwab with information and updates about the Kansas Case and used the deposition of Greco to attempt to discover specific facts about Greco's 2017 SEC Whistleblower Action, 2020 DOJ Complaint, and other cooperation with the SEC. See Greco Dep., pg. 85-87:1-5; 87: 1-24; 88-90:3-4; 92: 1-6; 141: 9-17; 160: 19-24; 161- 162:1-2; 200:21-24; 201: 1-2; 204: 15-24.

Fidelity Joins the Silencing and Retaliation

613.    In 2017, Spotlight entered into an RIA Custodial Services Agreement with Fidelity. Spotlight did so in reliance upon Fidelity's representations that it would act in the interests of Spotlight and help it grow and succeed. For example, in soliciting Spotlight's business, through a letter dated April 4, 2017, from Jonathan P. Matthews, Fidelity's Regional Vice President, Fidelity "sold" its RIA Custodial Services to newly formed RIA, Spotlight, in large part by promising to

help Spotlight "grow" its RIA business and confirming that Fidelity is "*focused on helping your firm succeed*," in pertinent part:

> On behalf of Fidelity Clearing & Custody Solutions, I want to thank you for your interest in Fidelity Brokerage Services, LLC (Fidelity) as a potential custodian **to help you grow your business.** As you evaluate firms in your search for the right resource to support you and your clients, I encourage you to consider the many benefits of working with Fidelity. …
>
> Fidelity Clearing & Custody Solutions is one of the fastest-growing service providers to the independent advisor community. ***Based on our previous discussion, Fidelity Clearing & Custody Solutions is focused on helping your firm succeed by providing resources of substantial breadth and depth***… We appreciate the opportunity to demonstrate how ***we can help support your business, and we look forward to building our relationship with you.*** (emphasis added)

614.     Spotlight relied on Fidelity's promises and representations in selecting and contracting with Fidelity for RIA Custodial Services. See Exhibit B.

615.     Spotlight and Fidelity entered into their RIA Custodial Services Agreement on May 10, 2017. From May 2017 through June 2021, Spotlight utilized Fidelity as one of its primary SEC Qualified Custodians.

616.     At all relevant times, Spotlight complied with all responsibilities and obligations under its RIA Custodial Service Agreement with Fidelity.  See Exhibit B.

617.     At no time did Fidelity notify Spotlight of any alleged breaches, failure to perform, irregularities, or other issues of concern. See Exhibit B.

618.     In March 2021, Spotlight had approximately $370 million in advisory client AUM in custody with Fidelity, pursuant to the terms of their existing RIA Custodial Services agreement.

619.     On March 16, 2021, Greco had a long conversation with Fidelity's representative, Luke Reynolds, about adding more advisors and assets to their relationship. Reynolds expressed

excitement at the prospect and then sent a follow up e-mail to set another telephone call to discuss expansion plans in April.

620.    On or about March 31, 2021, the court in the Kansas Case ruled that a responsive pleading could be amended to include Greco's 2020 DOJ Complaint.

621.    Defendants became concerned about the 2020 DOJ Complaint becoming public in the Kansas Case and conspired and, consistent with their previous pattern of making an immediate pre-emptive strike against Greco, Mallouk and Schwab conspired and agreed to communicate with Fidelity and elicit its participation in the Silencing and Retaliation Scheme.

622.    In March 2021, Creative Planning and Schwab did not have any ongoing business dealings with Plaintiffs, however Fidelity was supplying Spotlight with RIA Custodial Services. Mallouk and Schwab knew that Fidelity joining the Silencing and Retaliation Scheme would essentially sound the "death knell" for Spotlight in the RIA Industry.

623.    On or about April 1, 2021, Schwab's attorney in the Schwab FINRA arbitration against Spotlight contacted Fidelity's in-house counsel, using e-mail and telephone, for purposes of communicating misleading, disparaging, and defamatory information about Greco and his 2017 SEC Whistleblower Action and 2020 DOJ Complaint, intending Fidelity to rely upon those misrepresentations in deciding to join AMTD and Schwab's refusal to supply RIA Custodial Services to Spotlight, group boycotting of Plaintiffs, and Silencing and Retaliation Scheme.

624.    In early April, Schwab's attorney spoke directly to Fidelity's in-house counsel, including inquiring about whether any written communications existed between Spotlight and Fidelity related to Defendants' no-poach policies and other such anti-competitive agreements.

625.    Schwab also elicited Fidelity's participation in the Silencing and Retaliation Scheme, in particular by refusing to perform under its existing RIA Custodial Services Agreement

149

with Spotlight, terminating its business dealings with Spotlight, refusing to supply Spotlight or Greco with RIA Custodial Services, group boycotting and refusing to deal with Plaintiffs, and interference with Plaintiffs and 3rd party business relationships and prospective business dealings.

626.    At the time of Schwab's disparaging communications to Fidelity, Schwab was already the market dominator in the RIA Custodial Services Market and Fidelity had the second largest share. They knew the group boycott and refusal to deal would severely damage Plaintiffs.

627.    Schwab and Fidelity shared concerns that Greco had already provided the SEC and DOJ with some information about Defendants' collusion, RIA Services Scheme, and related anti-competitive practices, and since Schwab's acquisition of AMTD the anti-competitive practices and impact on the relevant markets had escalated.

628.    Fidelity further realized its employee, Luke Reynolds, had given Greco detailed information about the FMAX program and was soliciting Spotlight's utilization of FMAX, which is a technology offering RIAs automated services which is being used by Fidelity in furtherance of the RIA Services Scheme and its anti-competitive objectives.

629.    Defendants shared the concern that Greco's recent actions, such as disclosing the 2020 DOJ Complaint in the Kansas Case, signaled his willingness to provide additional information and analysis to the SEC and DOJ regarding Defendants' ongoing anti-competitive conduct, including use of technologies such as FMAX, iRebal,® Schwab Intelligent Portfolios in furtherance of the RIA Services Scheme.

630.    In or about April- May 2021, Fidelity joined the Silencing and Retaliation Scheme.

631.    On June 24th, 2021, Fidelity used wire to terminate its business relationship and dealings with Spotlight, refusing to supply Spotlight and its advisory clients with RIA Custodial Services, refusing to perform its obligations under the existing RIA Custodial Services Agreement,

and terminating the RIA Custodial Services Agreement with Spotlight. The terms and conditions imposed by Fidelity in connection with its termination of the RIA Custodial Services Agreement and business dealings with Spotlight, including time frame for transferring advisory client, were unreasonable and oppressive (collectively "Fidelity Termination").

632.    Also on June 24, 2021, less than an hour after Greco was informed by Fidelity of the termination, Mallouk posted a cryptic statement through social meeting, "*Play the Long Game. Play the Long Game. Play the Long Game.*" The message was intended to intimidate, harass, and threaten Spotlight and Greco by making it clear Mallouk, and the other Defendants would not tolerate any additional information sharing or cooperation by Greco with the federal government. Mallouk also intended to communicate his deliberate retaliation against Spotlight and Greco.

633.    Spotlight and Greco repeatedly requested Fidelity provide a reason for its abrupt termination of its existing RIA Custodial Services Agreement and flat refusal to deal with Spotlight. Fidelity refused to provide any reason.

634.    There is no legitimate business reason for Fidelity Termination and related actions.

635.    As of June 24, 2021, Spotlight had approximately $400 million in AUM in custody with Fidelity. Fidelity acted against its own financial and business interests in the Fidelity Termination and other action in furtherance of the Silencing and Retaliation Scheme.

636.    Despite repeated requests by Spotlight and Greco, Fidelity refused to reconsider its decision to terminate the RIA Custodial Services Agreement and business dealings with Spotlight.

637.    Fidelity's retaliation against Spotlight and Greco went even further than just action taken against them, Fidelity also blacklisted, and refused to deal with, Spotlight's current and former IARs and advisory clients.  Fidelity has actively published and otherwise communicated its blacklisting to others in the RIA industry.

638.    In July and August 2021, Fidelity repeatedly made phone calls and sent e-mails to interfere with, disparage, and defame Greco, Spotlight, and Spotlight employees for the purpose prevent of interfering their employment opportunities and economic expectancies.

639.    For example, in July 2021, Greco had multiple discussions with Shane Kieler and Mark McFarland, founders of an Independent RIA based in Wisconsin, called "Madison Partners," regarding a referral arrangement that would financially benefit Spotlight and Greco. See Exhibit B.

640.    Spotlight and Madison Partners reached a preliminary agreement that if any Spotlight advisors wished to keep their advisory clients' assets in custody with Fidelity, Madison Partners would hire those advisors and pay Spotlight a referral fee for several years ("Madison Partners Opportunity"). See Exhibit B.

641.    In reliance upon the Madison Partners Opportunity, in July 2021, two Spotlight advisors planned to join Madison Partners and move their advisory clients to Madison Partners. The two Spotlight advisors had client AUM in an amount of approximately $200 million. See Exhibit B.

642.    Fidelity interfered with the Madison Partners Opportunity, specifically refusing to allow the two Spotlight advisors to continue to custody their advisor client assets with Fidelity, even if they were to terminate their employment at Spotlight and join Madison Partners. See Exhibit B.

