## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STEPHEN ALBERT GRECO, individually, and SPOTLIGHT ASSET GROUP, INC., | |
| Plaintiffs, | |
| vs. | |
| PETER MALLOUK, individually, CREATIVE PLANNING, LLC, CPI HOLDCO A, LLC, CPI HOLDCO B, LLC, CREATIVE PLANNING HOLDCO, LLC, GENERAL ATLANTIC SERVICE COMPANY LP, GENERAL ATLANTIC (CP) COLLECTIONS, LP, FMR LLC D/B/A FIDELITY INVESTMENTS INC., NATIONAL FINANCIAL SERVICES LLC, TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE, INC, THE CHARLES SCHWAB CORPORATION, and CHARLES SCHWAB & CO, INC., | Case No. 22-cv-02661 Hon. Edmond E. Chang |
| Defendants. | |

## OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' JOINT MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL BACKGROUND .......................................................................... 3

    A.    The Parties ........................................................................................ 3

    B.    Greco's Conduct in the Industry ...................................................... 4

    C.    Greco's Allegations ......................................................................... 5

        1.    Creative Planning's Fraudulent Growth Scheme.................... 5

        2.    The RIA Services Scheme ...................................................... 6

        3.    Silencing and Retaliation Scheme ......................................... 7

            a.    *Creative Planning's Alleged "Silencing and Retaliation"* ............. 7

            b.    *AMTD's Alleged "Silencing and Retaliation"* ................. 7

            c.    *Schwab's Alleged "Silencing and Retaliation"* ................ 8

            d.    *Fidelity's Alleged "Silencing and Retaliation"* ................ 8

    D.    Harm to Industry and Plaintiffs........................................................ 9

LEGAL STANDARD ................................................................................... 10

ARGUMENT ................................................................................................ 11

I.    PLAINTIFFS DO NOT ALLEGE A PLAUSIBLE CONSPIRACY BETWEEN ANY DEFENDANTS (COUNTS 2, 4, 6, AND 13). ................... 11

    A.    The Conspiracy Claims Require Plausible Allegations of an Illegal Agreement.................................................................................. 11

    B.    Plaintiffs Do Not Allege a Plausible Conspiracy.................................... 12

        1.    Plaintiffs Do Not Allege Direct Evidence of an Agreement..................... 13

        2.    Plaintiffs Have Not Pleaded Circumstantial Allegations That Plausibly Suggest the Existence of an Illegal Agreement. ........................ 13

            a.    Plaintiffs' "RIA Services Scheme" Allegations Fail. .................... 14

b.     Plaintiffs' Pleadings in Support of Their "Silencing and Retaliation Scheme" Do Not Suggest a Plausible Conspiracy. ........................................................... 17

II.    **PLAINTIFFS' FEDERAL AND STATE ANTITRUST CLAIMS FAIL (COUNTS 2-4). ............................................................ 19**

    A.     Plaintiffs Do Not Allege Antitrust Injury. ............................................. 19

    B.     Plaintiffs Have Not Alleged Agreements That Restrain Trade. .......................... 21

    C.     Implied Immunity Necessitates Dismissal of the Section 1 Claim. ...................... 23

    D.     Plaintiffs' Section 2 Claim Fails Because It Is Predicated on a Shared Monopoly/Monopsony. ...................................... 25

    E.     Plaintiffs' Sherman Act Section 2 Allegations Do Not Describe Any Exclusionary Conduct. ...................................... 25

    F.     Plaintiffs Do Not Allege Facts That Support an Actionable Clayton Act Section 7 Claim. ...................................... 27

        1.     The Pleadings Do Not Describe Plausible Markets. ............................ 27

        2.     Plaintiffs Fail to Allege Facts That Plausibly Demonstrate Any Diminution of Competition in Any Relevant Market. .............................. 29

III.    **PLAINTIFFS FAIL TO PLEAD FRAUD-BASED CLAIMS WITH PARTICULARITY (COUNTS 1, 5, 13-15). .................................................. 31**

IV.    **PLAINTIFFS' RICO CLAIMS FAIL TO SUFFICIENTLY ALLEGE FOUNDATIONAL ELEMENTS. ................................................. 32**

    A.     Plaintiffs Fail to Allege Viable Predicate Acts. ...................................... 32

    B.     Plaintiffs Fail to Allege the Conduct of an Enterprise. ................................ 34

V.     **PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE NEXUS BETWEEN DEFENDANTS' ACTS AND ANY PURPORTED HARM (COUNT 1, 8, 13, 14, 15) .............................................. 34**

    A.     Plaintiffs Do Not Allege Injury Proximately Caused by Defendants' Alleged RICO Predicate Acts (Count 13). ...................................... 35

    B.     Plaintiffs' Lanham Act and Illinois State-Law Claims Fail to Plausibly Allege Harm to Plaintiffs' Commercial Interests (Counts 1, 14, and 15) ............. 36

    C.     Plaintiffs Do Not Connect Defendants to Any Alleged Tortious Interference With Contract (Count 8). ...................................... 38

VI.    THE UNJUST ENRICHMENT CLAIM FAILS BECAUSE ACTUAL
CONTRACTS EXIST (COUNT 12). ........................................................... 39

VII.   PLAINTIFFS' ICFA, UCL, DTPA, RICO, AND ANTITRUST
CLAIMS ARE BARRED BY STATUTES OF LIMITATION
(COUNTS 2, 3, 4, 5, 13, 14, AND 15). ...................................................... 39

VIII.  PLAINTIFFS' CALIFORNIA UNFAIR COMPETITION CLAIM
DOES NOT PERMIT DISGORGEMENT (COUNT 5)................................. 41

IX.    PLAINTIFFS' COMPLAINT VIOLATES FED. R. CIV. P. 8..................... 42

CONCLUSION ........................................................................................... 42

## TABLE OF AUTHORITIES

### CASES

*AAVN, Inc. v. WestPoint Home, Inc.*,
  2019 WL 1168102 (N.D. Ill. Mar. 13, 2019)..............................................37, 38

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012) ....................................................................22

*Alarm Detection Systems, Inc. v. Orland Fire Protection District*,
  129 F. Supp. 3d 614 (N.D. Ill. 2015) .......................................................21

*Alarm Detection Systems, Inc. v. Village of Schaumburg*,
  930 F.3d 812 (7th Cir. 2019) ........................................................12, 13, 26

*Always Towing & Recovery, Inc. v. Milwaukee*,
  2 F.4th 695 (7th Cir. 2021) .......................................................................21

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)...................................................................................35

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987).......................................................................13

*Arbitron Co. v. Tropicana Product Sales, Inc.*,
  1993 WL 138965 (S.D.N.Y. Apr. 28, 1993)..............................................30

*Asbeka Ind. v. Travelers Indemnity Co.*,
  831 F. Supp. 74 (E.D.N.Y. Aug. 17, 1993) ...............................................34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................10, 12

*Association of American Physicians & Surgeons, Inc. v. American Board of Medical
  Specialties*,
  15 F.4th 831 (7th Cir. 2021) ......................................................................13

*Bank of America, N.A. v. Knight*,
  725 F.3d 815 (7th Cir. 2013) .....................................................................13

*Banks v. National Collegiate Athletic Association*,
  977 F.2d 1081 (7th Cir. 1992) ...................................................................19

*Beaver v. Tarsadia Hotels*,
  816 F.3d 1170 (9th Cir. 2016) ...................................................................40

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................... *passim*

*Betkerur v. Aultman Hospital Association*,
   78 F.3d 1079 (6th Cir. 1996) .....................................................................22

*Blankenship v. Pushpin Holdings, LLC*,
   157 F. Supp. 3d 788 (N.D. Ill. 2016) ..........................................................41

*Bobb v. Swartz-Retson P.C.*,
   2018 WL 4384292 (N.D. Ill. Sept. 14, 2018) ..............................................11

*Bobbleheads.com, LLC v. Wright Brothers, Inc.*,
   259 F. Supp. 3d 1087 (S.D. Cal. 2017) .......................................................38

*Boyle v. United States*,
   556 U.S. 938 (2009)....................................................................................11

*Brown Shoe v. United States*,
   370 U.S. 294 (1962) ...................................................................................28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..............................................................................20, 21

*Business Electronics Corp. v. Sharp Electronics Corp.*,
   485 U.S. 717 (1988)....................................................................................22

*Calavan v. First Love International Ministries*,
   2022 WL 704810 (N.D. Ill. Mar. 9, 2022).................................................32

*Champion Laboratories, Inc. v. Central Ill. Manufacturing Co.*,
   157 F. Supp. 3d 759 (N.D. Ill. 2016) ..........................................................37

*Chicago Studio Rental, Inc. v. Ill. Department of Commerce & Economic Opportunity*,
   940 F.3d 971 (7th Cir. 2019) .....................................................................20

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) .....................................................................39

*Cohen v. American Security Insurance Co.*,
   735 F.3d 601 (7th Cir. 2013) .....................................................................39

*Conditioned Ocular Enhancement, Inc. v. Bonaventura*,
   458 F. Supp. 2d 704 (N.D. Ill. 2006) ..........................................................31

*In re Copper Antitrust Litigation*,
   436 F.3d 782 (7th Cir. 2006) .....................................................................41

*County of Tuolumne v. Sonora Community Hospital*,
   236 F.3d 1148 (9th Cir. 2001) ...................................................................11

*Crichton v. Golden Rule Insurance Co.*,
    576 F.3d 392 (7th Cir. 2009) ................................................................34

*Daddona v. Gaudio*,
    156 F. Supp. 2d 153 (D. Conn. 2000) ...................................................33

*Deslandes v. McDonald's USA LLC*,
    2018 WL 3105955 (N.D. Ill. June 25, 2018) .......................................23

*Dixon v. National Hot Rod Association*,
    450 F. Supp. 3d 831 (S.D. Ind. 2020) ...................................................17

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984) ................................................................29

*Douglas Theater Corp. v. Chicago Title & Trust Co.*,
    288 Ill. App. 3d 880 (1997) ..................................................................39

*Drobny v. JP Morgan Chase Bank, NA*,
    929 F. Supp. 3d 839 (N.D. Ill. 2013) ...................................................33

*Du Page Aviation Corp. v. Du Page Airport Authority*,
    229 Ill. App. 3d 793 (1992) ..................................................................38

*Edelson PC v. Bandas Law Firm PC*,
    2018 WL 7232787 (N.D. Ill. Feb. 6, 2018) .........................................33

*In re Elevator Antitrust Litigation*,
    502 F.3d 47 (2d Cir. 2007) ...................................................................17

*Elzeftawy v. Pernix Group, Inc.*,
    477 F. Supp. 3d 734 (N.D. Ill. 2020) ...................................................42

*Fran Welch Real Estate Sales, Inc. v. Seabrook Island Co., Inc.*,
    809 F.2d 1030 (4th Cir. 1987) ..............................................................22

*Friends of the Earth, Inc. v. Laidlaw Environment Serv's. (TOC), Inc.*,
    528 U.S. 167 (2000) ..............................................................................35

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016) ................................................................27

*FTC v. Advocate Health Care*,
    2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) .......................................29

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ...............................................41

vi

*Goldwasser v. Ameritech Corp.*,
    222 F.3d 390 (7th Cir. 2000) ..........................................................................26

*Gordon v. New York Stock Exchange, Inc.*,
    422 U.S. 659 (1975)........................................................................................25

*Goren v. New Vision International, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ..........................................................12, 31, 33

*Hemi Group, LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2010)......................................................................................35, 36

*Homestead Insurance Co. v. Chicago Transit Authority*,
    1997 WL 43232 (N.D. Ill. Jan. 23, 1997) .......................................................39

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) ........................................................................25

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
    2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ..................................................30

*International Shoe Co. v. FTC*,
    280 U.S. 291 (1930).........................................................................................29

*Jacobs v. Tempur-Pedic Intern., Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ......................................................................27

*James Cape & Sons Co. v. PCC Construction Co.*,
    453 F.3d 396 (7th Cir. 2006) ..........................................................................36

*Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*,
    610 F.3d 382 (7th Cir. 2010) ..........................................................................40

*Jennings v. Emry*,
    910 F.2d 1434 (7th Cir. 1990) ........................................................................33

*Jones v. Micron Technology Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) ...........................................................16

*Kadamovas v. Stevens*,
    706 F.3d 843 (7th Cir. 2013) ..........................................................................42

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ........................................................................31

*Kochert v. Greater Lafayette Health Services, Inc.*,
    463 F.3d 710 (7th Cir. 2006) ..........................................................................19

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ................................................................42

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)......................................................................22

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)......................................................................37

*Mann v. Boatright*,
    477 F.3d 1140 (10th Cir. 2007) ..................................................42

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................15

*McCoy v. Gamesa Technology Corp.*,
    2012 WL 245166 (N.D. Ill. Jan. 26, 2012) ................................11

