**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEPHEN ALBERT GRECO, individually, and SPOTLIGHT ASSET GROUP, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PETER MALLOUK, individually, CREATIVE PLANNING, LLC, CPI HOLDCO A, LLC, CPI HOLDCO B, LLC, CREATIVE PLANNING HOLDCO, LLC, GENERAL ATLANTIC SERVICE COMPANY LP, GENERAL ATLANTIC (CP) COLLECTIONS, LP, FMR LLC D/B/A FIDELITY INVESTMENTS INC., NATIONAL FINANCIAL SERVICES LLC TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE, INC, THE CHARLES SCHWAB CORPORATION, and CHARLES SCHWAB & CO, INC., <br><br> Defendants. | Case No.: 1:22-cv-02661 <br><br> Honorable Edmond E. Chang |

**PLAINTIFFS CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS'
JOINT AND INDIVIDUAL MOTIONS TO DISMISS**

TABLE OF CONTENTS

I.  Preliminary statement ................................................................................................. 1

   A.  Summary of Plaintiffs Factual Allegations............................................................. 2

   B.  Defendants' Motions To Dismiss ............................................................................ 6

II.  Legal standard ............................................................................................................. 7

III.  Analysis And Argument ............................................................................................. 8

   A.  Defendants are horizontal competitors ................................................................... 8

   B.  Plaintiffs' Relevant market definitions ................................................................. 11

   C.  Plaintiffs' conspiracy Allegations......................................................................... 16

      1.  Direct Evidence of Conspiracy...................................................................... 18

      2.  Indirect/Circumstantial Evidence of Conspiracy........................................... 21

      3.  Miscellaneous Challenges to Conspiracy allegations................................... 24

      4.  Creative Planning Challenges to Conspiracy ............................................... 25

      5.  Claims Against General Atlantic Should not be Dismissed .......................... 26

   D.  Plaintiffs' antitrust claims should not be dismissed.............................................. 27

      1.  Plaintiffs Sherman § 1 Violations.................................................................. 29

      2.  Sherman Act § 2 Violations........................................................................... 32

      3.  Clayton Act §7................................................................................................ 34

      4.  The Doctrine of implied Immunity is Irrelevant ........................................... 38

   E.  Plaintiffs' rico Claims should not be dismissed.................................................... 38

      1.  Enterprise Challenge...................................................................................... 39

      2.  Predicate Acts Establishing a Pattern of Racketeering Activity................... 40

      3.  Nexus Between RICO Predicate Acts and Plaintiffs' Injuries ..................... 43

   F.  State Law Claims Should Not Be Dismissed......................................................... 45

      1.  None of Plaintiffs' claims are Compulsory Counterclaims........................... 45

2.      Plaintiffs Breach of contract Claims should not be dismissed ..................................... 47

3.      Plaintiffs' Tortious interference claims should not be dismissed .............................. 48

4.      Plaintiffs' Defamation Claims Should not be Dismissed ............................................ 51

5.      Plaintiffs' California Law Claims Should not be Dismissed...................................... 53

6.      Plaintiffs Unjust Enrichment Claims Should not be Dismissed ................................. 53

G.     Plaintiffs' Claims are Timely .................................................................................. 54

IV.  Conclusion ...................................................................................................................... 54

# TABLE OF AUTHORITIES

## CASES

*Adcock v. Brakegate, Ltd.,*
  645 N.E.2d 888 (Ill. 1994)………………………………………………………...28, 51

*Agner v. NCAA,*
  683 F.3d 328 (7th Cir. 2012)………………………………………………..………30

*Albrecht v. Herald Co.,*
  390 U.S. 145 (1968) ……………………………………………………………..25

*Am. Tobacco Co. v. U.S.,*
  328 U.S. 781 (1946) ……………………………………………………………..19

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) ……………………………………………………………48

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ……………………………………………………….………8, 19, 22, 27

*Brennan v. Kadner,*
  814 N.E.2d 951 (Ill.App. 1st Dist. 2004) ………………………………………52

*In re Broiler Chicken Antitrust Litig.,*
  290 F.Supp.3d 772 (N.D.Ill. 2017) …………………….…………………………22, 27

*Brown Shoe Co. v. U.S.,*
  370 U.S. 294 (1962)…………………………………………………………………...36

*Bryson v. News Am. Publications, Inc.,*
  672 N.E.2d 1207 (Ill. 1996) ……………………………..…………………………52, 53

*Boyle v. United States,*
  556 U.S. 938 (2009) ……………………………………………………………..40

*Burlington N. R.R. Co. v. Strong,*
  907 F.2d 707 (7th Cir. 1990) …………………………………………………..46, 47

*Caitlin v. Wash. Energy Co.,*
  791 F.2d 1343 (9th Cir. 1986) ……….……………………………………………..34

*Cole-Haddon, Ltd. v. Drew Philips Corp.,*
  454 F.Supp.2d 772 (N.D.Ill. 2006) ……………………………………….………54

*Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chem. Corp.,*
  579 F.2d 20 (3d Cir. 1978) …………………………………………..………15

*Contl. Ore Co. v. Union Carbide & Carbon Corp.,*
  370 U.S. 690 (1962) ……………………………………………………………..19

*In re Copper Antitrust Litigation,*
  436 F.3d 782 (7th Cir. 2006) …………………………………………..………28

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984) ………………………………………………………..………..30

*Credit Suisse Sec. (USA) LLC v. Billing,*
551 U.S. 264 (2007) ………………………………………..……………………..39

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.,*
801 F.3d 758 (7th Cir. 2015) ………………………………………………………....28

*DeGuelle v. Camilli,*
664 F.3d 192 (7th Cir. 2011) …………………………………………………...…42, 45

*Denny's Marina, Inc., v. Renfro Prods., Inc.,*
8 F.3d 1217 (7th Cir. 1993) ……………………………………………………...30

*Deslandes v. McDonald's USA, LLC,*
2018 WL 3105955 (N.D.Ill. June 25, 2018) ……………………………….………32

*Goldberg v. Rush Univ. Med. Ctr.,*
929 F.Supp.2d 807 (N.D.Ill. 2013) …………………………………………………9

*Havoco of America, Ltd. v. Shell Oil Co.,*
626 F.2d 549 (7th Cir. 1980) ……………………………………………………28

*High-Tech Emp. Antitrust Litig.,*
856 F.Supp.2d 1103 (N.D.Cal. 2012) …………………………………………...31

*Holman v. Indiana,*
211 F.3d 399 (7th Cir. 2000) ……………………………………………………54

*Homestead Insurance Co. v. Chicago Transit Authority,*
1997 WL 43232 (N.D.Ill. Jan. 23, 1997) ……………………………………………54

*Hytera Communications Corporation Ltd. v. Motorola Solutions, Inc.,*
2022 WL 3645908 (N.D.Ill. Aug. 24, 2022) ……………………………………..……2

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,*
882 N.E.2d 1011 (Ill. 2008) ……………………………………………..…..52

*Inforizons, Inc. v. VED Software Servs., Inc.,*
204 F.R.D. 116 (N.D.Ill. 2001) ………………………………………….……46, 47

*Kelsey K. v. NFL Enterprises, LLC,*
254 F.Supp.3d 1140 (N.D.Cal. 2017) …………………………………….………22

*Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C.,*
214 F.3d 872 (7th Cir. 2000) …………………………………………….………27

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984) ………………………………………………….....19, 21

*In re Musical Instruments & Equipment Antitrust Litigation,*
798 F.3d 1186 (9th Cir. 2015) ……………………………………….……………22

*Neuros Co., Ltd. v. KTurbo, Inc.,*
   698 F.3d 514 (7th Cir. 2012) ……………………………………..………………..53

*Newcal Industries, Inc. v. Ikon Office Solution,*
   513 F.3d 1038 (9th Cir. 2008) …………………………………………………..17

*Oakland-Alameda Cnty. Builders' Exch. V. F.P. Lathrop Constr. Co.,*
   4 Cal.3d 354 (1971) …………………………………………………………….28

*Ohio v. Am. Express Co.,*
   201 L.Ed.2d 678 (June 25, 2018) ……………………………………………..12

*Omnicare, Inc. v. UnitedHealth Group, Inc.,*
   629 F.3d 697 (7th Cir. 2011) …………………………...…………………………..19

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.,*
   20 F.4th 466 (C.A.9 2021) ……………………………………………………34, 36

*In re Outpatient Med. Ctr. Employee Antitrust Litig.,*
   21-CV-00305, 2022 WL 4465929 (N.D.Ill. Sept. 26, 2022) …………………….25, 31

*Persian Gulf v. BP W. Coast Products LLC,*
   324 F.Supp.3d 1142 (S.D.Cal. 2018) …………………………………………22

*PharmacyChecker.com, LLC v. Natl. Assn. of Boards of Pharm.,*
   530 F.Supp.3d 301 (S.D.N.Y. 2021) ……………………………………………22

*Pizzo v. Bekin Van Lines Co.,*
   258 F.3d 629 (7th Cir. 2001) ……………………………………………………54

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
   764 F.Supp.2d 991 (N.D.Ill. 2011) ………………………………………...………24

*Ploss v. Kraft Foods Group, Inc.,*
   197 F.Supp.3d 1037 (N.D.Ill. 2016) ……………………………………….………17

*Republic Tobacco, L.P. v. N.A. Trading Co., Inc.,*
   254 F.Supp.2d 985 (N.D.Ill. 2002) …………………………………………...53

*Rocha v. Fedex Corp.,*
   15 F.Supp.3d 796 (N.D.Ill. 2014) ………………………………………………26

*RWB Services, LLC v. Hartford Computer Group, Inc.,*
   539 F.3d 681 (7th Cir. 2008) …………………………………..………………..45

*In re Ry. Indus. Employee No-Poach Antitrust Litig.,*
   395 F.Supp.3d 464 (W.D.Pa 2019) ………………………………….……………21

*SFC ILC, Inc. v. Visa U.S.A. Inc.,*
   819 F. Supp. 956 (D.Utah 1993), *aff'd in part, rev'd in part sub nom*
   36 F.3d 958 (10th Cir. 1994) …………………………………..………………..37

*SmileCare Dental Group v. Delta Dental Plan of California, Inc.*
   88 F.3d 780 (9th Cir. 1996) ………………………………………………..33

*Solaia Tech., LLC v. Specialty Pub. Co.,*
   852 N.E.2d 825 (Ill. 2006) …………………………………………...………..52, 53

*State of Colorado ex rel. Woodard v. Ramsour Bros., Inc.,*
   1986 WL 7823 (D.Colo. July 9, 1986) …………………………………...…………55

*Swanson v. Citibank, N.A.,*
   614 F.3d 400 (7th Cir. 2010) ……………………………………………..……………..2

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,*
   346 U.S. 537 (1954) ………………………………………………………………..18, 22

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001) ……………………………………………………………..17

*Toys "R" Us, Inc. v. F.T.C.,*
   221 F.3d 928 (7th Cir. 2000) …………………………………………...……………..11, 12, 22

*U.S. v. Citizens and Southern Nat. Bank,*
   422 U.S. 86 (1975) ………………………………………………………………..……….2

*U.S. v. E.I. du Pont de Nemours & Co.,*
   353 U.S. 586 (1957) ……………………………………………………………………..15

*U.S. v. Noble,*
   754 F.2d 1324 (7th Cir. 1985) ………………………………….……………………..25

*U.S. v. Pabst Brewing Co.,*
   384 U.S. 546 (1966) …………………………………………………………………….36

*U.S. v. Philadelphia Nat. Bank,*
   374 U.S. 321 (1963) …………………………………………………………………….36

*U.S. v. Reed Roller Bit Co.,*
   274 F.Supp. 573 (W.D.Okla. 1967) …………………………………………………..36

*U.S. v. Socony-Vacuum Oil Co.,*
   310 U.S. 150 (1940) …………………………………………………………………….26

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) …………………………………………………………………….48

*Viamedia, Inc. v. Comcast Corp,*
   951 F.3d 429 (7th Cir. 2020) …………………………………………...……………..24

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   401 U.S. 321 (1971) …………………………………………………………………….55

*Zick v. Version Allsteel Press Co.,*
   623 F.Supp. 927 (N.D.Ill. 1985) …………………………………………………..48

## STATUTES

15 U.S.C. § 1……………………………………………………...………..35, 39, 55

15 U.S.C. § 2……………………………………………………...…………….....33

15 U.S.C. § 15………………………………………………………………….55

15 U.S.C. §18……………………………………………..……….……35, 39

15 U.S.C. § 80B……………………………………………………….……..13

18 U.S.C. § 1341 ………………………………………….40, 41, 42, 44, 45

18 U.S.C. § 1343 ……………………………..……………34, 40, 41, 42, 44, 45

18 U.S.C. § 1512 …………………………………….39, 42, 43, 44, 45

18 U.S.C. § 1513 …………………………………….39, 42, 43, 44, 45

18 U.S.C. § 1956…………………………………………………….40, 41

18 U.S.C. § 1957…………………………………………………….40, 41

18 U.S.C. § 1961 …………………………………………………….40, 41

18 U.S.C. § 1962 ………………………………………..……….40, 41, 44

18 U.S.C. §1964 (c) …………………………………………….39, 44

## RULES

Fed. R. Civ. P. 8(c) …………………………………………….…….…..8

Fed. R. Civ. P. 9(b) …………………………………………….…….…..9

Fed. R. Civ. P. 15(a)(2) …………………………………….…….……..55

Plaintiffs, Stephen Greco and Spotlight Asset Group, by and through their undersigned counsel of record, hereby submit their Consolidated Response in Opposition to Defendants' Joint Omnibus Motion to Dismiss and Supplemental Memoranda.

I.    PRELIMINARY STATEMENT

*Have Plaintiffs given enough details about the subject-matter of their case to present a story that holds together?* According to the Seventh Circuit, the key question that should guide this Court's consideration of Defendants' joint and individual motions to dismiss pursuant to Fed. Civ. P. Rule 12(b)(6) is: *Could* these things have happened? Not, *did* they happen.*"[1]* Here, the answer is overwhelmingly "yes."

