## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| Stephen Albert Greco and Spotlight Asset Group, Inc., | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-02661 |
| Peter Mallouk, Creative Planning LLC, CPI Holdco A, LLC, CPI Holdco B, LLC, Creative Planning Holdco, LLC, General Atlantic Service Company LP, General Atlantic (CP) Collections, LP, FMR LLC D/B/A Fidelity Investments Inc., National Financial Services LLC, TD Ameritrade Holding Corporation, TD Ameritrade Inc., The Charles Schwab Corporation, and Charles Schwab & Co., Inc., | Hon. Edmond E. Chang |
| Defendants. | |

## DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

**Page**

ARGUMENT .................................................................................................................... 1

I.    Plaintiffs Fundamentally Misunderstand Their Pleading Obligations. ........................... 1

II.    Plaintiffs Do Not Meaningfully Address Antitrust Injury .............................................. 3

III.    Plaintiffs' Arguments Cannot Rehabilitate Their Section 1 Claims ............................... 5

    A.    Plaintiffs' Section 1 Allegations Fail to State a Claim Under Rule of
        Reason Analysis. ................................................................................................. 6

        1.    The Broker-Custodian Defendants are vertically positioned vis-à-
               vis independent RIAs. ............................................................................... 6

        2.    "Hybrid" relationships are subject to the Rule of Reason ......................... 8

    B.    Plaintiffs Do Not Allege a Plausible Conspiracy Between Any Defendants ........ 10

        1.    Plaintiffs do not identify any direct evidence of a conspiracy
               among Defendants. ................................................................................. 10

        2.    Plaintiffs have not pleaded circumstantial allegations of
               conspiracy. ............................................................................................. 11

            a.    Plaintiffs fail to plausibly allege parallel conduct. ...................... 11

            b.    Plaintiffs fail to articulate plausible "plus factors." .................... 13

    C.    Plaintiffs Have Not Pleaded Plausible Relevant Markets .................................... 15

    D.    Plaintiffs Do Not Plausibly Plead Anticompetitive Effects. ............................... 16

IV.    The Court Should Reject Plaintiffs' Proposed End-Run Around Their Section 2
    Pleading Problems .................................................................................................... 17

    A.    Plaintiffs Do Not Adequately Plead That Schwab Possesses Monopoly
        Power in a Relevant Market .............................................................................. 17

    B.    Plaintiffs Do Not Plausibly Allege that Schwab Excluded Any Rivals. .............. 18

    C.    Plaintiffs Fail to Plausibly Allege that Defendants Conspired to Enable
        Schwab to Acquire or Maintain Monopoly Power. ............................................ 19

V.    Plaintiffs' Efforts to Rehabilitate Their Deficient Section 7 Claims Fail. ....................... 20

VI.    Plaintiffs' California Claims Should Be Dismissed. .................................................... 24

VII.    Plaintiffs' Arguments in Support of Their RICO Cause of Action Are Unavailing. ........ 25

    A.    Plaintiffs Do Not Allege Viable RICO Predicate Acts. ...................................... 25

    B.    Plaintiffs Fail to Allege Conduct of an Enterprise. ............................................ 28

**TABLE OF CONTENTS**
**(continued)**

Page

C.      Plaintiffs Do Not Allege that They Suffered Any Injuries Proximately Caused by Purported RICO Predicate Acts .................................................... 28

VIII.      Plaintiffs Do Not Address the Deficiencies of Their State-Law Claims ......................... 29

A.      Plaintiffs' Arguments Do Not Save Their Breach of Contract Claims. ............... 29

B.      Plaintiffs Ignore the Deficiencies in Their Tortious Interference Claims. ........... 30

C.      Plaintiffs Offer No Explanation for the Defects in Their Defamation Claims. .................................................................................................................... 32

D.      Plaintiffs Plead Themselves Out of An Unjust Enrichment Claim ..................... 33

E.      Plaintiffs' State-Law Claims Against CP Are Compulsory Counterclaims .......... 33

IX.      Plaintiffs Abandon Their Claims Under the Lanham Act, Illinois Consumer Fraud and Deceptive Practices Act, and the Illinois Uniform Deceptive Trade Practices Act .................................................................................................................................. 34

X.      Plaintiffs' RICO, UCL, and Antitrust Claims Are Not Timely ....................................... 35

CONCLUSION .................................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

**CASES**

*7241 W. 100th Place Corp. v. Vill. of* Bridgeview,
  2014 WL 517961 (N.D. Ill. Feb. 6, 2014)................................................................. 24, 34

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012)................................................................................. 16

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
  2 F.4th 695 (7th Cir. 2021)................................................................................. 6, 8

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)........................................................................................... 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................... 1, 21

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
  15 F.4th 831 (7th Cir. 2021)................................................................................. 2

*Asset Allocation & Mgmt. Co. v. W. Emps. Ins. Co.*,
  892 F.2d 566 (7th Cir. 1989)............................................................................... 34

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)........................................................................................... 3

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983)............................................................................... 13

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... 1

*Betkerur v. Aultman Hospital Ass'n*,
  78 F.3d 1079 (6th Cir. 1996)............................................................................... 9

*Bonte v. U.S. Bank, N.A.*,
  624 F.3d 461 (7th Cir. 2010)........................................................................... 5, 33

*Bowman v. Ill. Dep't of Corr.*,
  2004 WL 406772 (N.D. Ill. Feb. 27, 2004)............................................................. 31

*Boyle v. United States*,
  556 U.S. 938 (2009)........................................................................................... 28

*Brillhart v. Mutual Med. Ins., Inc.*,
  768 F.2d 196 (7th Cir. 1985)............................................................................... 6, 8

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988) ................................................................................................. 6

*Caraluzzi v. Prudential Sec., Inc.*,
    824 F. Supp. 1206 (N.D. Ill. 1993) .......................................................................... 21

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ............................................................................................... 20

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
    961 F.2d 667 (7th Cir. 1992) ..................................................................................... 3

*Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*,
    384 Ill. App. 3d 849  (2008) ................................................................................... 32

*Cleveland v. Berkson*,
    878 F.2d 1034 (7th Cir. 1989) ................................................................................. 27

*Cnty. of McHenry v. Ins. Co. of the W.*,
    438 F.3d 813 (7th Cir. 2006) ................................................................................... 33

*Cohen v. Lewis*,
    2004 WL 2481015 (N.D. Ill. Nov. 3, 2004) ............................................................ 32

*Cole-Haddon, Ltd. v. Drew Philips Corp.*,
    454 F. Supp. 2d 772 (N.D. Ill. 2006) ...................................................................... 33

*Crichton v. Golden Rule Ins. Co.*,
    576 F.3d 392 (7th Cir. 2009) ................................................................................... 28

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
    349 F.3d 376 (7th Cir. 2003) ................................................................................... 30

*Dal Pozzo v. Basic Mach. Co., Inc.*,
    463 F.3d 609 (7th Cir. 2006) ..................................................................................... 3

*DeGuelle v. Camilli*,
    646 F.3d 192 (7th Cir. 2011) ................................................................................... 26

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984) ................................................................................... 23

*Douglas v. Wisc. Alumni Rsch. Found.*,
    81 F. Supp. 167 (N.D. Ill. 1948) ............................................................................ 34

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Du Page Aviation Corp. v. Du Page Airport Auth.*,
  229 Ill. App. 3d 793 (1992) ................................................................. 31

*Entretelas Americanas S.A. v. Soler*,
  2020 WL 9815186 (S.D.N.Y. Feb. 3, 2020) ....................................... 27

*Generac Corp. v. Caterpillar Inc.*,
  172 F.3d 971 (7th Cir. 1999) .................................................................. 7

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ............................................................................. 27

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1 (2010) ................................................................................. 29

*Homestead Ins. Co. v. Chi. Transit Auth.*,
  1997 WL 43232 (N.D. Ill. Jan. 23, 1997) ........................................... 33

*Hoopla Sports & Ent., Inc. v. Nike, Inc.*,
  947 F. Supp. 347 (N.D. Ill. 1996) ....................................................... 31

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
  2014 WL 64657 (N.D. Ill. Jan. 8, 2014) ............................................... 9

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*,
  889 F.2d 751 (7th Cir. 1989) .................................................................. 9

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*,
  227 Ill. 2d 381 (2008) .......................................................................... 32

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021) ................................................................. 24

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .............................................. 13

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .................................................. 2, 14, 15

*In re Sulfuric Acid Antitrust Litig.*,
  743 F. Supp. 2d 827 (N.D. Ill. 2010) ................................................. 8, 9

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ............................................................... 10

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Indep. Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989)..................................................................................18

*Indus. Representatives, Inc. v. CP Clare Corp.*,
    74 F.3d 128 (7th Cir. 1996)....................................................................................29

*Jennings v. Auto Meter Prod., Inc.*,
    495 F.3d 466 (7th Cir. 2007)..................................................................................26

*Jespersen v. 3M*,
    183 Ill. 2d. 290 (1998)...........................................................................................29

*Kirksey v. R.J. Reynolds Tobacco Co.*,
    168 F.3d 1039 (7th Cir.1999)...................................................................................5

*Lanahan v. Cnty. of Cook*,
    41 F.4th 854 (7th Cir. 2022)...................................................................................22

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1981)............................................................................17, 20

*Lerma v. Univision Commc'ns, Inc.*,
    52 F. Supp. 2d 1011 (E.D. Wis. 1999)..................................................................19

*Limestone Dev. Corp. v. Vill. of Lemont, Ill.*,
    520 F.3d 797 (7th Cir. 2008)....................................................................................2

*Linea Internacional De Credito, S.A. v. Western Union Fin. Servs., Inc.*,
    2004 WL 13336302 (N.D. Ill. June 14, 2004)......................................................18

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    354 F. Supp. 2d 293 (S.D.N.Y. 2004)......................................................................5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................................13

*Midwest Grinding Co. v. Spitz*,
    976 F.2d 1016 (7th Cir. 1992)................................................................................26

*Molina-Aranda v. Black Magic Enters., LLC*,
    983 F.3d 779 (5th Cir. 2020)..................................................................................29

*Neptun Light, Inc. v. City of Chi.*,
    2018 WL 1794769 (N.D. Ill. Apr. 16, 2018)........................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)...................................................................................6

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018)........................................................................13