643.    On or around July 23, 2021, Fidelity employee, Eric Hansen, notified Madison Partners that not only was Fidelity unwilling to deal with or provide RIA Custodial Services to Spotlight, it would also refuse to deal with or provide RIA Custodial Services to any former Spotlight advisors or their advisory clients, even if moved to Madison Partners. See Exhibit B.

644.    There was no legitimate business reason for Fidelity to refuse to supply RIA Custodial Services to former Spotlight advisors and advisory clients.

645.    Fidelity defamed and disparaged Spotlight and Greco and unequivocally published Defendants' group boycott and refusal to deal with Plaintiffs throughout the RIA Industry, including to Madison Partners, in furtherance of the Silencing and Retaliation Scheme.

646.    Madison Partners withdrew from its preliminary agreement with Spotlight, explaining to Greco that Fidelity would not permit it to do business with Greco, Spotlight, or any current or former advisor of Spotlight. See Exhibit B.

647.    As a direct and proximate cause of Fidelity's deliberate and malicious interference with the Madison Partners Opportunity, Spotlight and Greco suffered millions of dollars in concrete economic damages and significant reputational damage.

648.    In August 2021, after being informed that he would not be able to keep his assets custodied at Fidelity if he moved to Madison Partners, a Spotlight advisor sought to establish a custody relationship with Fidelity directly, as he was leaving Spotlight due to the enormous adverse impact and reputational damage Spotlight was sustaining as a direct result of Defendants' actions in furtherance of the Silencing and Retaliation Scheme.  See Exhibit B.

649.    In August 2021, Fidelity denied the former Spotlight advisor access to Fidelity's RIA Custodial Services and the former Spotlight employee was specifically informed, via a phone call with Fidelity employee Tim Connors, that Fidelity was refusing to deal with any current or former employee of Spotlight. See Exhibit B.

650.    In August 2021, another former Spotlight advisor also attempted to establish a custody relationship with Fidelity. Similarly, he was notified by two different Fidelity employees

that Fidelity will not do business with or provide him RIA Custodial Services, even though he was no longer employed by Spotlight. See Exhibit B.

651.     In November 2021, Greco engaged in discussions with another Independent RIA, Strategic Wealth Partners, regarding a potential partnership ("Strategic Wealth Partners Opportunity"). See Exhibit B.

652.     Despite Greco's ardent efforts and record high merger and acquisition activity of Independent RIAs during 2020 and 2021, Greco has been unable to sell Spotlight or find an RIA willing to partner or otherwise enter into business dealings with Spotlight because of Defendants' group boycott and refusal to deal.

653.     In November 2021, Greco reached tentative terms for a partnership agreement between Spotlight and Strategic Wealth Partners. However, based upon widespread industry disparagement of Greco, Strategic Wealth Partners made the partnership opportunity contingent upon approval by both Schwab and Fidelity. See Exhibit B.

654.     In November 2021, Matt Bures from Strategic Wealth Partners reached out to Schwab and Fidelity to inquire if any would object to Greco partnering with Strategic Wealth Partners.

655.     Fidelity responded stating that Greco could join Strategic Wealth Partners but would not be allowed to access Fidelity's RIA Custodial Services platform and Fidelity would not supply RIA Custodial Services to any of his advisory clients.

656.     On or about November 10, 2021, Schwab objected, through its employee Mark Fitzgerald, explaining Greco could not be listed as a principal on Strategic Wealth Partners Form ADV, could not have an equity stake, could not be in management, or be an agent on Schwab's RIA Custodial Services platform. See Exhibit B.

657.     As a direct and proximate result of Schwab's objection and restrictions imposed on Strategic Wealth Partners Opportunity, as well as Fidelity's refusal to provide RIA Custodial Services to Greco or his advisory clients, Greco suffered concrete economic losses and injury to his business and property. See Exhibit B.

658.     On or about February 18, 2021, Greco attempted to enter a business relationship with Zoe Financial. Zoe Financial is a third-party firm that operates a referral network of leads for RIAs like Spotlight.

659.     Spotlight and Greco were in discussions with Zoe Financial to be added to the referral network. Spotlight and Greco were told that things were ready to move forward, but then Zoe Financial suddenly changed their position and refused to allow Spotlight on the referral platform.

660.     Spotlight and Greco suffered millions of dollars in concrete economic damages, as well as reputational harm, as a direct and proximate result of the loss of the Madison Partners Opportunity, Strategic Wealth Partners Opportunity, Zoe Business Opportunity, and other prospective business opportunities.

661.     Greco has lost millions of dollars in equity in Spotlight, as well as his reasonable business expectancies, as a direct result of Defendants' RIA Services Scheme, Silencing and Retaliation Scheme, and other misconduct set forth herein.

662.     In March 2021, Spotlight had total client AUM approaching $450M and approximately 20 employees.

663.     As of the filing of this Complaint, Spotlight has total AUM of $210M and 5 full-time employees. *Id*. at pg. 2, ¶14.

*H. RICO Factual Allegations*

664.    Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court...." 18 U.S.C. § 1964(c).

665.    At all relevant times, Spotlight and Greco are persons who each sustained injury to their respective "*business and property, by reason of the Defendants violation of 18 U.S.C.§ 1962,*" as required under 18 U.S.C.A. § 1964(c).

666.    A violation of 18 U.S.C. § 1962(a) requires the receipt of income from a pattern of racketeering, and the use of that income in the operation of an enterprise.

667.    Under § 1962(b) it is unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

668.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by…any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

669.    It is a violation of 18 USCA § 1962 (d) "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

670.    At all relevant times, Defendants are each "person[s]" pursuant to 18 U.S.C. §§ 1961(3) and 1962, who violated 18 U.S.C. § 1962.

Defendants' Schemes

671.    There are three schemes relevant to Defendants' RICO violations: Creative Planning Fraudulent Growth Scheme; RIA Services Scheme; and Silencing and Relation Scheme.

672.    Defendants conspired, combined, and are carrying out their Silencing and Retaliation Scheme to further conceal their misconduct involved in the other schemes, and *because of* Greco's 2017 SEC Whistleblower Action and 2020 DOJ Complaint, which contained information, data, documents, communications, analysis, and sworn testimony about conduct in furtherance of the Creative Planning Growth Scheme and RIA Services Scheme and RIA Services Scheme.

673.    Defendants conspired and agreed to carry out the Silencing and Retaliation Scheme for the shared purpose and common interest of interfering with, impeding, and discrediting Greco as a witness and the veracity of his reports to the SEC and DOJ; concealing and continuing to carry-out their RIA Services Scheme, and related misconduct; Silencing Greco and Retaliating against Plaintiffs to injure them an punish them because of Greco's 2017 SEC Whistleblower Action and 2020 DOJ Complaint.

674.    Defendants' Silencing and Retaliation Scheme violations are inextricably intertwined with the RIA Services Scheme and Creative Planning Fraudulent Growth Scheme because the underlying conduct involved in those schemes was reported in, and the subject of, the 2017 SEC Whistleblower Action and 2020 DOJ Complaint, and the Silencing and Retaliation necessarily relate thereto.

675.    Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower. *DeGuelle v. Camilli*, 664 F.3d 192, 201 (C.A.7 (Wis.),2011).

RICO Enterprises

676.     An "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 USCA § 1961(4).

677.     The Silencing and Retaliation Enterprise consists of Defendants who are associated together for the shared common purpose of attempting to silence, intimidate, threaten, interfere with, and otherwise deter Greco from further complaints, provision of information, participation in, and other cooperation with the SEC, DOJ, or other federal law enforcement proceedings related to their conduct in furtherance of the RIA Services Scheme and other violations of federal law by the Defendants, in Greco's 2017 SEC Whistleblower Action, and 2020 DOJ Complaint, in violation of 18 U.S.C.§ 1512(b) and (d),  and also to punish and retaliate against Spotlight and Greco for Greco's 2017 SEC Whistleblower Action, and 2020 DOJ Complaint, in violation of 18 U.S.C. § 1513(e)-(f). The Greco Silencing and Retaliation Enterprise began in or around March 2017 and continues into the present.

678.     RIA Services Enterprise consists of Defendants, as well as unnamed co-conspirators and Participating RIAs, who have associated together for the shared common purpose of aligning their economic interests and resources to maximize sales, pricing, and profits by engaging in conduct in circumvention of federal laws and SEC rules and regulations, and dominating the Advisory Services Market, RIA Custodial Services Market, and other anti-competitive ambitions set forth herein.  The RIA Services Enterprise has existed since at least May 1, 2011 and is continuing through the present.

679.     AdvisorDirect® Program Enterprise consists of AMTD, Creative Planning, and unnamed co-conspirators Participating RIAs, associated together through the AdvisorDirect®

Program for the shared purpose of engaging in conduct in furtherance of the RIA Services Scheme, including covert revenue-sharing, circumventing SEC compliance, anti-competitive goals and other such purposes set forth herein. The AdvisorDirect® Program Enterprise has existed from at least January 1, 2012 through the present.

680. Schwab Advisor Network® Enterprise consists of Schwab, Creative Planning, and unnamed co-conspirators Participating RIAs, associated together through the Schwab Advisor Network®  for the shared purpose of engaging in conduct in furtherance of the RIA Services Scheme, including covert revenue-sharing, circumventing SEC compliance, anti-competitive goals and other such purposes set forth herein. The Schwab Advisor Network® Enterprise has existed and has been operating continuously since at least January 2015 through the present.