*MCM Partners, Inc. v. Andrews-Bartlett*,
    1997 WL 306577 (N.D. Ill. May 29, 1997) ................................12

*Michaelis v. Nebraska State Bar Ass'n*,
    717 F.2d 437 (8th Cir. 1983) (per curiam)................................42

*Midwest Gas Services, Inc. v. Indiana Gas Co.*,
    317 F.3d 703 (7th Cir. 2003) ......................................................25

*Midwest Grinding Co., Inc. v. Spitz*,
    976 F.2d 1016 (7th Cir. 1992) ....................................................32

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) ....................................14, 15, 18

*Nakajima All Co. v. SL Ventures Corp.*,
    2001 WL 641415 (N.D. Ill. June 4, 2001) ................................31

*National Experiential, LLC v. City of Chi.*,
    2022 WL 704781 (N.D. Ill. Mar. 9, 2022)................................38

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
    472 U.S. 284 (1985)......................................................................17

*O'Neill v. Coca-Cola Co.*,
    669 F. Supp. 217 (N.D. Ill. 1987) ..............................................21

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co.*,
    2017 WL 4310767 (N.D. Cal. Sept. 28, 2017) ..........................16

*Oxbow Carbon & Minerals LLC v. Union Pacific R. Co.*,
  926 F. Supp. 2d 36 (D.D.C. 2013) ...................................................................25

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
  776 F.2d 185 (7th Cir. 1985) .........................................................................23

*Pontius v. Children's Hospital*,
  552 F. Supp. 1352 (W.D. Pa. 1982) ...............................................................22

*Pro Music Rights, LLC v. Apple, Inc.*,
  2020 WL 7406062 (D. Conn. Dec. 16, 2020) ..................................................25

*QO Acquisition Corp. v. Julien Co.*,
  1990 WL 16459 (N.D. Ill. Feb. 12, 1990) .......................................................31

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*,
  917 F.3d 1249 (11th Cir. 2019) .....................................................................17

*Reapers Hockey Association, Inc. v. Amateur Hockey Association Illinois, Inc.*,
  412 F. Supp. 3d 941 (N.D. Ill. 2019) ...........................................12, 16, 26, 27

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .........................................................................25

*Retina Associates, P.A. v. Southern Baptist Hospital of Fla., Inc.*,
  105 F.3d 1376 (11th Cir. 1997) .....................................................................22

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*,
  491 F. Supp. 1199 (D. Haw. 1980) ................................................................30

*Rocha v. FedEx Corp.*,
  15 F. Supp. 3d 796 (N.D. Ill. 2014) ...............................................................13

*Rojas v. Delta Airlines, Inc.*,
  425 F. Supp. 3d 524 (D. Md. 2019) ...............................................................12

*Sanner v. Board of Trade of City of Chicago*,
  62 F.3d 918 (7th Cir. 1995) ...........................................................................19

*Slaney v. International Amateur Athletic Federation*,
  244 F.3d 580 (7th Cir. 2001) ....................................................................33, 34

*Smith-Victor Corp. v. Sylvania Electric Products, Inc.*,
  242 F. Supp. 315 (N.D. Ill. 1965) ..................................................................30

*South Austin Coalition Community Council v. SBC Communications Inc.*,
  2001 WL 1250101 (N.D. Ill. June 22, 2001) ..................................................31

ix

*Spinelli v. National Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ...............................................................................11

*Swanson v. Citibank, N.A.*,
    614 F.3d 400 (7th Cir. 2010) .........................................................................................31

*In re Text Messaging Antitrust Litigation*,
    2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) .................................................................10

*In re Text Messaging Antitrust Litigation*,
    630 F.3d 622 (7th Cir. 2010) .........................................................................................15

*Toys 'R' Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) .........................................................................................23

*Turner v. New Jersey State Police*,
    2017 WL 1190917 (D.N.J. Mar. 29, 2017)....................................................................33

*U.S. Futures Exchange, LLC v. Board of Trade of City of Chicago, Inc.*,
    346 F. Supp. 3d 1230 (N.D. Ill. 2018) ..........................................................................24

*Underground Solutions, Inc. v. Palermo*,
    2014 WL 4703925 (N.D. Ill. Sept. 22, 2014) ...............................................................40

*Uni\*Quality, Inc. v. Infotronx, Inc.*,
    974 F.2d 918 (7th Cir. 1992) .........................................................................................10

*United Food & Committee Workers Unions & Employers Midwest Health Benefits Fund*
    *v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) ...................................................................................10, 34

*United States ex rel. Garst v. Lockheed–Martin Corp.*,
    328 F.3d 374 (7th Cir. 2003) .........................................................................................42

*United States v. Aguilar*,
    515 U.S. 593 (1995)........................................................................................................34

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).........................................................................................26

*United States v. Van Engel*,
    15 F.3d 623 (7th Cir. 1993) ...........................................................................................34

*Vasquez v. Indiana University Health, Inc.*,
    40 F.4th 582 (7th Cir. 2022) .....................................................................................28, 29

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .........................................................................................27

*Walker v. Thompson,*
    288 F.3d 1005 (7th Cir. 2002) ...................................................................................40

*Washington County Health Care Authority, Inc. v. Baxter International Inc.,*
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ......................................................................16

*Washington County Health Care Authority, Inc. v. Baxter International Inc.,*
    2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) ...........................................................17

*In re Westinghouse Securities Litigation,*
    90 F.3d 696 (3d Cir. 1996)......................................................................................42

## STATUTES

15 U.S.C. § 15b .................................................................................................................41

15 U.S.C. § 18 .............................................................................................................27, 30

15 U.S.C. § 80b-3 .............................................................................................................24

18 U.S.C. §1503 ................................................................................................................34

18 U.S.C. § 1961 .........................................................................................................32, 33

18 U.S.C. § 1964(c) ..........................................................................................................35

Cal. Bus. & Prof. Code § 17200 ......................................................................................41

IL ST CH 815 § 505/10(a)(e)............................................................................................40

## RULES

Fed. R. Civ. P. 8................................................................................................................42

Fed. R. Civ. P. 9(b) ..........................................................................................................10

## REGULATIONS

17 C.F.R. § 275.206(4)-2 ..................................................................................................24

## PRELIMINARY STATEMENT

In their 199-page Complaint, Plaintiffs Stephen Greco ("Greco") and Spotlight Asset Group, Inc. ("Spotlight"), a small, regional registered investment advisor ("RIA"), blame their lack of success, in an admittedly growing industry, on a massive conspiracy of not only thirteen separate Defendants—with differing roles in the marketplace—but also various, unidentified co-conspirators.[1] Plaintiffs' fifteen separate causes of action, however, make no sense and are entirely unsupportable.

The centerpiece of Plaintiffs' Complaint—that Defendants "conspired" to carry out a so-called "RIA Services Scheme" and a "Silencing and Retaliation Scheme"—fails because Plaintiffs allege no plausible facts to support the existence of an agreement among the Defendants. Plaintiffs provide no evidence of collusion, either directly through "smoking gun" evidence, or indirectly, through facts from which a conspiracy could be inferred.

At most, Plaintiffs point to attendance by unidentified individuals at unspecified industry conferences and purportedly parallel conduct by Broker-Custodian Defendants, such as their offering of similar referral programs and pursuit of generally similar business strategies. But courts routinely conclude that such "opportunities to conspire" and conduct are entirely consistent with independent competitive activity and do not support an inference of conspiracy. Indeed, nothing about the imagined conspiracy makes sense: Plaintiffs do not, and cannot, allege that Defendants have acted in lockstep; that they have behaved so irrationally that a conspiracy must be afoot; or that they have coordinated on price increases or output cuts, as conspirators do. If anything,

---

[1] Defendant Creative Planning (referring, individually and collectively, to Defendants Creative Planning LLC, CPI Holdco A, LLC, CPI Holdco B, LLC, and Creative Planning Holdco, LLC) is an RIA, an SEC-registered entity that provides investment advice, but does not hold onto or trade investors' assets. Defendants Schwab, AMTD, and Fidelity (together, "Broker-Custodian Defendants") are custodians and hold the assets for RIAs like Creative Planning, but do not provide investment advice.

Plaintiffs' pricing allegations prove no conspiracy exists: Plaintiffs allege "price fixing" by invoking an instance in which Schwab *eliminated its commissions* on certain trades, and AMTD and Fidelity matched those price cuts shortly thereafter. That is competition, not a conspiracy, and the Court should reject Plaintiffs' conspiracy claim under the Sherman Act, RICO, and civil conspiracy law. Furthermore, how Defendants Creative Planning or General Atlantic (a Creative Planning investor), participated in a market-wide conspiracy goes entirely unsaid.

The remainder of Plaintiffs' Complaint is equally deficient.

*First*, Plaintiffs' federal antitrust claims—under Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act—lack multiple indispensable elements. Plaintiffs allege no "antitrust injury," or harm they experienced that is traceable to an anticompetitive market effect. Without antitrust injury Plaintiffs cannot pursue antitrust claims. Further, the only agreements identified in the Complaint—referral agreements between Broker-Custodian Defendants and certain RIAs, which have been disclosed to the SEC without generating any enforcement action—are *vertical* agreements among entities serving different roles in the relevant market. They are therefore subject to the rule of reason, which requires Plaintiffs to show harm to the market. They cannot do so: Creative Planning, the sole RIA defendant, represents approximately 1/1000th of the market, and, as Plaintiffs admit, the market for RIA services is *growing*. Nor can Plaintiffs state a Section 2 violation, because they claim that *multiple* Defendants are "monopolists" and "monopsonists" in the same market, which is definitionally impossible. The Section 7 claim is equally deficient: Plaintiffs fail to allege a plausible geographic or product market, just as they fail to allege any diminution of competition in any relevant market or antitrust injury. As applied to Creative Planning, with its recent growth into a thousandth of a market share, it is utterly frivolous.

*Second*, while many of Plaintiffs' claims sound in fraud, no portion of the Complaint

satisfies Rule 9(b)'s heightened requirement that a plaintiff identify who was involved in the purported fraud, let alone the particulars surrounding it. Much of Plaintiffs' Complaint improperly refers to "Defendants" or "Broker-Custodian Defendants" as an undifferentiated bloc, including within each Defendants' own corporate family.

*Third*, Plaintiffs' RICO, false advertising and tortious interference with contract claims all require Plaintiffs to link Defendants' purported acts with harm Plaintiffs purportedly experienced. Plaintiffs cannot do so. The predicate acts (like "wire fraud") alleged under RICO are untethered to any harm to Plaintiffs; the Complaint does not claim that purported false advertising affected Plaintiffs' business; and Plaintiffs decline to identify any interfered-with contracts.

*Finally*, statutes of limitation further bar Plaintiffs' antitrust, RICO, California state law, and Illinois state law claims. Plaintiffs state that Greco has been aware of the complained-of behavior since at least March 2017, yet did not file the Complaint until May 2022.

Far from a "short and plain statement" of claims, Plaintiffs have unloaded a meandering, often indecipherable, prolix pleading that violates Rule 8 and fails in its entirety. Defendants respectfully request that Plaintiffs' claims be dismissed.[2]

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiff Greco is an investment advisor representative ("IAR") whose company Spotlight acts as an RIA. Compl. ¶¶ 27, 30. An RIA registers with the SEC or local state authorities and provides fee-based, "fiduciary" investment advice and services to investors. *Id.* ¶ 83. The amount of money an RIA manages is its "Assets Under Management" or "AUM." The sole RIA Defendant

---

[2] For the Court's assistance, the attached Appendix A summarizes how the briefs correspond to the causes of action. The only claims not discussed in this joint memorandum are the breach of contract claims (Counts 7 and 10), intentional interference with prospective economic advantage (Count 9), and defamation (Count 11), which are each discussed in Defendants' individual memoranda.

is Creative Planning.

"Distinct" from these IAR services are "RIA Custodial Services," which are provided by qualified custodians to RIAs and include custody, clearing, execution, brokerage, and related services. *Id.* ¶ 83. Defendants Schwab, Fidelity, and AMTD are qualified custodians.

### B. Greco's Conduct in the Industry

Greco used to work at Creative Planning, *id.* ¶ 27, 63, and before then at AMTD and Schwab. *Id*. ¶ 27. While Greco was working at Creative Planning, he founded Spotlight in anticipation of resigning from Creative Planning and competing with it once he left. *Id.* ¶ 373, 374. Greco resigned on March 1, 2017. *Id.* ¶ 379. Six days later, he filed a complaint with the SEC in which he accused Creative Planning of securities law violations, *id.* ¶¶ 379, 383-367*,[3] asserting that Creative Planning's participation in a client-referral program with AMTD and its partnership with speaker Tony Robbins ran afoul of SEC Rules. *Id.* ¶¶ 386-372*. "At the time of Greco's concerns, there were over 100 RIAs participating in AMTD's AdvisorDirect Program." *Id.* ¶ 33. Creative Planning supposedly received a "disproportionate share of AdvisorDirect Program referrals," but Plaintiffs do not provide a single example of a mismanaged referral, allege why a different RIA would have been better, or explain how such referrals in the time he worked at Creative Planning possibly could have harmed Plaintiffs. *Id*. ¶ 334.