Plaintiffs' detailed factual allegations "(p)aint a picture of anticompetitive market[s] that [are] no accident,"[2] but rather the direct result of Defendants' horizontal conspiracy, unreasonable restraints on trade, and anticompetitive conduct which they intentionally agreed to carry-out through the "RIA Services Scheme," for common purpose of circumventing compliance with federal laws and regulations, gaining and maintaining market control and dominance, and maximize revenue by working "together to achieve what they could not otherwise achieve alone. (Compl.¶¶2). It is sadly a cautionary tale, recounting the destructive potential of corporate greed and self-dealing, and reminding why collusion among competitors is considered the "*supreme evil of antitrust.*"[3] Plaintiffs' story brings to life the concerns which motivated Congress in enacting the Adviser Act to protect investors from the "*dangers of fraud, deception, or overreaching… eliminate certain abuses in the securities industry, abuses which were found to have contributed*

---

[1] *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (C.A.7 (Ill.),2010).
[2] *Hytera Communications Corporation Ltd. v. Motorola Solutions, Inc.,* 2022 WL 3645908, at *15 (N.D.Ill., 2022).
[3] *U. S. v. Citizens and Southern Nat. Bank,* 95 S.Ct. 2099, 2116, 422 U.S. 86, 116 (U.S.Ga. 1975).

*to the stock market crash of 1929 and the depression of the 1930's*" (Compl.¶81)  Congress has long-recognized the inherent potentials of fraud, deception, and exploitation in the RIA Industry. For Plaintiffs, that "potential" became reality.  Detail by detail, Plaintiffs' allegations demonstrate Defendants' escalating reveal the corrupt and malicious lengths Defendants are willing to go to keep their illicit profit mill churning and silence any employees, like Greco, who dare to report their improper practices to the Securities and Exchange Commission ("SEC"), Department of Justice ("DOJ"), or other federal law enforcement. (Compl.¶1) Defendants' retaliation against Plaintiffs is endless, and as set forth in Plaintiffs' Complaint, will continue absent relief from this Court. Plaintiffs' "story" was not one they wished to tell, and certainly not one they wished to live. They occupy space before this Court because Defendants' have left them no choice.

### A.    SUMMARY OF PLAINTIFFS FACTUAL ALLEGATIONS

Plaintiffs' allege Defendants are horizontal competitors who set their collective designs on controlling, and maximizing their profits in, three particular submarkets of the $110 Trillion dollar RIA Industry: (1) the $5.7 Trillion dollar Investment Advisory Services Market (Compl.¶¶107-112)[4]; (2) RIA Custodial Services Market (Compl.¶¶100, 113-117); and (3) the IAR Labor Market (Compl.¶¶126-129). Defendants anticompetitive conduct in those three relevant markets, included agreements to allocate each of  the three markets, agreements to fix prices and pricing structures for RIA Services, horizontal non-competition agreements, horizontal group boycott, and other illegal, unfair and anti-competitive conduct occurring in three collusive schemes that are set forth in great detail in Plaintiffs' Complaint: Creative Planning Fraudulent Growth Scheme; RIA Services Scheme; and Silencing and Retaliation Scheme.

---

[4] It is also frequently referred to in the industry as the "Independent RIA Channel," and is distinguished from other RIAs because it consists of Independent RIAs providing investment advisory services to retail investors. See, https://www.riachannel.com/understanding-the-ria-channel/ (last accessed, 11.01. 2022).

Defendants' anticompetitive conduct did not just cause market-wide injury in the three markets, it caused very specific injury to Plaintiffs and their ability to competitively operate as an Independent RIA. As a direct and proximate result of Defendants anticompetitive schemes, Plaintiffs could not obtain competitive IAR Labor and RIA Custodial Services, paid more for IAR Labor and RIA Custodial Services, incurred higher operating costs, had diminished access to advisory clients, or freely do business with other industry participants because it was subjected to Defendants' collective group boycott. (See *Ex. A.*, Table of Complaint Citations, Sec. #98.)[5] Moreover, Plaintiffs are being strangled by the ever-intensifying death grip of "*the great squeeze in the RIA space*," as Defendant Mallouk has dubbed Defendants' anticompetitive agreements to consolidate the Investment Advisory Services Market. (Compl.¶¶203, 206). Mallouk described consolidation in the Investment Advisory Services Market, explaining that Independent RIAs are in the: "*beginning stages of the squeeze and ...people don't realize they're about to be squeezed*," and that escalating operating costs and pressures on middle-market RIAs will "*become a burden that forces consolidation*." (Compl.¶ 203) "Soon you're going to see the custodians impose their requirements … that are going to further drive the expense for these smaller [RIA] firms and encourage them to consolidate." Plaintiffs are among the Independent RIAs being squeezed, whereas Mallouk, and Creative Planning, are insulated from the "*great squeeze in the RIA Space*," because of their collusive agreements and participation in the RIA Services Scheme (including their own specific participation in the consolidation through the "Roll-Up Consolidation Plan"). (Compl.¶¶203, 203(a)-203(b), 204, 206, 208, 246-280(Roll-Up Consolidation Plan).

---

[5] In an effort to comply with the Court's page limitations, Plaintiffs have compiled *Exhibit A*, which provides the Court with paragraph citations for a specific topic/issue. The purpose of Exhibit A is to assist the Court to identifying the many relevant paragraphs, without exhausting space within the brief. Exhibit A is for exemplary purposes only and is not intended to be perceived as an all-inclusive list for any particular category.

Defendants' anticompetitive conspiracies have not only directly caused injury to Plaintiffs (in their capacity as market participants), but Defendants' fervent commitment to conceal their misconduct motivated them to directly target Plaintiffs with a "Silencing and Retaliation Scheme," after discovering Plaintiff Greco' 2017 Whistleblower Action and 2020 DOJ Complaint. (Compl.¶¶376(p. 114)-385; 461(p. 117)-490). Three of Defendants were very familiar with Greco and the information he possessed about their anticompetitive conduct, false and misleading representations to the SEC, and related violations of federal law and regulations.

Plaintiff Greco is an SEC-registered Investment Advisor Representative ("IAR") and the Chief Executive Officer of Plaintiff Spotlight (an Independent RIA), with an extensive and detailed understanding of the RIA Industry, in particular the Investment Advisory Services Market. Greco obtained his comprehensive understanding of the RIA Industry, as well as first-hand knowledge of Defendants business operations, through two decades of management level experience work experience, including his employment as Creative Planning's National Director of Wealth Management, Managing Director at AMTD, and financial services position at Schwab. (Compl. ¶¶ 7, 8). It is precisely through his employment by Defendants that Greco first began discovering their anticompetitive and illegal conduct, set forth in Plaintiffs' Complaint with great factual detail, in two schemes Greco refers to for purposes of the Complaint, as "Creative Planning Fraudulent Growth Scheme" (Compl. ¶ ¶ 9, 10, 11, 18) and "RIA Services Scheme." (Compl. ¶ ¶ 6, 18). As Creative Plannings' Wealth Management, Managing Director, Greco worked very closely with Defendant Mallouk and witnessed first-hand how Creative Planning participated in the schemes, direct communications between Creative Planning and Defendants in furtherance of the schemes, and the common purpose Defendants shared that motivated their agreements and conduct in furtherance of the schemes. (Compl. ¶ ¶ 7, 8, 9, 10, and 11).  On March 1, 2017, Greco resigned

from Creative Planning and, on or about March 7, 2017, Greco filed a Form TCR and a disclosure statement containing original information, documentary evidence, pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, and analysis pertaining to potential violations of federal securities laws by AMTD and Creative Planning ("2017 SEC Whistleblower Complaint") and provided additional supplemental information disclosures, data, documents, sworn testimony, cooperation and information to the SEC throughout the Spring and Summer of 2017 (collectively referred to herein as "2017 SEC Whistleblower Action"). In February 2020, Greco filed a complaint with the Department of Justice concerning collusive agreements and concerted unfair and anti-competitive conduct by AMTD, Schwab, and Creative Planning, including concerted action in furtherance of their RIA Services Scheme ("2020 DOJ Complaint"). (Compl. ¶14).

Greco dared to oppose Defendants' illegal conduct, and he did not just stop with a few internal workplace complaints. As a result, Greco has paid dearly as Defendants collectively used their ill-gotten market power and existing anti-competitive arrangements to attempt to silence Greco and deter him from providing any further cooperation or information to federal investigators, as alleged herein, as well as retaliate against him/punish him for being an SEC Whistleblower, the 2017 Whistleblower Action, and 2020 DOJ Complaint. Plaintiffs' Complaint describes with factual specificity the intentional, targeted, and malicious conduct each Defendant engaged in furtherance of the Silencing and Retaliation Scheme. Plaintiffs' identify when and how each Defendant came to join the Silencing and Retaliation Scheme, their common purpose in the Silencing and Retaliation Scheme, the details of how the carried out the Silencing and Retaliation Scheme, and how the specific conduct caused injury to Plaintiffs. See Ex. A., Sec. # 9, 22, 24, 26, 28, 29, 98).

Plaintiffs' Complaint provides extensive factual detail (i.e., dates, participants, and details), graphic timelines of key events, excerpts and references to publicly accessible documentary evidence, background information, and even sworn declarations providing further factual support for the misconduct alleged in their Complaint and injuries they have sustained as a direct and proximate result thereof. Plaintiffs weave the facts into a colorful tapestry that tells Plaintiffs' story and illuminates their need for judicial relief. Undoubtedly, Plaintiffs will develop substantially more detailed evidence during discovery. The reality is there are many documents, witnesses, data, and information that is in Defendants' exclusive possession. Plaintiff personally observed many during his employment by Defendants, and therefore has a reasonable basis to believe a lot more exists. At this stage in the litigation, however, Plaintiffs did their best to reasonably investigate and set forth the facts with sufficient specificity.

## B.     DEFENDANTS' MOTIONS TO DISMISS

Defendants acknowledge Plaintiffs' factual allegations, and understand the general contours of Plaintiffs "story," as well as the claims Plaintiffs are asserting against them. Defendants balk at labels Plaintiffs use to describe their misconduct and deny they engaged in a conspiracy or acted in concert. Defendants suggest their actions were independent and procompetitive, without providing any factual or legal support.

The arguments advanced in Defendants' MTDs are generously characterized as "thin," and are predicated on denying the existence of plain and unambiguous factual allegations in Plaintiffs' Complaints; unwarranted demands for additional factual specificity and "evidence" to support well-plead facts; gross mischaracterization of Plaintiffs' antitrust and RICO claims; misleading citations to case that do not support (or even address) Defendants' unfounded legal claims; and quite possibly most egregiously, intentionally making patently false statements of fact to this Court

in an ill-fated effort to avoid liability for their *per se* unlawful horizontal agreements in violation of the Sherman Act, which they committed as horizontal RIA competitors in the Investment Advisory Services Market. This Court should deny Defendants' MTDs in their entirety because, despite 75-pages of briefing, Defendants have been unable to identify any material factual or legal deficiencies that warrant dismissal of Plaintiffs' Complaint. Repeatedly, Defendants fault a "lack of evidence" and suggest evidentiary deficiencies based on standards applicable at summary judgement or trial. Ironically, Plaintiffs give them much more specificity than required – as the majority of Plaintiffs' claims are only subject to Fed. R. Civ. P. 8(c).

## II.    LEGAL STANDARD

Defendants primarily premise their arguments for dismissal on baseless demands for more factual specificity, essentially asking this Court to apply a standard more akin to that used at summary judgment or trial. See *Hytera Communications Corporation Ltd. v. Motorola Solutions, Inc.*, 2022 WL 3645908, at *15 (N.D.Ill., 2022) (declining to dismiss plaintiffs' complaint because it did not contain "more specific facts typically developed during discovery"). In *Bell Atl. Corp. v. Twombly,* the Supreme Court explicitly addressed the degree of factual specificity required at the pleading stage, confirming: "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations .... " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). It need only present "enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal acts. *Id. Twombly* instructs "the allegations do not even need to establish the probability of the plaintiff's recovery." *Id.* at 556, 127 S.Ct. 1955.

Defendants' argument that Plaintiffs do not plead fraud-based claims, such as mail and wire fraud, with sufficient specificity under Fed. R. Civ. P. 9(b) is also simply wrong. Plaintiffs' well-plead, factually specific allegations speak for themselves. Moreover, Defendants'

interpretation of Fed. R. Civ. P. 9(b) is improper. It is well established that a plaintiff may plead fraud based on information and belief if (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions. *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807 (N.D. Ill. 2013); see also, Fed. R. Civ. P. 9(b).

## III.     ANALYSIS AND ARGUMENT

### A.     DEFENDANTS ARE HORIZONTAL COMPETITORS

Defendants are intentionally misleading this Court by falsely representing that Creative Planning is the only Defendant that is an RIA; that Defendants are not horizontal competitors in the Investment Advisory Services Market; that the Referral Programs are vertical in nature; that the Referral Programs are operated by custodians; and that the Referral Program Agreements and other challenged agreements between Creative Planning and the other Defendants are *"( v)ertical, not horizontal, and therefore not subject to per se liability as Plaintiffs allege."* (Dkt.# 60, p.4); *see also* (Dkt.# 59, p. 13 fn. 1, p. 14). Defendants know that their statements are patently false.

Defendants are all RIAs, providing advice services to advisory clients in the Investment Advisory Market. Not only have Plaintiffs specifically alleged that each Defendant is an RIA, selling advisory services in the Investment Advisory Services Market, and horizontal competitors with one another; they actually provide information detailing each Defendants' SEC registrations and corresponding numbers.  (Complaint, ¶¶31, 39, 40, 44, 52, 63, 70). Defendants are required, as RIAs, to make certain regular public disclosures and filings with the SEC. (Compl. ¶¶ 91-93); *see also* Exhibit C (selected excerpts from Defendants' SEC filings). The SEC filings each confirm that they are, in fact, horizontal competitor RIAs providing advice services in the Investment Advisory Services Market.

8

Plaintiffs allege that Schwab, AMTD, and Fidelity, in their capacity as RIAs, operate the Referral Programs to facilitate Defendants' RIA Services Scheme, conspiracies, and *per se* illegal: horizontal market allocation, group boycotts, competitive information sharing, non-competition and other unreasonable restraints in furtherance of their RIA Services Scheme. (Compl. ¶¶ 39, 42, 45, 55, 130-170, 188-192, 208, 209, 386, 679-681, 710, 711, 726-731). Plaintiffs further allege that the Referral Programs and Referral Program Agreements are horizontal in nature, between an exclusive and limited group of horizontal competitor RIAs ("Participating RIAs"), such as Creative Planning (Compl. ¶¶ 132(c), 133-170), a fact which is further confirmed in the SEC filings, Referral Program Agreements and Disclosures, financial reporting, and other public documents of Schwab, AMTD, and Fidelity. (Compl. ¶¶ 134, 135, 137, 142-149, 164, 165, 168).