*Ploss v. Kraft Foods Grp., Inc.*,
  197 F. Supp. 3d 1037 (N.D. Ill. 2016)...............................................17, 18, 19

*Rea Associates, P.A. v. Southern. Baptist Hospital of Florida,, Inc.*,
  105 F.3d 1376 (11th Cir. 1997).......................................................................9

*Rocha v. Fedex Corp.*,
  15 F. Supp. 3d 796 (N.D. Ill. 2014)...............................................................11

*Rock v. NCAA*,
  928 F. Supp. 2d 1010 (S.D. Ind. 2013)..........................................................16

*Rotella v. Wood*,
  528 U.S. 549 (2000).......................................................................................28

*Rudolph v. IBM Corp.*,
  2009 WL 2632195 (N.D. Ill. Aug. 21, 2009).................................................30

*S. Austin Coal Cmty. Council v. SBC Commc'ns Inc.*,
  2001 WL 1250101 (N.D. Ill. June 22, 2001).................................................23

*Sanders v. JGWPT Holdings, Inc.*,
  2016 WL 4009941 (N.D. Ill. July 26, 2016).....................................................3

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020)....................................................................15, 16

*Slaney v. The Int'l Amateur Athletic Fed'n*,
  244 F.3d 580 (7th Cir. 2001)....................................................................25, 28

*Smith-Victor Corp. v. Sylvania Elec. Prod., Inc.*,
  242 F. Supp. 302 (N.D. Ill. 1965)............................................................20, 22

*Solaia Tech., LLC v. Specialty Publ'g Co.*,
  221 Ill. 2d 558 (2006)...................................................................................32

*Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*,
  125 F.3d 481 (7th Cir. 1997).........................................................................8

## TABLE OF AUTHORITIES
### (continued)

Page

*Thomason v. Nachtrieb*,
888 F.2d 1202 (7th Cir. 1989) .................................................................... 3

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
959 F.2d 468 (3d Cir. 1992) ...................................................................... 2

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
390 F. Supp. 3d 892 (N.D. Ill. 2019) ..................................................... 19

*United States v. Dunkel*,
927 F.2d 955 (7th Cir. 1991) .................................................................... 3

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 (1974) ................................................................................ 20

*United States v. Tracinda Inv. Corp.*,
477 F. Supp. 1093 (C.D. Cal. 1979) ....................................................... 23

*United States ex rel. Bogina v. Medline Indus., Inc.*,
809 F.3d 365 (7th Cir. 2016) .................................................................. 25

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ........................................ 19

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ..................................................... 12

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
511 F. Supp. 2d 372 (S.D.N.Y. 2007) ...................................................... 4

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971) ................................................................................ 35

*Zick v. Version All Steel Press Co.*,
623 F. Supp. 927 (N.D. Ill. 1985) ........................................................... 30

*Zimmer, Inc. v. Stryker Corp.*,
2014 WL 3866454 (N.D. Ind. Aug. 6, 2014) .......................................... 30

**STATUTES**

15 U.S.C. § 18 ........................................................................................ 24

18 U.S.C. §§ 1341 & 1343 ...................................................................... 25

18 USC § 1961(A)(1) .............................................................................. 27

**TABLE OF AUTHORITIES**
**(continued)**

Page

720 Ill. Comp. Stat. Ann. 5/29A-1 ........................................................................ 27

**OTHER AUTHORITIES**

Janet Levaux, *What the Schwab-TD Ameritrade Deal Means for Advisors:*
*Mallouk, ThinkAdvisor* (Nov. 3, 2020), https://www.thinkadvisor.com/2020/
11/03/what-the-schwab-td-ameritrade-deal-means-for-advisors-mallouk/ ......................... 21

John Manganaro, *Creative Planning CEO Peter Mallouk on Lockton Partnership*,
PLANADVISER (Nov. 12, 2021), https://www.planadviser.com/creative-
planning-ceo-peter-mallouk-lockton-partnership/ .............................................. 23

**RULES**

Fed. R. Civ. P. 8(a)(2) ........................................................................................ 2

**TREATISES**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1202 (2022 Cum. Supp.) ................. 23

Plaintiffs' Opposition fails to meaningfully respond to Defendants' substantive arguments for dismissal. Defendants showed that Plaintiffs' Complaint lacks the factual detail required to justify the massive investigation Plaintiffs propose to launch. In response, Plaintiffs have done little more than re-package their Complaint in the form of "Exhibit A"—a chart containing 125 separate "sections" that in turn cite disparate, conclusory allegations without explaining how they plausibly suggest Defendants' liability. This "colorful tapestry" of facts (Opp. at 6) is threadbare.

A spreadsheet is not a substitute for argument. And Exhibit A is a particularly poor proxy. Plaintiffs all but abandon several claims—the Lanham Act, Illinois Consumer Fraud and Deceptive Business Practices Act, and Illinois Uniform Deceptive Trade Practices Act counts— not even offering a defense. With respect to claims Plaintiffs do not totally abandon, they repeatedly refer to Exhibit A, in the apparent hope that somewhere within its cells the Court will find a reason to preserve their insufficiently pled action. Respectfully, the Court should reject Plaintiffs' conclusory allegations and dismiss the Complaint.

## ARGUMENT

## I. Plaintiffs Fundamentally Misunderstand Their Pleading Obligations.

Plaintiffs begin by misstating the legal standard governing their claims. Citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), they insist that Defendants demand too much "factual specificity." Opp. at 7. But Plaintiffs misunderstand two of *Twombly*'s central tenets—that conclusory assertions and legal conclusions cannot state a claim, and that a complaint "stops short" of plausibility when it "pleads facts that are merely consistent with a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

As to the first point, Plaintiffs ask the Court to accept their conclusory allegations because they will develop "specific facts" in discovery. Opp. at 7. However, "*Twombly* bars the

discover-first, plead-later approach[.]" *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021). And "[f]or good reason: modern antitrust litigation is expensive. Only by requiring plaintiffs to plead facts plausibly suggesting conspiracy can we avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a § 1 claim." *Id.* at 835.

The second requirement—to plead facts that are not merely consistent with liability, but plausibly suggest it—reaches even further. For Plaintiffs' claims of antitrust conspiracy, it means pleading facts "that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). For antitrust injury, it means pleading facts adequately "link[ing]" Defendants' allegedly anticompetitive behavior through "a theory of causation" to Plaintiffs' particular injury in a way that "is both plausible and cognizable by the antitrust laws." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486–87 (3d Cir. 1992) (en banc). And for "big" antitrust and RICO cases like this one, it means pleading a level of detail that is commensurate with the scope of the claims, because defendants "should not be put to the expense of big-case discovery on the basis of a threadbare claim." *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008).

In an attempt to cure their pleading problems Plaintiffs resort to three strategies. *First,* they insist that Defendants bear the burden to present evidence that contradicts Plaintiffs' allegations. *See, e.g.*, Opp. at 15. Rule 8 requires *Plaintiffs* to "show" they are "entitled to relief." Fed. R. Civ. P. 8(a)(2). At the pleading stage, Defendants have no obligation to offer facts or "evidence" to contradict Plaintiffs' allegations. Opp. at 15.

-2-

*Second*, Plaintiffs substitute their chart for argument defending their allegations, and presume that the Court will attempt to search for actionable claims. *See* Opp. Ex. A. But "[j]udges are not like pigs, hunting for truffles buried in briefs," *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and "[i]t is not the Court's responsibility to find arguments, facts, and supporting case law for the parties," *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *11 (N.D. Ill. July 26, 2016). Rather, it is the parties who must "make it easy for the court to rule" in their favor. *Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006). A chart with 125 separate sections, each containing cross references to scores of separate paragraphs, cannot substitute for the application of fact to law. *See id.*

*Third*, Plaintiffs attempt to plead new facts and inject new theories of relief in their Opposition.[1] They violate the "basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). Respectfully, the Court should ignore the new factual assertions in Plaintiffs' briefing, the provenance of which they do not specify.

## II. Plaintiffs Do Not Meaningfully Address Antitrust Injury.

"[E]ven in cases involving *per se* violations, the [antitrust] right of action is available only to those private plaintiffs who have suffered antitrust injury." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). In other words, to sustain an antitrust claim Plaintiffs must "show that [their] loss comes from acts that reduce output or raise prices to consumers." *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992). Mere

---

[1] *See, e.g.*, Opp. at 20 (alleging for the first time that Broker-Custodian Defendants "made direct threats to competitor Independent RIAs to induce their participation in the group boycott"); *id.* at 32 (alleging for the first time that Schwab alone monopolizes the RIA Custodial Services market and that other defendants conspired with Schwab to monopolize that market).

"allegations of injury to a competitor . . . [are] insufficient to constitute an antitrust injury without allegations of injury to competition in general." *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 382 (S.D.N.Y. 2007).

Plaintiffs fail to meaningfully address antitrust injury. Defendants' brief explained that Plaintiffs failed to plead antitrust injury because they did not (1) present a coherent explanation of how the so-called RIA Services conspiracy injured them, especially given Plaintiffs' claim that the alleged scheme existed during Spotlight's period of growth and success; (2) make any allegations regarding marketplace pricing; (3) allege a plausible injury to any aspect of the IAR labor market traceable to any of Defendants' acts (and indeed suggested that Defendants *expanded* the IAR labor market); (4) explain how a purported conspiracy to stop selling custodial services to Spotlight—a single independent RIA among thousands—harmed competition as a whole; (5) attempt to show how Defendants' purported monopolization affected prices in the marketplace or otherwise injured Plaintiffs through competition-reducing conduct; or (6) logically connect Plaintiffs' supposed injuries to either the Schwab-AMTD merger or Creative Planning's ("CP") growth into a thousandth of the market. Mem. at 19-21.