681. Fidelity Wealth Advisor Solutions® Enterprise consists of Fidelity and unnamed co-conspirators Participating RIAs, associated together through the Fidelity Wealth Advisor Solutions® for the shared purpose of engaging in conduct in furtherance of the RIA Services Scheme, including covert revenue-sharing, circumventing SEC compliance, anti-competitive goals and other such purposes set forth herein.

682. The Silencing and Retaliation Enterprise, RIA Services Enterprise, Fidelity Wealth Advisor Solutions® Enterprise, Schwab Advisor Network® Enterprise, and AdvisorDirect® Program Enterprise are each an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a)-(d).

683. Creative Planning is an Enterprise, within the meaning of 18 U.S.C. §§ 1961(4).

684. Mallouk directed, managed, and conducted the affairs of Creative Planning, through a pattern of racketeering activity, for the purpose of obtaining ill-gotten financial gains and increased market share of the Investment Advisory Services Market.

685.     Mallouk acted in his self-interest, in directing the conduct involved in the Creative Planning Fraudulent Growth Scheme, as he intended it to result in increased valuation of Creative Planning, increased financial gains to him personally, and his national professional recognition.

686.     Mallouk invested the ill-gotten financial gains from the AdvisorDirect® Program into Creative Planning and his other affiliated entities, such as his insurance program, law firm, and accounting businesses.

687.     Mallouk distributed portions of the ill-gotten gains to himself and the various companies and trusts he has established for purposes of concealing and protecting his ill-gotten gain. Mallouk personally obtained hundreds of millions of dollars in sale proceeds from the General Atlantic Partnership Transaction, based on a valuation of Creative Planning achieved by Mallouk's nefarious business practices, unlawful schemes, and investment of the ill-gotten proceeds he derived from the schemes and his racketeering activities.

688.     Creative Planning is an Enterprise, at all relevant times, both during the time Mallouk was the sole owner of Creative Planning, as well as since General Atlantic became a partner in Creative Planning. A corporate employee who conducts the corporation's affairs through an unlawful RICO pattern of activity, uses that corporation as a "vehicle" whether he is, or is not, its sole owner.

689.     Creative Planning, Mallouk, and General Atlantic are liable for Creative Planning's RICO violations during the period of their partnership. In the alternative, in the event Mallouk did make full disclosure to General Atlantic about Greco, Greco's 2017 SEC Whistleblower Complaint, and its conduct in furtherance of the RIA Services Scheme and Silencing and Retaliation Scheme, then General Atlantic is liable for violations by Creative Planning from the earliest date of its partnership, participation in, or decision-making on behalf of Creative Planning.

160

690. At all relevant times, Defendants and each enterprise were engaged in, and/or their activities affected, interstate commerce and/or foreign commerce within the meaning of 18 U.S.C. §§ 1962.

Predicate Acts and Pattern of Racketeering Activity

691. Defendants knowingly, willfully, directly or indirectly, unlawfully participated in, conducted, or managed the operation of the affairs of the Silencing and Retaliation Enterprise, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c) and (d), committing multiple predicate acts of in violation of 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1513 (witness retaliation), and  18 U.S.C. §§ 1341 and 1343 (mail/wire fraud), constituting a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c) and (d), as set forth in more detail herein.

692. Mallouk knowingly, willfully, directly or indirectly, unlawfully participated in, conducted, or managed the operation of the affairs Creative Planning, in furtherance of the Creative Planning Growth Scheme, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c) and (d), committing multiple predicate acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, commercial bribery in violation of 18 USCA § 1961(1)(A);  and violations of 18 U.S.C.§ 1956 (relating to the laundering of monetary instruments), violations of 18 U.S.C.§ 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

693. Greco's 2017 SEC Whistleblower Action reported conduct by Mallouk and Creative Planning, in furtherance of the Creative Planning Fraudulent Growth Scheme and RIA Services Scheme, constituting a pattern of racketeering activity, including:

(a) on thousands of separate occasions involving Referral Clients through AMTD's AdvisorDirect® Program, in carrying out the AdvisorDirect® Commercial Bribery Scheme, engaged in conduct constituting bribery, in violation of 18 USCA § 1961(1)(A);

(b) using mail/wire to transmit false, fraudulent, and misleading representations related to accepting unmanaged assets, monitoring and oversight of unmanaged assets, pricing of advisory services, and other information from AMTD Referral Clients, sending and receiving communications, wire transfers, contracts, documents, and conducting other business through mail/wire in carrying out the AdvisorDirect® Commercial Bribery Scheme and providing investment advisory services, conducting investment transactions, and managing the accounts of AMTD Referral Clients, constituting multiple predicate acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343;

(c) using mail/wire to transmit false, misleading, and fraudulent representations, and omissions of material fact, in the advertising, marketing, and solicitation and of advisory clients, including those related to the Robbins/Creative Planning Relationship, intending the advisory clients to rely upon the false and fraudulent representations in selecting Creative Planning and following recommendations by Creative Planning, constituting multiple predicate acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343;

(d) using mail/wire to transmit and file false, fraudulent, and misleading disclosures and other public communications with the SEC, as well as in connection with provision of information and communications to the SEC (including its concealment efforts) related to the SEC Audit, SEC investigations and proceedings arising from the 2017 SEC Whistleblower Action, knowing the representations to be materially relied upon and to be

162

false, fraudulent and misleading, constituting multiple predicate acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; and

(e) knowingly sending and receiving through wire transfer, and otherwise transacting in the proceeds from unlawful activities, intentionally concealing the nature and source of the ill-gotten proceeds from conduct alleged herein, and investing and using the proceeds from racketeering activities in Creative Planning and other entities owned by Mallouk, including the acquisition of real property, technology and infrastructure, and other valuable assets, in violation of 18 U.S.C.§ 1956 violations of 18 U.S.C.§ 1957.

694.     Defendants knowingly, willfully, directly or indirectly, unlawfully participated in, conducted, or managed the operation of the affairs of the association- in- fact enterprises, set forth herein, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c) and (d), committing multiple predicate acts of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C.§ 1956 (relating to the laundering of monetary instruments), 18 U.S.C.§ 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), and 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1513 (witness retaliation), in carrying out and concealing their RIA Services Scheme and related misconduct, including: using mail/wire to carry out Inflated Revenue Transactions and Conflicted Transactions that intentionally sell unnecessary services, inflate pricing, and otherwise cause advisory clients to pay unnecessary prices and costs, which Defendants share pursuant to their illegal and collusive agreements in the RIA Services Scheme; using mail and wire to distribute, transmit, and receive the ill-gotten proceeds from their RIA Services Scheme, and to invest such proceeds in their businesses and affiliated companies; using mail/wire to fraudulently induce Spotlight and other non-Participating RIAs to enter into RIA Custodial Services Agreements under

false pretenses and then supplying them with lesser quality RIA Custodial Services at inflated prices; using mail and wire to conduct thousands of separate transactions misrepresenting, carrying-out, and concealing their revenue-sharing, the system of debits and credits used to distribute revenue-sharing, actual services sold to Spotlight and other non-Participating RIAs, actual pricing and costs of RIA Custodial Services; using mail and wire in transmitting, receiving, and transacting in the ill-gotten proceeds from the RIA Services Scheme; using mail and wire in implementing and carrying-out group boycotts, such as the one against Plaintiffs; and other such action in furtherance of the RIA Services Scheme.

695.    Defendants knowingly, willfully, directly or indirectly, unlawfully participated in, conducted,  or managed the operation of the affairs of the association-in-fact Retaliation and Silencing Enterprise, set forth herein, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c) and (d), committing multiple predicate acts of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1513 (witness retaliation), including: in carrying out  and concealing their RIA Services Scheme and related misconduct; carrying out their Silencing of Greco; Retaliation against Greco, and other unlawful conduct constituting predicate acts of racketeering committed by Defendants during the 10 years preceding the filing of this action in carrying out the schemes set forth herein.

## VI.    LEGAL CLAIMS

696.    Plaintiffs' allegations and claims for relief against Defendants, set forth herein, are alleged in the alternative to the extent necessitated for proper construction under the law.

**COUNT ONE**
Violation of the Lanham Act, 15 U.S.C. § 1125(a)
(Spotlight v. All Defendants)

697.    Spotlight repeats, re-alleges, and incorporates by reference each paragraph alleged in this Complaint as if fully set forth herein.

698.    This Count is brought by Spotlight against all Defendants.

699.    The Lanham Act provides in pertinent part: (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, *false or misleading description of fact, or false or misleading representation of fact*, which— (B) In commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, Shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a) (emphasis added).

700.    As described herein, Defendants used in commerce false or misleading descriptions of fact, and/or false or misleading representations fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, related to the nature of Defendants' collusive relationships, advisory client allocation and sharing, revenue-sharing, as well as the source, nature, characteristics, qualities, pricing, suitability, costs, and performance of RIA Services.