To establish Spotlight in the industry, Greco hired employees, signed clients, and accumulated AUM. *Id.* ¶¶ 21-22, 662-63. He and Spotlight worked with AMTD—a target of his 2017 complaint to the SEC, *id.* ¶¶ 386-372—to custody the client assets that Spotlight managed. *Id.* ¶¶ 526, 582. But Spotlight's growth peaked in 2020, after which it began to lose AUM, employees, and the management fees it needed to sustain itself. *Id.* ¶¶ 21-22. Greco and Spotlight

---

[3] The numbering in this section of the Complaint is not consecutive.

faced a series of lawsuits and arbitrations, including from Creative Planning, Schwab, and AMTD, stemming from Plaintiffs' hiring decisions and alleged interference with client relationships. *Id*. ¶¶ 461-64; 516, 523, 535-37. A succession of custodians (AMTD, Schwab, and Fidelity) suspended or terminated their business relationship with Spotlight, in some instances on the basis of those allegations. *Id*. ¶¶ 554-55, 587, 631. Now, Greco claims that he cannot sell Spotlight because of his diminished business prospects. *Id.* ¶ 652.

### C. Greco's Allegations

Rather than attribute Spotlight's decline to their own mismanagement or poor business judgment, Plaintiffs point the finger at Defendants, asserting that Defendants perpetrated three schemes, *id*. ¶¶ 2, 6, 9, 16, that gave rise to fifteen causes of action. *Id*. ¶ 20.

### 1. Creative Planning's Fraudulent Growth Scheme

The first of the alleged schemes is the "Creative Planning Fraudulent Growth Scheme," which purportedly ran between 2013 and 2017; i.e., while Greco was employed there. *Id*. ¶¶ 323-24. The allegations relating to this scheme involve the nature of a partnership with celebrity Tony Robbins and "other related transactions," purported and unspecified mis-statements to the SEC and the public, purported mishandling of client AUM, and Creative Planning's participation in AMTD's AdvisorDirect Program. *Id.* ¶¶ 9, 323. Greco first consulted with a lawyer to develop the fundamentals of his Creative Planning Fraudulent Growth Scheme allegations in 2016, *id.* ¶ 382, and then submitted his allegations to the SEC in March 2017. *Id*. ¶¶ 386, 594. Plaintiffs do not allege that any agency filed an enforcement action based on his complaint.[4] They also do not allege they were harmed in any way by Creative Planning's purportedly fraudulent growth.

---

[4] Greco notes that in September of 2018, the SEC censured Creative Planning for improperly using client testimonials in radio advertisements. Compl. ¶¶ 351-353. Greco does not plead facts showing that he ever notified the SEC of the improper radio advertisements, or that the SEC relied on his 2017 complaint in investigating those advertisements.

## 2.    The RIA Services Scheme

The second scheme, the "RIA Services Scheme," largely revolves around allegedly fraudulent or anticompetitive activity in the provision of investment advisory services. *Id*. ¶¶ 131-32. In a series of conclusory allegations, Plaintiffs assert Defendants "intentionally market and sell Independent RIA Services and RIA Custodial Services using false and misleading advertisements and representations." *Id*. ¶ 132(o). "Defendants and Participating RIAs"—an undefined term that appears to refer to every RIA that participates in a referral or supported independence program ("SIP")—allegedly carry out the scheme through referral programs, specifically AMTD's AdvisorDirect Program, the Schwab Advisor Network, and Fidelity Wealth Advisor Solutions,[5] *id*. ¶ 135, by which Schwab, AMTD, and Fidelity refer their customers who self-direct trades and rely on these entities only for brokerage services to "third party investment advisory firms." *Id*. ¶¶ 137-39. Plaintiffs allege the three referral programs "all operate in the same way," *id*. ¶ 138, including with regard to the factors Broker-Custodian Defendants supposedly use to "determine whether an RIA is invited to participate in the Referral Program," *id*. ¶ 141. These allegedly include, *inter alia*, the RIAs' number of clients, total AUM, and revenue generation. *Id*.

Plaintiffs assert, without factual support, that Defendants carried out this scheme through:

- The institution of "no-poach" agreements that "diminished [adviser] mobility," *id*. ¶ 128 and "the threat of group boycott[s]. . . ," *id*. ¶ 192;[6]

- Barriers to entry in these markets, *id*. ¶¶ 186-202, and "collusive agreements which restrict transfer of existing AUM to alternative custodians," *id*. ¶ 196;

- Refusals to supply custodial services or the supply of inferior custodial services to RIAs that do not participate in their referral programs in order to "drive consolidation of the Investment Advisory Services Market," *id*. ¶¶ 211-14;

- Reducing the pool of qualified investment advisor representatives by driving them into

---

[5] Creative Planning is not alleged to have participated in Fidelity's referral program. *See id*. ¶ 169.

[6] Notably, plaintiffs never connect how such alleged agreements reduced the number of IARs nor allege how many IARs are employed by any of the Defendants, individually or collectively.

supported independence programs or a "Participating RIA," *id.* ¶ 241;

- Making "false and misleading representations" about how these referral programs work to hide "kickbacks and incentives," *id.* ¶¶ 281-93; and

- Thousands of unidentified predicate acts of mail and wire fraud, *id.* ¶¶ 294-95.

### 3.  Silencing and Retaliation Scheme

The so-called "Silencing and Retaliation Scheme" is the third putative scheme. Plaintiffs assert that, beginning in 2017, Mallouk and later AMTD, Schwab, and Fidelity joined together to silence and retaliate against Greco because he complained to the SEC and DOJ. *Id.* ¶¶ 376 – 663.

#### a.  *Creative Planning's Alleged "Silencing and Retaliation"*

Plaintiffs concede that in or around July 2017, shortly after Greco left Creative Planning, Mallouk, Creative Planning's CEO, contacted Greco regarding Greco's improper solicitation of Creative Planning's clients. *Id.* ¶ 385\*. Plaintiffs characterize this correspondence, which involved the parties directly, as well as their representatives, as part of a "Silencing and Retaliation Scheme," *id.* ¶¶ 383\*-85\*, 461-85, but admit that **Greco** paid thousands of dollars to Creative Planning in settlement of such claims. *Id.* ¶ 486 (emphasis added). Greco's alleged violation of that settlement agreement is the subject of an ongoing action in Kansas State Court filed by Creative Planning in June 2020. *Creative Planning, LLC v. Greco*, No. 20-cv-2465, Dkt. 1 (Kan. 10th Jud. Dist. Ct. June 11, 2020).

#### b.  *AMTD's Alleged "Silencing and Retaliation"*

AMTD allegedly participated in the Silencing and Retaliation Scheme by informing Plaintiffs in January 2019 that "Spotlight was soliciting AMTD clients" and that AMTD would "dig into things." *Id.* ¶ 516. AMTD then sent a cease-and-desist letter to a former AMTD employee hired by Spotlight for violation of post-employment obligations. *Id.* ¶ 518. After Spotlight hired a second former AMTD advisor, AMTD allegedly called Spotlight to terminate its business dealings

with the company. *Id.* ¶ 535. The Complaint asserts that "AMTD acted against its own economic and business interests," *id.* ¶ 543, but does not explain how terminating a relationship with a single RIA that encourages breaches of contract is against that self-interest. Indeed, on July 3, 2019, AMTD filed a FINRA Arbitration Action against both of AMTD's former advisors hired by Spotlight, and Greco. *Id.* ¶ 550.

Plaintiffs assert that the FINRA arbitration caused them "injury," *id.* ¶ 552, as did AMTD's decision to lock Spotlight out of its platform. *Id.* ¶ 554. But the Complaint does not specify how long this "lockout" lasted nor any harm that flowed from it or the arbitration. Plaintiffs do not allege that any communications between Schwab and any other Defendant led to the termination of Schwab's custodial relationship with Spotlight

### c. *Schwab's Alleged "Silencing and Retaliation"*

Plaintiffs state that as a result of "AMTD's early 2019 conduct toward Spotlight, Greco engaged in discussions with Schwab to provide Spotlight with RIA Custodial Services," and that Schwab and Spotlight executed a Custodial Agreement on April 17, 2019. *Id.* ¶¶ 562, 567. However, just days later, Spotlight hired a former Schwab Advisor, prompting Schwab to notify Spotlight that litigation would follow if any Schwab advisory clients followed the former Schwab advisor to Spotlight. *Id.* ¶¶ 569, 571.[7] On May 29, 2019, Schwab filed a FINRA Arbitration against its former employee, *id.* ¶ 578, and on July 1, 2019, Schwab notified Spotlight that it would terminate its business dealings with Spotlight, *id.* ¶ 587.

### d. *Fidelity's Alleged "Silencing and Retaliation"*

Meanwhile, Spotlight entered into an RIA Custodial Services Agreement with Fidelity on

---

[7] While Plaintiffs allege that these Defendants "conspired" to retaliate against Plaintiffs, each act Creative Planning, AMTD, and Schwab took to "retaliate" only occurred after Plaintiffs acted in a way to either violate their own, or their newly hired employees', contracts.

May 10, 2017, and until June 2021, utilized Fidelity as one of its primary custodians. *Id.* ¶ 615. Plaintiffs allege that in April 2021, Schwab's counsel "elicited" Fidelity's participation in the alleged Silencing and Retaliation Scheme. *Id.* ¶ 625. While Fidelity was not a subject of Greco's SEC and DOJ whistleblower complaints, *id.* ¶¶ 12, 14, Plaintiffs claim that Fidelity joined the alleged conspiracy over "shared concerns that Greco had already provided the SEC and DOJ with some information about Defendants' collusion," *id.* ¶ 627. Two months after the purported call from Schwab, in June 2021, Fidelity terminated its custodial relationship with Spotlight. *Id.* ¶ 631. Plaintiffs allege that Fidelity subsequently communicated to certain third parties that it would not do business with Spotlight and its individual advisors. *Id.* ¶¶ 642-43, 648-50, 654-55.

### D. Harm to Industry and Plaintiffs

The Complaint does not contain any specific allegations regarding the price or overall supply of RIA advisory or custodial services. Nevertheless, Plaintiffs state that the three schemes purport to serve one end: to "accelerate consolidation [in the Investment Advisory Services Market] by . . . manipulating the supplies and costs of the two essential inputs for RIAs: (1) RIA Custodial Services; and (2) [IAR] labor." *Id.* ¶¶ 205-07. Plaintiffs contend that they have been prevented from hiring advisers, retaining customers, and entering into strategic transactions with at least three independent RIAs as well as "other prospective business opportunities." *See, e.g., id.* ¶¶ 223-24 (describing Spotlight's woes in the labor market due to undescribed "labor market manipulation." ); *id.* ¶¶ 660-61 (describing Spotlight's alleged economic injuries from alleged interference with strategic business transactions). Each cause of action loosely refers to these harms. *See, e.g., id.* ¶¶ 707, 738, 745, 750, 759, 765, 787, 794, 874, 886, & 898.

Plaintiffs' allegations concede, however, that Spotlight's difficulties occurred despite a booming advisory industry. They admit that the "RIA industry is growing, with total client AUM steadily increasing," such that in 2020, "total client AUM hit a record amount of $110 trillion,

increasing by approximately 13.2% over 2019." *Id.* ¶ 100. They further note that in 2020 there were 13,880 RIAs, 185 of which had over $100 billion in AUM, *id.* ¶¶ 98, 101, and that in the past five years, the number of IARs has remained well over 600,000—at 630,235 in 2017 and at 612,457 advisers in 2021, *id.* ¶ 127.

## LEGAL STANDARD

To overcome a Rule 12(b)(6) motion to dismiss, a complaint must "raise a right to relief above the speculative level" and allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And a complaint must be dismissed when its allegations are "not only compatible with, but indeed more likely explained by, lawful" conduct. *In re Text Messaging Antitrust Litig.*, 2009 WL 5066652, at *11 (N.D. Ill. Dec. 10, 2009) (citing *Iqbal*, 556 U.S. at 680).

Allegations of fraudulent conduct must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and describe "*with particularity* the circumstances constituting fraud or mistake." This means that any allegation of fraud must "state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (citation omitted).

10

**ARGUMENT**

I.   **Plaintiffs Do Not Allege a Plausible Conspiracy Between Any Defendants (Counts 2, 4, 6, and 13).**

Plaintiffs fail to plausibly allege that any Defendant participated in a conspiracy or enterprise, mandating dismissal of at least Counts 2 (Sherman Act Section 1),[8] 4 (Cartwright Act), 13 (Civil RICO), and 6 ("civil conspiracy") (collectively, the "Conspiracy Claims").