Creative Planning has actively participated in AMTD and Schwab Referral Programs and entered into Referral Program Agreements with both of their respective RIAs. (Compl. ¶¶ 148, 169). Fidelity admits that its Referral Program, Fidelity Wealth Advisor Solutions®, is operated by Fidelity Personal and Workplace Advisors, LLC, and publishes its membership of horizontal competitors – Participating RIAs – on its website.[6] In fact, Schwab's RIA (CSIM) participates in Fidelity's Referral Program, the Wealth Advisor Solutions® program, and receives advisory client referrals from Fidelity's RIA (FPWA).[7]

On September 27, 2022, Plaintiffs sent correspondence to Creative Planning, in response to receiving a copy of their original draft Sanctions Motion, which provided in pertinent part: *"You are now being provided a second notice (and demand that you investigate) that both your Rule 11 Motion and Motion to Dismiss contain, among other insufficiencies, blatant misrepresentation of the facts plead in Plaintiffs' Complaint (i.e., use of wrong market definition, and false assertion*

---

[6] https://www.fidelity.com/wealth-management/private-wealth-management-advisors
[7] CSIM Disclosure Brochure, September 21, 2022, page 41.

that defendants are not horizontal competitors in the Investment Advisory Services Market), affirmative false factual assertions (i.e., Broker-Custodian Defendants are not RIAs), inaccurate analysis of applicable antitrust law, intentionally misleading representations about the RIA Industry and Defendants' business practices, and mischaracterization of well-established antitrust law." See Exhibit D, Plaintiffs September 27, 2022 Correspondence to Creative Planning Defendants. Notably, in response to Plaintiffs' correspondence, the Creative Planning Defendants removed the identified false allegations from their Sanctions Motion, prior to their Counsel signing and filing it with the Court on September 30, 2022.  (Dkt.# 66). However, to date, none of the Defendants have notified this Court (withdrawn or amended) of the material misrepresentations/ false allegations in their Motion to Dismiss.

Defendants' false allegations and misrepresentations are not innocent mistakes or a scrivener's error. Rather, they are intentionally being used by Defendants to support their arguments for dismissal that depend on them not being horizontal competitors in the Investment Advisory Services Market (Dkt.# 59, p. 13 fn.1). Defendants argue that since Creative Planning is "the sole RIA defendant" and that the Referral Agreements are  "*vertical  agreements among entities serving different roles in the relevant market*" [8]  Plaintiffs claims are therefore "*subject to the rule of reason*" (Dkt.#59, 14).

The "elephant in the room," that Defendants are desperate to obfuscate and conceal the reality of their horizontal relationships and horizontal agreements, as competitor RIAs in the Investment Advisory Services Market, which are *per se* illegal restraints of trade and presumptively violate the Sherman Act. *Toys "R" Us, Inc. v. F.T.C.,* 221 F.3d 928, 936 (C.A.7, 2000)(*per se* restraints

---

[8] Defendants also misleadingly imply that the SEC has reviewed and approved of the Referral Agreements (Dkt.#59, p. 14), yet fail to allege a single fact evidencing any such review, determination, or how the absence of an SEC enforcement action is relevant to Plaintiffs' antitrust claims, or any of the claims alleged in Plaintiffs' Complaint.

warrant condemnation without an extensive inquiry into market power and economic pros and cons). Defendants cannot cite a single case that holds that horizontal referral programs, such as the Referral Programs challenged here, are anything other than *per se* illegal market allocation agreements. Defendants did not (because they could not) cite a single case that found "*similar referral arrangements lawful and legitimate*," instead utterly misrepresenting that the 7th Circuit's opinion in *Toys "R" Us* blessed similar referral agreements.  In contrast, there are hundreds of cases that condemn similar horizontal market allocation agreements as unreasonable *per se*. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018).

## B.    PLAINTIFFS' RELEVANT MARKET DEFINITIONS

Plaintiffs allege Defendants conspire together to dominate, control, and monopolize[9] the services rendered in three particular submarkets of the $110 Trillion dollar RIA Industry: (1) the $5 Trillion dollar Investment Advisory Services Market (Compl. ¶¶ 83, 86, 87, 104, 106-109); (2) RIA Custodial Services Market (Compl. ¶¶ 82, 83, 97, 104-107, 110-114, 116-120); and (3) the IAR Labor Market (Compl. ¶¶ 84-86, 106, 112, 126-129).

Defendants are on notice of, and specifically identify in their MTDs, the specific details of the three submarkets of the RIA Industry which Plaintiffs allege are relevant for antitrust analysis. (Dkt.# 59, p. 39-40). Plaintiffs' Complaint specifically describes each relevant market, their respective distinctions, and delimitations, including: the services offered, services which are and are not interchangeable, the market participants, and geographic scope. (Compl. ¶¶ 83-88, 105-120, 122, 123, 126-129).  Plaintiffs further allege with specificity throughout the Complaint how Plaintiffs, as well as each Defendant, participated in each relevant market.

---

[9] For Schwab, not the other Defendants, to monopolize the RIA Custodial Services market, as set forth herein.

The registered investment adviser ("RIA") industry is defined by, and subject to, the Investment Adviser Act of 1940, 15 U.S.C. § 80b ("Adviser Act") and regulatory oversight of the United States Securities and Exchange Commission ("SEC"). (Compl. ¶ 4). The Adviser Act and SEC regulations establish the contours of the relevant submarkets and services. As such, the RIA Industry is distinguished from other financial advice and consulting, such as brokers, by its designation as a "fiduciary" to advisory clients. (Compl. ¶ 87). The fiduciary obligation is a significant distinction that makes Investment Advisory Services unique compared to, and not interchangeable with, other service markets which provide non-fiduciary investment recommendations, advice, and consulting. The SEC requires certain public reporting by RIAs, such as the Client Relationship Summaries ("CRS") and the Uniform Application for Investment Adviser Registration ("Form ADV"), which are intended to be relied upon by their clients. (Compl. ¶¶ 91, 92).

As defined in the Plaintiffs' Complaint, the Investment Advisory Services Market is  a submarket of the aggregate RIA Industry, which provides retail investment advisory services, primarily to high net worth investors, by RIAs with the following characteristics: they are SEC registered fiduciaries that are engaged in the business of providing fee-based investment advice, they typically provide investment advisory services to high net worth individuals (more than $1 million in AUM) and institutions and are required by the SEC, pursuant to the SEC Custody Rule, to custody their advisory client AUM with a Qualified Custodian. (Compl. ¶¶ 97, 107).

Investment Advisor Representatives ("IARs") are the licensed investment advisors employed by RIAs to provide the investment advisory services to advisory clients and are: subject to the fiduciary duties of the Adviser Act, required to pass certain licensing exams, must be registered with the SEC through the Investment Adviser Registration Depository ("IARD"), obtain

a central registration depository (CRD) number from FINRA, and file public forms with the SEC, such as the U-4. (Compl. ¶¶ 84, 85).

Notably, Defendants do not (and cannot) deny the existence of those markets because the existence and contours of those markets are too well-understood in the RIA Industry, and Defendants have each actively participated in the markets and publicly acknowledged their existence. For example, in his February 9, 2021 acknowledgment, Bernie Clark, the head of Schwab Advisor Services, identified the importance to Schwab of the "*5.7 trillion*" Investment Advisory Services Market, and promoting Schwab's SIPs/advisory services to Independent RIAs.[10] Clark further explained "[A]s we bring Schwab and TD Ameritrade together, we are going to build the experience of the future…" and promised Schwab's commitment to the Investment Advisory Services Market: "(w)e're all in. Schwab is invested in RIAs and the future of this profession. This business represented more than 50% of Schwab's core net new assets and nearly a third of its revenue last year."[11] Clark further admitted Schwab is continuing to capture market share in that particular market and noted the important interplay between its business activities in the Investment Advisory Services Market and RIA Custodial Services Market, stating: "*(w)e have continued to capture market share, as has TD Ameritrade Institutional. Together, we now serve $3.1 trillion in assets on behalf of our registered investment advisor (RIA) clients.*"[12]

Instead of directly challenging the existence of the relevant markets alleged by Plaintiffs, Defendants focus their arguments on disingenuously suggesting their own, absurdly broad alternative market definition for the Investment Advisory Services Market – encompassing all of

---

[10] https://www.aboutschwab.com/no-one-is-staying-in-their-lane-and-thats-a-good-thing
[11] *Id.*
[12] *Id.*

the vastly differentiated services of the entire RIA Industry (Dkt.#59, p. 14, 21, 22), as well as identifying purported technical pleading insufficiencies (which Plaintiffs dispute exist).

Defendants incorrectly assert that Plaintiffs did not plead facts related to the "cross-elasticity of demand," which is just a fancier way of saying a relevant product market includes all products that consumers perceive as reasonable substitutes for each other. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956); *Columbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20, 26–30 (3d Cir.1978). While Plaintiffs did not use the words "cross-elasticity of demand," they did plead facts distinguishing the investment advisory services that retail consumers would perceive as reasonable substitutes for each other, and those which are not. (Compl. ¶¶ 4, 5, 79-89, 91-114, 126, 127). For example, Plaintiffs allege "the fiduciary obligation is a significant distinction that makes Investment Advisory Services unique compared to, and not interchangeable with, other service markets which provide non-fiduciary investment recommendations, advice, and consulting." (Compl. ¶ 87); RIAs provide Investment Advisory Services, are regulated by the SEC, must register with the SEC, and must comply with reporting requirements, including publicly available filings such as Client Relationship Surveys and Form ADV, which are intended to be relied upon by their clients (Compl. ¶¶ 91, 92, 94); Investment Advisory Services are provided by RIAs subject to the SEC "Custody Rule" (Compl. ¶¶ 97, 110, 111); there are different types of RIAs providing distinct advisory services, such as independent RIAs, hybrids, asset managers, hedge funds, turnkey asset management programs, and other advisory services (Compl. ¶ 99); RIA Custodial Services are unique because they are regulated by the SEC, must meet certain threshold requirements, and are not subject to substitution (Compl. ¶¶ 97, 110, 111); IAR Labor consists of the essential, licensed and regulated IAR employees who provide the investment advice to the

14

advisory clients of Independent RIAs, and why IAR Labor is not interchangeable with unlicensed and unregistered financial advisors (Compl. ¶¶ 84-86, 88, 112, 126-129, 132(l), 216, 218, 219); and facts detailing the basis for national geographic scope (Compl. ¶¶ 78, 83, 84, 86, 106).

In contrast, Defendants do not offer any explanation or evidence supporting their alternative market definition for the Investment Advisory Services Market or explain why their definition would include such dissimilar services – which have zero interchangeability or cross-elasticity of demand – are appropriately lumped together into a single behemoth market. Defendants do not offer any facts contradicting geographic scope of the relevant markets is nationwide, and, in fact, each of the Defendants operate their respective businesses nationwide (Compl. ¶¶ 31-73, 78, 86, 106): Defendants provide advice services to advisory clients located throughout the United States (Compl. ¶¶ 31-73, 78, 86, 106); Schwab and Fidelity offer their RIA Custodial Services nationwide (Compl. ¶¶ 31-61, 73, 78, 86, 106, 114); and all Defendants solicit and retain IARs from a nationwide labor market (Compl. ¶¶ 84- 86, 106, 112, 126-129).

Defendants regularly refer to their business operations in the Investment Advisor Services Market and RIA Custodial Market, in terms of nationwide aggregates, such as the following admission by Schwab: "Schwab Advisor Services is an industry leader and the largest custodian of RIA assets, providing custodial, operational, practice management, and trading support to more than 7,500 independent RIA firms" and, further describing "Over 70% of U.S.-based, retail-focused RIA firms with $1 billion or more in AUM custody with Schwab."[13] Plaintiffs' relevant market definitions sufficiently allege how the services in each relevant market "have unique attributes that allow them to be substituted for one another, but make them difficult to replace with

---

[13] Forward Momentum: Elite teams take the helm at RIA firms | Advisor Services (schwab.com)

substitute products from outside the market." *Todd v. Exxon Corp.*, 275 F.3d 191, 201–02 (2d Cir.2001).

Defendants' demands for more detailed allegations are without legal merit. It is well-established that there is no requirement that the market definition elements of an antitrust claim be pled with specificity." *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1045 (9th Cir.2008). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.* The existence of a "relevant market" is typically a factual inquiry for the jury. *Id.* A complaint may be dismissed on this ground only if the market definition is "facially unsustainable." *Id.* Here, there are no fatal legal defects in Plaintiffs' alleged relevant markets. As this Court recognized in *Ploss v. Kraft Foods Group, Inc.*, "another reason that counsels against dismissal is that 'market definition is a deeply fact-intensive inquiry, [and] courts hesitate to grant motions to dismiss for failure to plead a relevant product market.'" 197 F.Supp.3d 1037, 1070 (N.D.Ill., 2016).

### C.    PLAINTIFFS' CONSPIRACY ALLEGATIONS

Defendants' concerted action/conspiracies is precisely what this litigation is about. In fact, in the very first sentences of Defendants' Motion to Dismiss, they acknowledge that that they understand "*the centerpiece of Plaintiffs' Complaint*" is that Defendants "'*conspired' to carry out a so-called 'RIA Services Scheme' and 'Silencing and Retaliation Scheme*'" and that Plaintiffs blame their "*massive conspiracy*" for the near-fatal injuries sustained to their business and property. (Dkt.# 59, p. 13) Moreover, Defendants summarize, albeit selectively and inaccurately, specific factual details of each of the three conspiratorial schemes in Plaintiffs' Complaint: Creative Planning Fraudulent Growth Scheme (Dkt.# 59, p. 17); the RIA Services Scheme (Dkt.# 59, p. 18-19); and Silencing and Retaliation Scheme (Dkt.# 59, p. 18-21).