To these detailed arguments, Plaintiffs offer no response. Plaintiffs simply reassert their basic allegation that they suffered antitrust injury, and they offer blanket references to Sections 93, 96, 97 and 98 of Exhibit A.[2] The cited sections themselves reference over a hundred paragraphs of the Complaint, vitiating Plaintiffs' characterization of Exhibit A as an "effort to

---

[2] The entirety of Plaintiffs' argument on antitrust injury reduces to the following: First, on page 3 of the Opposition, Plaintiffs state that "[a]s a direct and proximate result of Defendants['] anticompetitive schemes, Plaintiffs could not obtain competitive IAR Labor and RIA Custodial Services, paid more for IAR Labor and RIA Custodial Services, incurred higher operating costs, had diminished access to advisory clients, or freely do business with other industry participants because it was subjected to Defendants' collective group boycott (See Ex. A, Table of Complaint Citations, Sec #98)." Opp. at 3. Second, on page 33, Plaintiffs state, again without elaboration, that "Plaintiffs allege Schwab's monopolization has caused antitrust injury (See Exhibit A, Sections #93, 96, 97)." Opp. at 33.

comply with the Court's page limitations." Opp. at 3.[3] In any event, the conclusory allegations that Exhibit A cites do not plausibly establish Plaintiffs' antitrust injury. *See, e.g.*, Opp. Ex. A at 10-11 (citing Compl. ¶ 18, which asserts that Defendants have caused "harm to many, including Plaintiffs"); *id.* (citing Compl. ¶ 210, stating "[Broker-Custodian Defendants] have monopoly power in the RIA Custodial Market and abuse that power to maintain their monopoly power, as well as to attempt to obtain monopoly power in the Investment Advisory Services Market."). "[S]weeping, conclusory statements cannot suffice as evidence of antitrust injury." *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 307 (S.D.N.Y. 2004).

Here and elsewhere, Plaintiffs' failure to meaningfully respond to Defendants' arguments necessitates dismissal. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver[.]"); *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1042 (7th Cir.1999) ("If [judges] are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning."). And because antitrust injury is an essential element of each of Plaintiffs' antitrust claims, the Court should dismiss them all.

## III. Plaintiffs' Arguments Cannot Rehabilitate Their Section 1 Claims.

Plaintiffs cannot recast and assert their way to an actionable claim under Section 1 of the Sherman Act. They are bound by their Complaint, and those allegations fail to state a claim.

---

[3] The Court need not and should not accept vague cross-references to over a hundred paragraphs in lieu of responsive argument. *See supra* p.3 (collecting cases emphasizing that the litigants bear the burden to identify viable facts and arguments, not the court).

A.    **Plaintiffs' Section 1 Allegations Fail to State a Claim Under Rule of Reason Analysis.**

Plaintiffs' Section 1 claims are governed by—and fail under—the Rule of Reason. Even if Broker-Custodian Defendants and independent RIAs could be characterized as horizontal competitors—an assertion Plaintiffs' own pleadings *refute*—that conclusion remains.

1.    **The Broker-Custodian Defendants are vertically positioned vis-à-vis independent RIAs.**

Plaintiffs fail to plausibly allege that the Broker-Custodian Defendants' referral programs involve horizontal agreements between independent RIAs. Vertical restraints are those "imposed by agreement between firms at different levels of distribution." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)). Agreements between an entity that provides a service and the buyer of that service are therefore vertical. *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 705-06 (7th Cir. 2021) (agreement between service provider and recipient represents a vertical restraint) *and Brillhart v. Mutual Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985) (buyer/seller of services relationship is vertical). Here, the referral programs at issue involve vertical relationships between the Broker-Custodian Defendants who offer them and the independent RIAs that participate in them.

Plaintiffs claim the agreements are "horizontal" because Defendants "are all RIAs" that provide "advice services to advisory clients in the Investment Advisory Market." Opp. at 8. They take issue with Defendants' observation that only CP is alleged to be an RIA. *Id*. But the Complaint lacks factual allegations relating to the Broker-Custodian Defendants' activities as investment advisors, CP is indisputably the sole independent RIA Defendant, and the sole referral agreement specifically described is between CP and Schwab in Schwab's capacity as a custodian. Indeed, it is the agreement between the parties that governs, even if they otherwise

engage in similar activities in a broader marketplace. *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999). Here, Plaintiffs acknowledge that custodians and independent RIAs operate at different levels of the market. *See* Compl. ¶ 36 ("Fidelity is a market participant in the RIA Custodial Services Market, *supplying* RIA Custodial Services to Independent RIAs.") (emphasis added); *id.* ¶ 47 ("AMTD is a market participant in the RIA Custodial Services Market, *supplying* RIA Custodial Services to Independent RIAs,") (emphasis added); *id.* ¶ 57 ("Schwab has been a market participant . . . in the RIA Custodial Services Market, *supplying* RIA Custodial Services to Independent RIAs[.]") (emphasis added).

Neither of the two Fidelity entities named in the Complaint are RIAs; rather, NFS is a *custodian*.[4] And Plaintiffs repeatedly confirm that the referral programs at issue involve agreements under which the Broker-Custodian Defendants provide custodial services to independent RIAs. *See* Compl. ¶ 135 ("The Referral Agreements incorporate agreements related to the provision of RIA Custodial Services."); *id.* ¶ 154 (referral programs involve agreements related to revenue "received by Broker-Custodian Defendants from provision of RIA Custodial Services"); *id.* ¶ 173 ("Independent RIAs enter into written agreements with Broker-Custodian Defendants to be supplied RIA Custodial Services" which "are incorporated into their Referral Program Agreements"); *id.* ¶ 174 (Broker-Custodian Defendants participate in the "RIA Services Scheme" through "the RIA Custodial Services Agreements").[5] Plaintiffs' allegations regarding

---

[4] While NFS, a registered broker-dealer, was previously dually registered as an RIA, it did "not have any advisory clients, [did] not provide investment advice, and [did] not receive compensation for investment advisory services." Dkt. 69-3 at 54.

[5] Plaintiffs appear to abandon any Section 1 claim predicated on independent RIAs' participation in the Broker-Custodian Defendants' SIPs. *See* Opp. at 28, 37-38 (discussing SIPs only in the context of the Clayton Act § 7 claim). In any event, the Complaint expressly alleges that the Schwab entity that operates its "SIP" for independent RIAs is the same entity that supplies *custody* services to independent RIAs. *Compare* Compl. ¶ 135 (Schwab Advisor Services™ supplies RIA Custodial Services), *with id.* ¶ 228 ("Schwab's SIP is through Schwab Advisor Services™").

agreements between Broker-Custodian Defendants and independent RIAs therefore describe, at most, a vertical restraint. *See, e.g.*, *Always Towing*, 2 F.4th at 705-06 *and Brillhart*, 768 F.2d at 199.

Plaintiffs' definition of the Investment Advisory Services Market, which they identify as the relevant one for purposes of assessing their Section 1 claim based on the referral programs, *see* Opp. Ex. B at 1, reinforces this conclusion. Plaintiffs affirmatively *exclude* Broker-Custodian Defendants from this market by defining it to exclude entities that are "dually-registered with the SEC and [FINRA][,] such as broker-dealers and hybrid RIAs," as well as entities that "recommend or sell their own proprietary branded investment products to advisory clients." Compl. ¶ 107; *see also* Opp. at 2 n.4 (contending that the "Investment Advisory Services Market" is "frequently referred to in the industry as the 'Independent RIA Channel'" and is distinct from other RIAs).[6] Plaintiffs do not—and cannot—allege the Broker-Custodian Defendants are independent RIAs. This is fatal to Plaintiffs' contention that Broker-Custodian Defendants' referral programs with independent RIAs involve horizontal agreements between direct competitors. *See, e.g.*, *Brillhart*, 768 F.2d at 199 (no horizontal agreement where agreement does not run between competitors in the same market); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 867 (N.D. Ill. 2010) (an arrangement is horizontal only when its participants are "actual or potential rivals" in the relevant market).

### 2. "Hybrid" relationships are subject to the Rule of Reason.

Although Plaintiffs concede that the relationships between Broker-Custodian Defendants

---

[6] Plaintiffs cannot escape this specific allegation by pointing to their bald assertion that "Broker-Custodian Defendants, Creative Planning, and Spotlight are horizontal competitors in the Independent RIA Services Market," *see* Compl. ¶ 104. *See Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (recognizing "the well-settled rule that a party is bound by what it states in its pleadings").

and independent RIAs (like CP) to whom they supply custodial services are vertical, the Section 1 claims would still be governed by the Rule of Reason even if the referral programs *could* be characterized as "horizontal." Plaintiffs, in claiming a "horizontal" relationship, *themselves* appear to be characterizing the arrangements between the Broker-Custodian Defendants and independent RIAs as "dual" or "hybrid" arrangements, *i.e.*, situations in which parties in a vertical relationship also operate on the same market level in some capacities. *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir. 1989). And "[r]estraints in dual distribution systems are analyzed under the rule of reason." *House of Brides, Inc.* v. *Alfred Angelo, Inc.*, 2014 WL 64657, at *5 (N.D. Ill. Jan. 8, 2014).

Further, Plaintiffs fail to explain how referral arrangements are anticompetitive, such that they belong in the "small class of 'manifestly anticompetitive' horizontal agreements among competitors [that] falls under the per se rule." *Sulfuric Acid*, 743 F. Supp. 2d at 867. Absent plausible allegations of price fixing, bid rigging, or market allocation—all absent here—even a purely "horizontal" agreement would require Rule of Reason analysis. *See id.* (because "[a]ll other horizontal agreements, and all vertical ones, have been deemed potentially procompetitive," they "are thus judged under the rule of reason").[7] As Defendants describe in detail in *infra* Section III.D., Plaintiffs also fail to allege any market-wide anticompetitive harm.

---

[7] Plaintiffs claim that Defendants cannot cite a case indicating "referral programs . . . are anything other than *per se* illegal market allocation agreements." Opp. at 11. Defendants refer the Court to *Betkerur v. Aultman Hospital Ass'n*, 78 F.3d 1079, 1092 (6th Cir. 1996) (referral agreement would not be subject to *per se* liability absent evidence of party's use of market power used to increase prices and suppress competition), and *Rea Associates, P.A. v. Southern. Baptist Hospital of Florida,, Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (referral agreement among medical professionals not deemed unreasonable *per se* even assuming referring entity has market power due to lack of clear negative impact of practice).

**B.      Plaintiffs Do Not Allege a Plausible Conspiracy Between Any Defendants.**

Plaintiffs do not seriously address much less overcome the fundamental defects that inhere in their Conspiracy Claims, including Counts 2, 4, 5, 6, and 13. *See* Mem. at 11-19. They must plausibly show—either directly or indirectly—that each purported conspirator agreed to the supposed "RIA Services Scheme" or "Silencing and Retaliation Scheme." Mem. at 11-12.[8] Yet the supposedly "plain, unambiguous, and explicit factual allegations" to which Plaintiffs refer (Opp. at 17) are conclusions, not facts, and do not adequately plead an agreement.