701.    Defendants' false statements and misrepresentations in commercial advertising or promotion were likely to, and did, deceive or confuse consumers by creating the impression that the RIA Services were "conflict-free," provided by a fiduciary, in their best interests, sold to them for favorable prices and conditions, and were otherwise suitable and in their best interests. Advisory clients are deceived by Defendants' material misrepresentations and omissions related to RIA Services, because Defendants use covert and concealed practices to engage in Inflated

Revenue Transactions, engage in Conflicted Revenue Transactions, have entered into undisclosed collusive agreements, and otherwise covertly act antagonistically to advisory clients in promoting their aligned interests in maximizing and sharing revenue from RIA Services.

702.    Defendants' false statements and misrepresentations in commercial advertising or promotion for RIA Services are ongoing and material in that they pertained to an inherent quality or characteristic of the RIA Services and were intended to, likely to, and in fact did, influence purchasing decisions.

703.    The RIA Services which were the subject of Defendants' advertising and promotion, are conducted in and disseminated in interstate commerce.

704.    Defendants had an economic motivation for making the representations, as it was in Defendants' economic interest to remain competitive in the marketplace and to sell RIA Services.

705.    Defendants' false representations were targeted at the marketplace and general purchasing public, as set forth herein, in order to influence selection and purchase of their RIA Services.

706.    Defendants' conduct was willful. Spotlight has been, and continues to be, damaged by Defendants' misrepresentations. Spotlight continues to suffer injury, including lost sales, price erosion, increased expenses, and loss of goodwill in the Investment Advisory Services Market. Those economic injuries are likely to continue in the future.

707.    By reason of the foregoing, Defendants are liable to Spotlight for actual damages resulting from Defendants' violations of the Lanham Act, in an amount to be proved at trial, as well as for disgorgement of Defendants' profits resulting from the sales of RIA Services and

unlawful conduct; treble damages due to the extraordinary circumstances of Defendants' misrepresentations; and reasonable attorneys' fees.

## COUNT TWO
Violation of Sherman Act§§1,2 and 3 and Clayton Act § 4, 15 U.S.C. § 15
(All Defendants)

708.   Plaintiffs repeat, re-allege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

709.   This Count is brought by Plaintiffs against All Defendants.

710.   As set forth herein, Defendants are horizontal competitors who combined, conspired, and agreed to engage in the unfair and anti-competitive RIA Services Scheme, Referral Programs, and related collusive agreements for purposes of unreasonably restraining trade in the Investment Advisory Services Market, RIA Services Market, and IAR Labor Market (collectively "anti-competitive agreements").

711.   Defendants' anti-competitive agreements to restrain trade are *per se* illegal. As such, there is no need to assess Defendants' market power or the anticompetitive effects of their conduct.

712.   In the alternative, Defendants' anti-competitive agreements are illegal under a quick look or rule of reason analysis.

713.   Defendants' conduct has had an anticompetitive effect on RIA Custodial Service Market, Investment Advisory Services Market, and IAR Labor Market.

714.   Defendants have market power in the Investment Advisory Services Market, including power to set prices and exclude competition. Defendants are attempting to attain, monopoly power in the Investment Advisory Services Market, and are dangerously close to attaining it.

715.    Defendants have monopsony power in the IAR Labor Market and are using unlawful and illegitimate means to maintain their monopsony power.

716.    Broker-Custodian Defendants have monopoly power in the RIA Custodial Services Market, including the power to set prices and exclude competition, and are using unlawful and anti-competitive means to maintain their monopoly power.

717.    Broker-Custodian Defendants willfully and deliberately acquired monopoly power in the RIA Custodial Services Market and are willfully and deliberately maintaining monopoly power through unlawful and illegitimate means, including the RIA Services Scheme, and as otherwise set forth herein.

718.    Defendants are willfully and deliberately attempting to attain monopoly power through unlawful and illicit means, including the RIA Services Scheme and as otherwise set forth herein, in the Investment Advisory Services Market. Defendants are dangerously close to attaining monopoly power.

719.    Defendants willfully and deliberately obtained monopsony power in the IAR Labor Market, and are willfully and deliberately maintaining their monopsony power, using unlawful and illicit means, including the RIA Services Scheme, and as otherwise set forth herein. In the alternative, Defendants are dangerously close to attaining monopsony power.

720.    Plaintiffs are market participants in all three relevant markets. Spotlight is a consumer in the RIA Custodial Services Market and IAR Labor Market. Greco is a seller in the IAR Labor market.

721.    Spotlight is an Independent RIA and supplier of Investment Advisory Services to advisory clients in the Investment Advisory Services Market.

722.     Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

723.     Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."

724.     Prohibitions on *per se* illegal conduct are at the core of antitrust law's protection of our free enterprise system. "*Its contributions to consumer welfare over the decades have been enormous*."[64]

725.     "*Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused*."[65]

726.     Defendants are horizontal competitors who conspired, combined, and agreed to allocate advisory clients and services, fix prices for RIA Services, engage in group boycott and refusal to deal, manipulate the supply and pricing of IAR labor, manipulate the supply and pricing of RIA Custodial Services, participate in *per se* illegal Referral Programs and concerted action in furtherance of the RIA Services Scheme, which conduct is *per se* illegal and an unreasonable and unlawful restraint of trade in violation of § 1 Sherman Antitrust Act, 15 U.S.C. § 1.

727.     During the relevant period, Defendants used the Referral Programs and other collusive programs to combine, conspire, and agree to (a)allocate and divide advisory clients and the relevant services, (b) generate unlawful profits for themselves by sharing pricing information, agreeing to fix prices, charge discriminatory prices, charge artificially inflated prices, (c) share-

---

[64] Robert H. Bork, The Antitrust Paradox 263 (rev. ed. 1993).

[65] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

revenue from advisory clients and use a covert system of debits and credits to distribute the revenue, (d) engage in group boycott and refusals to deal; ( e) agree to non-competition, non-solicitation, confidentiality, and other restrictive agreements; and (f) share non-public, confidential and competitive business information for purposes of unreasonably restraining trade.

728.    The Referral Programs have no legitimate purpose and are *per se* unlawful pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

729.    Alternatively, Defendants' unlawful conduct and RIA Services Scheme is a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. Defendants' conspiracies, agreements, RIA Services Scheme, Referral Programs, and related misconduct resulted in substantial anticompetitive effects in the Investment Advisory Services Market, RIA Custodial Services Market, and IAR Labor Market. There is no legitimate business justification for, or procompetitive benefits attributable to, Defendants' conspiracies, RIA Services Scheme, Referral Programs, and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein

730.    Defendants have engaged in predatory, exclusionary, and anti-competitive conduct, as set forth herein, including the RIA Services Scheme, Referral Programs, and other unfair and anti-competitive conduct attempting monopolization and wrongfully and intentionally acquiring and maintaining monopoly power, in the RIA Custodial Services Market and Independent RIA Services. Such conduct is in violation of §2 of the Sherman Antitrust Act,15 U.S.C. §2.

731.    By engaging in the conduct described herein, Defendants have knowingly and intentionally combined, conspired, and agreed with their co-conspirators with the specific intent

to unreasonably restrain trade in the markets for RIA Custodial Services, Independent RIA Services, and IAR Labor Market.

732.    Defendants' conduct in furtherance of its contracts, combinations, and/or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representative while actively engaging in the management of Defendants' affairs.

733.    Defendants' anticompetitive conduct is continuing and has targeted and injured Plaintiffs. For example, as set forth herein, Defendants instituted a group boycott and refusal to deal against Plaintiffs and perpetrated the misconduct with the specific intent of harming Plaintiffs and barring Spotlight from effectively operating as an RIA, damaging its goodwill and business reputation, and interfering with, blocking, and otherwise destroying Plaintiffs' current business relationships, contract, and prospective business opportunities in the relevant markets.

734.    Plaintiffs are threatened with future injury to their business and property by reason of Defendants' continuing violation of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C.A. § 26.

735.    Defendants' anti-competitive conduct, as alleged herein, is harming competition in the US markets for RIA Custodial Services, Investment Advisory Services and IAR labor. It is further increasing prices for RIA Services, while diminishing the quality, quantity, differentiation, and selection of available services; diminishing consumer choice; is increasing barriers to entry, and stifling innovation.

736.    Plaintiffs seek, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), a declaratory judgment that Defendants' conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

737.    Plaintiffs further seek equitable and injunctive relief pursuant to §16 of the Clayton Act,15 U.S.C. §26, and other applicable law, to correct for the anticompetitive market effects

caused by the unlawful conduct of Defendants, and other relief to assure that similar anticompetitive conduct does not reoccur in the future.

738.    Plaintiffs have been injured in their business and property by reason of Defendants' violations of Section 1 and 2 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C.A. § 15. Plaintiffs have suffered antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial.

## COUNT THREE
Restraint of Trade in Violation of Section 7 of the Clayton Act ,15 U.S.C. § 18
(All Defendants)

739.    Plaintiffs repeat, re-allege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

740.    Plaintiffs bring this claim against all Defendants seeking redress for its lessening of competition and unlawful restraint of trade and violations of Violation of Section 7 of the Clayton Act,15 U.S.C. § 18.