A.   **The Conspiracy Claims Require Plausible Allegations of an Illegal Agreement.**

Under Section 1 of the Sherman Act (and the Cartwright Act),[9] a plaintiff cannot survive a motion to dismiss without plausibly alleging the purported conspirators shared "a conscious commitment to a common scheme designed to achieve an unlawful objective." *McCoy v. Gamesa Tech. Corp.*, 2012 WL 245166, at *5 (N.D. Ill. Jan. 26, 2012) (citation omitted). Failure to allege that "the parties entered into an agreement" is also fatal to a civil conspiracy claim, which likewise requires two or more people to "knowingly and voluntarily participate[] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Id.* at *4-5 (citation omitted).

Civil RICO claims under Sections 1962(a), (c), and (d) are similar; each requires plaintiffs to plausibly allege defendants acted as part of an "enterprise." *Bobb v. Swartz-Retson P.C.*, 2018 WL 4384292, at *6 (N.D. Ill. Sept. 14, 2018). Where the alleged "enterprise," as here, refers to a "group of persons associated together for a common purpose of engaging in a course of conduct," *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citation omitted), assessing whether a RICO "enterprise" exists is "close[ly] analog[ous]" to assessing whether there is an "agreement . . . in antitrust law." *Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 537-44 (D. Md. 2019) (collecting

---

[8] Count II's heading references Section 3 of the Sherman Act, which "merely extends the [geographic] reach of Section 1," meaning that "Section 3 claims are analyzed in the same manner as Section 1 claims." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 106 n.10 (S.D.N.Y. 2015).

[9] The analysis for Cartwright Act claims "mirrors the analysis under federal [antitrust] law." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

11

cases). Thus, failing to plausibly allege an agreement is fatal to antitrust conspiracy and RICO claims alike. *See, e.g.*, *MCM Partners, Inc. v. Andrews-Bartlett*, 1997 WL 306577, at \*14 (N.D. Ill. May 29, 1997) (dismissing RICO claims for the reasons "discussed in connection with the Sherman Act claim"); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998) (plaintiffs "must allege that a defendant agreed to the objective of a violation of RICO") (citation omitted).

### B. Plaintiffs Do Not Allege a Plausible Conspiracy.

Plaintiffs do not plausibly support either of the two purported conspiratorial "schemes": (1) an alleged RIA Services scheme centered around allegedly similar referral programs, Compl. ¶¶ 133 - 170, "no poach agreements" relating to IAR employees, *id*. ¶¶ 22l, 315, and general business strategies; and (2) an assertion that Broker-Custodian Defendants "participate[d] in a group boycott" by refusing to supply Spotlight with RIA custodial services pursuant to a "Silencing and Retaliation Scheme." *Id.* ¶¶ 185, 376-77, 583, 623, 626.

A plaintiff alleging an antitrust conspiracy must evince "enough factual matter (taken as true) to suggest that an agreement . . . was made." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019) (citation omitted). A plaintiff may do so "directly" through "smoking gun" admissions requiring no inferences, *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 955 (N.D. Ill. 2019), or "indirectly" through circumstantial evidence such as "parallel conduct" in addition to so-called "plus factors" that allow for plausible inferences of agreement. *Twombly*, 550 U.S. at 556-57, 561. Circumstantial evidence that is "more likely explained by[] lawful[] unchoreographed free-market behavior" does "not plausibly suggest an illicit accord," *Iqbal*, 556 U.S. at 680, and allegations must be evaluated "in light of common economic experience." *Twombly*, 550 U.S. at 554, 556. Plaintiffs fail to plausibly allege either category of evidence.

### 1. Plaintiffs Do Not Allege Direct Evidence of an Agreement.

Plaintiffs provide no "direct allegations of an agreement, like an admission by a defendant that the parties conspired." *Alarm Detection Sys.*, 930 F.3d at 827. Nowhere does the Complaint identify any "smoking gun" communications by which any person admitted to participating in an "RIA Services Scheme" or any "Silencing and Retaliation Scheme."

Plaintiffs' inability to plead direct evidence is telling, because purported conspiracies "concern[ing] long-term complex relationships" among firms should be "more susceptible of direct proof." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). Plaintiffs never identify even one conspiratorial communication to substantiate the "massive" collusion they imagine between the Defendants in this case, multiple affiliates in their corporate families, and the "[v]arious other persons . . . not named" in the Complaint. Compl. ¶¶ 1, 6, 75, 678.[10] Instead, Plaintiffs' 199-page Complaint gloms together "Defendants" or "Broker-Custodian Defendants" as an undifferentiated bloc and baldly asserts that they "colluded," "conspired," "schemed," "coordinated," or "agreed" with other named and unnamed parties.[11] But "repetition cannot substitute for factual allegation[s]" that plausibly suggest a conspiracy, *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021), just as a conspiracy claim "based on a theory of collective responsibility must be dismissed." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

### 2. Plaintiffs Have Not Pleaded Circumstantial Allegations That Plausibly Suggest the Existence of an Illegal Agreement.

Plaintiffs do not allege parallel conduct with sufficient "plus factors" to support a plausible

---

[10] Plaintiffs' failure to identify other supposed conspirators (*e.g.*, Compl. ¶¶ 75-76, 79, 678, 681) supports dismissal. *See Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 809 (N.D. Ill. 2014) (dismissing conspiracy claim based on agreement with "an amorphous group of unnamed" contractors and "unspecified" parties).

[11] *See, e.g.*, Compl. ¶¶ 1, 2, 6, 17, 74-75, 79, 130-32, 136, 152, 170, 181, 183-84, 195, 214, 376-77*.

inference of an "RIA Services Scheme" or "Silencing and Retaliation Scheme."

a.     **Plaintiffs' "RIA Services Scheme" Allegations Fail.**

With regard to the purported "RIA Services Scheme," Plaintiffs' core contention is that Defendants must have conspired because the Broker-Custodian Defendants supposedly participated in similar referral programs, offered similar RIA custodial service agreements and wealth management platforms, all cut commissions, and assertedly used similar employment policies. Compl. ¶¶ 310-15. Plaintiffs also note that the referral programs often have overlapping membership, which, they say, "facilitates collusion." *Id.* ¶ 312. But, as courts assessing conspiracy claims have long recognized, competitors' adoption of "policies with similar terms" does "not raise the specter of collusion" at the pleading stage. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (dismissing antitrust conspiracy claims premised on competitors adopting similar policies around the same time). As the Supreme Court recognized in *Twombly*—itself a circumstantial evidence case—plaintiffs must plausibly plead "parallel behavior that would probably not result from chance, coincidence, *independent responses to common stimuli*, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (emphasis added) (citation omitted).

Plaintiffs offer no reason to conclude the purportedly parallel conduct here—offering broadly similar packages of investment products, participating in an RIA referral program, and eliminating commissions—reflects anything but "independent responses to common stimuli." *Twombly*, 550 U.S. at 556 n.4. Remarkably, Plaintiffs allege that "Broker-Custodian Defendants engage[d] in price fixing and coordinate[d] changes" to RIA custodial services pricing because "on October 2, 2019," Schwab "announced that it would no longer charge" certain "commissions" on trades and AMTD followed suit within "hours," followed by Fidelity "about a week later." Compl. ¶ 314; *id.* ¶ 296(b). Cutting prices to zero is the ***exact opposite*** of the anomalous price

*increases* at issue in *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010). The Supreme Court has long warned against "infer[ring] conspiracies" from "price-cutting activities" which are "the very essence of competition" and precisely what "the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).

In other words, offering a basic package of investment products, providing access to referral programs, and cutting prices are *exactly* the types of policies that *customers*, a common stimulus for each Defendant, are likely to demand. *See Twombly*, 550 U.S. at 556 n.4. Similarly, each corporate Defendant faces the threat that departing employees will coerce firm clients into transferring AUM to their new employer; it is therefore rational for each to independently adopt policies to mitigate that problem. *See Musical Instruments*, 798 F.3d at 1196 ("Even assuming that the progressive adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism.").

These policies are intrinsically different than the type of parallel conduct that might give rise to an inference of collusion, such as where "all at once" competitors either change their "heterogenous and complex" pricing structures or decrease their output in favor of something "uniform," while "simultaneously jack[ing] up their prices." *See In re Text Messaging Antitrust Litig.*, 630 F.3d at 628. As the leading antitrust treatise recognizes, "the first inference to be drawn [from parallel conduct] is not that the firms are conspiring with each other, but that competition, consumer preference, or market conditions have forced them to behave in a similar way." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 307d1 (5th Ed, 2022).

Plaintiffs' vague references to plus factors like purported "information sharing," Compl.

¶¶ 299-305, "mergers and acquisitions," *id.* ¶¶ 308-09, and "conferences and opportunities to meet," *id.* ¶¶ 306-07, cannot save their implausible claims. Those allegations are wholly conclusory: Plaintiffs decline to explain what information was exchanged, when, and why it mattered. As to the claim that mergers or industry conferences presented Defendants with opportunities to conspire, courts have reasonably concluded that mere "opportunities for collusion" are "unspectacular" and "fail[] to move the needle" toward conspiracy. *See Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018) (collecting cases). Indeed, Plaintiffs fail to specify which individuals associated with which Defendants purportedly capitalized on these asserted "opportunities."

The remainder of Plaintiffs' plus-factor allegations are just as underwhelming. While Plaintiffs claim Defendants shared a "motive" to conspire and increase their profits, Compl. ¶ 1, "[m]otivation to enter a conspiracy is never enough" to state a conspiracy claim. *Reapers*, 412 F. Supp. 3d at 955 (citation omitted).[12] Similarly, Plaintiffs allude to "industry characteristics" that purportedly "facilitate[d] collusion," Compl. ¶ 296(e), but bromides about the economic characteristics of relevant markets do not support an inference of a conspiracy. *See Jones v. Micron Technology Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) (dismissing antitrust conspiracy claims, in part because "[p]laintiffs' allegations concerning market characteristics [we]re . . . just as likely to be consistent with innocent as unlawful behavior"). Plaintiffs state that certain referral programs have overlapping memberships, noting that Creative Planning has participated in AMTD

---

[12] If anything, Plaintiffs' allegations that Defendants "aim[ed] and intended" to "inflat[e] pricing" and "eliminat[e] competitors," Compl. ¶¶ 6, 74, exposes the Conspiracy Claims as implausible. As explained below, Plaintiffs allege that Defendants each possessed market, monopoly, or monopsony power, which Plaintiffs acknowledge is the power to control price or exclude competition. *See infra* at 25. If Defendants supposedly "desired to increase prices" or exclude competition, "it would be far easier" to do so through their own "purported level of control over the relevant market," rather than by "collud[ing] with another company." *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2017 WL 4310767, at *7 (N.D. Cal. Sept. 28, 2017) (dismissing conspiracy claim as implausible).

and Schwab's referral program. But Plaintiffs are forced to admit that Creative Planning does *not* participate in Fidelity's referral program, Compl. ¶ 148, affirmative evidence *against* Creative Planning's participation in a supposed industry-wide conspiracy.

Next, Plaintiffs vaguely reference "a history of government regulation, investigation, and collusive conducts." Compl. ¶ 296(e). Whatever Plaintiffs intend to invoke with these vague assertions, the allegations amount to the same kind of "if it happened there, it could have happened here" conjecture that courts routinely reject. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007). Indeed, allegations about past governmental investigations "shed no light whatsoever on whether the defendants engaged in an antitrust conspiracy." *See Wash. Cnty. Health Care Auth. Inc., v. Baxter Int'l, Inc.*, 2020 WL 1666454, at *9 (N.D. Ill. Apr. 3, 2020). Plaintiffs' circumstantial allegations in support of their "RIA Services Scheme" conspiracy theory fail to substantiate their claims.

> **b.   Plaintiffs' Pleadings in Support of Their "Silencing and Retaliation Scheme" Do Not Suggest a Plausible Conspiracy.**

Similarly, Plaintiffs fail to plausibly allege indirect evidence of a boycott or any other agreement to engage in a "Silencing and Retaliation Scheme." According to Plaintiffs, the Court should infer that Defendants entered into a group boycott agreement because Schwab, AMTD, and Fidelity stopped supplying Spotlight with RIA custodial services at different times. Compl. ¶¶ 575, 621, 631-632. But to plead parallel conduct that plausibly indicates the existence of a group-boycott agreement, the "boycotting methods" must be "so idiosyncratic that they suggest conspiracy." *See Quality Auto Painting Ctr. Of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1272 (11th Cir. 2019); *see also Dixon v. Nat'l Hot Rod Ass'n*, 450 F. Supp. 3d 831, 853 (S.D. Ind. 2020) ("The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominately anticompetitive.") (quoting *Nw. Wholesale*

*Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985)). Here, Plaintiffs do not present any such allegations, such as pleading that Broker-Custodian Defendants abruptly and simultaneously ceased doing business with Spotlight. To the contrary, Plaintiffs allege that AMTD terminated Spotlight's agreement on April 17, 2019; that Schwab terminated about three months later in July 2019; and that Fidelity followed *almost two years* later on June 24, 2021. Compl. ¶¶ 535, 587, 631.