Defendants lightly summarize what they characterize to be Plaintiffs' "conspiratorial schemes" and reference factual allegations related to those schemes: "(1) an alleged RIA Services scheme centered around allegedly similar referral programs, Compl. ¶¶ 133 - 170, "no poach agreements" relating to IAR employees, id. ¶¶ 22l, 315, and general business strategies; and (2) an assertion that Broker-Custodian Defendants "participate[d] in a group boycott" by refusing to supply Spotlight with RIA custodial services pursuant to a "Silencing and Retaliation Scheme." *Id.* ¶¶ 185, 376-77, 583, 623, 626." (Dkt.# 59, p. 24). While Plaintiffs do not agree that Defendants' selected factual allegations (or their analysis thereof) is complete and accurate, it nevertheless demonstrates Defendants have a general understanding of the conspiracies being alleged, and that specific facts in Plaintiffs' Complaint describe all of the requisite elements to plausibly suggest agreement/conspiracy.

Despite very clearly identifying and demonstrating their understanding of the conspiracy allegations, Defendants nevertheless move for dismissal of Count 2 (Sherman Act § 1 Conspiracy), Count 4 (Cartwright Act), Count 6 (Civil Conspiracy), and Count 13 (Civil RICO) claims on the absurd basis that Plaintiffs' factually dense Complaint failed to allege an illegal agreement or that any "Defendant participated in a conspiracy or enterprise." (Dkt. # 59, p. 23) Defendants cannot reach that conclusion without ignoring and disregarding Plaintiffs' plain, unambiguous, and explicit factual allegations of illegal agreements (See Exhibit A, Sections #2, 5, 7, 13, 33, 40, 41) and each Defendants' participation in conspiracies (See Exhibit A, Sections #2, 7, 9, 10, 15, 19-27) and a RICO enterprise (Compl. ¶¶ 676-690).

In considering whether Plaintiffs plausibly allege conspiracy, "the crucial question is whether ... [the defendants'] conduct stemmed from independent decision or from an agreement, *tacit* or express [emphasis supplied]." *Theatre Enterprises, Inc. v. Paramount Film*

*Distributing Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). At the heart of an antitrust conspiracy is concerted action, "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Conspiracy allegations should be evaluated as a whole. The "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Defendants' isolation of Plaintiffs' allegations providing examples of specific parallel action and specific plus-factors is not proper.

Here, Plaintiffs' Complaint plainly and repeatedly sets forth myriad facts plausibly demonstrating each of Defendants' conscious commitment to a common scheme designed to achieve an unlawful objective. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Such may be alleged through factual allegations involving either direct evidence of an anticompetitive agreement or circumstantial evidence "from which the existence of such an agreement can be inferred." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018). Plaintiffs have alleged both direct and circumstantial evidence.

### 1.    DIRECT EVIDENCE OF CONSPIRACY

Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate. *See Twombly,* at 564. Here, Plaintiffs' direct evidence of conspiracy includes: allegations that Defendants entered into explicit and tacit agreements (See Exhibit A, Sections #2, 5, 7, 13, 33, 40, 41), direct evidence of conspiratorial communications between Defendants (See Exhibit A, Sections #52, 55), public admissions by Defendants related to their agreements to

participate in the Referral Programs (Compl. ¶¶ 142-148, 281-290, 307), and threats made to Plaintiffs, Spotlight IARs, and competitor Independent RIAs. (See Exhibit A, Sections #59-64, 98). Plaintiffs allege specific agreements entered into by Defendants which unequivocally demonstrate their conscious commitment to the RIA Services Scheme: Referral Program Agreements, Revenue-Sharing Agreements, RIA Custodial Service Agreements. (See Exhibit A, Sections #2, 5, 7, 11, 13, 33, 40, 41, 44). Plaintiffs allege that the challenged agreements are part of one overarching conspiracy by Defendants (the RIA Services Scheme) and the agreements contain nearly identical material terms, covenants, restrictions, and enforcement provisions.

The Referral Agreements are entered into by horizontal competitor RIAs and include specific *per se* restraints, such as: allocation of advisory clients in the Investment Advisory Services Market; explicit non-competition and non-solicitation agreements; price-fixing and pricing agreements; horizontal group boycotts and agreements to act in concert to refuse to deal; agreements related to supply, with portfolio-mixes and performance metrics used to manipulate supply of products and services; sharing of confidential competitive information; and penalties for non-compliance and other enforcement provisions. (Compl. ¶¶ 134-136, 138, 141, 145-147, 151-170, 173, 174, 181-183, 190, 196-199, 202, 211, 214, 221, 222, 227, 287-289). The Referral Agreements themselves, as well as public admissions by Defendants related to the Referral Programs, are direct evidence of Defendants' conspiracy. Plaintiffs' factual allegations paint a much more robust picture of how these coordinated and interrelated agreements are used to join together Defendants, and their co-conspirators, to carry out their conspiratorial agreements and police compliance with the conspiracy. (See Exhibit A, Sections # 2, 5, 6, 7, 9, 10, 11).

Plaintiffs also allege direct evidence of conspiratorial communications between Defendants that evidence their conspiracy (See Exhibit A, Section #52). For example, in

furtherance of the Silencing and Retaliation Scheme, Plaintiffs allege that Mallouk and Creative Planning, in or around November 2018 and throughout January 2019, directly communicated with AMTD about Miguel's Fall 2018 deposition testimony, Greco's 2017 SEC Whistleblower Action, a fabricated story by Mallouk about Plaintiff Greco and the content of Plaintiff Greco's 2017 SEC Whistleblower Complaint, and AMTD joining Creative Planning in the Silencing and Retaliation Scheme. (Compl.¶¶ 505, 506). Schwab and Fidelity communicate and coordinate pricing structure and changes to pricing structure for RIA Custodial Services. (Compl.¶¶ 314). Defendants communicate regarding mergers and acquisitions, obtain confidential "due diligence" in connection therewith, and share such confidential information amongst each other in furtherance of the RIA Services Scheme. (Compl.¶¶ 308-309).

Threats by Defendants are direct evidence that is "plainly relevant and persuasive as to a meeting of the minds." *Monsanto Co. v. Spray-Rite Service Corp.*, 104 S.Ct. 1464, 1471, 465 U.S. 752, 765 (U.S.Ill., 1984). Here, Plaintiffs allege Defendants Fidelity and Schwab made direct threats to competitor Independent RIAs to induce their participation in the group boycott against Plaintiffs and refuse to deal with Plaintiffs. (Compl. ¶¶ 623-626, 642-644, 651-656, 659). Plaintiffs also allege a number of threats made to them and Spotlight employees, by Defendants, evidencing their IAR no-poach agreements and related use of enforcement mechanisms. (See Exhibit A, Sections #59-64). Those threats are direct evidence of conspiracy.

While Plaintiffs contend the challenged agreements, standing alone, are sufficient, Plaintiffs nevertheless allege a number of plus-factors, "*something more*" than just the agreements, from which reasonable inference can be drawn that Defendants were "members of an overarching conspiracy." *In re Railway Industry Employee No-Poach Antitrust Litigation*, 395 F.Supp.3d 464, 487 (W.D.Pa., 2019).

20

2.    INDIRECT/CIRCUMSTANTIAL EVIDENCE OF CONSPIRACY

To plead an agreement through indirect evidence, Plaintiffs must allege parallel conduct by Defendants coupled with certain "plus factors." *In re Musical Instruments*, 798 F.3d at 1194. "Under *Twombly*, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior." *Id.* at 1193. "Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Id.* at 1194. "Plus factors" may include: "common motive to conspire, action against self-interest, government investigation, participation in trade associations, and parallel pricing." *Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 324 F. Supp. 3d 1142, 1148 (S.D. Cal. 2018). "[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors and made for no other discernible reason would support a plausible inference of conspiracy." *Twombly*, 550 U.S. at 557 n. 4. Other examples of plus-factors (or "something more") courts have found to include: (1) a common motive to conspire, *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 334 (S.D.N.Y. 2021); *Kelsey K. v. NFL Enterprises, LLC*, 254 F. Supp. 3d 1140, 1145 (N.D. Cal. 2017); (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, *Toys "R" Us, Inc. v. F.T.C.,* 221 F.3d 928, 936 (C.A.7, 2000); (3) parallel business behavior by Defendants, *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); and allegations that Defendants knew they were in agreement and used publicly available reports to monitor each other's compliance, suggests conspiracy. *In re Broiler Chicken Antitrust Litigation*, 290 F.Supp.3d

21

772, 798 (N.D.Ill., 2017). Plaintiffs plausibly allege both parallel conduct and plus factors. Plaintiffs' factual allegations in support of "parallel conduct" Ex. A, Sec. #53.

Additionally, Plaintiffs allege a number of common motives for Defendants to conspire, including: (1) increase profits and share revenues that would be otherwise impossible under federal law and the SEC framework governing the RIA Industry (Compl. ¶¶ 2, 6, 54, 132); (2) obtain a competitive advantage by coordinating and working together to circumvent compliance with burdensome SEC regulatory requirements (Compl. ¶¶ 2, 6, 130-132, 291, 323, 366, 678-681); (3) conceal their conduct through confidentiality and enforcement provisions (Compl. ¶¶ 90, 131, 132, 134, 138, 167, 174, 188, 196, 221, 727); (4) diminish competitor access to IAR Labor and ensure their own access to the best qualified IARs (Compl. ¶¶ 128, 129, 132, 206, 216-224); (5) increase the operating costs of and profits from small and mid-size Independent RIAs, such as Spotlight, to drive consolidation and increase their own market share and power (Compl.¶¶ 203(a), 294(f), 303); (6) obtain access to exclusive products and services that are only accessible through participation in the RIA Services Scheme (Compl. ¶¶ 138, 168); (7) prevent new entrants and foreclose competition in the RIA Custodial Services Market, allowing Schwab to obtain monopoly power which is then leveraged in the Investment Advisory Services Market to consolidate that market, eliminate competitors, increase pricing and revenue (through covert revenue-sharing, agreed portfolio mixes, and "Inflated Revenue Transactions") (See Exhibit A, Sections #33-37, 50, 76, 82, 87, 88, 97); and (8) Fidelity benefits from Schwab's acquisition of monopoly power in the RIA Custodial Services because their conspiracy provides that Schwab and Fidelity will agree to maintain their respective market shares, not solicit or compete with one another for RIA Custodial Services, and coordinate and agree to pricing and pricing structures for RIA Custodial Services (Compl. ¶¶115, 132(b), 138, 176, 294, 296, 302, 303, 314, 316, 694). There are numerous other

specific examples of Defendants' collective and individual motives. (See Exhibit A, Sections #2, 5, 6, 7, 37, 38, 99).

Defendants acknowledge Plaintiffs' Complaint alleges a parallel conduct and plus factors, including: parallel conduct (Compl. ¶¶ 310, 311, 312, 313, 314, 315); information sharing (Compl. ¶¶299, 300, 301, 302, 303, 304, 305); mergers and acquisitions (Compl. ¶¶308, 309); opportunities to meet (Compl. ¶¶ 306, 307); shared motive to conspire and increase their profits (Compl. ¶1); and Industry characteristics facilitating collusion (Compl. ¶ 296(e)). (Dkt. #59, p. 24-25, 27-28). Plaintiffs actually alleged more than just those factors, as set forth in Plaintiffs' Complaint. (Compl. ¶¶ 296-303, 305-315). Accordingly, there really is no legitimate dispute that Plaintiffs have plead parallel behavior and plus-factors. In fact, Defendants dispute that Plaintiffs have not offered any reason to conclude that Defendants' parallel conduct "reflects anything but 'individual responses to common stimuli.'" (Dkt. # 59, p. 26). Yet, at the pleading stage, "(i)t is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion." *In re Plasma-Derivative Protein Therapies Antitrust Litigation*, 764 F.Supp.2d 991, 1002 (N.D.Ill., 2011); *Viamedia, Inc. v. Comcast Corporation,* 951 F.3d 429, 460 (C.A.7 (Ill.), 2020).

Nevertheless, Defendants argue that their parallel "policy changes" are intrinsically different than the type of parallel conduct that might give rise to an inference of collusion. Defendants point to Plaintiffs' specific allegations of parallel conduct by Schwab, AMTD, and Fidelity, in their nearly identical sudden and historically unprecedented change to the pricing structure of RIA Custodial Services, as being just a "*consumer-friendly decision the antitrust laws encourage*." (Dkt.# 59, p. 34-35). Defendants ignore that the simultaneous pricing change actually increased the costs of RIA Custodial Services (and corresponding pricing/revenues to Defendants),

involved a combination of changes that imposed mandatory portfolio-mix (asset allocation) agreements and dedicated percentages of advisory client AUM to be held in cash and cash sweep accounts (Compl. ¶¶ 138(e), 281, 291, 303, 324), and that the purported pricing structures were alleged to be "confidential" and therefore it is unlikely Schwab, AMTD, and Fidelity could have made nearly identical structural changes absent coordination and collusion. Either way, at the pleadings stage, a material dispute of fact is not a basis for dismissal. Whether Plaintiffs or Defendants prevail on their interpretation of the parallel pricing and pricing structure changes is better left to a later stage in this litigation.

### 3.   MISCELLANEOUS CHALLENGES TO CONSPIRACY ALLEGATIONS

Defendants make a number of weak, "one-liner" challenges in support of their arguments against Plaintiffs' conspiracy claims. None of Defendants' miscellaneous arguments have merit – all lack a factual or legal basis supporting dismissal. Despite Defendants' suggestion, co-conspirators do not have to have identical motives in order to conspire with each other and have the same ultimate objective of each conspirator does not have to be the actual restraint of trade. *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Defendants' suggestion that incongruent timing of Defendants' participation in the conspiracy disproves the fact of conspiracy is equally unavailing. *United States v. Noble,* 754 F.2d 1324, 1329 (7th Cir.1985). Defendants fault Plaintiffs' conspiracy allegations because they, at times, refer to Defendants collectively and do not set out with specificity each Defendants' conduct in the conspiracy, but a complaint need not contain detailed 'defendant by defendant' allegations, it must simply allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision to join it." *In re Outpatient Medical Center Employee Antitrust Litigation*, 2022 WL 4465929, at *7

(N.D.Ill., 2022). Antitrust conspiracy does not require any overt act other than joining the conspiracy. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) Defendants also assert, in a footnote, that Plaintiffs' antitrust conspiracy claims fail because they are required to identify and include all of the other co-conspirators (Dkt.# 59, p. 25 fn.10), relying on *Rocha v. FedEx Corporation*, 15 F.Supp.3d 796, 809 (N.D.Ill., 2014). *Rocha* is not only completely factually inapposite, it also does not stand for Defendants' absurd legal proposition. In fact, no case does. Defendants simply misrepresent the law.