**1.      Plaintiffs do not identify any direct evidence of a conspiracy among Defendants.**

Direct evidence is explicit "smoking gun" evidence that requires no inferences to establish the existence of a conspiracy, and "usually take[s] the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy[.]" *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015). Plaintiffs insist they alleged (1) the existence of "explicit and tacit agreements,"[9] such as referral agreements and custodial services agreements; (2) "conspiratorial communications" between Defendants; and (3) "threats by Defendants." Opp. at 18-20. Plaintiffs fail to do so specifically, relying again on citations to Exhibit A's cross-references to scores of irrelevant paragraphs. *Id.*[10]

*None* of Plaintiffs' allegations meet the Seventh Circuit's description for directly showing that anyone agreed to either of the alleged "schemes." Regarding purported "explicit

---

[9] Not only is "direct evidence" of "tacit agreements" definitionally impossible, but Plaintiffs also do not allege any specifics regarding the purported "tacit agreements" they vaguely reference.

[10] For example, to support a finding of "conspiratorial communication," Plaintiffs cite to Exhibit A, Section #52. That Section cites dozens of paragraphs, among them Paragraph 504, which relates to one Defendant's purported communication with industry press.

agreements," Plaintiffs reference referral and custodial services agreements but never detail specific terms, analyze any language, or plausibly explain how the existence of lawful and uncontroversial custody and referral agreements directly prove the existence of their "schemes."[11] With respect to "conspiratorial communications" (Opp. at 19) and "threats" (*id*. at 19-20), Plaintiffs largely cross-reference to the dozens of paragraphs cited in Exhibit A, but otherwise provide little in the way of specific argument. *Id*. The communications Plaintiffs *do* describe are little more than scant and occasional communications regarding items that have nothing to do with a purported conspiracy (much less "smoking guns"), but rather relate to depositions, whistleblower complaints, mergers and acquisitions, due diligence, confidential information, and potential business opportunities. *Id*. (citing Compl. ¶¶ 308-09, 505-06, 642-44, 651-66, 659). Plaintiffs fail to allege any anticompetitive agreement directly.

## 2. Plaintiffs have not pleaded circumstantial allegations of conspiracy.

To state a circumstantial-evidence conspiracy claim, Plaintiffs "must allege parallel conduct by Defendants coupled with certain 'plus factors.'" Opp. at 21. They do neither.

### a. Plaintiffs fail to plausibly allege parallel conduct.

Plaintiffs' pronouncement that their "Complaint alleges a [sic] parallel conduct" (Opp. at 23) rests on a conclusory foundation. Plaintiffs never explain how the allegations they cite plausibly establish parallel conduct for their "RIA Services Scheme" or "Silencing and Retaliation Scheme." Opp. at 17, 22-24 (citing Compl. ¶¶ 310-15). Nor do they attempt to

---

[11] Plaintiffs also fail to seriously defend their improper group pleading and admit that the Complaint blends Defendants together "at times." Opp. at 24. Any fair reading shows that the Complaint consists almost entirely of allegations directed at "Defendants" or "Broker-Custodian Defendants" as an undifferentiated bloc. Mem. at 13. Without explanation, Plaintiffs also brush aside *Rocha v. Fedex Corp.*, 15 F. Supp. 3d 796 (N.D. Ill. 2014), as "completely factually inapposite." Opp. at 25. But there, as here, dismissal was warranted because "[p]laintiffs failed to allege co-conspirators with any specificity," relying instead on "an amorphous group of unnamed dominant contractors, and numerous other unspecified" parties. *Id.* at 809.

overcome the legal deficiencies Defendants detailed for both purported "schemes." Mem. at 11-17. Rather, Plaintiffs disavow *any* requirement to plausibly allege that "Defendants' parallel conduct 'reflects anything but 'individual response to common stimuli.'" Opp. at 23.

The Supreme Court and courts in this District do not agree with Plaintiffs. In *Twombly*, the Supreme Court established that plausible allegations of parallel conduct are necessary but not sufficient to sustain a circumstantial-evidence antitrust claim. 550 U.S. at 556 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."). And courts in this District have applied that holding to dismiss antitrust conspiracy claims for failure to plausibly plead parallel conduct. *See e.g., Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 832 (N.D. Ill. 2018) (dismissing antitrust conspiracy complaint where, *inter alia*, "the probative force of plaintiffs' allegations of parallel conduct [wa]s particularly weak"). Plaintiffs never reckon with this precedent.

Nor can Plaintiffs' remaining arguments salvage their claims. Opp. at 22-23. First, as to the supposed "RIA Services Scheme," Plaintiffs allege that "on October 2, 2019," Schwab announced it would cut certain commissions on trades, with AMTD following suit "within hours," and Fidelity "about a week later." Compl. ¶ 314; *id*. ¶ 296(b). These allegations do not, as Plaintiffs assert, set forth a "[c]omplex and historically unprecedented change[] in pricing structure made at the very same time . . . for no other discernible reason" than a conspiracy. Opp. at 21 (citation omitted). By Plaintiffs' own admission, Defendants did not eliminate commissions all at once—Schwab publicly announced price cuts, and AMTD and Fidelity acted later, as competitors often do when *competing* for customers. Mem. at 14-15. Besides, *cutting prices to zero* reflects competitive behavior, and Plaintiffs point to no case in which a court inferred a

conspiracy from seriatim price cuts.[12] Plaintiffs' assertions that the price cuts somehow raised costs (Opp. at 23) and broke with prior industry precedent are both conclusory and entirely unsubstantiated in the Complaint. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) (explaining that "scant allegations of pricing behavior that came *before* the alleged conspiracy" preclude any finding that the behavior was historically unprecedented) (emphasis in original).

As to the supposed "Silencing and Retaliation Scheme," Plaintiffs barely address Defendants' arguments, Mem. at 17-21, contending in passing that the Court should infer a parallel boycott even though Schwab, AMTD, and Fidelity allegedly stopped supplying Spotlight with custodial services at different times over months and years. *Id.* at 17-18. In Plaintiffs' view, "incongruent timing" of conduct does not "disprove[] the fact of conspiracy." Opp. at 24. But Plaintiffs confuse the inquiry, which is not whether Defendants "disproved" a conspiracy, but whether Plaintiffs *plausibly alleged* one. The facts here—including disparate timing of decisions to stop supplying Spotlight with custodial services—do not support any inference of parallel conduct.

### b. Plaintiffs fail to articulate plausible "plus factors."

Because Plaintiffs "fail[] to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary," *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018), but the purported "plus factors" further confirm Plaintiffs do not state a claim.

---

[12] The cases point in the opposite direction. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) (holding, in a conspiracy to monopolize case, that "cutting prices in order to increase business often is the very essence of competition," and that "mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect"); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 231 (1st Cir. 1983) (noting that the court should "be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up discouraging legitimate price competition").

Plaintiffs ask the Court to infer the existence of the purported "RIA Services Scheme" from Defendants' purported "common motives . . . to conspire." Opp. at 22. But a supposedly shared motive to "increase profits and share revenues" (*Id.*) does not advance a plausible inference of a conspiracy because "common motive for increased profits always exists." *Musical Instruments*, 798 F.3d at 1195 n.8. Plaintiffs' conjecture about other purported motives merely restates this deficient profit motive in different ways. *See e.g.*, Opp. at 22 (speculating about motives to "obtain a competitive advantage," "diminish" competition to "ensure" self-benefit, "drive consolidation and increase" market power, "foreclose competition," "increase pricing and revenue," and fix prices and not compete).[13]

In any event, the Complaint itself suggests plausible, non-conspiratorial motivations for Defendants' conduct. For example, with respect to Greco's group boycott allegation—a component of the "RIA Services Scheme," Compl. ¶¶ 211-214—the Complaint presents a series of reasons that terminating Spotlight would further Broker-Custodian Defendants' independent self-interest, such as the litigation history between Plaintiffs and certain Defendants. *See, e.g.*, Compl. ¶¶ 517-531 (outlining conflict regarding former AMTD advisor hired by Spotlight).

Plaintiffs *concede* that the whistleblower complaints—the supposed impetus for the separate Silencing and Retaliation Scheme—did *not* involve Fidelity, Opp. at 5, one of the purported participants in this conspiracy. So Plaintiffs' conclusory claim that Fidelity agreed to a boycott to "retaliate" against Plaintiffs as part of the "RIA Services Scheme" makes no sense. Plaintiffs' rejoinder—that "conspirators do not have to have identical motives in order to

---

[13] It also makes no sense to reason, as Plaintiffs do here, that Defendants could share a common motive to *enter into* an "RIA Services Scheme" based on their purportedly common motive to "*conceal* their conduct" in that supposed scheme. Opp. at 22. Plaintiffs' related theory—that Fidelity had a motive to conspire with Schwab because their "conspiracy provides that Schwab and Fidelity will agree to maintain their respective market shares"—lacks any support in the factual allegations.

conspire," Opp. at 24—misses the point. Plaintiffs bear the burden to assert a plausible claim, and they allege no coherent reason that Fidelity would have joined a boycott here. Much more plausible is that there simply is no "group boycott," but rather individual firms working in their own self-interest.

Plaintiffs assert other plus factors—engaging in "information sharing," "mergers and acquisitions," "opportunities to meet" and other "industry characteristics"—that allegedly "facilitat[ed] collusion." Opp. at 23 (citing Compl. ¶¶ 296-315). Both the arguments and the allegations to which Plaintiffs cite are conclusory, as Defendants have explained. Mem. at 15-17. Plaintiffs make no attempt to respond to those points. Because their allegations setting forth "plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies," and because they do not plead "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," *see Musical Instruments*, 798 F.3d at 1194, the Court should dismiss Plaintiffs' Conspiracy Claims.