741.    The agreements, as described herein, in which Schwab acquired AMTD and thereafter has abused its market power, are unlawful restraints on trade and resulted in increased pricing, diminished supply and quality, imposed additional adverse conditions on the supply of RIA Custodial Services, diminished innovation, increased barriers to entry, and substantially lessened competition in the RIA Custodial Services Market and the Investment Advisory Services Market.

742.    The agreements, as described herein, in which Creative Planning has acquired more than 30 competitor Independent RIAs, in furtherance of its RIA Service Scheme and Roll-Up Consolidation Plan, is an unlawful restraint on trade, has eliminated competitors and consolidated the Investment Advisory Services Market, diminished innovation and pricing competition,

diminished selection and diversity, diminished quality and increased costs of RIA Services, and otherwise substantially lessened competition in the RIA Custodial Services Market and the Investment Advisory Services Market.

743.    General Atlantic's acquisition of a partnership interest in Creative Planning was done so in furtherance of its intent to facilitate Creative Planning's Roll-Up Consolidation Plan and attempts to monopolize and otherwise increase Creative Planning's profits, market share, and market power in the Investment Advisory Services Market, and as such constitute unlawful restrains on trade and violations of Section 7 of the Clayton Act,15 U.S.C. § 18.

744.    Broker-Custodian Defendants' SIPs program and related agreements resulted in them acquiring control over thousands of IARs and small RIAs, aggregating them into a de facto RIA and diminishing competitors and competition in the relevant markets alleged herein, constituting unreasonable restraints on trade and lessening competition in the relevant markets in violation of Section 7 of the Clayton Act,15 U.S.C. § 18.

745.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were injured in their business or property

## COUNT FOUR
Violation of the Cartwright Act,
Cal. Bus. & Prof. Code §§ 16700 et seq.
(All Defendants)

746.    Plaintiffs repeat, re-allege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

747.    Plaintiffs bring this claim against all Defendants seeking redress for their violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et. seq.

748.    California's Cartwright Act prohibits any "combination of capital, skill or acts by two or more persons for" the purpose of restraining trade.

749.    The conduct alleged herein violates the Cartwright Act.

750.    Plaintiffs suffered an antitrust injury as a direct and proximate result of the conspiracy between Defendants, and Defendants are therefore liable for treble damages, costs, attorneys' fees and punitive damages in an amount to be proven at trial.

**COUNT FIVE**
Violation of California's Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, et seq. (The "UCL")
(All Defendants)

751.    Plaintiffs repeat, re-allege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

752.    Plaintiffs bring this claim for relief against all Defendants.

753.    The violations of federal antitrust law set forth above also constitute violations of section 17200, et seq. of California Business and Professions Code

754.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

755.    The Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, et seq., of California Business and Professions Code, set forth above.

756.    Defendants' acts, omissions, misrepresentations, practices, and non- disclosures, as described above, whether or not in violation of section 16720, et seq., of California Business and

Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

757.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

758.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent business practice, Plaintiffs have been injured and suffered harm, including lost money and property.

759.    Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

## COUNT SIX

Civil Conspiracy
(All Defendants)

760.    Plaintiffs repeat and reallege and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

761.    Defendants agreed to perpetrate the schemes against Plaintiffs set forth herein.

762.     Defendants agreed on the objective and method to perpetrate their schemes.

763.    The schemes alleged herein were unlawful.

764.    Each Defendant committed an overt act in furtherance of the schemes.

765.    Spotlight and Greco have each been injured by the conspiracy.

## COUNT SEVEN

Breach of Contract
(Spotlight v. Schwab, Fidelity, and AMTD)

766.    Plaintiffs repeat and reallege and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

767.    Plaintiff Spotlight brings this claim for relief against Schwab, Fidelity, and AMTD.

768.    Each Broker-Custodian Defendant entered into an RIA Custodial Agreement with Spotlight for the provision of RIA Custodial Services to Spotlight and its advisory clients.

769.    All contracts contain an implied covenant of good faith and fair dealing.

770.    As detailed herein, each Broker-Custodian Defendant intentionally, and in bad faith, breached their respective RIA Custodial Agreements with Spotlight.

771.    Spotlight established a business relationship with Fidelity to supply RIA Custodial Services and entered into a written RIA Custodial Services Agreement on May 10, 2017.

772.    On June 24, 2021, Fidelity use mail/wire to notify Spotlight of the Fidelity Termination.

773.    The Fidelity Termination, and related misconduct by Fidelity, violated Fidelity's duty of good faith and fair dealing owed to Spotlight, and constituted breach of its valid RIA Custodial Services Agreement with Spotlight.

774.    Spotlight established a business relationship with Schwab to supply RIA Custodial Services in April 2019 and entered into a written RIA Custodial Services Agreement on April 17, 2019.

775.    On July 1, 2019, used mail/wire to notify Spotlight of the Schwab Termination.

776.    The Schwab Termination, and related misconduct by Schwab, violated Schwab's duty of good faith and fair dealing owed to Spotlight, and constituted breach of its valid RIA Custodial Services Agreement with Spotlight.

777.    Spotlight established a business relationship with AMTD to supply RIA Custodial Services in July 2018 and entered into a written RIA Custodial Services Agreement on or around July 11, 2018.

778.   On April 17, 2019, AMTD used mail/wire to notify Spotlight of the AMTD Termination.

779.   The AMTD Termination, and related misconduct by AMTD, violated AMTD's duty of good faith and fair dealing owed to Spotlight, and constituted breach of its valid RIA Custodial Services Agreement with Spotlight.

780.   Schwab and AMTD were acting in concert in carrying out the AMTD Termination and Schwab Termination, intentionally and willfully causing Spotlight substantially increased harm by coordinating the dates of termination, as set forth herein.

781.   Schwab and AMTD knew and intended the timing and conduct related to the coordinated AMTD Termination and Schwab Termination would amplify the harm caused to Spotlight.

782.   At all relevant times, Spotlight had complied with all responsibilities and fulfilled its obligations under each Broker-Custodian Defendant's RIA Custodial Agreement.

783.   At no time did any of the Broker-Custodian Defendants notify Spotlight of any breaches, failures to perform, delay in performance, irregularities, disqualification, or other issues which could give rise to a legitimate business concern.

784.   There is no legitimate reason or justification for Broker-Custodian Defendants' breaches of their respective RIA Custodial Service Agreements with Spotlight, or abrupt refusal to supply Spotlight with RIA Custodial Services or other misconduct alleged herein.

785.   Broker-Custodian Defendants' breaches of contract and related actions willfully denied, frustrated, interfered with, and prevented Spotlight's business operations and provision of Independent RIA Services to advisory clients.

786.    As a direct and proximate consequence of each Broker-Custodian Defendant's breach of their respective RIA Custodial Services Agreements with Spotlight, Spotlight has suffered and will continue to suffer actual damages, financial loss, losses from business interruption, lost revenues, lost profits, lost advisory clients, lost employees, and lost opportunities in an amount to be proven at trial.

787.    Defendants' continuing refusal to sell RIA Custodial Services to Spotlight and its advisory clients has caused Spotlight injuries and harm that lack any remedy at law, and an award of monetary damages alone cannot fully compensate Plaintiff for its injuries. Accordingly, Spotlight is entitled to a preliminary and/or permanent injunction restraining such Defendant from further engaging in the unlawful conduct described herein.

## COUNT EIGHT
### Tortious Interference with Contract
### (All Defendants)

788.    Plaintiffs repeat and reallege and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

789.    Plaintiffs bring this claim for relief against all Defendants

790.    Since March 2017, Defendants repeatedly, maliciously, willfully, and intentionally interfered with Plaintiffs' valid and existing contracts, including its valid and enforceable contracts for RIA Custodial Services, as well as with approximately 10 wealth adviser contracts, and over 200 advisory client contracts (collectively referred to as "Terminated Contracts").

791.    At all relevant times, Spotlight had fulfilled all of its contractual obligations under the Terminated Contracts.

792.    As set forth in part herein, Defendants knew of Spotlight's contracts and intentionally and without justification interfered with the Terminated Contracts. For example, Defendants knew about Spotlight's RIA Custodial Agreements, in part, from Spotlight's ADV

filings. Defendants' knowledge of specific employees and clients is evidenced by communications sent to Spotlight, as well as knowledge obtained from data and information maintained in Broker-Custodian Defendants' RIA Custodial Services Programs.

793.    Defendants' conduct was intentional, knowing, and calculated to interfere with and damage existing business relationships.

794.    As a direct and proximate cause of Defendants' misconduct constituting interference with contract, Plaintiffs have each suffered concrete economic damages, lost revenues, lost profits, lost advisory clients, lost employees, lost economic and business opportunities, and other harm to their business, property, reputation, and person. Defendants' misconduct is ongoing, causing irreparable harm and damage, and is wanton and malicious behavior warranting punitive damages.

### COUNT NINE
Intentional Interference with Prospective Economic Advantage
(All Defendants)

795.    Plaintiffs repeat and reallege and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

796.    Plaintiffs bring this Count against all Defendants.

797.    Plaintiffs have legal rights to be free from intentional interference with prospective economic advantage.

798.    Since March 2017, as set forth in part herein, Defendants have each maliciously and intentionally interfered with Plaintiffs' business expectancies with employees, customers, vendors and suppliers, referral and partnership arrangements, and sale transactions.