Nor have Plaintiffs pleaded surrounding facts that plausibly suggest conspiracy rather than independent conduct. Reasoning backwards, Plaintiffs assert that there *must* have been a conspiracy because terminating Spotlight was purportedly contrary to each Broker-Custodian Defendant's self-interest. Compl. ¶¶ 296(d), 543, 635. Plaintiffs do not substantiate that contention, and their Complaint suggests plausible reasons that termination *would* further independent self-interests. *See, e.g.*, Compl. ¶¶ 461-64, 516, 523, 535-37, 594-95 (summarizing litigation and arbitration history between Plaintiffs and certain Broker-Custodian Defendants).

Regardless, Plaintiffs' conclusory allegations do not evince the "extreme action against self-interest" that "may suggest prior agreement—for example, where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *See Musical Instruments*, 798 F.3d at 1195. To the contrary, Plaintiffs' allegations demonstrate that terminating Spotlight was not a "perilous" decision for any of the Broker-Custodian Defendants. As Plaintiffs' allegations make clear, Spotlight's AUM was insignificant in comparison with the industry as a whole and the amounts that other RIAs managed. *See, e.g.*, Compl. ¶ 21 (Spotlight's AUM peaked at approximately $430 million); *id.* ¶¶ 101 (noting that "92.0% of the total RIA Market AUM was managed by RIAs with more than $5 billion in AUM"); 102 (explaining that "less than 2.5% of total RIA Market AUM

18

is managed by RIAs with less than $1 billion in AUM"). In short, the Court should dismiss these and Plaintiffs' other farfetched Conspiracy Claims.

## II.     Plaintiffs' Federal and State Antitrust Claims Fail (Counts 2-4).

### A.     Plaintiffs Do Not Allege Antitrust Injury.

Plaintiffs' antitrust claims should be dismissed because Plaintiffs fail to allege how Defendants' purported antitrust violations harmed competition or Plaintiffs. To state an antitrust claim, Plaintiffs must allege an "antitrust injury," meaning personal injury flowing from a broader harm to competition, *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (internal citations omitted); i.e., "a direct link between the antitrust violation and the antitrust injury." *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 927 (7th Cir. 1995) (quotation omitted). Plaintiffs do not allege personal harm traceable to the purportedly anticompetitive conspiracies.

Plaintiffs fail to show any antitrust injury, much less explain how they were harmed, by the purported "RIA Services" conspiracy. Whatever this conspiracy purportedly entailed—the Complaint is not entirely clear—Plaintiffs identify its "primary" component as so-called "referral agreements" between certain larger Broker-Custodian Defendants and some RIAs. Compl. ¶ 133. But Plaintiffs also allege these Referral Agreements existed in the same form for approximately a decade, including during Spotlight's alleged period of growth and success between 2017 and 2020. *Id.* ¶ 132. Plaintiffs present no coherent explanation of how the referral agreements harmed them, either directly, or through an effect on prices in the marketplace that somehow drove consumers away from Spotlight. Indeed, Plaintiffs make no allegations regarding marketplace pricing at all. *Kochert*, 463 F.3d at 716; *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1094 (7th Cir. 1992) (affirming dismissal where plaintiffs did not articulate "a cogent argument . . . the alleged

restraints impose an anti-competitive effect on the alleged markets").[13]

Neither do Plaintiffs describe a plausible harm to the IAR labor market, much less to themselves, resulting from the purported "no-poach" component of the supposed "RIA Services" conspiracy. Plaintiffs' sole allegation is that the number of IARs wavered (including during a pandemic) from 630,235 in 2017 to 612,457 in 2021. Compl. ¶ 127. Plaintiffs do not attempt to explain how Defendants caused this contraction, how the decrease is anything but a reflection of the industry dynamics, *id.* ¶ 101, whether IAR wages have been affected in any way at all, nor how the supposed "contraction" in IAR supply harmed Spotlight. Indeed, Plaintiffs allege they ***added*** advisors even as the pool of IARs was allegedly contracting. Compl. Ex. A at 2.

For many of the same reasons, Plaintiffs fail to plausibly explain how the purported conspiracy to stop selling custodial services to Spotlight—a single RIA among thousands—harms competition, including any cognizable impact on marketwide pricing or output, much less that Plaintiffs' alleged injury resulted from this competitive harm.

Next, while Plaintiffs' "monopolization" claim is independently meritless, *see infra* at 25, Plaintiffs do not attempt to show any effects of purported monopolization on prices in the marketplace, or how Plaintiffs were injured by any competition-reducing conduct. *See Chi. Studio Rental, Inc. v. Ill. Dep't of Com. & Econ. Opportunity*, 940 F.3d 971, 977-79 (7th Cir. 2019) (affirming dismissal where plaintiffs did not plausibly allege reduced output or higher prices in the relevant market or facts to support allegation of increased transaction costs).

Finally, Plaintiffs' Section 7 allegations provide no logical connection between Plaintiffs' supposed injuries and the Schwab-AMTD merger, Creative Planning's "Roll-Up Consolidation

---

[13] Nor can Plaintiffs show any antitrust injury by invoking purported difficulties in selling Spotlight to a larger RIA because, as the Supreme Court made clear in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488 (1977), the antitrust laws afford no remedy to plaintiffs who claim injury as a result of their having to compete.

Plan," General Atlantic's investment in Creative Planning, or Broker-Custodian Defendants' SIPs. *See O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 224 (N.D. Ill. 1987) (dismissing Section 7 complaint where plaintiff failed to establish "any logical connection between [the] acquisitions" and the plaintiff's "pocketbook injury," and noting that "[p]ure speculation, or vaguely defined links" are insufficient to plead antitrust injury for a Section 7 claim); *see also Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 632 (N.D. Ill. 2015) ("'Antitrust injury' is [] an element of a claim under Section 7 of the Clayton Act."). These problems are particularly glaring with respect to the Schwab-AMTD merger, which post-dated Spotlight's termination from the Schwab and AMTD custodial platforms by over a year. *Compare* Compl. ¶ 48 (October 2020 merger), *with id.*, Ex. A, Riesenberg Decl. ¶ 21 (April 17, 2019 AMTD termination of Spotlight custodial arrangement), *and id.* ¶ 27 (July 1, 2019 Schwab termination). And Greco's alleged inability to sell Spotlight or otherwise profit from spinning off its clients is even more problematic because it not only lacks any logical connection to the alleged Section 7 conduct, but also because remedying it would be inimical to the purposes of the antitrust laws. *See Brunswick*, 429 U.S. at 488 (in a Section 7 case, the antitrust laws afford no remedy to plaintiffs who claim injury as a result of having to compete).

### B.    Plaintiffs Have Not Alleged Agreements That Restrain Trade.

Plaintiffs' claims under Section 1 of the Sherman Act and the Cartwright Act also fail because Plaintiffs do not plausibly allege "a contract, combination, or conspiracy" that unreasonably restrained trade in a relevant market. *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021). The antitrust laws differentiate between "horizontal" and "vertical" contracts, applying distinct standards for each. "Horizontal" agreements are "between competitors," while vertical agreements are "between firms at different levels of distribution." *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 729 (1988). As discussed *supra*

21

12-18, Plaintiffs have not adequately alleged a horizontal agreement—or conspiracy—between Defendants. The only agreements they do allege are the referral arrangements between certain RIAs and certain Broker-Custodian Defendants, two groups that are allegedly in "distinct service markets." Compl. ¶ 83. In short, Plaintiffs describe a series of bilateral, vertical agreements, which are subject to the rule of reason, *see Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007), which require that Plaintiffs plead facts demonstrating that "an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012).[14]

Plaintiffs have not done so. Instead, Plaintiffs rely on conclusory assertions that Defendants' conduct generated "substantial anticompetitive effects in the Investment Advisory Services Market, RIA Custodial Services Market, and IAR Labor Market," and that "[t]here is no legitimate business justification for, or procompetitive benefits attributable to" such conduct. Compl. ¶ 729. These bare averments lack the "factual matter" necessary to comply with Rule 8 or survive a motion to dismiss, *Twombly*, 550 U.S. at 556.

Similarly, Plaintiffs' allegations that the "RIA Services Scheme" restrained innovation and pricing competition in the Investment Advisory Services Market and RIA Custodial Services Markets, *see, e.g.*, Compl. ¶ 316, are bereft of factual support. The only specific allegation Plaintiffs make regarding prices relates to an instance in which Broker-Custodian Defendants reacted to competition by *eliminating* commissions on certain trades—a consumer-friendly

---

[14] Even if Plaintiffs had sufficiently alleged a horizontal agreement with respect to the referral programs, they would still have to meet the rule-of-reason standard. Courts have repeatedly held that referral programs, even between horizontal competitors, are subject to rule of reason analysis because they can have procompetitive effects. *See, e.g.*, *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381-83 (11th Cir. 1997) (analyzing Section 1 claim relating to referral program under rule of reason); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1091 (6th Cir. 1996) (same); *Fran Welch Real Estate Sales, Inc. v. Seabrook Island Co.*, 809 F.2d 1030, 1033 (4th Cir. 1987) (same); *see also Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1373-74 (W.D. Pa. 1982) (same).

decision the antitrust laws encourage.[15] The complaint is also silent on any specific "artificially inflated prices" Spotlight allegedly paid for RIA Custodial Services and "RIA Labor," and fails to describe how Defendants' alleged conduct affected those prices. *See* Compl. ¶ 297.

Indeed, the type of vertical agreement that Plaintiffs describe is one that courts have long recognized as procompetitive. Plaintiffs appear to contend that the primary agreements at issue are referral arrangements between the Broker-Custodian Defendants and certain independent RIAs. *See* Compl. ¶¶ 135, 138, 146, 170, 173, 174. The Seventh Circuit has described similar referral arrangements as lawful and legitimate. *See Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (referral arrangements amount to a "story of a legitimate vertical transaction").

The same problems afflict Plaintiffs' assertions regarding post-employment non-compete agreements. Plaintiffs repeatedly label these alleged arrangements as "no-poach agreements," *see, e.g.*, Compl. ¶¶ 221, 222, 315, 624, but they do not allege *any* facts supporting an inference of a horizontal agreement between competitors not to hire one another's employees. *See, e.g.*, *Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *6 (N.D. Ill. June 25, 2018). Instead, Plaintiffs allege that certain Broker-Custodian Defendants require their former employees to abide by certain post-employment obligations designed to protect the employer's confidential information and assets. *See, e.g.*, Compl. ¶¶ 535-39, 569-76. Vertical post-employment covenants are subject to rule of reason analysis and are lawful "unless they bring a large market share under a single firm's control." *Polk Bros., v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). Plaintiffs allege no facts to substantiate such a market effect.

### C.    Implied Immunity Necessitates Dismissal of the Section 1 Claim.

The Section 1 claim (and its state-law corollaries) should also be dismissed by operation

---

[15]   *See supra* at 14.

of the doctrine of implied immunity. Under that doctrine, "conduct is implicitly immune from antitrust liability where finding liability would create a risk of 'clear repugnancy' or 'clear incompati[bility]' between a specialized regulatory scheme and the antitrust laws." *U.S. Futures Exch., LLC v. Bd. of Trade of City of Chicago, Inc.*, 346 F. Supp. 3d 1230, 1256 (N.D. Ill. 2018) (internal citation omitted) (alteration in original). With respect to SEC regulations, "[t]he Supreme Court has found implied antitrust immunity where the SEC effectively authorized the conduct in question, where the SEC chose not to issue prohibitions or restrictions despite having the authority to do so, and where the SEC disapproved the challenged practices, but it was possible that lines drawn by antitrust courts could lead to future conflicts with SEC determinations." *Id*. at 1255-56 (collecting cases) (internal citations omitted).

While Plaintiffs are unable to describe a coherent antitrust conspiracy, they state repeatedly that the "RIA Services Scheme" is designed "to circumvent" SEC rules and regulations. *See, e.g.,* Compl. ¶¶ 6, 130, 131, 132, and 291. The apparent argument is that Defendants' referral agreements run afoul of SEC requirements for '"separation of services' in the RIA Industry," *id*. at 131, what Plaintiffs characterize as the required relationship between custodians and RIAs. *Id.* ¶ 97 (*citing* 15 U.S.C. § 80b-3; 17 C.F.R. § 275.206(4)-2). But as Plaintiffs acknowledge, the propriety of custodial relationships is directly regulated by the SEC. *See id*.