### 4.  CREATIVE PLANNING CHALLENGES TO CONSPIRACY

Creative Planning and General Atlantic claim that "it goes entirely unsaid," in Plaintiffs' Complaint, how they participated in a market-wide conspiracy (Dkt.# 59, p. 14), ignoring all of the specific examples in Plaintiffs' Complaint that set forth Creative Planning's participation in the conspiracies and each of the three alleged schemes. Ex. A., Sec. #9, 15, 17, 18, 19, 20, 28, 29.

The Creative Planning Defendants' arguments that they are "too small" and have too little market share to violate the antitrust laws is unfounded. Plaintiffs do not allege Creative Planning is a monopolist in any market. Plaintiffs only bring Sherman Act § 1 (Conspiracy) and Sherman Act § 2 (Conspiracy to Monopolize) claims against Creative Planning.  Neither type of antitrust conspiracy claim requires Creative Planning to be a certain size or to individually have market power or be individually capable of effectuating an anticompetitive impact on the relevant markets.

Plaintiffs not only allege Creative Planning participates in the conspiratorial schemes, they also allege they are motivated to uphold their conspiratorial agreements because they derive substantial pecuniary and non-pecuniary benefits from compliance (Compl.¶¶ 131, 132 (e), 132(f), 132(k), 132(l), 134, 138, 138(j), 138(l), 152-154, 165- 170, 188- 192, 198-202, 216, 221, 222, 243, 244, 287-289, 292, 726, 727, 741) and face enforcement mechanisms and financial penalties for

non-compliance. (Compl.¶¶ 90,132(f), 134,138(h), 138(k),167, 187, 190, 191, 196, 197). Creative Planning, as well as their unnamed co-conspirator Participating RIAs, are not only provided with a valuable allocation of the Investment Advisory Services Market, they are provided most-favored-nation treatment, revenue-sharing and financial incentives, non-monetary preferential treatment and benefits, and insulation from competitive pressures which would otherwise exist in a free and competitive Investment Advisory Services Market. Together, Defendants and Participating RIAs control over 85% of the AUM in the Investment Advisory Services Market. (Compl.¶¶ 37, 48, 59, 109, 171, 204, 205, 207, 210-212, 245, 280).

Co-conspirators do not have to be "enthusiastic participants" in the conspiracy, and they are still liable even if they were coerced into participating. *Hytera Communications Corporation Ltd. v. Motorola Solutions, Inc.*, 2022 WL 3645908, at *18 (N.D.Ill., 2022). At the pleading stage, Plaintiffs have more than sufficiently satisfied their pleading burden. The "Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct. That would be equivalent to "impos[ing] a probability requirement at the pleading stage," which *Twombly* expressly does not do. 550 U.S. at 556, 127 S.Ct. 1955. *In re Broiler Chicken Antitrust Litigation*, 290 F.Supp.3d 772, 801 (N.D.Ill., 2017).

### 5.   CLAIMS AGAINST GENERAL ATLANTIC SHOULD NOT BE DISMISSED

General Atlantic is liable for the tortious acts of Creative Planning in this case under the principles of partnership law, antitrust law, conspiracy law, and RICO. It is a basic axiom of partnership law that the liability of a partnership is imputed to the partners. *Miller v. McCalla, Raymer, Padrick, Cobb. Nichols, and Clark, L.L.C.*, 214 F.3d 872, at 876 (7th Cir.2000). Moreover, once a defendant knowingly agrees with another to commit an unlawful act or a lawful

act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature. *Adcock,* 164 Ill.2d at 64, 206 Ill.Dec. at 642–43, 645 N.E.2d at 894–95. It is well recognized that a co-conspirator who joins a conspiracy may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Havoco of America, Ltd. v. Shell Oil Co*., 626 F.2d 549, 554 (7th Cir.1980). In this case, General Atlantic and Creative Planning commenced partnership discussions in 2018, which culminated in a partnership transaction in January 2020. (Complaint, at ¶¶ 246-280, "Creative Planning's Roll-Up Consolidation Plan"). General Atlantic is active in Creative Planning leadership and its Managing Director, Co-Head of Financial Services, Paul Stamas, serves on Creative Planning's Board of Directors and participates in Creative Planning's corporate governance, key decision-making, and competitor acquisition strategy ("Roll-Up Consolidation Plan"). *Id*. at ¶ 72. General Atlantic's partnership investment in Creative Planning is based upon Creative Planning's commitment to aggressive acquisitions, the Roll-Up Consolidation Plan. *Id*. at ¶ 273.

### D.    PLAINTIFFS' ANTITRUST CLAIMS SHOULD NOT BE DISMISSED

In their Complaint, Plaintiffs grouped their state and federal antitrust claim into legal counts by statute: Sherman Act (Count 2), Clayton Act (Count 3) and Cartwright Act (Count 4), collectively referred to as "antitrust claims." [14] While all Defendants are alleged to have participated in the RIA Services Scheme, Silencing and Retaliation Scheme, antitrust conspiracies,

---

[14] Plaintiffs conduct a single analysis applicable to both the Cartwright Act and Sherman Act, since Cartwright Act "is patterned after the federal Sherman Act and both have their roots in the common law, federal cases interpreting the Sherman Act are applicable in construing the Cartwright Act.'" *In re Copper Antitrust Litigation,* 436 F.3d 782, 802 (7th Cir.2006) (quoting *Oakland–Alameda Cnty. Builders' Exch. v. F.P. Lathrop Constr. Co.,* 4 Cal.3d 354, 93 Cal.Rptr. 602, 482 P.2d 226, 231 n. 3 (1971)); In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, 801 F.3d 758, 762 (C.A.7 (Ill.), 2015).

and related challenged conduct, Plaintiffs have <u>not</u> alleged that each Defendant acted identically or violated each section of each statute. Defendants either misunderstand, or have intentionally mischaracterized Plaintiffs' antitrust claims. As a result, many of Defendant' arguments for dismissal of Plaintiffs' antitrust claims are simply inapplicable. Defendants' arguments also fail because they are predicated on misrepresentations of material facts by Defendants and lack any support in the law. As such, Defendants motion to dismiss Plaintiffs' antitrust claims should be denied.

In order to dispense with any confusion raised by Defendants' mischaracterization of their antitrust claims, Plaintiffs prepared a detailed chart breaking-out the specific claims brought against each Defendant, attached as Exhibit B, and further offer the following clarification summary: Sherman Act §1 (Conspiracy) claims are brought against: (1) all Defendants for violations in the Investment Advisory Services Market and IAR Labor Markets; and (2) Schwab and Fidelity for violations in the RIA Custodial Services Market. Sherman Act §2 (Monopolization and Attempt Monopolization) claims are brought against the only monopolist- Schwab- for monopolization of the RIA Custodial Services Market, with the Sherman Act §2 (Conspiracy) claim being brought against all Defendants for conspiring and carrying out their antitrust conspiracy of monopolization of the RIA Services Industry. Plaintiffs Clayton Act §7 claims challenging Schwab's horizontal acquisition of AMTD are brought against Schwab. Plaintiffs Clayton Act §7 claims challenging the Creative Planning Defendants' acquisitions of competitor RIAs ("Roll-Up Consolidation Plan") are brought against the Creative Planning Defendants. Plaintiffs Clayton Act §7 claims challenging Fidelity and Schwab's respective SIPs Programs, acquiring thousands of small RIAs and IARs, are brought against Fidelity and Schwab.

Defendants erroneously argue that Plaintiffs' Sherman Act § 2 claims fail because they are "predicated on a shared monopoly/monopsony." (Dkt. #59, p. 37). That is simply untrue. Plaintiffs do not bring claims for Sherman Act §2 (Monopolization/Attempt Monopolization) against any Defendant other than Schwab, for its monopoly of the RIA Custodial Service Market. Plaintiffs' factual allegations establish Schwab is the market dominator and has monopoly power in the RIA Custodial Services Market, with an estimated 75% market share and the ability to exclude competitors, limit output, raise prices, and otherwise control the market. (Compl. ¶¶116).

As explained above, Plaintiffs' Sherman Act §2 (Conspiracy) claim is brought against all Defendants, which is entirely appropriate. While Sherman Act §2 (Monopolization/Attempt Monopolization) addresses independent action, Sherman Act §2 (Conspiracy) does not. By making a conspiracy to monopolize unlawful, §2 reaches both concerted and unilateral behavior. *Copperweld Corp. v. Independence Tube Corp.*, 104 S.Ct. 2731, 2740, 467 U.S. 752, 768, Fn.13 (U.S.Ill., 1984).

1. <u>PLAINTIFFS SHERMAN § 1 VIOLATIONS</u>

The elements of a Sherman §1 Violation are: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury."  *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)) (internal quotation marks omitted). Plaintiffs sufficiently alleged each element. Plaintiffs allege Defendants' anticompetitive misconduct constitutes *per se* violations of Sherman §1. In the alternative, Plaintiffs allege both a Quick Look and Rule of Reason analysis is applicable,[15] and sufficiently

---

[15] Courts have established three categories of analysis—per se, quick-look, and Rule of Reason—for determining whether actions have anticompetitive effects. *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (C.A.7 (Ind.), 2012).

set forth facts establishing the additional requisites thereunder. (Compl. ¶¶6, 136, 179, 594, 711, 712, 728, 729, 741). Since Plaintiffs allege (in the alternative) facts establishing the elements and applicability of each antitrust analysis, the Court need not make the determination- at the pleading stage- which analysis applies. *High-Tech Emp. Antitrust Litig.,* 856 F. Supp. 2d at 1122.

Defendants are Horizontal RIA Competitors in the Investment Advisory Services Market, who entered into per se illegal agreements, including to: allocate the Investment Advisory Services market; fix pricing and pricing structures; engage in horizontal group boycott; manipulate supply of products and services; enter into restrictive agreements; engage in revenue-sharing; share sensitive competitive information; utilize enforcement mechanisms and monitor compliance with agreements; illegally form and operate Referral Programs to facilitate their anticompetitive conspiracies; and otherwise carry-out the anticompetitive conduct described in the RIA Services Scheme, Silencing and Relation Scheme, and other related agreements. Similarly, Schwab and Fidelity are direct competitors in the RIA Custodial Services Market and conspired and agreed to carry out the RIA Service Scheme in the RIA Custodial Services Market, as set forth in the detail in Plaintiffs' Complaint.

Agreement among employers that they will not compete against each other for the services of their respective employees is a naked horizontal service division agreement, analogous to a product division agreement, and per se unreasonable in violation of the Sherman Act §1. Plaintiffs' Sherman Act §1 claims against Defendants, involving unreasonable restraints in the IAR Labor Market, are *per se* unreasonable naked horizontal market allocation agreements that served no purpose other than to reduce competition for IAR Labor. As pleaded, Defendants agreed to divide the market for IAR employees by agreeing not to compete for the services of particular employees—namely, those formerly or currently employed by another Defendant. *In re Outpatient*

*Med. Ctr. Emp. Antitrust Litig.*, No. 21-CV-00305, 2022 WL 4465929, at *10 (N.D. Ill. Sept. 26, 2022). It makes no difference that Defendants were dividing employees as opposed to territories, customers, or products. *Id*. Indeed, courts have found that "[a]ntitrust law does not treat employment markets differently from other markets." *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955, at *6 (N.D. Ill. June 25, 2018) ("[a] horizontal agreement not to hire competitors' employees is, in essence, a market division.").

Here, Plaintiffs Complaint alleges Defendants entered into tacit and explicit no-poach, non-solicitation, and non-competition agreements related to IAR employees. (Compl.¶¶ 128, 130, 132(c), 132(l), 138(j), 138(l), 143, 172, 196, 214, 221, 315, 710, 726, 727). As alleged throughout the Complaint, Defendants further agree to enforcement mechanisms, such a penalties, fines, litigation, and group boycott, intended to ensure compliance with the restrictive agreements. Plaintiffs define IAR labor and the IAR labor market, including its distinct characteristic (i.e., licensing requirements and fiduciary duties). (Compl.¶¶109-112, 126-135). Plaintiffs allege specific instances of purported enforcement (Compl.¶ ¶ 90,132(f), 134,138(h), 138(k),167, 187, 190, 191, 196, 197), injuries sustained by Plaintiffs (See Ex. A., Sec. #98), and injuries to competition in the IAR Labor Market. (Compl.¶¶ 127, 128, 129, 132(h), 132(l), 216, 217, 220, 223, 594(c), 595, 714, 726, 727, 735, 744). Plaintiffs have plead more than sufficient facts to place Defendants on notice of their claim and establish the plausibly of Defendants' alleged violations.

Importantly, Defendants do not deny the no-poach/restrictive IAR labor practices and policies or the enforcement mechanisms used to exact compliance. (Dkt. #59). Instead, they argue that they share a common business interest in doing so. Such defense is not applicable to naked horizontal restraints and has been rejected by courts. Even if it was a defense, now is not the time to adjudicate the merits of defenses.

2.    SHERMAN ACT § 2 VIOLATIONS

Section 2 of the Sherman Act provides in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 26 Stat. 209, as amended, 15 U.S.C. § 2. Plaintiffs allege three Section 2 violations: (1) monopolization; (2) attempted monopolization and (3) conspiracy to monopolize. In order to state a claim for monopolization under Section 2 of the Sherman Act a plaintiff must prove that: (1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury. *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citations omitted). Plaintiffs allege Schwab possesses monopoly power in the RIA Custodial Services market (Compl. ¶¶ 36, 58, 118, 171, 210, 245, 715-717, 730), that Schwab willfully acquired and maintains that power, through unjustified means, which are set forth in detail in the RIA Services Scheme, Silencing and Retaliation Scheme (Compl. ¶¶ 13, 171, 174, 188, 189, 205, 210, 245, 280, 714-718, 730) and IAR Labor Manipulation (Compl. ¶¶ 184, 132(h)(l), 206, 216, 220, 594(c), 710, 715, 719, 726, 729, 731, 735), and factual details related to Schwab's acquisition of AMTD. (Compl. ¶¶ 48, 51, 114-116, 118- 125, 203, 308, 590-593).