**C.    Plaintiffs Have Not Pleaded Plausible Relevant Markets.**

Plaintiffs' Sherman Act and Clayton Act claims independently fail because their putative relevant markets are not defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *See Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (affirming dismissal for failing to allege a cognizable relevant market) (quotation omitted). While purporting to identify allegations regarding the "products that consumers perceive as reasonable substitutes for each other" in the three alleged markets, Plaintiffs repeat the same vague and conclusory definitions they advanced in the Complaint. *See* Opp. at 12, 14. Plaintiffs omit any factual allegations that identify substitutes or potential substitutes within *any* of the proposed markets, just as they cannot present

a plausible explanation of how any Defendant could wield market power in a nationwide geographic market for any of these services. *See Sharif*, 950 F.3d at 917 (affirming dismissal for failure to plausibly explain how Defendants could wield anticompetitive power in a nationwide market).

Notably, Plaintiffs remain unable to define the contours of the purported Investment Advisory Services Market. In some places, they appear to acknowledge that a wide array of companies offer some form of investment advisory services. *See* Compl. ¶ 99 ("There are different types of RIAs providing Independent RIA Services, including: independent RIAs, hybrids, asset managers, hedge funds, turnkey asset management programs ('TAMPS'), broker/dealers, family offices, and others as defined by the Investment Adviser Act."). Elsewhere, they expressly exclude certain categories of firms—categories that include the Broker-Custodian Defendants—from that market definition. *See id*. ¶ 107. Plaintiffs do not plead facts that identify the contours of the markets at issue "or account for the commercial realit[ies]" of the industry, and it is neither the Court's nor Defendants' obligation to fill in those gaps. *See Rock v. NCAA*, 928 F. Supp. 2d 1010, 1022 (S.D. Ind. 2013).

### D.      Plaintiffs Do Not Plausibly Plead Anticompetitive Effects.

To avoid dismissal under the Rule of Reason, Section 1 plaintiffs must plausibly allege that the restraints caused anticompetitive effects in cognizable relevant markets. *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012). As Defendants explained, the Complaint contains no such allegations. *See* Mem. at 19-20. In response, Plaintiffs simply cite a list of paragraphs from the Complaint without further discussion. *See* Opp. at 31. These allegations are still insufficient for all the reasons Defendants identified. *See* Mem. at 19-20.

IV.    **The Court Should Reject Plaintiffs' Proposed End-Run Around Their Section 2 Pleading Problems.**

Disavowing their defective shared monopoly theory,[14] Plaintiffs attempt to solve their Section 2 pleading problems by recasting Schwab as a lone monopolist in the new narrative they present in their Opposition. Again, Plaintiffs fail to support their assertions with factual allegations that Schwab acquired, maintained, or attempted to obtain monopoly power in the putative RIA Custodial Services market, engaged in any exclusionary conduct vis-à-vis its rivals, or that any Defendant conspired with the specific intent to enable Schwab to obtain or maintain monopoly power. Many if not most of the new allegations simply flunk the common-sense test.

A.    **Plaintiffs Do Not Adequately Plead That Schwab Possesses Monopoly Power in a Relevant Market.**

Plaintiffs' unpled Section 2 theory fails because their allegations do not show that Schwab possesses "the power to control prices or exclude competition in a relevant market." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1071 (N.D. Ill. 2016) (quotation omitted).

Relying solely on indirect allegations of monopoly power, Plaintiffs baldly assert that Schwab is the "market dominator" because it purportedly possesses a 75% share in the custody market. But market share alone is "an insufficient indicator of a company's capacity to control prices and exclude competitors." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981). Indeed, market share and monopoly power "are not necessarily the same," such that the inquiry under Section 2 is whether "the defendant has or reasonably might come close to having

---

[14] Plaintiffs alleged—no less than nineteen separate times—that Defendants *collectively* acquired (or attempted to acquire) monopoly or monopsony power in the putative markets. *See, e.g.*, Compl. ¶¶ 36, 58, 131, 171, 174, 184, 188, 189, 205, 210, 245, 280, 714, 715, 716, 717, 718, 719, 730. As Defendants explained, Plaintiffs' invalid shared monopoly claims required dismissal, even before Plaintiffs abandoned them here. Mem. at 25.

the ability to control total market output and prices." *Indep. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989).

Here, Plaintiffs allege no facts indicating Schwab possesses the power to control price or output in the custody market. To the contrary, they allege competition forced Schwab to *eliminate* commissions for trades. *See* Compl. ¶ 314. Price cutting is competition that the antitrust laws encourage, not proscribe, and is the hallmark of a competitive market, not a monopolized one.[15] Conclusory allegations about Schwab's market share and assertions that it is "intending and actively attempting monopolization of the RIA Custodial Services Market and is dangerously close to achieving it" fall far short of plausibly alleging monopoly power. Opp. at 33. Plaintiffs' unpled theory fails on that basis alone. *See Linea Internacional De Credito, S.A. v. Western Union Fin. Servs., Inc.*, 2004 WL 13336302, at *3 (N.D. Ill. June 14, 2004) (dismissing plaintiff's monopolization claim where the complaint relied on "non sequitur[s]" about defendant's status as "largest, best-known and almost exclusive provider of money wire transfer services" to plead monopoly power).

### B.     Plaintiffs Do Not Plausibly Allege that Schwab Excluded Any Rivals.

Plaintiffs' unpled theory also fails the second element of a monopolization claim: "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *See Ploss*, 197 F. Supp. 3d at 1073 (citation omitted)). To satisfy this element, a plaintiff must plausibly allege the purported monopolist "attempt[ed] to exclude rivals on some basis other than efficiency." *Id*. Nowhere do Plaintiffs plausibly allege Schwab excluded *any* rival custodian. Instead, Plaintiffs reference referral arrangements between Schwab and certain independent RIAs; *i.e.*, non-

---

[15] *See supra* n.12 (collecting cases cautioning against inferring anticompetitive conduct from price cuts).

collusive conduct directed at a broader Investment Advisory Services Market, *not* the custody market that has supposedly been monopolized. *See, e.g.*, Compl. ¶¶ 134, 152-70 (identifying RIA referral agreements as anticompetitive conduct); Opp. Ex. B at 2.

For similar reasons, Plaintiffs' attempt to shoehorn their group-boycott allegations into a monopolization claim falls flat. Schwab's termination of Spotlight's RIA Custodial Agreement is not exclusionary—even if carried out as part of a far-fetched conspiracy—because Plaintiffs do not allege it resulted in the exclusion of *any* rival custodian on a basis other than efficiency. *See Ploss*, 197 F. Supp. 3d at 1073; *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1021 (E.D. Wis. 1999) ("It is not anticompetitive conduct for a party, even a monopolist, to terminate an at-will contract with one dealer").

### C.     Plaintiffs Fail to Plausibly Allege that Defendants Conspired to Enable Schwab to Acquire or Maintain Monopoly Power.

The final aspect of Plaintiffs' unpled monopolization argument—that Defendants conspired with the specific intent to enable Schwab to acquire or maintain monopoly power—is their most implausible. Among other elements, a conspiracy-to-monopolize claim requires "the existence of specific intent to monopolize." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *6 (N.D. Ill. Sept. 28, 2015). As discussed in *supra* Section II.B, Plaintiffs allege no plausible agreement amongst Defendants to restrain trade, let alone any agreement specifically intended to enable Schwab to acquire monopoly power. *See U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 907 (N.D. Ill. 2019) (dismissing Section 2 claim where complaint contained "no facts related to the conspiracy that [were] specific to the monopolization claim, . . . and fail[ed] to adequately allege a conspiracy under § 1"). Nor do Plaintiffs present a coherent rationale to suggest why Fidelity, for example, would conspire to give its rival custodian the power to control prices and exclude competition, or

CP would enable a custodian to charge monopoly rates. *See Neptun Light, Inc. v. City of Chi.*, 2018 WL 1794769, at *6 (N.D. Ill. Apr. 16, 2018) (dismissing claim as "inherently implausible" where complaint provided "no reason whatsoever as to why [d]efendants would conspire to injure themselves") (quotation omitted). This claim does not pass the common-sense test, much less cross the plausibility threshold.

## V. Plaintiffs' Efforts to Rehabilitate Their Deficient Section 7 Claims Fail.

Rather than respond to Defendants' arguments, Plaintiffs attempt to recast the allegations supporting their Section 7 claims. Because the rehashed allegations are no more plausible than the originals, and because Plaintiffs offer no rejoinder to Defendants' arguments, the Court should dismiss the Section 7 claims.[16]

Congress "set the standard of proof at a reasonable probability, not mere possibility, of anticompetitive effect" for claims that arise under Section 7. *Lektro-Vend Corp.*, 660 F.2d at 274. Given that "remote possibilities are not sufficient to satisfy the test set forth in s[ection] 7," Plaintiffs' task is to plausibly allege (1) a "loss of competition which is sufficiently probable and imminent," *Marine Bancorporation, Inc.*, 418 U.S. at 623 n.22, and (2) facts establishing a "nexus between the acquisitions by the defendant and the alleged lessening of competition," *Smith-Victor Corp. v. Sylvania Elec. Prod., Inc.*, 242 F. Supp. 302, 314 (N.D. Ill. 1965). Plaintiffs' original and recast allegations fall short on both counts.

*Schwab's Acquisition of AMTD.* Although it was not clear from the Complaint, Plaintiffs now say that the RIA Custodial Services Market is the relevant one for purposes of assessing

---

[16] Plaintiffs' failure to allege the contours of plausible product and geographic antitrust markets, *supra* Section III.C., infects each of their Section 7 theories, because "[d]etermination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (quotation omitted). Plaintiffs' Section 7 claim is also predicated upon a showing of antitrust injury, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986), which Plaintiffs cannot do. *See supra* Section II.

Schwab's acquisition of AMTD. Opp. Ex. B at 3. How do Plaintiffs purport to adequately plead a "loss of competition which is sufficiently probable and imminent" in that market? First, they assert that the acquisition "essentially eliminat[ed] competition altogether" in the custody market and that Schwab is the "undisputed market dominator with monopoly power." Opp. at 35. Those are conclusions, not well-pleaded facts that appear in the Complaint. *See Iqbal*, 556 U.S. at 678. In any event, Plaintiffs' pleadings refute both of those claims.