799.    Defendants intentionally interfered with Greco's business expectancies related to Spotlight, including his employment as its CEO and his equity interest as the largest shareholder in Spotlight.

800.    Defendants were aware of the prospective business relationships and purposefully and without justification, interfered with the business expectancies and induced or caused a breach or termination of the expectancies.

801.    Plaintiffs had nearly $500 million in AUM and were expanding rapidly until Defendants' unlawful interference in Spotlight's business operations, contracts, relationships, and other economic expectancies.

802.    Plaintiffs have a reasonable expectancy of entering into a valid business relationship, specifically providing Independent RIA Services to advisory clients in the Independent RIA Services  Market. Greco has over two decades of experience and success as an investment advisor, and Spotlight is a dually licensed Illinois RIA with the experience and demonstrated competency for success in the Independent RIA Services  Market.

803.    Plaintiffs reasonably expected it could hire and retain qualified employees, establish and maintain contractual relationships with advisory clients, and establish and maintain contractual relationships with suppliers and vendors.

804.    Merger and Acquisition activities have been at record highs for the RIA Industry since 2019, and the target RIAs are middle-market Independent RIAs with between $100 million to $1 billion in AUM, exactly within Spotlight's AUM range during the relevant time period.

805.    Spotlight has had several serious acquisition inquiries, however Defendants' direct interference and related misconduct, including blacklisting Greco and Spotlight, has proven fatal to each preliminary acquisition agreement. Based on the record-high acquisitions, Plaintiffs have a reasonable expectancy that the preliminary acquisition agreements would come to fruition.

806.    Greco would have personally financially benefitted from each partnership and acquisition opportunity that Spotlight lost from 2019 through the present. Defendants know Greco

has a majority equity interest in Spotlight, in part from Spotlight's public SEC disclosures, and know and intend for Greco to be injured and harmed each time it interferes with and causes the termination of Spotlight's prospective business opportunity.

807.    Plaintiffs have entered into numerous preliminary business agreements with suppliers, employees, advisory clients, and third parties interested in partnerships or purchase of Spotlight, and Plaintiffs has a reasonable expectancy that these preliminary business agreements would come to fruition, as they were beneficial to all parties,

808.    For example, when Spotlight reached a preliminary business agreement to refer advisory clients to Madison Partners, in or about July 2021, the terms of the preliminary agreement were beneficial to all parties involved, but Fidelity directly interfered with the preliminary agreement and caused its termination even though the preliminary agreement would have benefitted Fidelity because Madison Partners would have retained the advisory client AUM with Fidelity for RIA Custodial Services.

809.    Defendants know Plaintiffs are selling Independent RIA Services in the Independent RIA Services Market and are intentionally, and without justification, interfering with Plaintiffs' procurement of RIA Custodial Services, employment of IARs, and ability to provide competitive Independent RIA Services and RIA Custodial Services to new and existing advisory clients.

810.    As alleged in part herein, Defendants have each engaged in specific conduct with the intention of interfering with and destroying Plaintiffs' business expectancies

811.    Defendants each knew and expected their interference and related misconduct would interfere with and damaged Plaintiffs' business expectancies and cause Plaintiff to lose valuable business opportunities, reputational damage, and monetary losses.

812.   Defendants' misconduct did in fact induce or cause such loss and termination of expectancy, business opportunities, and other prospective economic advantage. There was no legitimate business reason or justification for Defendants' interference and related misconduct which caused Plaintiffs' legitimate expectancies from ripening into realized business relationships.

813.   As a direct and proximate cause of Defendants' misconduct constituting interference with business expectancies, Plaintiffs have each suffered concrete economic damages, lost revenues, lost profits, lost advisory clients, lost employees, lost economic and business opportunities, and other harm to their business, property, reputation, and person.

814.   Defendants' misconduct is ongoing, willful, malicious, and intentionally done to cause Plaintiffs harm, including causing ongoing irreparable injury to Plaintiffs' reputation and goodwill.

815.   Plaintiffs' injuries and harm lack any remedy at law, and an award of monetary damages alone cannot fully compensate Plaintiffs for their injuries. Accordingly, Plaintiffs are entitled to a preliminary and/or permanent injunction restraining Defendants from further engaging in the unlawful conduct described herein.

## COUNT TEN
Breach of Contract
(Greco v. Mallouk, Creative Planning, and General Atlantic)

816.   Greco repeats, realleges, and incorporates by reference each paragraph alleged in this Complaint as if fully set forth herein.

817.   Greco brings this Count against Mallouk, Creative Planning, and General Atlantic.

818.   This Count is plead in the alternative to unjust enrichment count and any other count as necessitated for proper construction under the law.

819.   At all relevant times, Mallouk has been a partner in Creative Planning and its President and Chief Executive Officer, with full decision-making authority.

820.     On or about September 5, 2017, Greco and Creative Planning entered into a Settlement Agreement resolving claims between them related to Greco's employment and separation from employment with Creative Planning, including disputes related to post-employment obligations. The Settlement Agreement contained, among other things, mutual releases, mutual denials of liability, and a mutual non-disparagement provision.

821.     Creative Planning's promise to Greco that neither it, "*nor any of its employees, will make any disparaging or defamatory remarks against or concerning*" him, is a material obligation in the Settlement Agreement and Greco relied upon Creative Planning's agreement not to disparage or defame him in entering into the Settlement Agreement.

822.     Greco would not have entered into the Settlement Agreement if Creative Planning had not agreed to non-disparagement, as set forth in ¶10 of the Settlement Agreement.

823.     After executing the Settlement Agreement, Mallouk took no steps to notify or advise Creative Planning employees of their obligations not to disparage or defame Greco, rather he did the opposite and has actively encouraged their disparagement and defamation of Greco.

824.     On numerous occasions, both prior to and subsequent to executing the Settlement Agreement, Mallouk and Creative Planning have intentionally and maliciously disparaged and defamed Greco, including but not limited to making misleading, defamatory, and otherwise disparaging statements about Greco, and his business Spotlight, including about non-public, highly personal, and/or private to misrepresentations about Greco's character and capacity for truthfulness, Greco and Spotlight's professional competency, capacity, and qualifications, and other malicious and intentionally harmful misrepresentations, in part as set forth herein.

825.     After General Atlantic became a partner in Creative Planning, Mallouk and Creative Planning had a duty to inform and advise General Atlantic about their non-disparagement

obligations to Greco under the Settlement Agreement. Since it became a partner in Creative Planning in January 2020, General Atlantic has affirmatively participated in, ratified, approved and /or authorized Creative Planning and Mallouk's ongoing disparagement, defamation, and breach of Settlement Agreement.

826.    Creative Planning and Mallouk's disparagement and defamation of Greco, as set forth in part herein, has been ongoing and egregious since March 2017, continuing through and immediately subsequent to execution of the Settlement Agreement.

827.    Creative Planning and Mallouk's disparagement and defamation of Greco breached the Settlement Agreement.

828.    At all relevant times, Greco has performed his obligations under the Settlement Agreement and there was not legitimate reason or justification for Creative Planning and Mallouk's breach of the Settlement Agreement.

829.    As a direct and proximate result of Mallouk, Creative Planning, and General Atlantic's breach of the Settlement Agreement, Greco has suffered and will continue to suffer injuries, including irreparable harm to his reputation, harm to his ability to practice his profession, loss of current and future clients and business associates, loss of business opportunities, damage to his business interests and property, and other monetary and non-monetary damage.

830.    Greco lacks any remedy at law, and an award of monetary damages alone cannot fully compensate Greco for his injuries. Accordingly, Greco is entitled to equitable relief including a preliminary and/or permanent injunction barring Creative Planning, Mallouk, and General Atlantic from further disparaging or defaming Greco.

831.    Greco is entitled to injunctive relief, compensatory damages, and any and all other such relief and damages available in law or equity as deemed just and appropriate.

## **COUNT ELEVEN**
Defamation
(Greco v. All Defendants)

832.    Greco repeats, realleges, and incorporates by reference each paragraph alleged in this Complaint as if fully set forth herein.

833.    Greco brings this claim for relief against all Defendants.

834.    As set forth herein, on numerous occasions, since at least 2017, Defendants have made false, disparaging, and defamatory statements about Greco to multiple third parties, including advisory clients, IARs, RIAs, journalists and mass media outlets. The false, disparaging, and defamatory statements have harmed Greco.

835.    In Illinois, there are five categories of statements that are considered *defamatory per se, and Defendants statements about Greco fall squarely within the following three of the five categories*:  (1) commission of a criminal offense; (2) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; and (3) words that impute a person lacks ability or otherwise prejudices that person in her or his profession.

836.    Defamation *Per Se* is so harmful to reputation that damages are presumed.

837.    Defamation *Per Quod* applies where statements require extrinsic facts to show their defamatory meaning, and damages are not presumed.

838.    Defendants made the statements about Greco knowing them to be false, misleading, disparaging, and defamatory and with the intent that the statements cause injury and harm to Greco.

839.    The defamatory character of Defendants' statements are so obvious, apparent, and harmful that injury to Greco's reputation can be presumed and are actionable *per se*. In the alternative, Defendants made the false statements about to third parties and the unprivileged publication caused damage to Greco and is actionable *per quod*.