Indeed, in its attempt to argue that Defendants are engaging in a series of "kickbacks" associated with referral fees as part of the antitrust conspiracy, the Complaint quotes extensively from various "Form ADVs"—a required SEC filing—which specifically describe the allegedly collusive relationship.[16] Plaintiffs plead themselves out of the claim: the activities in the Form

---

[16] *See, e.g.*, Compl. ¶ 142 (stating that an RIA discloses in a Form ADV that "AMTD will most likely refer clients through their AdvisorDirect Program to Participating RIAs that encourage their advisory clients to custody with AMTD and 'whose client accounts are profitable'" to AMTD.").

ADVs are explicitly disclosed to the SEC, and the SEC has taken no action regarding them. The doctrine of implied immunity prohibits prosecution of an antitrust claim for actions that are permitted by the SEC. *Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 689 (1975).

**D.    Plaintiffs' Section 2 Claim Fails Because It Is Predicated on a Shared Monopoly/Monopsony.**

Plaintiffs' claim under Section 2 of the Sherman Act—that Defendants jointly monopolized, monopsonized, or attempted to monopolize or monopsonize the putative relevant markets, Compl. ¶¶ 714-719—fails as a matter of law because "a § 2 claim can only accuse one firm of being a monopolist," *Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003), and one firm of being a monopsonist, *Pro Music Rts., LLC v. Apple, Inc.*, 2020 WL 7406062, at *9 (D. Conn. Dec. 16, 2020) (rejecting Section 2 "shared monopsony" theory); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995) ("one firm alone" can "have the power to control [a market] and exclude competition"). Indeed, the "very phrase 'shared monopoly' is paradoxical; when a small number of [firms] dominates a market, this typically is described as an oligopoly." *Oxbow Carbon & Mins. LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013) (citation omitted). But Section 2 cannot be invoked to challenge "conduct aimed only at creating an oligopoly." *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1416 (7th Cir. 1989). Plaintiffs explicitly allege that "Defendants" or "Broker-Custodian Defendants" collectively—not any Defendant in particular—possess monopoly, monopsony, and market power.[17] Accordingly, the Court should dismiss the Section 2 claim as a matter of law.

**E.    Plaintiffs' Sherman Act Section 2 Allegations Do Not Describe Any Exclusionary**

---

[17] For example, Plaintiffs allege that: (i) "Defendants have market power in the Investment Advisory Services Market, including power to set prices and exclude competition," and are "attempting to attain . . . monopoly power" in that market (Compl. ¶¶ 714, 718); (ii) "Defendants have monopsony power in the IAR Labor Market," or alternatively, "are dangerously close to attaining" it (*id.* ¶¶ 715, 719); and that (iii) "Broker-Custodian Defendants have monopoly power in the RIA Custodial Services Market, including the power to set prices and exclude competition" (*id.* ¶ 716).

**Conduct.**

Plaintiffs also fail to allege any "willful, anticompetitive conduct" as required to sustain a claim under Section 2. *Schaumburg*, 930 F.3d at 828. Every Section 2 plaintiff must establish that the putative monopolist engaged in exclusionary conduct that produced an anticompetitive effect. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). In their Complaint, Plaintiffs do not allege facts that even purport to satisfy that element. To the extent Plaintiffs hinge this claim on the same allegations that set forth the "RIA Services Scheme," *see* Compl. ¶¶ 717, 727, 730, those pleadings do not suffice. They do not indicate that any firm with monopoly power engaged in exclusionary conduct vis-à-vis its rivals, nor do they offer any factual support for the bare assertion that vertical referral program agreements caused anticompetitive effects in a relevant market. *See id.* ¶ 727.

To the extent Plaintiffs are alleging that Defendants illegally refused to deal with them, that theory fails. "The Sherman Act generally does not prohibit freely exercising one's 'independent discretion as to parties with whom [one] will deal.'" *Reapers*, 412 F. Supp. 3d at 956. (internal citation omitted) (alteration in original). A Section 2 claim premised on a refusal to deal fails "unless it can be shown that [a firm's] decisions are part of a broader effort to maintain its monopoly power." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 398 (7th Cir. 2000). Plaintiffs do not plausibly allege how terminating a custodial relationship with Spotlight—a single, relatively small RIA—could have contributed to any Defendant's supposed monopoly power. Nor do Plaintiffs explain how Defendants intended to acquire or maintain a monopoly or engaged in conduct that was irrational but for its anticompetitive effect. *See Reapers*, 412 F. Supp. 3d at 956. As noted, *supra* at 18, there were ample reasons for Defendants not to do business with Greco and Spotlight, that are entirely consistent with rational, independent business behavior and therefore not actionable under the antitrust laws. Finally, Plaintiffs never allege that they *competed* with any

26

of the Broker-Custodian Defendants to offer custody services, a critical predicate for any refusal-to-deal claim under binding Seventh Circuit precedent. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020) (characterizing "refusal to sell to *rivals* on the same terms as other potential buyers" as essential element of refusal-to-deal claim) (emphasis added). The Court should dismiss Plaintiffs' Section 2 claim for this reason, too.

### F. Plaintiffs Do Not Allege Facts That Support an Actionable Clayton Act Section 7 Claim.

Plaintiffs' Section 7 claim fares no better. Section 7 prohibits acquisitions where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. In Count Three, Plaintiffs appear to allege four discrete violations of the statute: Schwab, in acquiring AMTD (Compl. ¶ 741); Creative Planning, in acquiring "more than 30 competitor Independent RIAs" (*id.* ¶ 742); General Atlantic, in acquiring a minority partnership interest in Creative Planning (*id.* ¶¶ 261, 743); and all Broker-Custodian Defendants, in offering independent RIAs access to wealth management platforms, or "SIP" programs (*id.* ¶ 744). Each theory lacks a plausible factual foundation.

#### 1. The Pleadings Do Not Describe Plausible Markets.

Plaintiffs' Section 7 claims fail at the outset because they do not present sufficient information to plausibly define the contours of the relevant product and geographic markets. "[T]o show a Section 7 violation, [the plaintiff] must identify . . . the relevant product and geographic markets," *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016), the outer boundaries of which "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). Plaintiffs do not even attempt to carry that burden.

In summary fashion, Plaintiffs allege three relevant products: Investment Advisory

27

Services (Compl. ¶ 108), RIA Custodial Services (*Id.* ¶ 113), and IAR Labor (*Id.* ¶ 126). But Plaintiffs decline to identify substitutes or potential substitutes for *any* of those products or services, much less present information about the cross-elasticity of demand between the relevant products and those substitutes. *See Jacobs v. Tempur-Pedic Int'l., Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (affirming dismissal where "[t]he complaint provide[d] no factual allegations of the cross-elasticity of demand or other indications of price sensitivity"). By failing to consider substitutes as required, Plaintiffs define an implausibly narrow marketplace.[18]

Plaintiffs' geographic-market allegations are commensurately flawed. As the Seventh Circuit explained recently, "the appropriate object of the geographic-market analysis is the smallest market a hypothetical monopolist could dominate." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 587 (7th Cir. 2022). The *Vasquez* court framed the question at the pleading stage as whether the complaint presents a plausible explanation "of how a hypothetical monopolist could wield anticompetitive power in [the proposed geographic] market." *Id.* at 586.

Plaintiffs never explain how a hypothetical monopolist could wield anticompetitive power, much less provide a plausible account of how a dominant firm could control nationwide markets for investment advisory services, RIA custodial services, and/or IAR labor. The extent of Plaintiffs' geographic market allegations are (1) a bare averment that the United States is the relevant geographic market (Compl. ¶ 106) and (2) a conclusory assertion that the relevant geographic market must be the United States because "the accounts, wire transfers, purchase and sale of securities, brokerage services, and other relevant transactions . . . involve the national securities

---

[18] For example, the market for Investment Advisory Services as pleaded would exclude all investment advice provided by financial advisors who dually register with the Securities and Exchange Commission and the Financial Industry Regulatory Authority ("FINRA"), such as "broker-dealers and hybrid RIAs." Compl. ¶ 107. But Greco acknowledges elsewhere that broker-dealers and hybrid RIAs *do* provide certain investment advisory services, *id.* ¶ 99, and never reconciles that point with his myopic market definition.

exchanges, over the counter exchanges, national banking system, and otherwise occur in a systemic and coordinated fashion throughout the United States." *Id*. ¶ 86. The allegations fall short of even the "plausible scenario" that is "require[d] to establish the geographic market" at the pleading stage. *See Vasquez*, 40 F.4th at 586.

> ### 2. Plaintiffs Fail to Allege Facts That Plausibly Demonstrate Any Diminution of Competition in Any Relevant Market.

The pleadings also fall short at the second step of the Clayton Act analysis: they do not show "whether the effect of the merger may be substantially to lessen competition in the relevant market." *FTC v. Advoc. Health Care*, 2017 WL 1022015, at *7 (N.D. Ill. Mar. 16, 2017) (internal quotation omitted). Even when an acquisition may "result in some lessening of competition," it still is "not forbidden" by Section 7, which "deals only with such acquisitions as probably will result in lessening competition to a substantial degree." *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930). Here, Plaintiffs plead no facts that purport to demonstrate a market-wide diminution of competition resulting from three of the four categories of conduct alleged.

*First*, Plaintiffs cannot show a reduction in competition by alleging that the "Roll-Up Consolidation Plan" and General Atlantic's investment in Creative Planning purportedly enabled "Defendants" to come "dangerously close to acquiring monopoly power in the Investment Advisory Services Market." Compl. ¶ 280. That allegation is nonsensical, as the Complaint suggests that the acquisitions led Creative Planning to capture approximately 1/1000 of a $110 trillion RIA Services market. *Id*. ¶¶ 100, 148; *see Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984) (resulting market percentage of 4% is insufficient "as a matter of law" to sustain a Sherman Act Section 2 Claim or Clayton Act Section 7 claim).

*Second*, Plaintiffs never explain (as they must) how operating a SIP constitutes "acquir[ing]" the "whole or any part of the stock or other share capital" of another. 15 U.S.C. §

18. Nor could they, because Plaintiffs acknowledge the Broker-Custodian Defendants merely "*market*" and "*offer*" their SIPs to clients, Compl. ¶¶ 222, 240, and it is "meritless" to claim that "sell[ing]" or "licens[ing]" something falls under Section 7. *See Arbitron Co. v. Tropicana Prod. Sales, Inc.*, 1993 WL 138965, at *4-6 (S.D.N.Y. Apr. 28, 1993). In any event, Plaintiffs fail to allege how the SIPs diminished competition in the three putative markets. *See* Compl. ¶ 744. Contrary to Plaintiffs' blanket assertion, "Section 7 requires more than allegations that there were mergers or acquisitions and a lessening of competition in a relevant line of commerce[.]" *Smith-Victor Corp. v. Sylvania Elec. Prod., Inc.*, 242 F. Supp. 315, 320 (N.D. Ill. 1965).

*Third*, Plaintiffs cannot make the required showing based on their flawed allegations regarding Schwab's acquisition of AMTD.[19] *See* Compl. ¶¶ 114, 118. Plaintiffs do not allege facts beyond market share statistics to attempt to "make plausible [their] claim that the effect of [the relevant acquisition] may be substantially to lessen competition, or to tend to create a monopoly." *See Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 2013 WL 6682981, at *8 (E.D. Va. Dec. 18, 2013). Nor do Plaintiffs' allegations demonstrate that Schwab's "acts were anticompetitive because of the acquisition[], or that their anticompetitive nature was enhanced by the acquisition[.]" *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 491 F. Supp. 1199, 1224 (D. Haw. 1980), aff'd, 732 F.2d 1403 (9th Cir. 1984).

Instead, Plaintiffs rely on characterizations and legal conclusions.[20] Like other plaintiffs whose allegations did not suffice to state a Section 7 claim, Plaintiffs "simply allud[e] to the

---

[19] As required by the Hart-Scott-Rodino Act, Schwab notified the Department of Justice of its proposed acquisition of AMTD so that the agency could review the scope and potential effect of the transaction. The Department of Justice closed its investigation on June 3, 2020 without seeking any structural changes or conditions.