Plaintiffs specifically allege Defendant Schwab has engaged in the following exclusionary conduct directed at obtaining and maintaining a monopoly in the RIA Custodial Services Market: the acquisition of AMTD (Compl. ¶¶ 48, 51, 114-116, 118- 125, 203, 308, 590-593), the operations of its Referral Program (See Exhibit A, Sections #11, 12), exclusive dealing agreements and restrictive covenants (See Exhibit A, Section #13), use of enforcement provisions and group boycotts (See Exhibit A, Sections #39, 46), and various actions leveraging their power in the RIA

Custodial Market in the Investment Advisory Services Market. (Compl. ¶¶ 6, 142, 146, 170, 171, 174-176, 181, 184, 203, 204, 210, 212, 726, 727, 730, 731, 846, 870). Plaintiffs allege Schwab's monopolization has caused antitrust injury (See Exhibit A, Sections #93, 96, 97) and specific individual injury to Plaintiffs. (See Exhibit A, Sections #98, 125).

A claim of attempted monopolization under the Sherman Act § 2 requires: "(1) specific intent to monopolize a relevant market; (2) predatory or anticompetitive conduct; and (3) a dangerous probability of success." *Catlin v. Wash. Energy Co*., 791 F.2d 1343, 1348 (9th Cir. 1986). Plaintiffs allege that Schwab, if Schwab has not already achieved monopolization, it is intending and actively attempting monopolization of the RIA Custodial Services Market and is dangerously close to achieving it. (Compl. ¶¶ 36, 58, 118, 171, 210, 245, 715-717, 730). As with the monopolization claim, Plaintiffs specifically allege that Schwab is "willfully" acquiring, or attempting to acquire and maintain, a monopoly through improper exclusionary means. (See Exhibit A, Sections #2, 5, 6, 7, 9, 10-13, 22-25, 30, 34, 37-42, 46-49).

Conspiracy to monopolize requires: (1) an agreement or understanding between alleged conspirators; (2) a specific intent to monopolize; and (3) overt acts in furtherance of the alleged conspiracy. *Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co*., Ltd., 20 F.4th 466, 481–82 (C.A.9 (Cal.), 2021). Here, Plaintiffs have satisfied each of the requisite elements to plausibly allege their Sherman §2 conspiracy claim against all Defendants. Plaintiffs allege that all of the Defendants conspired and are actively carrying out the RIA Services Scheme and Silencing and Retaliation Scheme, which schemes are designed, in part, for Schwab to gain monopoly power in the RIA Custodial Services Market. (See Exhibit A, Sections #2, 5, 6, 7, 9, 10, 19-29) Defendants understand and intend that their conspiratorial conduct will facilitate Schwab's monopoly and maintenance of the monopoly in the RIA Custodial Services Market. Schwab's monopoly is a key

component to the success of the schemes because it forecloses competition in the RIA Custodial Services Market (See Exhibit A, Sections #6, , 33-35, 42, 48, 49) and, because Independent RIAs are dependent upon RIA Custodial Services in order to provide Investment Advisory Services, Schwab is able to leverage its monopoly power to control the Investment Advisory Services Market, by among other things: restricting supply and manipulating pricing of RIA Custodial Services; requiring exclusivity, non-competition, and no-poach agreements; allocating advisory clients and preventing competition through non-solicitation agreements; imposing group boycotts, and otherwise requiring Independent RIAs to "play by the rules" Defendants establish. (See Exhibit A, Sections #2, 5, 6, 7, 9, 10, 19-29). Schwab's monopoly power in the RIA Custodial Services Market facilitates Defendants' common interest in consolidating the Investment Advisory Services Market, eliminating competitor Independent RIAs, and collectively exercising oligopoly power in the Investment Advisory Services Market. (Compl. ¶¶_1, 2, 4-6, 79, 90, 128-132, 138(f), 150, 152, 176, 203, 204, 207, 210, 279). *Matsushita Elec. Indus. Co.*, 475 U.S. at 583, 106 S.Ct. 1348 ("[C]ompetitors ... stand to gain from any conspiracy to raise the market price.").

### 3.   CLAYTON ACT §7

Clayton Act §7 prohibits mergers that tend "substantially to lessen competition" or "create a monopoly." 15 U.S.C. § 18. The Congressional history of the Clayton Act makes clear that Section 7 was enacted by Congress to halt acquisitions and mergers that "(l)ead in the direction of what is sometimes called oligopolistic or "monopolistic" competition, that is, to a situation where the remaining competition in the particular market is between big companies." *In the Matter of Pillsbury Mills, Inc.*, 50 F.T.C. 555, 573, 1953 WL 13116, at *13. "Where several large enterprises are extending their power by successive small acquisitions, the cumulative effect of their purchases may be to convert an industry from one of intense competition among many enterprises to one in

which three or four large concerns produce the entire supply." *Brown Shoe Co. v. U.S.*, 82 S.Ct. 1502, 1528, 370 U.S. 294, 334 (U.S.Mo., 1962), citing S.Rep. No. 1775, 81st Cong., 2d Sess. 5, U.S.Code Cong. and Adm.News 1950, p. 4297;[16] see also H.R.Rep. No. 1191, 81st Cong., 1st Sess. 8.To establish a prima facie violation of the Clayton Act §7, a plaintiff must (1) identify the relevant market and, (2) show that the effect of the merger in that market is likely to be anticompetitive." *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337–38 (3d Cir. 2016). *Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*, 20 F.4th 466, 485 (C.A.9 (Cal.), 2021). A trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding whether mergers and acquisitions have a substantial anticompetitive effect and violate Clayton Act §7. *U.S. v. Pabst Brewing Co.*, 86 S.Ct.1665, 384 U.S. 546, 16 L.Ed 765 (U.S.Wis.1996); *Brown Shoe Co. v. U.S.*, 82 S.Ct. 1502, 1527, 370 U.S. 294, 332 (U.S.Mo., 1962).

Plaintiffs first challenged Schwab's acquisition of AMTD. Schwab was a horizontal competitor of AMTD, in all three relevant markets, until its acquisition of AMTD in October 2020. Schwab's acquisition diminished competition in all three relevant markets, essentially eliminating competition altogether in the RIA Custodial Services Market, where the acquisition of AMTD resulted in Schwab gaining control of an estimated 75% of the market.[17] Schwab is now the undisputed market dominator, with monopoly power, in the RIA Custodial Services Market. When a horizontal acquisition, between companies occupying the same relevant market, creates

---

[16] Stigler, Mergers and Preventive Antitrust Policy, 104 U. of Pa.L.Rev. 176, 180 (1955).

[17] Merger presents threat of undue concentration within proscription of this section when surviving corporation will control 30% of market share, though fact that merger results in less-than-30% market share does not raise inference that it is not violative of this section. *U. S. v. Philadelphia Nat. Bank, U.S.Pa.1963, 83 S.Ct. 1715, 374 U.S. 321, 10 L.Ed.2d 915*. Where an industry is already concentrated or there are trends toward concentration, corporate mergers resulting in controlling even less than thirty per cent of the relevant market might be unlawful. *U. S. v. Reed Roller Bit Co., W.D.Okla.1967, 274 F.Supp. 573*.

one firm controlling an undue percentage share of the relevant market, and results in significant increase in concentration of firms in that market, there is prima facie violation of the Clayton Act. *SFC ILC, Inc. v. Visa U.S.A. Inc.,* 819 F. Supp. 956 (D.Utah 1993), affirmed in part, reversed in part, 36 F.3d. 958, certiorari denied 115 S.Ct.2600, 515 U.S. 1152, 132 L.E.2d 846. Here, that is precisely what occurred in the RIA Custodial Services Market. The competition-diminishing impact of the merger has been widely acknowledged throughout the RIA Industry. (Compl. ¶¶ 116-120). As set forth in Plaintiffs' Complaint, it has caused diminished competition in all three markets (See Exhibit A, Sections # 35, 94), it has increased barriers to entry in the RIA Custodial Service Market (See Exhibit A, Sections #50, 82, 87, 88, 97) and Investment Advisory Services Market. (See Exhibit A, Sections #33-39, 93-96) It has resulted in increased costs of RIA Custodial Services, diminished choice and supply of RIA Custodial Services, and lessened innovation and quality of RIA Custodial Services. (Compl. ¶¶ 14, 105, 114-120, 122-125, 186, 187, 193, 195, 210, 613, 735). Schwab is now able to leverage its market power in the RIA Custodial Services Market to drive consolidation in the Investment Advisory Services Market. (See Exhibit A, Sections #51, 86, 87).

Next, Plaintiffs challenge Creative Planning's acquisition of dozens of competitor Independent RIAs is an example of how the cumulative effect of multiple "successive small acquisitions" can "convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply." *Brown Shoe Co. v. U.S.*, 82 S.Ct. 1502, 1528, 370 U.S. 294, 334 (U.S.Mo., 1962). The Creative Planning Defendants conspired together (adding General Atlantic as a new equity partner) to make a historically unprecedented shift in business strategy (Compl. ¶¶ 203-209, 247-258, 270-280) and increase its market share by aggressively acquiring multiple horizontal competitors in the Investment Advisory

Services Market. (Compl. ¶¶ 203-209, 247-258, 270-280). Creative Planning did so as part of the RIA Services Scheme and conspiracy with the other Defendants. (See Exhibit A, Section #6). Since January 2020, the Creative Planning Defendants have acquired more than 30 competitor RIAs and increased their AUM from approximately $50 billion to over $200 billion. (Compl. ¶¶ 203-209, 247-258, 270-280). Defendant Mallouk has publicly acknowledged the rapid consolidation of the Investment Advisory Services Market (Compl. ¶¶ 203-209, 247-258, 270-280), generally, and his intentions for the Creative Planning Defendants to continue its hot-paced consolidation efforts, bragging that he has more "dry gunpowder" to spend on competitor acquisitions than any other anyone. (Compl. ¶¶ 247-258, 270-280).

Third, Schwab and Fidelity each participate in the conspiracy to aggregate the Investment Advisory Services Markets, in violation of Clayton Act §7, by agreeing to combine their efforts and: (a) leverage their collective market power in the relevant markets to restrict supply, increase pricing, manipulate pricing structures, and otherwise increase the costs of doing business for small and mid-sized Independent RIAs (Compl. ¶¶ 203, 207, 209, 217, 222, 225-242, 244, 245, 744); (2) each launch nearly identical SIPs programs to gain control over the small Independent RIAs by aggregating them into their *de facto* "RIA Models." (Compl. ¶¶ 203, 207, 209, 217, 222, 225-242, 244, 245, 744). The SIPs programs basically transfer control over the Independent RIAs advisory client AUM to Schwab and Fidelity, by comprehensively micromanaging every aspect of their advisory client AUM. In fact, Schwab and Fidelity even referred to as "supported independence." (Compl. ¶¶ 203, 207, 209, 217, 222, 225-242, 244, 245, 744). The SIPs programs require the participating Independent RIAs to use Schwab or Fidelity for RIA Custodial Services, mandate specific investment mixes for advisory client AUM, preclude certain investment products, and often actually provide the investment advice to the participating Independent RIAs advisor

clients. (Compl. ¶¶ 203, 207, 209, 217, 222, 225-242, 244, 245, 744). Through contractual agreements, automated programs, confidentiality and exclusivity agreements, the SIPs programs effectively strip any freedom or independence from the participating RIAs. Fidelity and Schwab's aggregation of thousands of small RIAs and IARs into their SIPs programs, which operate as alternative RIA models, constitute "acquisitions" through which they gain control of the competitor Independent RIAs, tending to "lessen competition" and create oligopoly power by Defendants over the Investment Advisory Services Market, "in violation of Clayton Act § 7, 15 U.S.C. § 18.

### 4.    THE DOCTRINE OF IMPLIED IMMUNITY IS IRRELEVANT

The doctrine of implied immunity is entirely irrelevant Plaintiffs' claims and provides no basis for dismissal. *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 127 S. Ct. 2383, 168 L. Ed. 2d 145 (2007). The doctrine of implied immunity, which is only ever applied in rare circumstances, does not apply to the present matter. Defendants' only argument is that because the SEC regulates the industry, the doctrine of implied immunity precludes Plaintiffs' claims. (Dkt. #59, pg. 36). Here, Defendants fail to address the additional elements required for the application of implied immunity. *Id*. The mere existence of regulation does not afford Defendants reprise from antitrust liability. *Id*. omissions. Defendants have failed to argue that anything other than the mere existence of SEC regulation affords the application of the doctrine of implied immunity. Accordingly, this Court must find that the doctrine of implied immunity does not apply.

### E.    PLAINTIFFS' RICO CLAIMS SHOULD NOT BE DISMISSED

Plaintiffs have brought RICO claims against all Defendants pursuant to 18 U.S.C. §1964, alleging they sustained injuries to their business and property as a direct result of Defendants' commission of the predicate acts of 18 U.S.C.§ 1512 (witness tampering), 18 U.S.C. § 1513(e)-(f)

(witness retaliation),18 U.S.C. § 1341 (relating to mail fraud), and 18 U.S.C. § 1343 (relating to wire fraud) in violation of 18 U.S.C. §1962. (Compl.¶¶ 691-695, 854-875). Plaintiffs allege that the interrelated predicate acts, occurring within 10 years of filing of Plaintiffs Complaint, which establish the requisite "pattern of racketeering activity" also include: commercial bribery in violation of 18 USCA § 1961(1)(A); 18 U.S.C.§ 1956 (relating to the laundering of monetary instruments); and of 18 U.S.C.§ 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity). *Id.* Defendants' move for dismissal of Plaintiffs' RICO claims challenging the sufficiency of Plaintiffs' factual allegations of: (1) a RICO Enterprise, (2) predicate acts, and (3) injuries caused by Defendants' RICO violations/predicate acts. Defendants' challenges to Plaintiffs' RICO claims lack any basis in fact or law or otherwise warrant Rule 12(b)(6) dismissal.

### 1. ENTERPRISE CHALLENGE

Defendants' single paragraph "shout-out" challenge to Plaintiffs' enterprise allegations fail because it simply ignores Plaintiffs' numerous specific factual allegations related to the enterprise element of the RICO violation. (Compl.¶¶ 676-692, 694-695, 855-858, 861-866). Defendants misstate that Plaintiffs' do not allege that each defendant conducted or participated in the conduct of the affair of an enterprise, as opposed to just individually conducting their own business affairs. (Dkt. #59, p. 46). A RICO "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. "18 USCA § 1961(4). An association-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009). RICO's definition of enterprise "has a wide reach," in particular "the very concept of an association in fact is expansive." *Id*.