First, Plaintiffs' assertion that Schwab's acquisition of AMTD "essentially eliminat[ed] competition altogether" (Opp. at 35) is inconsistent with their allegations that Fidelity competes with Schwab to custody assets (Compl. ¶ 120), that Goldman Sachs announced plans to enter the custody business (*id.* ¶ 193), and that Spotlight itself custodies its assets with LPL, yet another custodian and competitive alternative to Schwab (Riesenberg Decl. ¶ 8). Moreover, the articles that Plaintiffs incorporate into their Complaint indicate that Schwab's acquisition of AMTD spurred, rather than eliminated, competition to offer custody services. *See, e.g.*, Janet Levaux, *What the Schwab-TD Ameritrade Deal Means for Advisors: Mallouk, ThinkAdvisor* (Nov. 3, 2020), https://www.thinkadvisor.com/2020/11/03/what-the-schwab-td-ameritrade-deal-means-for-advisors-mallouk/ (cited at Compl. ¶ 119 n.27) (indicating that the AMTD acquisition allowed Pershing and Raymond James to enter the market).[17]

Plaintiffs' other allegations regarding diminished competition, increased barriers to entry, increased costs for custodial services, diminished choice and supply of custodial services, and "lessened innovation and quality" of custodial services, Opp. at 36, are legal conclusions. *See Iqbal*, 556 U.S. at 679. Plaintiffs never substantiate those assertions with facts, instead pointing

---

[17] The Court can consider "complete documents incorporated by reference in plaintiffs' complaint" without "converting the [dismissal] motion to one for summary judgment." *Caraluzzi v. Prudential Sec., Inc.*, 824 F. Supp. 1206, 1210 n.1 (N.D. Ill. 1993).

back to those conclusory assertions in the Complaint as support for the same conclusory assertions in their brief. *Compare, e.g.*, Compl. ¶ 741 *with* Opp. at 36; *see Lanahan v. Cnty. of Cook*, 41 F.4th 854, 862 (7th Cir. 2022) ("We are not obligated to accept sheer speculation, bald assertions, and unsupported conclusory statements on a motion to dismiss.") (quotation omitted). Moreover, many of the allegations Plaintiffs cite in their brief and exhibits do not even share a tangential connection to the 2020 AMTD acquisition. *See, e.g.*, Opp. at 36 (citing Compl. ¶ 613) (alleging that Fidelity entered into a custody agreement with Spotlight in 2017); *id.* (citing Ex. A, Section 51, which cites to Compl. ¶ 846) (alleging in Unjust Enrichment Count that "Defendants have benefitted from the profits gained from the unlawful and inequitable acts alleged in this Complaint"). In short, neither the Complaint nor the revised narrative that appears in Plaintiffs' brief establishes a plausible nexus between the AMTD acquisition and any alleged lessening of competition. *See Smith-Victor Corp.*, 242 F. Supp. at 314 (dismissing Section 7 claim for failure to "set out the nexus between the acquisitions by the defendant and the alleged lessening of competition").

*Creative Planning's "Roll Up" Acquisitions.* Plaintiffs assert that CP increased market share "by aggressively acquiring multiple horizontal competitors" and "did so as part of the RIA Services Scheme and conspiracy with the other Defendants." Opp. at 36-37. The nature of this conspiracy, and how CP's growth into a thousandth of the marketplace aids in it, remains a mystery. By any measure of the marketplace, CP's miniscule market share (it is not even the largest of the entities in Schwab's own referral program) could never make it into a "monopolist." Even if the relevant market comprised "only" $5.7 trillion dollars, CP would account for only 2.3% of the market following its "aggressive acquisitions." Opp. at 27. The allegation that a merger leading to a miniscule market share violates Section 7 is frivolous. *See*

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984) (resulting market percentage of 4% is insufficient "as a matter of law" to sustain a Sherman Act Section 2 Claim or Clayton Act Section 7 claim); *United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093, 1108 (C.D. Cal. 1979) (where entity with 2.2% of the market merges with another with 9.7%, "there would be no reasonable probability of a substantial lessening of competition or any tendency to create a monopoly").

Plaintiffs' related claim—that General Atlantic conspired with CP for the purpose of making a series of illegal acquisitions, Opp. at 36-37—is especially implausible. The articles Plaintiffs cite in their Complaint indicate that CP could *not* use General Atlantic's investments to make *any* acquisitions.[18] Here, as with the acquisition of AMTD, Plaintiffs propose to "leav[e] it to the court to infer a threat of an antitrust violation simply because the merger[s] [are] now a fact." *See S. Austin Coal Cmty. Council v. SBC Commc'ns Inc.*, 2001 WL 1250101, at *13 (N.D. Ill. June 22, 2001).

*Schwab's and Fidelity's SIPs Programs.* Notwithstanding their allegation that Schwab and Fidelity *sell* access to their SIPs—Plaintiffs allege that both Schwab and Fidelity "market" and "offer" access to independent RIAs, Compl. ¶¶ 222, 240—Plaintiffs hypothesize that the SIPs "constitute 'acquisitions'" within the meaning of Section 7. Opp. at 38. Yet Plaintiffs do not plead any facts to show independent RIAs transfer ownership of themselves or their assets under management to Schwab or Fidelity as part of the SIPs, as required to invoke Section 7. *See* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1202 (2022 Cum. Supp.) ("To acquire the

---

[18] John Manganaro, *Creative Planning CEO Peter Mallouk on Lockton Partnership*, PLANADVISER (Nov. 12, 2021), https://www.planadviser.com/creative-planning-ceo-peter-mallouk-lockton-partnership/ (cited at Compl. ¶ 219 & n.41) ("'General Atlantic's investment in Creative Planning is a passive minority stake, meaning the PE firm has not provided additional assets to make acquisitions or sought to change our firm's goals, strategy or approach,' he explains. 'It is important to understand that this is a passive ownership stake it has taken on. So we have not utilized its capital to do acquisitions.'").

'whole or any part of the assets' within the meaning of Clayton Act § 7 is to acquire a going (even though failing) concern, or its equivalent, involving a relatively immediate and relatively permanent transfer of market share from one to another covered corporation."). Even if the SIPs could qualify as an acquisition of "the whole or any part of the stock . . . or assets of another person," 15 U.S.C. § 18, Plaintiffs allege no facts to plausibly demonstrate the SIPs inflicted any sufficiently probable and imminent loss of competition on the "Investment Advisory Services Market."[19]

## VI.  Plaintiffs' California Claims Should Be Dismissed.

Plaintiffs' brief confirms that their California state-law claims cannot survive. *First*, Plaintiffs concede that they premised their Cartwright Act claim on their federal antitrust claims, Opp. at 27 n.14; the pleading deficiencies of the former infect the latter. The same is true of the California UCL claim. *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 144 n.12 (2d Cir. 2021) ("Because the UCL claim is predicated on violations of the Sherman and Cartwright Acts, we affirm the dismissal of that claim as well.").

*Second*, Plaintiffs do not dispute that they are not entitled to disgorgement under the UCL. Mem. at 41-42.

*Finally*, both claims fail as against Fidelity for the additional reason that Plaintiffs allege no plausible nexus between Fidelity's alleged conduct and California. *See* Fidelity Mem. at 11. Retreating from their allegations that FMR and NFS (Delaware LLCs headquartered in Massachusetts) "directed their activities giving rise to this litigation at Plaintiffs, citizens of

---

[19] Plaintiffs no longer contend, as they did in the Complaint, that General Atlantic's acquisition of a partnership interest in CP itself violated Section 7. Compl. ¶ 743. The Court should therefore dismiss that claim with prejudice. *7241 W. 100th Place Corp. v. Vill. of Bridgeview,* 2014 WL 517961, at *3 (N.D. Ill. Feb. 6, 2014) ("[B]ecause claims that a plaintiff fails to defend in opposing a Rule 12(b)(6) motion are deemed abandoned, the dismissal is with prejudice.")

Illinois, and their business operations in Illinois," Compl. ¶¶ 24, 893, Plaintiffs speculate about Fidelity's operations in California and claim that Fidelity "impact[ed] Plaintiffs' ability to conduct business across the nation, including California." Opp. at 53. But the Complaint lacks well-pled facts showing Fidelity's operations in California, and the allegations Plaintiffs cite say nothing of such operations, much less purported harm in California. *Id.* (citing Compl. ¶¶ 26-30).

## VII.    Plaintiffs' Arguments in Support of Their RICO Cause of Action Are Unavailing.

### A.    Plaintiffs Do Not Allege Viable RICO Predicate Acts.

The Complaint presents broad, unsubstantiated RICO allegations without providing the required specifics as to time, place, and content of the alleged predicate acts for each Defendant. *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); Mem. at 32-33. Plaintiffs cannot rescue their claim by gesturing to "Exhibit A" to their Opposition, which simply reorganizes the Complaint's allegations into over a hundred unsupported categories.

For example, Plaintiffs argue Defendants committed mail and wire fraud, 18 U.S.C. §§ 1341 & 1343, but never identify specific mailings or wirings containing fraudulent misrepresentations.[20] Opp. at 40-41. Nor do Plaintiffs point to allegations showing that any Defendant "intended to defraud" with respect to any of those unidentified acts. Instead, Plaintiffs insist they have "plead[ed] multiple instances of the commission of the predicate acts of mail and wire fraud with the specificity required under Rule 9(b) against each Defendant," and cite sections from Exhibit A. Opp. at 42. But neither Plaintiffs' brief nor Exhibit A explains *how* they plead predicate acts of fraud with specificity. *Ipse dixit* is not enough.

---

[20] Plaintiffs argue that pleadings based on information and belief satisfy Rule 9(b). *See* Opp. at 7-8. Plaintiffs' reliance is misplaced. "Allegations based on 'information and belief'…won't do in a fraud case-for 'on information and belief' can mean as little as 'rumor has it that.'" *United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016).

-25-

Similarly, to try to connect mail and wire fraud to witness tampering claims, Plaintiffs assert that the Seventh Circuit held in *DeGuelle v. Camilli* that "predicate acts of retaliation § 1513(e) are inherently connected to the underlying wrongdoing exposed by a whistleblower and are considered predicate acts in establishing a pattern of wire activity." Opp. at 41 (citing 646 F.3d 192 (7th Cir. 2011)). Plaintiffs misread *DeGuelle*: the court held that "a relationship *can* exist between § 1513(e) predicate acts and predicate acts involving the underlying cause for such retaliation.," but that "[c]ourts must still examine the facts of each case" to ensure that they are not "isolated events." *Id.* at 201 (emphasis added). Here, Plaintiffs do not explain how the alleged mail and wire fraud bears any connection to the Silencing and Retaliation Scheme, let alone how any allegedly fraudulent mailings or wirings led to purported retaliation against them.