185

840. Defendants made unprivileged publication of the defamatory statements, and the defamatory statements were not capable of an innocent construction.

841. As a direct and proximate result of Defendants' defamation of Greco, he has suffered and will continue to suffer, injuries and irreparable harm to his reputation, harm to his ability to practice his profession, loss of current and future business opportunities and other economic and non-economic damages.

842. Greco lacks any remedy at law, and an award of monetary damages alone cannot fully compensate Greco for his injuries. Accordingly, Greco is entitled to equitable relief including a preliminary and/or permanent injunction barring Defendants from further defaming Greco.

## COUNT TWELVE
Unjust Enrichment
(All Defendants)

843. Plaintiffs repeat, reallege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

844. Plaintiffs bring this Count against all Defendants.

845. This Count is plead in the alternative to breach of contract and any other counts as necessitated by law.

846. Defendants have benefited from the profits gained from the unlawful and inequitable acts alleged in this Complaint.

847. Defendants' financial benefit resulting from unlawful and inequitable conduct is traceable to fees generated from the RIA Services Scheme, Referral Programs, false and misleading advertising, and other unfair, anti-competitive, and collusive agreements, as alleged herein.

848. The economic benefit of fees generated by Defendants is a direct and proximate result of Defendants' unlawful practices.

849.    The financial benefits derived by Defendants rightfully belongs to Plaintiffs, as the Plaintiffs have suffered from anticompetitive prices during the relevant period.

850.    It would be inequitable under unjust enrichment principles in the district of Columbia and each of the fifty states for Defendants to be permitted to retain any of the ill-gotten profits derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

851.    Defendants are aware of and appreciated the benefits bestowed upon them.

852.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they have received and a constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants.

## COUNT THIRTEEN
Violations of Civil RICO 18 U.S.C. §§ 1964 and 1962(a), (c) and (d)
(All Defendants)

853.    Plaintiffs repeat, reallege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

854.    Plaintiffs bring this cause of action against all Defendants.

855.    As set forth herein, Defendants have violated 18 U.S.C.§ 1962 (c) and (d) by participating in, managing or conducting the affairs of the enterprises, through a pattern of racketeering activity, as set forth more fully herein, with each committing two (2) or more predicate acts, during a ten (10) year period, constituting a pattern of "racketeering activity," as defined by 18 U.S.C. § 1961(1), including: 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), commercial bribery in violation of 18 USCA § 1961(1)(A); 18 U.S.C.§ 1512 (witness tampering); 18 U.S.C. § 1513(e)-(f) (witness retaliation); 18 U.S.C.§ 1956 (relating to the laundering of monetary instruments); and of 18 U.S.C.§ 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

856.    Mallouk has violated 18 U.S.C.§ 1962 (a) by receiving income derived, directly or indirectly, from a pattern of racketeering activity… to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition or any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

857.    As set forth more fully herein, Mallouk received income from his fraudulent schemes and used that income in the operations of Creative Planning, acquisitions of competitor Independent RIAs, and in establishing and operating other businesses in interstate commerce, such as his businesses involving insurance, accounting, and law.

858.    At all relevant times, Mallouk participated in, managed and conducted the affairs of Creative Planning, through a pattern of racketeering activity, as set forth more fully herein, by committing two (2) or more predicate acts, during a ten (10) year period, constituting a pattern of "racketeering activity," as defined by 18 U.S.C. § 1961(1), including: 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), commercial bribery in violation of 18 USCA § 1961(1)(A); 18 U.S.C.§ 1512 (witness tampering); 18 U.S.C. § 1513(e)-(f) (witness retaliation); 18 U.S.C.§ 1956 (relating to the laundering of monetary instruments); and of 18 U.S.C.§ 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

859.    Defendants' predicate acts, pattern of racketeering activity, and RICO violations related to and arise from the racketeering activity and misconduct involved in the three interrelated schemes: the Creative Planning Fraudulent Growth Scheme; the RIA Services Scheme; and Silencing and Retaliation Schemes.

860. The Creative Planning Fraudulent Growth Scheme and RIA Services Scheme were the subjects of, reported, and complained about in Greco's 2017 SEC Whistleblower Action and 2020 DOJ Complaint, which in turn were the reasons Defendants sought to Silence and Retaliate against Greco.

861. The Silencing and Retaliation Scheme occurred because of Greco's reporting, communications, provision of information, and other cooperation with the SEC and DOJ, and in furtherance of Defendants' shared interests in concealing and preventing further disclosure of the misconduct involved in the schemes. The Silencing and Retaliation are inextricably intertwined with the other two schemes, and the pattern of racketeering activity, actors, and RICO enterprises share common features, such as overlapping enterprise participants, Defendants, purposes, conduct, victims, and harm. The pattern of racketeering is appropriately considered together for purposes of Defendants' violations of RICO, 18 U.S.C. §§ 1962 and 1964, causing injury and harm to Plaintiffs business and property.

862. Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together, and with others, to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d). RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of RICO Defendants was necessary to allow the commission of this pattern of racketeering activity. RICO Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

863. Defendants have each engaged in multiple predicate acts of mail and wire fraud in carrying out the RIA Services Scheme and Silencing and Retaliation Scheme, as set forth in more

detail herein. Defendants use the wires and mails in interstate commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of their fraudulent and deceptive practices and in furtherance of the schemes, including:

a. False, fraudulent, and misleading advertisements, marketing, and promotion of RIA Services in e-mails, podcasts, infomercials, national television, national radio, websites, and other public broadcast and mass media forums;

b. Registration and filing of disclosures and documents with the SEC, using the internet and electronic and/or web-based applications and portals;

c. Transmitting and distributing the ill-gotten gains from their RIA Services Scheme, including proceeds related to Referral Programs, RIA Custodial Services Agreements, Revenue-Sharing Agreements, and other collusive agreements;

d. knowingly making disparaging, defamatory, deceptive, and misleading representations of material facts about Plaintiffs to 3rd parties, intending the 3rd parties to rely thereon, in coercing the 3rd parties to terminate existing contractual relationships with Plaintiffs, as well as refusing to deal in the future;

e. knowingly making disparaging, defamatory, deceptive, and misleading representations of material facts about Plaintiffs to 3rd parties, intending the 3rd parties to rely thereon, in disparaging and discrediting Greco and the veracity of his 2017 SEC Whistleblower Complaint and 2020 DOJ Complaint;

f. Using mail and wire to terminate Broker-Custodian Defendants' business dealings and RIA Custodial Services Agreements with Plaintiffs;

g. Schwab and AMTD April 2019- July 2019 fraudulent scheme, using mail and wire, to induce Spotlight into an RIA Custodial Services Agreement, and to transfer

advisory clients in reliance thereon, in bad faith with intent to cause injury and harm to Plaintiffs in furtherance of the Silencing and Retaliation Scheme;

h.      Using mail and wire to send false accusations, intimidate, and threaten Greco, Spotlight, and its employees with frivolous litigation;

i.      Using wire to electronically file and obtain service of court and arbitration papers containing false and misleading statements intended to further Defendants' Silencing and Retaliation Scheme;

j.      Use of mail and wire between and among Defendants concerning the RIA Services Scheme and Silencing and Retaliation Scheme, as well as in concealing those schemes;

k.      Using mail and wire to transmit intentionally disparaging, defamatory, deceptive, and misleading representations of material facts about Plaintiffs to 3rd parties, intending the 3rd parties to rely thereon; and

l.      Otherwise using mail and wire to carry-out, and in furtherance of, the RIA Services Scheme, the Silencing and Retaliation Scheme, and other such unlawful conduct.

864.    In addition to conducting the affairs of the enterprises through a pattern of racketeering committing, in furtherance of the RIA Services Scheme and Silencing and Retaliation Scheme, Mallouk and Creative Planning committed many additional predicate acts, constituting a pattern of racketeering activity in violation of RICO, in carrying out the Creative Planning Fraudulent Growth Scheme, as set forth in detail herein.

865.    From at least September 2013, Mallouk has continuously received income from a pattern of racketeering activity and used that income in the operation of his various businesses,

including but not limited to law firm, insurance companies, Creative Planning, and affiliates of Creative Planning disclosed in its Form ADV filed with the SEC.

866.    In January 2020, Mallouk received millions of dollars in cash from the General Atlantic Partnership transaction, in part based on a valuation of Creative Planning that included the illicit proceeds and ill-gotten benefits from the Creative Planning Fraudulent Growth Scheme and RIA Services Scheme.

867.    Mallouk used mail/wire to conceal or disseminate false and misleading material facts about the Creative Planning Fraudulent Growth Plan, 2017 Greco Whistleblower Action, and truth about Greco's resignation and post-employment conduct.

868.    Mallouk personally derived, and has transacted in, hundreds of millions of dollars in illicit proceeds that he unlawfully obtained through his pattern of racketeering activities. For example, Mallouk received, transferred, and otherwise transacted in the illicit proceeds unlawfully derived from the General Atlantic Partnership Transaction, including: depositing the illicit proceeds into specific accounts which he uses to leverage his position and influence in the RIA Services Scheme, increase Creative Planning's market share of the Investment Advisory Services Market, increase its Revenue-Share, kickbacks, and incentives, and increase its allocation of advisory clients through Schwab's Referral Programs.