[20] *E.g.*, Compl. ¶ 116 (characterizing Schwab post-acquisition as the "market dominator"), *id.* ¶¶ 115, 741 (asserting, without factual support, that Schwab's acquisition of AMTD "resulted in increased pricing" and rendered the "market . . . even more concentrated and anti-competitive, with high barriers to entry and no innovation or pricing competition").

proportions of the merger, and leav[e] it to the court to infer a threat of an antitrust violation simply because the merger is now a fact." *S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 2001 WL 1250101, at *13 (N.D. Ill. June 22, 2001). That level of pleading detail is not commensurate with the massive factual investigation Plaintiffs propose to launch, and leaves Defendants without the notice they need to understand "how, in the plaintiff[s'] mind at least, the dots should be connected." *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

### III. Plaintiffs Fail to Plead Fraud-Based Claims with Particularity (Counts 1, 5, 13-15).

Plaintiffs' claims under the Lanham Act (Count 1), California's Unfair Competition Law ("UCL") (Count 5), civil RICO (to the extent based on mail and wire fraud) (Count 13), ICFA (Count 14), and DTPA (Count 15) should be dismissed because Plaintiffs have not pled the fraud-based allegations underlying them[21] with particularity, as they must.[22]

Plaintiffs named thirteen Defendants, including twelve separate companies and an individual. Yet throughout the Complaint, Plaintiffs lump Defendants together, without "distinguish[ing] in any way what actions were committed" by each of the defendants (the who), let alone the what, when, where, and how of the alleged fraud. *QO Acquisition Corp. v. Julien Co.*, 1990 WL 16459, at *2 (N.D. Ill. Feb. 12, 1990).[23] For example, Plaintiffs allege "Defendants [made] intentionally false and misleading representations and omissions in their SEC Reports, and in other representations to clients," *id.* ¶ 281, yet do not identify what Defendant made misrepresentations, the misrepresentations' alleged content, or where, when or how the

---

[21] *See, e.g.*, Compl. ¶ 700 (Lanham Act); *id.* ¶ 755 (UCL); *id.* ¶ 863 (RICO); *id.* ¶ 884 (ICFA); *id.* ¶ 890 (DTPA).

[22] *See Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 709 (N.D. Ill. 2006) (Lanham Act); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (UCL); *Goren,* 156 F.3d at 726 (RICO); *Nakajima All Co. v. SL Ventures Corp.*, No. 00 C 6594, 2001 WL 641415, at *4 (N.D. Ill. June 4, 2001) (ICFA and DTPA).

[23] *See e.g.*, Compl. ¶¶ 281-84, 290, 292-95, 693-95, 700-05, 755-58, 863, 880, 884, 890-91.

misrepresentations were made. In the few instances where Plaintiffs make fraud allegations against a specific Defendant group, Plaintiffs frequently fail to allege *who* made the statement or any details regarding the nature of the purported misrepresentation.[24]

Courts routinely dismiss claims based on conclusory assertions of "fraudulent and misleading representations" where, as here, plaintiffs fail to identify the particular communications at issue or the required who, what, when, where, and how. *See, e.g.*, *Calavan v. First Love Int'l Ministries*, 2022 WL 704810, at *5 (N.D. Ill. Mar. 9, 2022). The same holds here.

## IV. Plaintiffs' RICO Claims Fail to Sufficiently Allege Foundational Elements.

### A. Plaintiffs Fail to Allege Viable Predicate Acts.

Plaintiffs cannot state a RICO claim because they fail to allege qualifying RICO predicate acts; *i.e.*, specific criminal acts enumerated in 18 U.S.C. Section 1961(1)(B), including mail and wire fraud. *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). Where a plaintiff relies on predicate acts sounding in a fraud, the plaintiff must, "at a minimum, describe [at least] two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). This requirement applies to each Defendant. *Goren*, 156 F.3d at 726 ("Rule 9(b) requires a RICO plaintiff to plead sufficient facts to notify *each defendant* of his alleged participation in the scheme") (citation omitted) (emphasis added).

Plaintiffs cannot meet this standard because they broadly and vaguely allege that

---

[24] *See, e.g.*, *id.* ¶ 568 (alleging misrepresentations "on multiple occasions" by Schwab Defendants but not who made statement or nature of misrepresentation); *id.* ¶ 693 (alleging misrepresentations by Creative Planning Defendants without specifying who made statement or nature of misrepresentation) *id.* ¶¶ 137, 229-34, 240, 613 (quoting excerpts from Fidelity's website and marketing materials but not identifying any purportedly fraudulent or misleading statements).

Defendants as a group engaged "in multiple predicate acts of mail and wire fraud" to carry out the alleged schemes. Compl. ¶¶ 294, 694, 863. The allegations fail to describe any specific instances of mail or wire fraud, let alone for each Defendant, and never explain "when the false documents were transmitted, who mailed or wired them, or why [Plaintiffs] believe that person had an intent to defraud." *Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 849 (N.D. Ill. 2013).

Plaintiffs' reliance on alleged antitrust-law violations is misplaced: a "violation of antitrust law is not a predicate act under RICO" because such acts are "outside the scope of 18 U.S.C. § 1961, which defines" predicate acts actionable under RICO. *Jennings v. Emry*, 910 F.2d 1434,1438 (7th Cir. 1990). Similarly, Plaintiffs' allegations of witness tampering and witness retaliation, Compl. ¶ 677, do not amount to RICO predicate acts where, as here, the vast majority of the alleged threats and retaliation relate to "bringing or threatening to bring [allegedly] wrongful litigation." *Edelson PC v. Bandas Law Firm PC*, 2018 WL 723287, at *5 (N.D. Ill. Feb. 6, 2018); *see also Turner v. N.J. State Police*, 2017 WL 1190917, at *32 (D.N.J. Mar. 29, 2017) ("Without more, this threat to take legal action cannot constitute witness tampering, witness retaliation, or obstruction of justice."); *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 161, 163, 162 (D. Conn. 2000) ("[T]he filing of complaints and other legal documents" without any "additional allegations of extortion or some other pattern of racketeering activity" amount to little more than a "vague abuse of process or malicious prosecution claim.").

In any case, Plaintiffs' allegations regarding Creative Planning's litigation and threats of litigation, and AMTD's and Schwab's filing of separate FINRA Arbitration actions against former employees who went to work for Spotlight are a non-starter under RICO. They are nothing more than "innocuous business communications" in furtherance of Defendants' business objectives. *Asbeka Ind. v. Travelers Indem. Co.*, 831 F. Supp. 74, 89 (E.D.N.Y. Aug. 17, 1993). "[A]bsent

some factual basis for inferring the sender's intent to defraud the recipient via a scheme to defraud," these communications cannot serve as predicate acts. *Id*.

Finally, Plaintiffs' obstruction of justice allegations also fail because they do not arise out of *federal* judicial proceedings. 18 U.S.C. §1503 (must be "in or of any court of the United States"); *United States v. Van Engel*, 15 F.3d 623, 627 (7th Cir. 1993) (§ 1503 limited to obstruction of federal judicial proceedings); *United States v. Aguilar*, 515 U.S. 593, 599 (1995) ("it is not enough that there be intent to influence some ancillary proceeding").

### B. Plaintiffs Fail to Allege the Conduct of an Enterprise.

Plaintiffs' RICO claims further fail because the Complaint lacks factual allegations sufficient to show that each defendant "conducted or participated in the conduct of the *enterprise's* affairs, not just their own affairs." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009). To do so, each defendant "must have asserted some control over the enterprise." *Slaney*, 244 F.3d at 598. But, as discussed *supra* at 12-18, Plaintiffs' allegations indicate that each Defendant was individually conducting its own business affairs, as opposed to controlling or engaging in the wrongful acts of a separate enterprise. *See Walgreen Co.*, 719 F.3d at 854 (dismissing RICO claim where complaint failed to explain how actions were "undertaken on behalf of the *enterprise* as opposed to on behalf of [each entity] in their individual capacities" (emphasis in original)).

### V. Plaintiffs Fail To Allege A Plausible Nexus Between Defendants' Acts and Any Purported Harm (Count 1, 8, 13, 14, 15)

Many of Plaintiffs' claims suffer from the same defect: Plaintiffs do not plausibly link their purported injury to Defendants' alleged acts. *Friends of the Earth, Inc. v. Laidlaw Env't Serv's. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (to establish standing, a plaintiff must suffer an injury in fact "fairly traceable to the challenged action of the defendant").

## A. Plaintiffs Do Not Allege Injury Proximately Caused by Defendants' Alleged RICO Predicate Acts (Count 13).

Plaintiffs' RICO claim fails to plausibly allege a concrete injury to Plaintiffs attributable to Defendants' purportedly wrongful acts. To support a RICO claim, a plaintiff must plead injury to its business or property "by reason of" the defendant's RICO violations. 18 U.S.C. § 1964(c); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (the predicate act must "[lead] directly to the plaintiff's injuries."). This means "the compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm caused by [the] predicate acts.'" *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 13 (2010) (quoting *Anza*, 547 U.S. at 457). If the link between the RICO violation and the alleged business or property injury is "too remote, purely contingent, or indirect," the claim must be dismissed. *Hemi Grp.*, 559 U.S. at 9. Courts repeatedly reject claims when the alleged RICO violation was distinct from the conduct causing the injury. *Id.* at 11; *Anza*, 547 U.S. at 458. Plaintiffs premise their RICO claim on: (i) purported commercial bribery and mail and wire fraud based on AMTD's AdvisorDirect Program, Compl. ¶ 693(a)-(b); (ii) mail and wire fraud based on allegedly false statements to investors, the public, and the SEC regarding how Defendants handle investor accounts, *id.* ¶¶ 693(c)-(d), 863(a); (iii) purported witness retaliation and tampering based on the supposed silencing of, and retaliation against, Greco for his SEC and DOJ complaints, *id.* ¶¶ 691, 694; and (iv) money laundering funds derived from the foregoing conduct, *id.* ¶¶ 693(e), 694. Plaintiffs state the alleged predicate acts harmed them, but never explain how.

Indeed, most of the alleged predicate acts are not purported to have been directed at Plaintiffs at all. Defendants' supposed "commercial bribery" apparently refers to the referral agreement between Creative Planning and AMTD, *id.* ¶ 693(a), and the "mail fraud" allegation appears to refer to purportedly untrue statements made to the public and regulators regarding

Defendants' products and services. *Id.* ¶¶ 693(c)-(d), 863(a). But Plaintiffs do not connect such conduct to harm to themselves, and the alleged "money laundering" also has no plausible relationship to Plaintiffs. *Id.* ¶ 693(e). A predicate act will not support a civil RICO claim absent the type of direct injury Plaintiffs do not allege. *See James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403 (7th Cir. 2006).

Additionally, Plaintiffs do not plausibly connect any of the alleged threats and retaliation to Greco's whistleblowing complaints. Creative Planning's alleged threats and retaliation—which occurred when it was not even aware of the SEC complaint, Compl. ¶¶ 382*, 384*—concerned Greco's improper solicitation of Creative Planning's clients, *id.* ¶ 385*, for which Greco subsequently paid Creative Planning $6,000 in compensation, *id.* ¶ 487. Plaintiffs' allegation that the Broker-Custodian Defendants engaged in retaliation is similarly untenable. Following Greco's alleged SEC testimony, Spotlight *entered* custodial relationships with each of Fidelity, *id.* ¶ 635, AMTD, *id.* ¶ 526, and Schwab, *id.* ¶ 583. Plaintiffs fail to explain how the Broker-Custodian Defendants "got their revenge" for Greco's alleged testimony by entering into custodial relationships with Spotlight in the months and years directly following that testimony.

In short, despite Plaintiffs' prolixity, they have not adequately explained how each Defendant's predicate acts proximately or "directly" caused Plaintiffs' injury to their business or property. *See Hemi Grp.*, 559 U.S. at 12 ("[I]n the RICO context, the focus is on the directness of the relationship between the conduct and the harm."). Plaintiffs fail to outline a plausible theory of proximate causation, necessitating dismissal of their RICO claim.

**B.    Plaintiffs' Lanham Act and Illinois State-Law Claims Fail to Plausibly Allege Harm to Plaintiffs' Commercial Interests (Counts 1, 14, and 15).**

Plaintiffs also fail to plead a Lanham Act false advertising claim, as well as claims under the Illinois Deceptive Trade Practices Act ("DTPA") and Illinois Consumer Fraud and Deceptive

Business Practices Act ("ICFA") which "rise or fall with [plaintiffs'] claim under the Lanham Act[.]" *AAVN, Inc. v. WestPoint Home, Inc.*, 2019 WL 1168102, at *4 (N.D. Ill. Mar. 13, 2019); *see also Champion Lab'ys, Inc. v. Cent. Ill. Mfg. Co.*, 157 F. Supp. 3d 759, 762 n.1 (N.D. Ill. 2016) (analysis under Illinois Consumer statutes mirrors analysis under Lanham Act). To plead a plausible Lanham Act false advertising claim, it is not enough to allege a misleading statement. A plaintiff must also "plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014).

Plaintiffs, however, nowhere explain how Defendants' allegedly false advertising either "fooled" Plaintiffs to their detriment or caused Plaintiffs to lose business. Instead, Plaintiffs allege Defendants made false and misleading statements to investors about *their own* services; namely, compliance with fiduciary standards and the nature of supposed conflicts of interest. Compl. ¶¶ 9, 132(o), 281-90, 292, 328, 337-39, 341-42, 344, 346-47. But Plaintiffs state that *only investors* suffered harm from these alleged misstatements via allegedly "lower quality investment advisory services." *Id.* ¶ 291. Although Defendants dispute those allegations, Plaintiffs' failure to identify harm to themselves renders the claims legally insufficient.