Plaintiffs have more than sufficiently alleged the specific RICO enterprises (Compl. ¶¶676-690), each Defendants' conduct or participation in the conduct of the affairs of the enterprise(s) (Compl. ¶¶676-695, 854-875) [18], and the common purpose and common course of conduct involved in the three relevant schemes (Compl. ¶¶1-6, 79, 90, 128-132, 138(f), 150, 152, 176, 203, 204, 207, 210, 279). A simple reading of Plaintiffs' Complaint dispenses with Defendants' enterprise challenge, which Plaintiffs' suspect is the reason for their brief and unsupported criticism of the enterprise element.

### 2.   PREDICATE ACTS ESTABLISHING A PATTERN OF RACKETEERING ACTIVITY

Defendants dispute that Plaintiffs allege viable predicate acts that establish a "pattern of racketeering activity."[19] A pattern requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5).  Defendants' erroneously assert that Plaintiffs "fail to allege qualifying RICO predicate acts; i.e., specific criminal acts enumerate in 18.U.S.C. Section 1961(1)(B). (citations omitted). (Dkt. #59, p. 44) Plaintiffs allege specific facts establishing the commission of multiple predicate acts (enumerated in 18.U.S.C. Section 1961(1)(B), occurring within the 10 years preceding the filing of Plaintiffs' Complaint, which were interrelated and together constitute a pattern of racketeering activity within the meaning of within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c) and (d), including:

- violations of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), 18 U.S.C.§ 1956 (relating to the laundering of monetary instruments), violations of 18 U.S.C.§ 1957 (relating to engaging in monetary transactions in property derived from

---

[18] See Exhibit A, Table of Complaint Citations, for additional factual references relating to each specific scheme and each specific Defendant. Note, Exhibit A is for exemplary purposes only, and Plaintiffs recognize that some facts may overlap in different categories.

[19] "Racketeering activity" is limited to the specific acts statutorily enumerated in 18 U.S.C. § 1961(1).

specified unlawful activity), and 18 USCA § 1961(1)(A) (commercial bribery), committed by Mallouk, Creative Planning, and AMTD, in relation to the Creative Planning Fraudulent Growth Scheme and related conduct reported in Greco's 2017 SEC Whistleblower Complaint (Compl. ¶¶294, 295, 350-353, 384, 386, 504-506, 510, 592, 603-605, 607, 609, 693(a)-693(e), 694, 695, 777, 863(g), 864-869);

- violations of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), 18 U.S.C.§ 1956 (relating to the laundering of monetary instruments), 18 U.S.C.§ 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), and 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1513 (witness retaliation), committed by Defendants in carrying out and concealing their RIA Services Scheme, which was in part reported in the 2017 SEC Whistleblower Complaint and 2020 DOJ Complaint (Compl. ¶177, 375 (p.114), 376-379(p.114), 384, 385, 462-485, 491-513, 637-659, 694); and

- violations of 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1513 (witness retaliation), and 18 U.S.C. §§ 1341 and 1343 (mail/wire fraud), committed by Defendants as part of their Silencing and Retaliation Scheme. *Id*. at preceding two bullet-points.

In *DeGuelle v. Camilli*, the 7th Circuit held that the predicate acts of retaliation § 1513(e) are inherently connected to the underlying wrongdoing exposed by a whistleblower and are considered predicate acts in establishing a pattern of racketeering activity. *DeGuelle*, at 201. As such, the predicate acts committed in all three schemes are properly considered part of the pattern of racketeering activity engaged in by Defendants. Plaintiffs cited *DeGuelle* in their Complaint (Compl. ¶675) and Defendants did not disagree, in their MTD, that pursuant to *DeGuelle*, the predicate acts committed in all three schemes are considered in establishing the pattern of racketeering activity. Defendants argue Plaintiffs' predicate act allegations fail because: (1) the mail/wire fraud allegations have not been plead with enough specificity to satisfy a 9(b) pleading standard; and (2) Plaintiffs witness tampering and retaliation allegations are not viable because they are mostly concerned with "bringing or threatening to bring wrongful litigation;" (3) in Defendants' opinion, the challenged threats and litigation set forth in Plaintiffs Complaint are "(n)othing more than "innocuous business communications;" (4) Plaintiffs allege violations of

antitrust laws constitute predicate acts; and (5) Plaintiffs 18 U.S.C. § 1503 (obstruction of justice) predicate acts are not viable. (Dkt. #59, p. 44-46). Defendants' arguments are utterly meritless.

First, Plaintiffs do not allege predicate acts in violation of 18 U.S.C §1503 or that Defendants' violations of antitrust laws constitute predicate acts. Therefore, both of those arguments are simply irrelevant and not a valid basis for dismissing Plaintiffs' RICO claims.

Second, Plaintiffs plead multiple instances of the commission of the predicate acts of mail and wire fraud with the specificity required under Rule 9(b) against each Defendant. See Ex. A, Sec. #100-112. Plaintiffs also alleged specific violations of 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1513 (witness retaliation) pertaining to each Defendant. Plaintiffs alleged dozens of specific predicate acts, including conduct by specific Defendants, far more than sufficient to satisfy their requirement of plausibly alleging the commission of at least two separate predicate acts occurring within the ten (10) years preceding the filing of Plaintiffs Complaint.

Third, Defendants incorrectly characterize Plaintiffs' claims of witness tampering and retaliation as "mostly involving the conduct of bringing or threatening to bring wrongful litigation," when such conduct constituted only one aspect of the witness tampering and retaliation. Plaintiffs also allege the following constituted witness tampering and retaliation: terminate RIA Custodial Services Agreements (Compl. ¶177, 535-546, 685-589, 592, 594(b), 631-637, 771-781, 863(f); intentionally causing Spotlight substantial business interruptions (Compl. ¶592, See also Ex. A, Sec. #118); interfering with Spotlight's existing contracts and access to essential inputs, such as RIA Custodial Services and IAR labor (Compl. ¶ 177, 782-784, 790-793, 798-800, 809-811); deliberately and in bad faith inducing Spotlight to enter into an RIA Custodial Services Agreement with Schwab, transfer advisory clients from AMTD to Schwab, and then have Schwab summarily breach the RIA Custodial Services Agreement and refuse to provide RIA Custodial

42

Services to Spotlight (Compl. ¶ 535-546, 571-581, 592); impose onerous post-termination transfer conditions after terminating the RIA Custodial Services Agreement (Compl. ¶ 592); interfere with Plaintiffs' existing contractual relationships with advisory clients and IAR employees (Compl. ¶¶638-646), see also, Ex. A, Sec. # 65-67, #113-117); interfering with prospective business opportunities and economic expectancies (Compl. ¶¶638-646); threatening and refusing to deal with third parties who do business with Plaintiffs (Compl. ¶¶642, 653-659); and disparage, defame, and discredit Greco and Spotlight (Compl. ¶¶592, 834, 838, 839, 840, 863(d), 863(e)); *See also,* Ex. A., Sec. #119-124). Moreover, Defendants' opinions that the threats and legal actions they made against Plaintiffs were nothing more than "innocuous business communications," at best, may be considered a defense that is not properly adjudicated at the pleading stage.

### 3.      Nexus Between RICO Predicate Acts and Plaintiffs' Injuries

Defendants next advance the legally flawed argument that Plaintiffs must allege how each "Defendant's predicate acts proximately or 'directly' caused Plaintiffs injury to their business or property." (Dkt. #59, p. 48). While Plaintiffs have alleged direct injury to their business and property that was caused by each Defendants' commission of predicate acts, Defendants are wrong that Plaintiffs are required to do so in order to prevail on their RICO claims. Plaintiffs' claim Defendants violated 18 U.S.C. § 1962 (c) and (d), which both require Plaintiffs' injuries be "by reason of" a violation of § 1962. *See* 18 U.S.C. § 1964(c). Plaintiffs allege that the wrongful predicate acts of witness tampering under 18 U.S.C. §1512, retaliation under 18 U.S.C. § 1513(e), and mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, proximately caused their injuries.

While Plaintiffs allege that Defendants pattern of racketeering included numerous additional interrelated predicate acts, including predicate acts committed in the Creative Planning

Fraudulent Growth Scheme and RIA Services Scheme, Plaintiffs do not allege injury from every predicate act involved in the pattern of racketeering.

Here, Plaintiffs injuries flow from the predicate acts committed in the Silencing and Retaliation Scheme, which are interrelated with and flow from the predicate acts committed in the other two schemes. Defendants committed the predicate acts of the Silencing and Retaliation Scheme to silence Plaintiff Greco, cover-up and conceal their misconduct in the other schemes, and to retaliate against Plaintiffs for Greco's 2017 SEC Whistleblower Action and 2020 DOJ Complaint. (Compl.¶¶691-695, 854-875). Like in *DeGuelle*, Plaintiffs do not need to be injured by every predicate act involved in the interrelated schemes, and associated predicate acts, comprising the pattern of racketeering that give rise to the RICO violations. It is sufficient that Plaintiffs allege direct injury from the violations of 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1513 (witness retaliation), and 18 U.S.C. §§ 1341 and 1343 (mail/wire fraud), committed by Defendants as part of their Silencing and Retaliation Scheme.

Defendants ignore the numerous specific facts alleging injury to Plaintiffs' business or property by reason of Defendants' commission of predicate acts in the Silencing and Retaliation Scheme. (Compl.¶¶ 541, 542, 552, 559, 568, 581, 657,870-874). For example, in November 2021 both Schwab and Fidelity retaliated against Plaintiffs by interfering with Plaintiffs' business dealings with Strategic Wealth Partners (Compl.¶¶ 653-656) and as a direct and proximate cause of the retaliation (Schwab's restrictions imposed on Strategic Wealth Partners Opportunity, as well as Fidelity's refusal to provide RIA Custodial Services to Greco or his advisory clients), Greco suffered concrete economic losses and injury to his business and property. (Compl.¶657, and Exhibit B of Complaint). When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries. *Id.* at

461. Saying that the injury to the plaintiff is "direct" is akin to saying that the victim was reasonably foreseeable, the traditional principle for hemming in tort liability. *RWB Services, LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 688 (C.A.7 (Ill.), 2008). Here, Plaintiffs were not just reasonably foreseeable victims- they are Defendants intended victims.

### F. STATE LAW CLAIMS SHOULD NOT BE DISMISSED

#### 1. NONE OF PLAINTIFFS' CLAIMS ARE COMPULSORY COUNTERCLAIMS

The Creative Planning Defendants lump together Plaintiffs' defamation, tortious interference with contract, breach of contract, and unjust enrichment claims, and erroneously contend they are all compulsory counterclaims to an action Creative Planning, LLC, filed against Plaintiffs in Kansas State court in 2020. (Dkt. #60, p. 6). The Creative Planning Defendants ignore the totality of Plaintiffs' claims, conflate a few stray overlapping facts between the Kansas state court action and the case at bar, and ignore 7th Circuit precedent for determining whether claims are compulsory counterclaims in a previously filed action. *Id*. at 6-8.

Creative Planning, LLC's Kansas state court claims against Greco and Spotlight relate to a handful of discrete purported actions by Greco and Spotlight, whereas Plaintiffs' defamation, tortious interference, breach of contract, and unjust enrichment claims in the instant case are based on different actions of the Creative Planning Defendants, and are part and parcel, indispensable, and interwoven with larger and more complex conspiracy and collusion claims perpetrated with multiple additional defendants and concurrently violative of numerous federal laws, for which the Kansas state court would lack jurisdiction.

In order to be a compulsory counterclaim, Rule 13(a) requires that the claim (1) exist at the time of pleading, (2) arise out of the same transaction or occurrence as the opposing party's claim, and (3) not require for adjudication parties over whom the court may not acquire jurisdiction. *Burlington N. R.R. Co. v. Strong,* 907 F.2d 707, at 710-711 (7th Cir.1990). The 7th Circuit

developed a "logical relationship" test to determine whether the "transaction or occurrence" is the same for purposes of Rule 13(a). *Id*. at 711. A court should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds. *Id*. The Creative Planning Defendants reliance on the factually inapposite case, *Inforizons, Inc. v. VED Software Servs., Inc.,* 204 F.R.D. 116 (N.D. Ill. 2001).

The Creative Planning Defendants' supplemental brief ignores 7th Circuit precedent, as set forth in *Burlington*, and discussed and applied in *Inforizon*, for determining whether the claims are "logically related" because it would not support a determination that Plaintiffs' claims are compulsory counterclaims to the Kansas state court action. Here, Plaintiffs' claims do not involve the same parties, facts, law, or evidence as the Kansas state court action. In fact, twelve of the thirteen defendants in the case at bar are not parties in Creative Planning, LLC's Kansas state court action. In fact, six of the seven Creative Planning Defendants are not parties to the Kansas state court action. (Compl.; see also, Dkt. #60, Ex. A, First Amended Petition). Moreover, the facts, law and evidence are starkly divergent between the two lawsuits, as Plaintiffs' defamation, breach of contract, tortious interference, and unjust enrichment claims are part and parcel, indispensable, and interwoven with larger and more complex conspiracy and collusion claims perpetrated with multiple additional defendants and concurrently violative of numerous federal laws, as set forth in the Complaint. *Id*. Finally, even if Plaintiffs' claims could be properly characterized as compulsory counterclaims, Creative Planning, LLC's Kansas state court litigation is of merely peripheral concern to the instant lawsuit. *Asset Allocation & Mgmt. Co*, 892 F.3d 566, at 573 (7th Cir. 1989). In sum, taken together, all these facts indicate that the "totality of the claims" are not related, and judicial economy would not be served by their treatment as compulsory counterclaims.

2.  <u>PLAINTIFFS BREACH OF CONTRACT CLAIMS SHOULD NOT BE DISMISSED</u>

Schwab and Fidelity each argue that Plaintiffs' breach of contract claim fails because their respective RIA Custodial Services Agreements allowed either party to terminate the agreement at-will, and the implied covenant of good faith and fair dealing creates no obligation upon them under the agreements. (Dkt. #61, p. 4; see also, Dkt. #62, p. 1). Defendants' argument fails because an at-will contract is not without limits, and Defendants cannot hide behind an at-will provision to shieled themselves for terminating contracts for *illegal* reasons, such as: in furtherance of Defendants' IAR Labor no-poach agreements and conspiracy to manipulate the IAR Labor market (Compl. ¶¶ 216-224); Defendants' anti-competitive group boycott and refusal to deal with Plaintiffs (Compl. ¶¶ 178-185); or to retaliate against Plaintiffs for Greco's 2017 SEC Whistleblower Action and 2020 DOJ Complaint (Compl. ¶¶ 376-663).  Courts in this district have expressly recognized that the concept of "at-will" is not without limits, such as those imposed by the inherent contractual obligation to act in good faith and deal fairly. In *Zick v. Verson Allsteel Press Co*., 623 F.Supp. 927 (N.D. Ill. 1985), this court recognized: "(G)ood faith has been construed as an obligation to refrain from certain contractual types of conduct "because they violate community standards of decency, fairness or reasonableness." citing, *Restatement* § 205 comment a, (citations omitted).