Plaintiffs appear to concede that Defendants' litigation and threats of litigation do not establish witness tampering or retaliation—they now claim that Defendants have "incorrectly characterized" their claims on these points. Opp. at 42. Instead, Plaintiffs offer a laundry list of other business-related actions, including termination of the RIA Custodial Services Agreements, as replacement RICO predicates. *Id.* But those allegations are nothing more than a restatement of their pleadings in support of their state-law claims for breach of contract or tortious interference. And courts will not permit litigants "to turn routine commercial disputes into civil RICO actions." *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 472-73 (7th Cir. 2007) (quotation omitted); *see also Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) (civil RICO should not "becom[e] a surrogate for garden-variety fraud actions properly brought under state law.").

Nor does Plaintiffs' brief resolve another failing evident in the Complaint: Plaintiffs do not plausibly connect any of Defendants' putative conduct with the "whistleblowing complaints"

to the SEC and DOJ. Mem. at 36. Specifically, Plaintiffs never explain why their own misconduct did not cause the termination of the RIA Custodial Services Agreement.

Finally, Plaintiffs continue to vaguely allege predicate acts of commercial bribery under 18 USC § 1961(A)(1) for some, but not all, Defendants in connection with the "Fraudulent Growth Scheme." In Illinois, "[a] person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." 720 Ill. Comp. Stat. Ann. 5/29A-1. Plaintiffs do not plausibly allege intent in connection with the "Fraudulent Growth Scheme," or that any of the conduct unfolded without the consent of the recipient's employer or principal, both of which are elements of their claim.[21]

Moreover, the Complaint alleges the commercial bribery scheme "came to a screeching halt" after Greco filed his 2017 SEC Whistleblower Complaint. Compl. ¶ 246. Commercial bribery, which is only a predicate act for the Fraudulent Growth Scheme, Opp. at 40-41, is therefore irrelevant because that scheme is barred by the 4-year statute of limitations. *Cleveland v. Berkson*, 878 F.2d 1034, 1036 (7th Cir. 1989). A RICO plaintiff must show both "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Even if Plaintiffs could allege a connection between commercial bribery and the later witness retaliation, the Complaint establishes that the commercial bribery and the Fraudulent Growth Scheme ended in 2017, and is

---

[21] Plaintiffs continue to assert money laundering as a predicate act, but cite no plausible allegations of specific transactions that constituted money laundering or any suggestion that Defendants knew that an alleged transaction was derived from illegal activity and sought to conceal that activity. *Entretelas Americanas S.A. v. Soler*, 2020 WL 9815186, *9-10 (S.D.N.Y. Feb. 3, 2020). Plaintiffs' allegations are little more than boilerplate, devoid of factual support, and cannot stave off dismissal. *Id.*

barred by the statute of limitations. *Rotella v. Wood*, 528 U.S. 549, 555, 558 (2000) (statute begins running even if plaintiff is unaware of pattern).

### B. Plaintiffs Fail to Allege Conduct of an Enterprise.

In their joint brief, Defendants explained that Plaintiffs failed to show that each Defendant "asserted some control over the enterprise" or otherwise "conducted or participated in the conduct of the *enterprise's* affairs, not just their own affairs." Mem. at 34 (quoting *Slaney*, 244 F.3d at 598 and *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (quotation omitted)). Rather than respond to Defendants' caselaw or argument, Plaintiffs simply refer back to their Complaint and assert that it contains "numerous specific factual allegations related to the enterprise element of the RICO violation." Opp. at 39 (citing, without elaboration, Compl., ¶¶ 676-92, 694-95, 855-858, 861-66). But that is not argument, and these paragraphs do not explain *how* each Defendant asserted control over any enterprise.

Plaintiffs do not even plausibly allege the purported enterprise. A RICO enterprise must reflect "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *see* Mem. at 11-19. Plaintiffs show none of these factors, and instead point to boilerplate pleadings that assert the existence of six different enterprises. That does not suffice. The Court should dismiss the RICO claims on that basis alone.

### C. Plaintiffs Do Not Allege that They Suffered Any Injuries Proximately Caused by Purported RICO Predicate Acts.

Plaintiffs equate a "proximate causation" requirement with reasonable foreseeability. Opp. at 43, 45 ("Saying that the injury to the plaintiff is 'direct' is akin to saying that the victim was reasonably foreseeable, the traditional principle for hemming in tort liability."). But "[t]he proximate causation standard in th[e RICO] context is not one of foreseeability; instead, the

plaintiff must demonstrate that the alleged violation 'led directly' to the injuries." *Molina-Aranda v. Black Magic Enters., LLC*, 983 F.3d 779, 784 (5th Cir. 2020) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) *and Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010)). Supreme Court "precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *Hemi Grp.*, 559 U.S. at 12.

Plaintiffs cannot demonstrate that Defendants' alleged violations led directly to their injuries. *See id.* at 11. Instead, Plaintiffs vaguely allege that their "injuries flow from the predicate acts committed in the Silencing and Retaliation Scheme." Opp. at 44. Plaintiffs never explain how the alleged predicate acts of money laundering or mail/wire fraud proximately caused them to suffer any injury. Indeed, Plaintiffs appear to abandon the notion altogether. Opp. at 43 (omitting money laundering and commercial bribery from the predicate acts that allegedly proximately caused their injuries); *id.* at 44 (same).

The *only* purported predicate act Plaintiffs attempt to connect to an injury is witness retaliation. Opp. at 44. But as described above, that is not a cognizable predicate act, particularly as Plaintiffs plead it. The injuries that Plaintiffs suffered as a result of Defendants' refusals to deal with them are, if anything, "garden variety" breach of contract or tortious-interference injuries, not cognizable RICO predicates that Plaintiffs connect to witness retaliation.

## VIII. Plaintiffs Do Not Address the Deficiencies of Their State-Law Claims.

### A. Plaintiffs' Arguments Do Not Save Their Breach of Contract Claims.

Plaintiffs do not dispute that the separate Custody Agreements between Spotlight and Fidelity, Schwab, and AMTD were terminable at any time and for any reason.[22] They

---

[22] Contracts of indefinite duration, like the Custody Agreements, are terminable at will and can therefore be terminated at any time and "for any reason or no reason without committing a breach of contract." *Jespersen v. 3M*, 183 Ill. 2d. 290, 296 (1998); *see also Indus. Representatives, Inc. v. CP Clare Corp.*, 74

nevertheless claim the breach of contract claims are viable because Illinois courts have recognized—in employment cases—that the implied covenant of good faith and fair dealing "has been construed as an obligation to refrain from certain contractual types of conduct 'because they violate community standards of decency, fairness or reasonableness.'" Opp. at 47 (quotation omitted). But Plaintiffs do not cite any case that has extended that "limited and discretely-bounded public-policy exception" to a commercial contract. *See Zick v. Version All Steel Press Co.*, 623 F. Supp. 927, 929 (N.D. Ill. 1985). Precedent establishes that "an implied covenant of good faith cannot overrule or modify the express terms of a contract." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395-96 (7th Cir. 2003); *see also Rudolph v. IBM Corp.*, 2009 WL 2632195, at *4 (N.D. Ill. Aug. 21, 2009) (granting Rule 12(c) motion where agreement "expressly allowed [defendant] to terminate or modify the [contract] at any time, for any reason," and rejecting plaintiff's attempt to "use the duty of good faith to avoid the dispositive impact of the explicit disclaimers" included in the contract).[23]

### B. Plaintiffs Ignore the Deficiencies in Their Tortious Interference Claims.

In their Opposition, Plaintiffs lump together their tortious interference with contract (Count Eight) and purposeful interference with business relationships (Count Nine) allegations. Even doing so, they still fail to identify Schwab's or AMTD's specific actions that resulted in the breach of contracts or interference with prospective economic relationships between Spotlight and third parties. *See Zimmer, Inc. v. Stryker Corp.*, 2014 WL 3866454, at *8 (N.D. Ind. Aug. 6, 2014) (tortious interference with contract claim requires "factual specificity" as to "what

---

F.3d 128, 129 (7th Cir. 1996) ("[I]n Illinois a contract without a fixed term may be ended for any or no reason.").

[23] Plaintiffs do not dispute that FMR is not a party to the Custody Agreement and therefore cannot be held liable for any alleged breach. *See* Fidelity Mem. at 6.

contracts" were allegedly terminated); *Hoopla Sports & Ent., Inc. v. Nike, Inc.*, 947 F. Supp. 347, 357 (N.D. Ill. 1996) (intentional interference claim requires allegations of specific conduct "directed toward a third party through which defendants purposely cause[d] that third party not to enter into or continue a prospective economic relationship with plaintiff") (quotation omitted).

Instead, Plaintiffs rely on the same general allegations about Schwab's or AMTD's actions with respect to former employees who went to work for Spotlight, or business relationships that Schwab itself terminated with third parties. Opp. at 49. But Plaintiffs do not present any factual allegations showing widespread knowledge of Plaintiffs' reputation, much less widespread knowledge of any purported blacklisting. In any case, evidence of general, industrywide attitudes about Plaintiffs would not cure the deficiencies in Plaintiffs' interference claims: they still fail to identify specific contracts, prospective business, or acts of interference. *See Du Page Aviation Corp. v. Du Page Airport Auth.*, 229 Ill. App. 3d 793, 803-04 (1992); *Bowman v. Ill. Dep't of Corr.*, 2004 WL 406772, at *2 (N.D. Ill. Feb. 27, 2004) (dismissing tortious interference with contract claim where complaint omitted description of "defendant's wrongful actions towards an existing contract between the plaintiff and a third party"); *Hoopla*, 947 F. Supp. at 357 (dismissing intentional interference claim).

Similarly, Plaintiffs offer no support—because there is none—for their claim that Fidelity can be held liable for intentional interference with prospective economic advantage when Fidelity is alleged to have done nothing more than communicate information about its decision not to do business with Spotlight or its individual advisors. Opp. at 51. That conduct does not amount to "active persuasion, encouragement, or inciting" of a third party "that goes beyond merely providing information in a passive way," and is therefore insufficient to state a claim for

intentional interference with prospective economic advantage. Fidelity Mem. at 6-7 (quoting *Cohen v. Lewis*, 2004 WL 2481015, at *6 (N.D. Ill. Nov. 3, 2004)).