869.    Similarly, Mallouk used mail and wire to transmit and transact in the ill-gotten proceeds from the AdvisorDirect® Commercial Bribery Scheme, Robbins/Creative Planning Relationship, and RIA Services Scheme, that were the subject of and reported in the 2017 SEC Whistleblower Complaint and 2020 DOJ Complaint. Mallouk has also used the ill-gotten proceeds derived from racketeering activity to facilitate Creative Planning's Roll-Up Consolidation plan and acquisitions of Independent competitor RIAs.

870. Mallouk has used the ill-gotten proceeds derived from the Creative Planning Fraudulent Growth Scheme in further growing Creative Planning's market share and power, in gaining participation in the Referral Programs, to conceal his misconduct, and in carrying out the Silencing and Retaliation Scheme.

871. Greco has been directly and proximately injured and harmed by Mallouk's misconduct because (1) but for Mallouk's misconduct and violations of federal law, as set forth herein, the Creative Planning Fraudulent Growth Scheme would not have existed and Greco would not have discovered the RIA Services Scheme, therefore Greco would have had nothing to report to the SEC and DOJ about Mallouk and Creative Planning, and the derivative Silencing and Retaliation Scheme would not have occurred; (2) Mallouk has invested the proceeds of his illicit activities into Creative Planning to grow it into one of the largest Participating RIAs and has used that power and illicit financial proceeds to elicit the participation of the other Defendants, and to carry out, the Silencing and Retaliation Scheme.

872. Defendants' racketeering activities directly and proximately caused injury to Plaintiffs' business and property by causing them financial loss, loss of advisory clients, loss of IARs and other employees, loss of existing contracts and business dealings, loss of economic expectancies, diminished ability to compete and provide Investment Advisory Services to advisory clients, harm to livelihood, and other injuries and damages in an amount to be determined at trial.

873. Plaintiffs are the ultimate victims of Defendants' unlawful Silencing and Retaliation Enterprise and among the ultimate victims of the other enterprises. Plaintiffs have been and are continuing to be injured by Defendants' ongoing violations of RICO.

874. Plaintiffs have suffered injury and damages as a direct and proximate result of Defendants' predicate acts, pattern of racketeering activity, and other such conduct in violation of 18 U.S.C. § 1962 (a), (c) and (d).

875. Plaintiffs are entitled to declaratory and equitable relief, actual damages, treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of 18 U.S.C. § 1964(c).

## COUNT FOURTEEN
Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act
815 ILCS § 505/1 *et seq.* ("ICFA")
(All Defendants)

876. Plaintiffs repeat, reallege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

877. Plaintiffs bring this Count against all Defendants.

878. The IFCA, 815 ILCS 505/1 *et seq*. prohibits: "(u)nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice." 815 ILCS § 505/2.

879. The ICFA prohibits deception through affirmative conduct, such as misrepresentation, as well as through omissions. *Id.*

880. Defendants engage in unfair acts, omissions and practices that violate Illinois public policy; were immoral, unethical, oppressive, unscrupulous, and caused substantial injury to Plaintiffs.

881. Defendants are a "person" as defined in the ICFA, 815 ILCS§ 505/1(c), and conduct

"trade" and "commerce" within the meaning of the ICFA, 815 ILCS § 505/1(f).

882.    Plaintiffs are "consumers" as defined in the ICFA, 815 ILCS § 505/1(e).

883.    A violation of the Act constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act. 815 ILCS § 530/20.

884.    Defendants have engaged in deceptive acts and practices, misled, deceived, and misrepresented its business operations as alleged herein.

885.    Defendants engaged in the complained of misconduct knowingly and recklessly. Defendants disregarded the safety, well-being, and legal rights of Plaintiffs in pursuit of otherwise unattainable market share, competitive advantage, and financial gain.

886.    As a direct and proximate result of Defendants' unlawful conduct described herein, Plaintiffs have suffered actual damages and will continue to suffer injuries and damages in the future, of which there is no adequate remedy at law, unless and until, injunctive relief is awarded requiring Defendants to comply with the IFCA.

## COUNT FIFTEEN
Violations of the Illinois Uniform Deceptive Trade Practices Act
815 ILCS §510/1, *et. seq.*
(All Defendants)

887.    Plaintiffs repeat, reallege, and incorporate by reference each paragraph alleged in this Complaint as if fully set forth herein.

888.    Plaintiffs bring this Count against all Defendants.

889.    Defendants engage in unfair acts, omissions and practices that violate Illinois public policy; were immoral unethical, oppressive of unscrupulous; and caused substantial injury to Plaintiffs and the Putative Class, in violation of the Unfair Trade Practices Act.

890.    Defendants, on an ongoing and continuous basis, conduct their business operations through false and misleading representations, deceptions, and material omissions directed at the

general marketplace for RIA Custodial Services and Investment Advisory Services, Illinois advisory clients, the general public, and Plaintiffs. Defendants RIA Services Scheme and related misconduct deceived, confused, and caused misunderstandings about their RIA Services, including characteristics, pricing, and costs.

891.   Broker- Custodian Defendants' opaque disclosure and pricing of RIA Custodial Services, and actions to conceal the RIA Services Scheme, caused Plaintiffs to pay inflated pricing for lesser quality RIA Custodial Services and has similarly injured other Independent RIAs and advisory clients.

892.   Businesses, such as Spotlight, have standing to sue under the Consumer Fraud Act to redress competitive injury they suffer when other businesses deceive customers.

893.   Defendants' RIA Services Scheme and other unfair and anticompetitive conduct is intended to deceive advisory clients in Illinois, occurred in Illinois, deceived and injured Illinois advisory clients, and harmed Spotlight and Greco in Illinois.

894.   By the misconduct alleged herein, Defendants have intentionally derived commercial gain, competitive advantage, increased sales, increased profits, and increased market share and power.

895.   Defendants willfully and deliberately engage in unfair acts, deceptive and misleading business practices, material omissions, and other improper business practices that violate Illinois public policy; are immoral unethical, oppressive, and unscrupulous; and cause substantial injury to Plaintiffs and advisory clients.

896.   Plaintiffs, and their advisory clients, are precisely the persons "(l)ikely to be damaged by Defendants deceptive trade practices" and should "(b)e granted injunctive relief upon terms that the court considers reasonable." 815 ILCS § 510/3. Plaintiffs have been damaged and

will continue to be damaged in the future.

897.    There is no adequate remedy at law.

898.    As a direct and proximate result of Defendants' unlawful conduct described herein, Plaintiffs have suffered actual damages and will continue to suffer injuries and damages in the future, of which there is no adequate remedy at law, unless and until, injunctive relief is awarded.

899.    The relief provided for pursuant to 815 ILCS § 510/3 is in addition to remedies otherwise available against the same conduct under the common law or other statutes of the State of Illinois. 815 ILCS § 510/3.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Stephen Greco and Spotlight Asset Group, LLC, hereby pray that this Court enter judgement in their favor on all counts, and awarding the following relief:

a.    Acceptance of jurisdiction of this case;

b.    That the unlawful conduct alleged herein be adjudged and decreed to violate the Sherman Act, 15 U.S.C. §§1,2, and §3 of the Clayton Act, 15 U.S.C. §14, § 7 of the Clayton Act,15 U.S.C. § 18; Cal. Bus. & Prof. Code Sections 16720 et seq. and 17200 et seq.; RICO, 18 U.S.C. §§ 1962 and 1964; the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS § 505/1 et seq.; and the Illinois Uniform Deceptive Trade Practices Act 815 ILCS §510/1, et seq;

c.    Finding Defendants have combined in a way that substantially lessened competition or tended to create a monopoly in the market for RIA Custodial Services and Investment Advisory Services in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that Plaintiff and have been injured in their business and property as a result of Defendants' violations;

d.     Ordering Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the conduct alleged herein, or from entering into any other contract or engaging in any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

e.     Awarding compensatory damages to Plaintiffs in an amount to be established at trial, or, alternatively, require Defendant to disgorge or pay restitution in an amount to be determined at trial;

f.     A constructive trust over any ill-gotten property or assets, including but not limited to the proceeds received as a result of the conspiracy or agreement or other wrongful conduct as alleged herein;

g.     Treble damages as permitted by law;

h.     Punitive damages for Defendants' willful and reprehensible conduct;

i.     Costs of this action and reasonable attorneys' fees;

j.     Pre-judgement and post-judgement interest at the highest legal rate from and after the date of service of this Complaint; and

k.     Any and all other such other relief this Court deems just and equitable.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: <u>May 19, 2022</u>                         Respectfully submitted,

*/s/ Robert M. Foote*

198

Robert Foote, Esq. (3124325)
Kathleen C. Chavez, Esq. (06255735)
Elizabeth C. Chavez, Esq. (6323726)
Bret K. Pufahl, Esq. (6325814)
**FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC**
10 W. State Street, Suite 200
Geneva, IL 60134
Tel. No.: (630) 232-7450
Fax No.: (630) 232-7452
kcc@fmcolaw.com
rmf@fmcolaw.com
ecc@fmcolaw.com
bkp@fmcolaw.com

*Attorneys for Plaintiffs*