The closest Plaintiffs come to stating harm is the conclusory allegation that "Defendants obtained advisory clients through false and misleading advertising to the detriment of Spotlight and other competitors." *Id*. ¶ 348. But Plaintiffs provide no further detail than that conclusory assertion. They do not identify, for example, would-be clients who, but-for the allegedly false advertising, chose Defendants rather than Spotlight. Their "failure to allege how influence of [Defendant's] customers actually impact[ed] [Plaintiffs'] business proves fatal" to their claim. *AAVN*, 2019 WL 1168102, at *3; *see also Bobbleheads.com, LLC v. Wright Bros., Inc.*, 259 F.

Supp. 3d 1087, 1097 (S.D. Cal. 2017) (dismissing Lanham Act claim where plaintiffs did not adequately allege lost sales caused by defendant's purportedly false assertions).

### C. Plaintiffs Do Not Connect Defendants to Any Alleged Tortious Interference With Contract (Count 8).

Plaintiffs fail to connect Defendants' actions to any purportedly disrupted contracts, necessitating dismissal of Plaintiffs' tortious interference with contract claim. A claim for tortious interference with contract must be "specific" in identifying the third parties and contracts with which there has been an alleged interference, and fails where it describes purportedly injured business relations only "in general and conclusory terms." *Du Page Aviation Corp. v. Du Page Airport Auth.*, 229 Ill. App. 3d 793, 803–04 (1992).

The sole statement that purports to describe interfered-with contracts resides in the statement of claim, wherein Plaintiffs assert that "Defendants . . . maliciously, willfully, and intentionally interfered" with "Terminated Contracts," defined as "valid and enforceable contracts for RIA Custodial Services, as well as with approximately 10 wealth advisor contracts, and over 200 advisory client contracts." Compl. ¶ 790.[25] Illinois law requires dismissal as to the unspecified contracts. *See Du Page Aviation Corp.*, 229 Ill. App. at 803-04.

The sole specifically-identified contracts are those for "RIA Custodial Services," but for *those* contracts, it is unclear what "tortious interference" allegedly took place. Plaintiffs allege that the Broker-Custodian Defendants (*i.e.*, the counterparties to the RIA Custodial Service contracts) are part of the "scheme" to interfere. A "party cannot tortiously interfere with his own contract; the tortfeasor must be a third party to the contractual relationship." *Douglas Theater Corp. v. Chi.*

---

[25] Plaintiffs' reference to "Terminated Contracts" as opposed to "breached contracts" is significant, as a tortious interference claim does not arise from mere termination of a contract; rather there must be a breach. *See Nat'l Experiential, LLC v. City of Chi.*, 2022 WL 704781, at *11 (N.D. Ill. Mar. 9, 2022) (dismissing tortious interference claim based on lawful termination of contract because "without a breach, there is no tortious interference claim").

*Title & Tr. Co.*, 288 Ill. App. 3d 880, 884 (1997).

## VI.     The Unjust Enrichment Claim Fails Because Actual Contracts Exist (Count 12).

Plaintiffs' unjust enrichment claim fails for two reasons. *First*, "[i]n Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). Where, as here, an unjust enrichment claim alleges an express contract, the unjust enrichment claim must be dismissed under Illinois law, even if it is pled in the alterative. *See Homestead Ins. Co. v. Chi. Transit Auth.*, 1997 WL 43232, at \*4 (N.D. Ill. Jan. 23, 1997) (dismissing an unjust enrichment claim pleaded in the alternative because the claim "adopts by reference all the allegations in the contract claim . . . including paragraphs alleging an express contract between the parties"). Plaintiffs plead several express agreements governing the relationships between the parties, including Spotlight's custodial agreements with Schwab, AMTD, and Fidelity, Compl. ¶¶ 766-87, and the 2017 settlement agreement between Plaintiffs and Creative Planning, *id.* ¶¶ 816-31. Because Plaintiffs purport to incorporate these agreements into their unjust enrichment claim, *id.* ¶ 843, the claim is barred.

*Second*, the unjust enrichment claim fails because it is predicated on the same allegations of unlawful and inequitable conduct that support Plaintiffs' other claims, *id.* ¶¶ 847, all of which are inadequately pled. As the Seventh Circuit has held, "if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then . . . unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).

## VII.    Plaintiffs' ICFA, UCL, DTPA, RICO, and Antitrust Claims Are Barred By Statutes of Limitation (Counts 2, 3, 4, 5, 13, 14, and 15).

Plaintiffs' ICFA, DTPA, UCL, RICO, and antitrust claims should be dismissed because plaintiffs plead facts showing that the applicable limitations periods have expired. *Walker v.*

*Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("[W]hen the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous, the district judge need not wait for an answer before dismissing the suit.").

First, Plaintiff's RICO claims are untimely under the applicable four-year limitations period, which starts when a potential plaintiff "discovers (or should if diligent have discovered) both the injury that gives rise to his claim and the injurer." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010). Plaintiffs' claims under the UCL are similarly barred by a four-year statute of limitations that began to run at the time of the alleged injury. *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016). Here, Plaintiffs repeatedly state that Greco was aware of the factual allegations underlying the so-called "Creative Planning Fraudulent Growth Scheme" and "RIA Services Scheme" as early as 2016 (and potentially 2013). Compl. ¶¶ 320, 323, 386. They further allege that in March 2017, Greco filed a whistleblower complaint with the SEC based on that same conduct. *Id.* ¶¶ 320, 323-24, 382-86, 365-67*, 860. The Complaint thus confirms that Greco knew of the alleged RICO conduct (and any supposed injury) no later than March 2017. Plaintiffs filed their Complaint in May 2022, well after the four-year statute of limitations had run.

Second, Plaintiffs' ICFA and DTPA are barred by their 3-year statute of limitations. 815 Ill. Comp. Stat. § 505/10a(e); *Underground Sols., Inc. v. Palermo*, 2014 WL 4703925, at *2 (N.D. Ill. Sept. 22, 2014). The three-year clock begins "when the plaintiff knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Blankenship v. Pushpin Holdings, LLC*, 157 F. Supp. 3d 788, 792 (N.D. Ill. 2016) (quotation omitted). While the Complaint is exceedingly vague as to the factual allegations that form the basis of Plaintiffs' ICFA and DTPA claims, *see* Compl. ¶¶ 876-86 (ICFA); 887-88 (DTPA), these claims

40

appear to be based on the "RIA Services Scheme." *See, e.g.*, Compl. ¶¶ 890-93. As discussed above, the Complaint repeatedly concedes that Greco was aware of the allegedly wrongful conduct underlying the "RIA Services Scheme" as early as 2013 and no later than March 2017. *Id.* ¶¶ 320, 323-24, 382-65, 367, 860. These claims are therefore time-barred.

Finally, Plaintiffs' Sherman Act and Cartwright Act claims based on the "RIA Services Scheme," *see* Compl. ¶ 710, 750, are barred by applicable four-year statutes of limitation, which begin on the later of (1) the action that causes the plaintiff's antitrust injury or (2) the plaintiff's discovery "that he has been *injured* and who *caused* the injury." *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (quotation omitted; emphasis in original); 15 U.S.C. § 15b. *See also Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1062 (N.D. Cal. 2016) (Cartwright Act claim subject to same "default accrual rules" as Sherman Act statute of limitations).

Plaintiffs' antitrust claims based on the "RIA Services Scheme" are barred under either standard. The Complaint lacks any allegation that Plaintiffs suffered *any* injury in connection with that supposed "scheme" after 2017. Moreover, Plaintiffs repeatedly allege that Greco was aware of the allegedly anticompetitive conduct at issue no later than 2017, when he filed his whistleblower complaint. Compl. ¶¶ 320, 323-24, 382-65, 367, 860. And Plaintiffs allege no overt acts in furtherance of these supposed conspiracies within the limitations period.

## VIII. Plaintiffs' California Unfair Competition Claim Does Not Permit Disgorgement (Count 5).

Plaintiffs are wrong to state that, pursuant to the UCL, Cal. Bus. & Prof. Code § 17200, they are entitled to "disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants." Compl. ¶ 759. "[P]laintiffs generally cannot recover money damages on a UCL claim." *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 787 n.23 (N.D. Ill. 2020) (emphasis omitted). Monetary relief under the UCL is available only to the extent

it constitutes restitution; *i.e.*, a "return [of] money obtained through an unfair business practice to those persons in interest *from whom the property was taken*." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144-51 (2003) (emphasis added). Plaintiffs do not allege Defendants took money or clients directly from them through "unfair" business practices. At *most*, they allege there has been a disruption in an "expectancy" of potential client partnerships, but "[c]ompensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims" and therefore "not permitted under the UCL." *See id*. at 1148-51.

## IX.    Plaintiffs' Complaint Violates Fed. R. Civ. P. 8.

As shown above, Plaintiffs' 199-page Complaint is a quagmire that lacks any foundation in plausible fact and is far from the "short and plain statement of the claim" that the law requires. Fed. R. Civ. P. 8. Courts recognize that "[l]ength may make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter," *United States ex rel. Garst v. Lockheed–Martin Corp.,* 328 F.3d 374, 378 (7th Cir. 2003), and are empowered to dismiss a complaint that is "so long that it imposes an undue burden on the judge, to the prejudice of other litigants seeking the judge's attention," *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013).[26] Plaintiffs' Complaint is overlong, needlessly complex, obscures the relevant actors through rampant group pleading, fails to connect the alleged facts and causes of action, and is largely indecipherable. It should be dismissed for failure to comply with Rule 8.

## CONCLUSION

For the above-stated reasons, Plaintiffs' Complaint should be dismissed.

---

[26] *See id*. (400-paragraph, 155-page complaint); *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007) (99-page, single-spaced complaint); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703 (3d Cir. 1996) (600-paragraph, 240-page complaint); *Michaelis v. Nebraska State Bar Ass'n*, 717 F.2d 437, 439 (8th Cir. 1983) (per curiam) (144-paragraph, 98-page complaint).

Dated: September 6, 2022           Respectfully submitted,

QUINN    EMANUEL    URQUHART    & SULLIVAN, LLP

*/s/ Andrew H. Schapiro*

Andrew H. Schapiro
Stephen A. Swedlow
Daniel R. Schwartz
andrewschapiro@quinnemanuel.com
stephenswedlow@quinnemanuel.com
danielschwartz@quinnemanuel.com
191 North Wacker Drive
Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705 7400
Facsimile: (312) 705 7401

Adam B. Wolfson
adamwolfson@quinnemanuel.com
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendants Creative Planning, LLC, CPI HoldCo A, LLC, CPI HoldCo B, LLC, Creative Planning HoldCo, LLC, General Atlantic Service Company LP and General Atlantic (CP) Collections, LP*

*/s/ Daniel Petrocelli*

DANIEL PETROCELLI
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
(310) 553-6700

KATRINA MARIE ROBSON (*pro hac vice*)
krobson@omm.com
BRIAN PATRICK QUINN (*pro hac vice*)
bquinn@omm.com
O'MELVENY & MYERS LLP

1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

KHADIJA SYED (*pro hac vice*)
ksyed@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
(415) 984-8700

VINCENT P. SCHMELTZ, III
tschmeltz@btlaw.com
BARNES & THORNBURG LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 357-1313

*Attorneys for TD Ameritrade Holding Corporation, TD Ameritrade Inc., The Charles Schwab Corporation, and Charles Schwab & Co., Inc.*

/s/ Charles F. Smith
Charles F. Smith
Lindsey Sieling
Danielle Simms
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 North Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 407-0700
Fax: (312) 407-0411
charles.smith@skadden.com
lindsey.sieling@skadden.com
danielle.simms@skadden.com

Boris Bershteyn (*pro hac vice*)
Evan Levicoff (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West

New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
boris.bershteyn@skadden.com
evan.levicoff@skadden.com

*Attorneys for Defendants FMR LLC and National Financial Services LLC*

**SIGNATURE ATTESTATION**

Pursuant to the United States District Court for the Northern District of Illinois' General Order on Electronic Case Filing, General Order 16-0020(IX)(C)(2), I hereby certify that authorization for the filing of this document has been obtained from each of the other signatories shown above and that all signatories concur in the filing's content.

/s/ *Andrew H. Schapiro*
Andrew H. Schapiro

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2022, I caused a true and correct copy of the foregoing Omnibus Memorandum of Law in Support of Defendants' Joint Motion to Dismiss to be filed by the Court's CM/ECF filing system, which will send an electronic notification of such filing to all counsel of record.

/s/ *Andrew H. Schapiro*
Andrew H. Schapiro