Similarly, Defendants' corollary "right to deal" is not without limits. The Supreme Court has long recognized that, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 124 S.Ct. 872, 879, 540 U.S. 398, 408 (U.S., 2004).

Schwab, AMTD, and Fidelity terminated their RIA Custodial Agreements in bad faith, as part of their Group Boycott and refusal to deal with Plaintiffs; in furtherance of their Silencing and Retaliation Scheme; or, in the alternative, pursuant to their illegal IAR Labor market manipulation and anticompetitive no-poach agreements (and related enforcement agreements) because Plaintiffs hired former AMTD and Schwab IARs. Discovery will further color the basis for Defendants' nearly identical, abrupt, premature terminations of their respective RIA Custodial Services Agreements with Plaintiffs; but at the pleading stage, Plaintiffs have met their burden of plausibly alleging the contractual termination was illegal, in breach of the covenant of good faith and fair dealing, and done for a reason, and in a manner, that falls far outside even the outermost boundaries of an at-will termination. As such, Schwab and Fidelity's motion to dismiss Plaintiffs Breach of Contract Claims should be denied.

### 3. PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS SHOULD NOT BE DISMISSED

Plaintiffs' intentional interference with prospective economic advantage claims, and tortious interference with contract claims, against each Defendant are supported by factual allegations of specific acts of tortious interference by each Defendant, individually, and in combination, and as part of their conspiracy. See Ex. A., Sec. # 113-117).

Defendants each made numerous disparaging and defamatory statements about Plaintiffs, individually, and in combination, and as part of their conspiracy, through their Silencing and Retaliation Scheme and Group Boycott, including but not limited to: Creative Planning/Mallouk (Compl. ¶¶ 259-264, 375(pg.113), 504, 505, 507-513, 597, 598-600, 823-827); AMTD (Compl. ¶¶ 523, 525, 546, 560, 561); Schwab (Compl. ¶¶ 623-626); and Fidelity (Compl. ¶¶ 638-643, 645). In alleging Tortious Interference with Contract, Plaintiffs have clearly demonstrated (as outlined by the facts listed herein and communications amongst the various Defendants) that Defendants'

disparaging and defamatory statements about Plaintiffs led to the proverbial "slippery slope" of third-party interference with the various contracts.

By way of example, at all relevant times, Schwab knew/had knowledge that Plaintiffs had advisory clients located in California; nevertheless, Schwab terminated RIA Custodial Services to those California advisory clients and forced Plaintiffs to transfer those California advisory clients' AUM to alternative custodians, in furtherance of Schwab's unlawful termination of RIA Custodial Agreements, group boycott, and refusals to deal with Plaintiffs. (Compl. ¶¶ 177, 586-588, 594(b), 774-776, 780, 781, 863(f)). Schwab instituted a FINRA Arbitration against one of Plaintiffs' IAR employees in California, who had previously been employed by Schwab, pursuant to Defendants' anti-competitive no-poach agreements, related enforcement policies and anti-competitive IAR Labor market manipulation. (Compl. ¶¶ 16, 571-574, 577-581, 593). It was the attorney representing Schwab in the FINRA Arbitration against Plaintiffs' California IAR who contacted Fidelity to defame and disparage Plaintiffs, discuss Plaintiff Greco's 2020 DOJ Complaint, illicit Fidelity's participation in the Silencing and Retaliation Scheme, and demand Fidelity terminate its existing RIA Custodial Services Agreement and business dealings with Plaintiffs, (Compl. ¶¶ 623, 624, 625, 627, 628, 629), in compliance with their IAR Labor Market conspiracy and agreements to group boycott and refuse to deal with Independent RIAs that solicit or retain Defendants' IAR Labor (violate no-poach policies). Plaintiffs alleged a very detailed description of Schwab contacting Fidelity directly "for purposes of communicating misleading, disparaging and defamatory information about Greco and his 2017 SEC Whistleblower Action and 2020 DOJ Complaint, intending Fidelity to rely upon these representations in deciding to join AMTD and Schwab's refusal to supply RIA Custodial Services to Spotlight, group boycotting of Plaintiffs and Silencing and Retaliation Scheme." (Compl., ¶ 623).

The Creative Planning Defendants initially argue that Plaintiffs failed to identify a specific third party with whom Plaintiffs expected to do business, but subsequently recognized that Plaintiffs specifically identified third party Madison Partners. (Dkt. #60, p. 8). As such, the Creative Planning Defendants pivot to arguing that Plaintiffs do not allege the Creative Planning Defendants had anything to do with the alleged failure of that potential acquisition. *Id*. The Creative Planning Defendants argument wholly ignores the conspiracy, group boycott, and silencing and retaliation allegations of Plaintiffs' Complaint. *Id.*; see also, (Compl., throughout; see also, *Id*. at ¶¶ 376-663 "Defendants' Silencing and Retaliation Scheme"; see also, *Id*. at ¶¶ 514-561 "AMTD's Participation in the Silencing and Retaliation Scheme"; see also, *Id*. at ¶¶ 562-593 "Schwab's Participation in the Silencing and Retaliation Scheme"; see also, *Id*. at ¶¶ 613-663 "Fidelity Joins the Silencing and Retaliation").

Once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature. *Adcock, 164 Ill.2d at 64, 206 Ill.Dec. at 642–43, 645 N.E.2d at 894–95*. The Creative Planning Defendants were original actors in the conspiracy, silencing and retaliation scheme, and group boycott. The Schwab and Fidelity defendants were at one point third parties, with whom the Creative Planning Defendants interfered, and who later became co-conspirators in the Silencing and Retaliation Scheme and group boycott. The Creative Planning Defendants' argument that it had nothing to do with the Madison Partners deal is belied by the conspiracy, silencing and retaliation, and group boycott allegations of the Complaint.

Moreover, the Creative Planning Defendants misrepresent that Madison Partners is the only specific third-party Plaintiffs identified in the Complaint related to the intentional interference

with prospective economic advantage. Plaintiffs specifically identified both Strategic Wealth Partners, and separately, Zoe Financial, deals in which Defendants interfered as part of their silencing and retaliation scheme. (Compl., ¶¶ 651-660). Plaintiffs also specifically identified two advisor employees and advisory clients with whom Defendants interfered pursuant to their silencing and retaliation scheme and group boycott. *Id*. at ¶¶ 648-650.

Fidelity challenges Plaintiffs' Intentional Interference with Prospective Economic Advantage by asserting it committed no improprieties related to the Madison Partners, Strategic Wealth Partners, or any other prospective relationships related to Plaintiffs. (Dkt. #61, p. 6). Fidelity again plainly misrepresents the allegations in the Complaint. Plaintiffs alleged that upon joining the conspiracy, group boycott, and silencing and retaliation scheme, Fidelity actively published and communicated its blacklisting of Plaintiffs and directly informed Madison Partners that not only would Fidelity not do business with Plaintiffs but would not do business with current or former Spotlight advisors or advisory clients, even if they left Spotlight for Madison Partners. (Compl. ¶ 637-647). Plaintiffs further alleged how the widespread knowledge of Plaintiffs' blacklisting by Fidelity and Schwab induced Strategic Wealth Partners to make its partnership with Plaintiff contingent upon approval by Fidelity and Schwab. *Id*. at 653-657.

4. PLAINTIFFS' DEFAMATION CLAIMS SHOULD NOT BE DISMISSED

To establish defamation, a plaintiff must present facts showing that the defendant made a defamatory statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages. *Solaia Technology,* 221 Ill.2d at 579, 304 Ill.Dec. 369, 852 N.E.2d 825. "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Id*.

51

There are two types of defamatory statements: defamation *per se* and defamation *per quod.* *Brennan v. Kadner,* 351 Ill.App.3d 963, 968, 286 Ill.Dec. 725, 814 N.E.2d 951 (2004). In an action for defamation *per quod,* the plaintiff must plead and prove actual damages in order to recover. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,* 227 Ill.2d 381, 390, 317 Ill.Dec. 855, 882 N.E.2d 1011 (2008). If a defamatory statement is actionable *per se,* however, the plaintiff need not plead or prove actual damage to his or her reputation to recover. *Bryson v. News America Publications, Inc.,* 174 Ill.2d 77, 87, 220 Ill.Dec. 195, 672 N.E.2d 1207 (1996). "Rather, statements that fall within actionable *per se* categories are thought to be so obviously and materially harmful to [the plaintiff] that injury to [the plaintiff's] reputation may be presumed." *Bryson,* at 1207. In a defamation *per se* action, damage to a corporate plaintiff is presumed if the statement imputes the commission of a criminal offense, impugns the plaintiff's competence or integrity, or otherwise prejudices the plaintiff in its business. *See Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 519 (7th Cir.2012); *Republic Tobacco, L.P. v. N. Atl. Trading Co.*, 254 F.Supp.2d 985, 998–99 & n. 16 (N.D.Ill.2002).

The Illinois Supreme Court recognizes only five categories of statements that are defamatory *per se:* (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing his or her employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in his or her profession; and (5) words that impute a person has engaged in adultery or fornication. See *Solaia*, at 825. As alleged with specificity throughout the Complaint, Defendants each made numerous disparaging and defamatory statements about Plaintiffs, individually, and in combination, and as part of their conspiracy, through their Silencing and Retaliation Scheme and Group Boycott. Plaintiffs also

52

alleged injury from the defamation. (Compl. ¶¶ 640, 641, 642, 643, 644, 646, 647, 648, 652, 841, 842).

### 5. PLAINTIFFS' CALIFORNIA LAW CLAIMS SHOULD NOT BE DISMISSED

Plaintiffs' California law claims are viable. Plaintiffs' business operations are conducted throughout the United States, with offices, IAR employees, and advisory clients located in California (Compl. ¶¶ 26-30). Plaintiff Greco is licensed and registered in the state of California. *Id*. The allegations contained in the Complaint against Fidelity impact Plaintiffs' ability to conduct business across the nation, including California, where Plaintiffs maintain business operations. Plaintiffs' Complaint alleges that Fidelity acted in concert with the other Defendants, and unnamed co-conspirators, which are located in California. Each Defendant has offices, IAR employees, advisory clients, and active business operations in California, and have committed RICO predicate acts and engaged in other misconduct, in furtherance of the schemes alleged in Plaintiffs' Complaint, from within California. Thus, Defendants' arguments fail.

### 6. PLAINTIFFS UNJUST ENRICHMENT CLAIMS SHOULD NOT BE DISMISSED

Under federal pleading standards, a plaintiff may plead claims in the alternative, even if the claims are contradictory. Fed.R.Civ.P. 8(d)(3); *Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 635 (7th Cir.2001); Cole–Haddon, 454 F.Supp.2d at 777. That is precisely what Plaintiffs did with respect to their breach of contract and unjust enrichment claims. Plaintiffs' Complaint specifically provides that "allegations and claims for relief against Defendants" are in the alternative "where necessitated for a proper construction under the law" (Compl. ¶696) and further specifically plead the breach of contract claims and unjust enrichment claims "in the alternative to breach of contract claims." (Compl.¶817, 844). The Seventh Circuit has held, "While [plaintiffs] need not use particular words to plead in the alternative, they must use a formulation from which it can be

53

reasonably inferred that this is what they were doing," such as the use of "either-or" or "if-then" language. *Holman v. Indiana,* 211 F.3d 399, 407 (7th Cir.2000). Plaintiffs have done that in this case. Defendants' reliance upon *Homestead Ins. Co. v. Chicago Transit Authority*, 1997 WL 43232, at *3 (N.D.Ill.,1997) is unavailing.

### G.   PLAINTIFFS' CLAIMS ARE TIMELY

Defendants' statute of limitations defense is meritless and inappropriately adjudicated at the pleadings stage. Each of Plaintiffs' claims have been brought within the applicable limitations period. The statute of limitations applicable to Plaintiffs' RICO and Sherman Act claims is four years from the date of discovery of damage caused by Defendants' violations. 15 U.S.C. § 15b. In the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and ..., as to those damages, the statute of limitations runs from the commission of the act. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Factual allegations involving events occurring outside of the limitations period are still relevant.  "Evidence of claims which cannot give rise to liability because of a statute of limitations may be introduced to show the nature of the transactions under scrutiny and to establish a continuing course of conduct." *Colorado ex rel. Woodard v. Ramsour Bros.*, No. 84-CV-802, 1986 WL 7823, at *6 (D. Colo. July 9, 1986).

### IV.   CONCLUSION

For the reasons set forth more fully herein, Plaintiffs respectfully request that this Court deny, in their entirety, Defendants' Joint and Individual Motions to Dismiss. In the alternative, if

this Court determines there are factual or legal deficiencies warranting dismissal of Plaintiffs' claims, Plaintiffs request leave to refile pursuant to Fed. R. Civ. P. 15(a)(2).

Respectfully submitted,

Dated: <u>November 2, 2022</u>

By: <u>Kathleen C. Chavez, Esq.</u>
Kathleen C. Chavez, Esq. (6255735)
Robert Foote, Esq. (3124325)
Peter L. Currie, Esq. (6281711)
Elizabeth C. Chavez, Esq. (6323726)
Bret K. Pufahl, Esq. (6325814)
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 W. State Street, Suite 200
Geneva, IL 60134
Tel. No.: (630) 232-7450
Fax No.: (630) 232-7452
Email: kcc@fmcolaw.com
rmf@fmcolaw.com
plc@fmcolaw.com
ecc@fmcolaw.com
bkp@fmcolaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2022, I caused a true and correct copy of the foregoing Plaintiffs' Memorandum in Opposition to Defendants Joint and Supplemental Motions to Dismiss to be filed by the Court's CM/ECF filing system, which will send electronic notification of such filing to all counsel of record.

*/s/ Kathleen C. Chavez*