Finally, Plaintiffs do not explain how CP, a fellow independent RIA, knew of any of Plaintiffs' prospective business relationships, much less interfered with them. CP Mem. at 8. Apparently conceding the point, Plaintiffs now argue that CP interfered with Plaintiffs' business expectancy because the CP Defendants were "original actors in the conspiracy" and "group boycotts" that allegedly harmed Plaintiffs. Opp. at 50. As explained above, the conspiracy and group boycott claims are unsupportable, and in any event a claim for tortious interference requires a Defendant's actual knowledge of the business expectancy allegedly interfered with, *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 863 (2008), something Plaintiffs do not show.

### C. Plaintiffs Offer No Explanation for the Defects in Their Defamation Claims.

Plaintiffs recite the elements of a defamation claim, but decline to address any of the Defendants' arguments, including that Plaintiffs failed to allege Defendants made a false statement about Plaintiffs to a third party. *See, e.g., Solaia Tech., LLC v. Specialty Publ'g Co.*, 221 Ill. 2d 558, 579 (2006) ("To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff[.]"); *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381 (2008) (similar). Defendants each presented arguments highlighting defects of the defamation claims.[24] Plaintiffs respond to *none* of them.

---

[24] *See* CP Mem. at 8-11 (specifically discussing each alleged statement attributed to a CP defendant and explaining why the statements do not constitute defamation); Fidelity Mem. at 7-8 (explaining that Plaintiffs failed to describe any false statement as Fidelity is merely alleged to have informed third parties it would not do business with Spotlight or its advisors); Schwab Mem at 8-10 (explaining that none of Plaintiffs' allegations identifies or describes a defamatory statement made by Schwab).

Plaintiffs accordingly forfeited any arguments in support of their defamation claims. The Court should dismiss them. *See Bonte*, 624 F.3d at 466 ("Failure to respond to an argument—as the [plaintiffs] have done here—results in waiver[.]"); *Cnty. of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action.") (quotation omitted).

### D. Plaintiffs Plead Themselves Out of An Unjust Enrichment Claim.

A plaintiff cannot successfully plead an unjust enrichment claim in the alternative when it "adopts by reference all the allegations in the contract claim . . . including paragraphs alleging an express contract between the parties." *Homestead Ins. Co. v. Chi. Transit Auth.*, 1997 WL 43232, at *4 (N.D. Ill. Jan. 23, 1997). That is exactly what Plaintiffs did here. *See, e.g.*, Compl. ¶ 768 (alleging existence of RIA Custodial Agreements), ¶ 820 (alleging existence of Settlement Agreement), ¶¶ 843-45 (realleging each previous paragraph, including existence of contracts, and then stating unjust enrichment "in the alternative"). Plaintiffs insist that they have nevertheless pleaded unjust enrichment in the alternative, citing *Cole-Haddon, Ltd. v. Drew Philips Corp.*, 454 F. Supp. 2d 772, 777 (N.D. Ill. 2006). But in *Cole-Haddon*, the Court dismissed an unjust enrichment claim *exactly* like this one. There, as here, the plaintiff "[did] not properly plead the [unjust enrichment] claim in the alternative, but rather, assert[ed] the existence of a contractual agreement and then request[ed] compensation under [unjust enrichment]." *See id.* at 777. The *Cole-Haddon* court succinctly explained that, where, as here, a count "asserts all allegations previously stated, including those claiming the existence of a contract," a claim for unjust enrichment is not cognizable. *See id.*

### E. Plaintiffs' State-Law Claims Against CP Are Compulsory Counterclaims.

As the CP Defendants argued in the opening brief and Plaintiffs do not rebut, Plaintiffs' state-law claims against the CP Defendants arise out of the same relationship breakdown that is

already at issue in the Kansas action, and thus are compulsory counterclaims there. CP Mem. at 6-8. Plaintiffs ignore these arguments and instead point to the technical differences in parties between the two actions, as "twelve of the thirteen defendants in the case at bar are not parties to" to the Kansas state action. Opp. at 46.

Naming additional parties does not make a claim that would have been "compulsory" in a prior action permissive in a successor case. "[O]therwise the compulsory-counterclaim rule could be easily defeated by the naming of additional counterclaim defendants." *See Asset Allocation & Mgmt. Co. v. W. Emps. Ins. Co.*, 892 F.2d 566, 574 (7th Cir. 1989); *see also Douglas v. Wisc. Alumni Rsch. Found.*, 81 F. Supp. 167, 169 (N.D. Ill. 1948) ("That they are not precisely identical, or that the counterclaim embraces additional allegations . . . does not matter.").

Plaintiffs also assert without explanation that this case differs from Defendants' cited authority. As their only legal support, Plaintiffs cite *Asset Allocation*, 892 F.2d at 571, a case that does not discuss the criteria for compulsory counterclaims, but instead relates to the power of an Illinois federal court to enjoin a California court. *Id.* Plaintiffs' state-law claims against the CP Defendants should be dismissed as unalleged compulsory counterclaims in the Kansas action.

## IX. Plaintiffs Abandon Their Claims Under the Lanham Act, Illinois Consumer Fraud and Deceptive Practices Act, and the Illinois Uniform Deceptive Trade Practices Act.

Defendants explained that Plaintiffs' Lanham Act and Illinois State-Law claims (Counts 1, 14, and 15) must be dismissed for failure to allege a harm to their own commercial interests as a result of so-called false advertising. Mem. at 36-38. Plaintiffs do not dispute Defendants' arguments for dismissal of those Counts, and they should therefore be deemed abandoned and dismissed with prejudice. *See 7241 W. 100th Place Corp.*, 2014 WL 517961, at *3 ("[B]ecause claims that a plaintiff fails to defend in opposing a Rule 12(b)(6) motion are deemed abandoned, the dismissal is with prejudice.").

-34-

X.      **Plaintiffs' RICO, UCL, and Antitrust Claims Are Not Timely.**

The allegations underpinning each of Plaintiffs' RICO, UCL, and antitrust claims establish that the applicable limitations periods have expired. Again, Plaintiffs fail to substantively engage with that problem and instead assert without elaboration that "[e]ach of [their] claims have been brought within the applicable limitations." Opp. at 54.[25]

As discussed in Defendants' brief, a four-year limitations period applies to Plaintiffs' RICO, Sherman Act, and Cartwright Act claims, and the Complaint makes clear that Plaintiffs were aware of the alleged RICO and anticompetitive conduct no later than 2017. *See* Mem. at 40-41. Instead of explaining how their claims are timely, Plaintiffs cite *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971), for the proposition that in antitrust conspiracy cases, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act." Opp. at 54 (quoting *Zenith*, 401 U.S. at 338). But Plaintiffs do not adequately plead any agreement (let alone a continuing conspiracy) amongst Defendants to violate antitrust laws, much less an agreement within the four-year period. *See supra* Section III.B. Considering Plaintiffs' own admissions about their awareness of alleged RICO and antitrust violations as early as 2017, the statute of limitations forecloses their RICO, Sherman Act and Cartwright Act claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

---

[25] Defendants also seek dismissal of Plaintiffs' claims under the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Uniform Deceptive Trade Practices Act on timeliness grounds. But as noted, Plaintiffs fail to defend or address these claims in their Opposition, and the Court should dismiss them with prejudice. *See supra* Section IX.

Dated: December 5, 2022

Respectfully submitted,


By: */s/ Katrina Robson*
     One of Their Attorneys

KATRINA ROBSON (*pro hac vice*)
krobson@omm.com
BRIAN P. QUINN (*pro hac vice*)
bquinn@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone:    +1 202 383 5300
Facsimile:    +1 202 383 5414

DANIEL M. PETROCELLI (*pro hac vice*)
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, California 90067-6035
Telephone:    +1 310 553 6700
Facsimile:    +1 310 246 6779

KHADIJA SYED (*pro hac vice*)
ksyed@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
Telephone:    +1 415 984 8700
Facsimile:    +1 415 984 8701

VINCENT P. SCHMELTZ III
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
tschmeltz@btlaw.com
Telephone: 312-357-1313
Facsimile: 312-759-5646

*Attorneys for Defendants TD Ameritrade
Holding Corporation, TD Ameritrade, Inc., The
Charles Schwab Corporation, and Charles
Schwab & Co., Inc.*

/s/ Andrew H. Schapiro
Andrew H. Schapiro
Daniel R. Schwartz
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
andrewschapiro@quinnemanuel.com
danielschwartz@quinnemanuel.com
191 North Wacker Drive
Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705 7400
Facsimile: (312) 705 7401

Adam B. Wolfson
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
adamwolfson@quinnemanuel.com
865 S. Figueroa Street
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendants Creative Planning,
LLC, CPI HoldCo A, LLC, CPI HoldCo B, LLC,
Creative Planning HoldCo, LLC, General
Atlantic Service Company LP and General
Atlantic (CP) Collections, LP*

/s/ Charles F. Smith
Charles F. Smith
Lindsey Sieling
Danielle Simms
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 North Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 407-0700
Fax: (312) 407-0411
charles.smith@skadden.com
lindsey.sieling@skadden.com
danielle.simms@skadden.com

Boris Bershteyn (*pro hac vice*)
Evan Levicoff (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

-37-

One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
boris.bershteyn@skadden.com
evan.levicoff@skadden.com

*Attorneys for Defendants FMR LLC and*
*National Financial Services LLC*

## SIGNATURE ATTESTATION

Pursuant to the United States District Court for the Northern District of Illinois' General Order on Electronic Case Filing, General Order 16-0020(IX)(C)(2), I hereby certify that authorization for the filing of this document has been obtained from each of the other signatories shown above and that all signatories concur in the filing's content.

*/s/ Katrina Robson*
Katrina Robson

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I caused a true and correct copy of the foregoing Omnibus Reply in Support of Joint Motion to Dismiss for Failure to State a Claim to be filed by the Court's CM/ECF filing system, which will send an electronic notification of such filing to all counsel of record.

*/s/ Katrina Robson*
Katrina Robson