**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Stephen Albert Greco and Spotlight Asset Group, | |
| Plaintiffs, | |
| v. | Case No. 22 C 2661 |
| Peter Mallouk, individually, Creative Planning, LLC, CPI Holdco A, LLC, CPI Holdco B, LLC, General Atlantic Service Company LP, General Atlantic (CP) Collections, LP, FMR LLC d/b/a Fidelity Investments Inc., National Financial Services LLC, TD Ameritrade Holding Corporation, TD Ameritrade, Inc., The Charles Schwab Corporation, and Charles Schwab & Co., Inc., | Hon. LaShonda A. Hunt |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Stephen Albert Greco and Spotlight Asset Group, Inc. bring this action asserting various claims under the Sherman, Clayton, and RICO Acts, California and Illinois statutes, and state common law against 13 Defendants relating to the investment advisory industry. Essentially, Plaintiffs allege in their 15-count Complaint (Dkt. 1) that Defendants engaged in wide-ranging unfair and anticompetitive practices and schemes, Greco reported their conduct, and, as a result, Defendants attempted to silence Greco and retaliate by interfering with Plaintiffs' business. Defendants filed a joint motion to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) (Dkt. 58). For the reasons discussed below, Defendants' motion to dismiss is granted in part and denied in part.

1

## BACKGROUND[1]

The investment advisory industry is made up of individuals and companies that provide advice and services related to securities investments. An "investment adviser" is "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . ." 15 U.S.C. § 80b-2(a)(11). Subject to certain exceptions, investment advisers are required to register with the Securities Exchange Commission ("SEC"). 15 U.S.C. § 80b-3. Any investment adviser registered with the SEC is referred to as a "registered investment adviser" ("RIA"). (Compl. ¶ 4).

RIAs are subject to strict rules concerning custody of client assets under management ("AUM"), including the requirement that assets be maintained by a "qualified custodian" in a separate account. 17 C.F.R. § 275.206(4)-2. Services provided by qualified custodians include custody, clearing, trading, and brokerage of investment assets. (Compl. ¶ 110). Any person who works for an RIA as an investment adviser by providing clients with investment advice, portfolio management, and other advisory services is referred to as "investment adviser representative" ("IAR"). (Id. ¶ 84). IARs are required to be licensed and registered through the SEC and the Financial Industry Regulatory Authority ("FINRA"). (Id.)

Plaintiff Spotlight is an independent RIA, and Plaintiff Greco is an IAR and Spotlight's chief executive officer. (Id. ¶¶ 26-30). Defendant Creative Planning, LLC is an independent RIA, and Defendant Peter Mallouk is an IAR and Creative Planning's president, chief executive officer,

---

[1] This section consists of allegations from Plaintiffs' Complaint, (Compl., Dkt. 1), which are taken as true purposes of this motion unless otherwise noted. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

and majority owner.[2] (*Id.* ¶¶ 62, 64, 68). Defendants Fidelity,[3] Charles Schwab,[4] and AMTD[5] (collectively, the "Broker-Custodian Defendants") are financial services firms that operate as RIAs, brokerages, and qualified custodians.

Greco has over two decades of experience in the investment advisory industry, having worked for AMTD, Schwab, and Creative Planning. (*Id.* ¶ 7). Most recently, Greco was employed by Creative Planning as its national director of wealth management from September 2013 through March 2017. (*Id.* ¶ 319). During that time, Creative Planning had approximately 35-40 employees and $7 billion in AUM. (*Id.*) Based on Greco's years of experience in the industry and first-hand involvement in Creative Planning's operations, he came to believe that some of the company's practices were in violation of federal laws and regulations. (*Id.* ¶ 321). Specifically, Greco became concerned that certain client referral programs, purported collusive agreements, asset management, trading, and other related practices created direct conflicts of interest and caused breaches of fiduciary duties owed to clients. (*Id.* ¶¶ 322-324). When Greco raised concerns with Mallouk, they were dismissed, and he was reminded that his compensation was tied to the percentage of referrals Creative Planning received through the AMTD referral program. (*Id.* ¶¶ 354-358). Because of these perceived issues, Greco resigned from Creative Planning in March 2017. (*Id.* ¶ 379). Greco subsequently filed two complaints, one with the SEC and the other with the Department of Justice

---

[2] "Creative Planning" refers to Defendant Creative Planning LLC. "CP Defendants" refers collectively to Creative Planning and Defendants Peter Mallouk, CPI Holdco A, LLC, CPI Holdco B, LLC, Creative Planning Holdco, LLC, General Atlantic (CP) Collections, L.P., and General Atlantic Service Company LP, which own interests in Creative Planning. (*Id.* ¶¶ 69-72).

[3] "Fidelity" refers collectively to Defendants FMR LLC d/b/a Fidelity Investments Inc. and National Financial Services LLC.

[4] "Charles Schwab" refers collectively to Defendants The Charles Schwab Corporation and Charles Schwab & Co, Inc.

[5] "AMTD" refers collectively to Defendants TD Ameritrade Holding Corporation and TD Ameritrade, Inc. On October 6, 2020, AMTD became a wholly owned subsidiary of Charles Schwab. (Compl. ¶ 43).

reporting the issues he believed existed. (*Id.* ¶¶ 383, 594). In anticipation of leaving Creative Planning, Greco opened and began operating his own RIA, Spotlight.

According to Greco, Defendants were involved in three illegal schemes that are the subject of the Complaint: the "CP Fraudulent Growth Scheme"; the "RIA Services Scheme", and the "Silencing and Retaliation Scheme". The specifics of each scheme will be discussed in greater detail throughout this Opinion, but they are summarized as follows:

- The **CP Fraudulent Growth Scheme** allegedly involved illegal transactions with celebrity Tony Robbins, SEC statements and investigations, mishandling of client funds, acquisition of competitors, and participation in referral programs.

- The **RIA Services Scheme** involved supposedly conspiratorial and anticompetitive activity of the Broker-Custodian Defendants, in which the CP Defendants partook. Specifically, Plaintiffs allege that the scheme involved selective referral programs, supportive independence programs, non-compete restrictions on IARs, group boycotts, and mischaracterizing how the programs work to hide kickback and incentives. In addition, Defendants made more overt steps towards consolidating their market power through acquisitions such as Creative Planning's acquisition of other independent RIAs, General Atlantic's purchase of a partnership interest in Creative Planning, and Schwab's acquisition of AMTD. According to Plaintiffs, all of these activities were carried out through mail and over wire.

- Finally, Plaintiffs claim that Defendants engaged in a **Silencing and Retaliation Scheme** aimed at disrupting Plaintiffs' business in response to Greco's complaints. This purported scheme involved certain communications and legal actions relating to non-solicitation,

arbitration actions against former advisors, and decisions not to terminate custodial agreements and cease doing business with Plaintiffs.

As a result of all these purported schemes, Plaintiffs claim to have suffered injuries to their business in the form of being unable to recruit from the IAR labor market and lost clients, which resulted in decreased AUM and stifled growth. Still, from 2017 to 2020, Plaintiffs' allegations tend to show that Spotlight experienced overall growth and success as an RIA. More broadly, Plaintiffs assert that Defendants' wrongful conduct has caused and will result in industry-wide decreases in competition, barriers to access, and increased costs for consumers.

Plaintiffs commenced this action in May 2022, asserting the following claims: Count 1 – Violation of Lanham Act (Spotlight v. All Defendants); Count 2 – Violation of Sherman Act § 1, 2, & 3 and Clayton Act § 4 (All Plaintiffs v. All Defendants); Count 3 – Violation of Clayton Act § 7 (All Plaintiffs v. All Defendants); Count 4 – Violation of Cartwright Act (All Plaintiffs v. All Defendants); Count 5 – Violation of California's Unfair Competition Law (UCL) (All Plaintiffs v. All Defendants); Count 6 – Civil Conspiracy (All Plaintiffs v. All Defendants); Count 7 – Breach of Contract (Spotlight v. Broker-Custodian Defendants); Count 8 – Tortious Interference with Contract (All Plaintiffs v. All Defendants); Count 9 – Intentional Inference with Prospective Economic Advantage (All Plaintiffs v. All Defendants); Count 10 – Breach of Contract (Greco v. CP Defendants); Count 11 – Defamation (Greco v. All Defendants); Count 12 – Unjust Enrichment (All Plaintiffs v. All Defendants); Count 13 – Violation of RICO Act (All Plaintiffs v. All Defendants); Count 14 – Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (CFA) (All Plaintiffs v. All Defendants); Count 15 – Violation of Illinois Uniform Deceptive Trade Practices Act (DTPA) (All Plaintiffs v. All Defendants). Plaintiffs seek the following relief: acceptance of jurisdiction; adjudication and decree of violations of statutes; finding of market

monopoly and resulting injury; permanent injunction; compensatory damages, or, alternatively, disgorgement or restitution; constructive trust; treble damages; punitive damages; costs and fees; and pre- and post-judgment interest.

Defendants jointly moved to dismiss all claims in the Complaint, and after extensive briefing, (Dkts. 59, 60, 61, 62 , 69, 74), the matter is ready for ruling.

## LEGAL STANDARD

Rule 12(b)(6) permits a party to move for dismissal based on a pleading's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In determining whether a complaint states a claim under Rule 12(b)(6), courts must accept all non-conclusory factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In addition, the Court must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 626 (7th Cir. 2022). While ruling on a motion to dismiss for failure to state a claim, a court may generally consider only the plaintiff's complaint, exhibits to the complaint, matters central to the plaintiff's claim and incorporated into the complaint by reference, and items subject to judicial notice. *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Applying these principles, a complaint will survive a motion to dismiss if it "states a plausible claim for relief." *Iqbal*, 556 U.S. at 679 (2009) (citing *Twombly*, 550 U.S. at 556). To state a plausible claim for relief, a complaint must "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679. The movant has the ultimate burden to show that dismissal is warranted. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

6

## DISCUSSION

Defendants' joint memorandum of law and supplemental briefs in support of dismissal present myriad challenges to the Complaint, some of which apply to all claims and all Defendants and others apply to only some claims and some Defendants. The Court will first address issues that affect the entire pleading or multiple counts and then turn to arguments directed at specific claims.

## I. General Rules of Pleading

"A pleading that states a claim for relief must contain . . . a *short and plain statement* of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2) (emphasis added); *see also* Fed. R. Civ. P. 8(d)(1) ("Each allegation must be simple, concise, and direct."). Because "[l]ength may make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter," *United States ex rel. Garst v. Lockheed-Martin Corp.,* 328 F.3d 374, 378 (7th Cir. 2003), district courts have the right to dismiss a complaint "so long that it imposes an undue burden on the judge, to the prejudice of other litigants seeking the judge's attention," *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013).

Defendants argue that Plaintiffs' 199-page, 899-paragraph[6] Complaint should be dismissed for failure to comply with Rule 8 because it "is overlong, needlessly complex, obscures the relevant actors through rampant group pleading, fails to connect the alleged facts and causes of action, and is largely indecipherable." (Joint Mem. at 54, Dkt. 59).[7] In support of this argument, Defendants

---

[6] The paragraphs of Plaintiffs' Complaint are misnumbered in several locations. (*See, e.g.,* Compl. at 49 (jumping from ¶ 154 to ¶ 164), 108-111 (jumping from ¶ 386 to ¶ 365), and 116-117 (jumping from ¶ 385 to ¶ 461). Although the final numbered paragraph is ¶ 899, taking into account the foregoing errors, the total number of paragraphs appears to be 834.

[7] Unless otherwise noted, all references to page numbers in the parties' filings are to page numbers in the CM/ECF header, not the document.

cite several cases in which lengthy complaints were dismissed. *See, e.g., Lockheed-Martin*, 328 F.3d at 378 (155-page, 400-paragraph complaint); *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007) (99-page, single-spaced complaint); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703 (3d Cir. 1996) (240-page, 600-paragraph complaint); *Michaelis v. Nebraska State Bar Ass'n*, 717 F.2d 437, 439 (8th Cir. 1983) (per curiam) (98-page, 144-paragraph complaint); *but see Kadamovas*, 706 F.3d at 844 ("[A] complaint may be long not because the draftsman is incompetent or is seeking to obfuscate . . . , but because it contains a large number of distinct charges."). While Plaintiffs do not directly address this argument, in response to Defendants' assertion that the complaint is lacking in detail, they remark that "[i]ronically, Plaintiffs give [Defendants] much more specificity than required . . . ." (Resp. at 15, Dkt. 69).

True, this Complaint is overlong and needlessly complex. Plaintiffs included many irrelevant details, repeated the same information in several different places, and combined 15 causes of action against 13 defendants in a single case. This is why it was necessary for Plaintiffs to append a 13-page, 125-section "Table of Complaint Citations" to their Response. (*See* Resp. Ex. A, Dkt. 69-1). Still, the Court declines to dismiss the pleading on that basis. Defendants were able to glean the pertinent information from the pleading to formulate their briefs, and the Court has also done so to craft this decision. And if the Court were to dismiss the Complaint under Rule 8(a), Plaintiffs would be allowed to replead, Defendants would undoubtedly move to dismiss again, and the briefing cycle would begin anew. Enough ink has been split on the pleadings in this case. Briefing is complete, and the matter has been under advisement long enough. To restart the pleading process would be a waste of resources. For these reasons, the Court declines to dismiss the case for failure to comply with Rule 8(a) but cautions the parties that further unduly lengthy filings will not be allowed.

8

## II.     <u>False Advertising Claims (Counts 1, 14, and 15)</u>

In Counts 1, 14, and 15 of the Complaint, Plaintiffs assert claims for false advertising under the Lanham Act, CFA, and DTPA, respectively. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). If based on the same misrepresentation, "claims for false advertising under the [DTPA] and CFA rise or fall with [a] claim under the Lanham Act[.]" *AAVN, Inc. v. WestPoint Home, Inc.*, No. 17 C 8329, 2019 WL 1168102, at *4 (N.D. Ill. Mar. 13, 2019). Defendants argue that Plaintiffs' false advertising claims should be dismissed because Plaintiffs failed to plausibly allege harm to their own commercial interests. (Joint Mem. at 48-50). In addition, because Plaintiffs failed to respond to that argument, Defendants contend that those claims should be deemed abandoned and dismissed with prejudice. (Reply at 44, Dkt. 74).[8]

Longstanding and abundant case law in this Circuit holds that a person effectively abandons (or waives) a claim by not responding to arguments made in a motion to dismiss. *See Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) (affirming district court's decision that the plaintiff had forfeited his opportunity to oppose the defendants' motions to dismiss by failing to respond to the arguments in support of those motions); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the [plaintiffs] have done here—results in waiver."); *County of McHenry v. Ins. Co. of the West,* 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal

---

[8] Defendants also argue that Counts 14 (CFA) and 15 (DTPA) are barred by their respective statutes of limitations; however, that issue will be discussed separately below.

basis to support his cause of action.") (internal quotations omitted); *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (finding that claim had been waived where the plaintiff "did not present legal arguments or cite relevant authority to substantiate that claim in responding to defendants' motion to dismiss[.]"); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning. An unresponsive response is no response. In effect the plaintiff was defaulted for refusing to respond to the motion to dismiss. And rightly so."); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995), *as amended* (Apr. 7, 1995) ("when presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action. The federal courts will not invent legal arguments for litigants.") (internal citation omitted); *see also 7241 W. 100th Place Corp. v. Vill. of Bridgeview*, No. 13 C 4336, 2014 WL 517961, at *3 (N.D. Ill. Feb. 6, 2014) ("[B]ecause claims that a plaintiff fails to defend in opposing a Rule 12(b)(6) motion are deemed abandoned, the dismissal is with prejudice."); *Jones v. Connors*, No. 11 C 8276, 2012 WL 4361500, at *7 (N.D. Ill. Sept. 20, 2012) ("A party's failure to respond to arguments the opposing party makes in a motion to dismiss operates as a waiver or forfeiture of the claim and an abandonment of any argument against dismissing the claim.").

Accordingly, because Defendants have offered plausible arguments for dismissal and Plaintiffs have failed to respond, any argument to the contrary has been forfeited and the false advertising claims have been abandoned. Counts 1, 14, and 15 are therefore dismissed with prejudice.

## III.   <u>Conspiracy-Based Claims (Counts 2, 4, 6, and 13)</u>

In Counts 2, 4, 6, and 13 of the Complaint, Plaintiffs assert conspiracy-based claims for violations of the Sherman,[9] Clayton, Cartwright, and RICO Acts and for civil conspiracy. To survive dismissal, each of these claims must all plausibly allege the existence of an illegal agreement or conspiracy, among other things. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("we hold that stating [a Sherman Act § 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."); *McCoy v. Gamesa Tech. Corp.*, 2012 WL 245166, at *4-5 (N.D. Ill. Jan. 26, 2012) (noting that a plaintiff alleging antitrust conspiracy must ultimately "establish that the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'") (quoting O*mnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984))); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (The analysis for Cartwright Act claims "mirrors the analysis under federal [antitrust] law."); *McCoy*, 2012 WL 245166, at *4 ("To establish a civil conspiracy under Illinois law, a plaintiff must show that each alleged conspirator 'knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.'") (quoting *McClure v. Owens Corning Fiberglass Corp.,* 188 Ill. 2d 102, 133 (1999)); *Bobb v. Swartz-Retson P.C.*, No. 17 C 7694, 2018 WL 4384292, at *6 (N.D. Ill. Sept. 14, 2018) ("the existence of an 'enterprise' is fundamental to each provision [of RICO].") (citing 18 U.S.C. §§ 1962(a)-(d)).

---

[9] The title of Count 2 references Sections 1, 2, and 3 of the Sherman Act. Section 1 is discussed herein. Section 2 is addressed below. Section 3 "merely extends the [geographic] reach of Section 1," meaning that "Section 3 claims are analyzed in the same manner as Section 1 claims." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 106 n.10 (S.D.N.Y. 2015).

To determine whether Plaintiffs have plausibly alleged conspiracy, "the crucial question is whether . . . [defendants'] conduct stemmed from independent decision or from an agreement, tacit or express." *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954); *see also Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). To meet that requirement, a plaintiff may allege an illegal agreement through direct or circumstantial evidence. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018). Direct evidence constitutes a "smoking gun" and "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* (quoting *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)). Circumstantial evidence consists of "facts 'from which the existence of such an agreement can be inferred.'" *Dealer Mgmt.*, 313 F. Supp. 3d at 949 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002)).

"Absent 'smoking gun' direct evidence of a conspiracy . . . , circumstantial evidence can support an inference of an agreement if it sufficiently alleges 'a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion.'" *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 955 (N.D. Ill. 2019) (quoting *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010)). Alleging inferences of "parallel conduct that could just as easily be independent action does not suggest a conspiracy to restrain trade" and are therefore not enough. *Reapers Hockey*, 412 F. Supp. 3d at 955 (citing *Twombly*, 550 U.S. at 556-557). Thus, a plaintiff alleging a conspiracy based on circumstantial evidence must also allege certain "plus factors[,]" which "are economic actions and outcomes that

12

are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (citing *Twombly*, 550 U.S. at 557 [sic] n. 4). Relevant "plus factors" may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 985 (N.D. Ill. 2022) (quoting *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 334 (S.D.N.Y. 2021); *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).

Defendants argue that Plaintiffs' conspiracy-based claims should be dismissed because Plaintiffs have failed to plausibly allege the existence of an illegal agreement between Defendants. Specifically, Defendants claim that the allegations concerning the purported RIA Services Scheme and Silencing and Retaliation Scheme are insufficient to show any agreement between the Defendants because Plaintiffs allege only parallel conduct (i.e., offering broadly similar packages of investment products, participating in an RIA referral program, and eliminating certain commissions) and nothing consistent with coordinated action. (Joint Mem. at 25-26).

Plaintiffs respond that they have alleged direct evidence of a conspiracy in the form of agreements, communications, admissions, and threats. (Resp. at 26-27). Specifically, Plaintiffs point to allegations about referral agreements between RIAs and the Broker-Custodian Defendants, admissions concerning such agreements, communications between Mallouk, Creative Planning, and AMTD about the Silencing and Retaliation Scheme, communications between Schwab and Fidelity about pricing and confidential information in the context of due diligence for

13

mergers and acquisitions, threats by Schwab and Fidelity concerning a group boycott, and threats by Creative Planning concerning no-poach agreements.

Even if those allegations of direct evidence are insufficient, Plaintiffs claim that they have alleged adequate circumstantial evidence to infer a conspiracy. Namely, Plaintiffs assert that Defendants engaged in parallel conduct, had many common motives to conspire, shared information, participated in mergers and acquisitions, had opportunities to meet, and were subject to industry characteristics that facilitated collusion. (Resp. at 31). In response to Defendants' argument that the alleged parallel conduct is nothing more than "individual responses to common stimuli[,]" (Joint Mem. at 26), Plaintiffs contend that they need not plead around alternative explanations and that, in any event, Defendants' assertion that their pricing changes were consumer-friendly ignores the fact that there were corresponding changes to other terms that increased costs, and this is a dispute of fact that precludes dismissal, (Resp. at 31-32). In addition, Plaintiffs challenge a number of Defendants' attacks to their conspiracy-based claims on other miscellaneous grounds and for reasons applicable to specific Defendants (e.g., Creative Planning and General Atlantic). Because the Court agrees with Defendants that there are fundamental problems with Plaintiffs' conspiracy allegations, the Court need not address the miscellaneous and defendant-specific issues.

The overarching problem with Plaintiffs' conspiracy-based claims is that although the Complaint allegations are voluminous, they remain conclusory in many respects. As Defendants note, Plaintiffs often engage in "group pleading" alleging that "Defendants" or the "Broker-Custodian Defendants" engaged in certain activity but failing to differentiate with factual allegations about specific Defendants. This is particularly problematic where the Court must

14

consider whether allegations about each Defendant's purported conduct is sufficient to infer an illegal agreement.

Looking beyond this fundamental issue, Plaintiffs' conspiracy-based claims are also lacking in factual allegations of direct or circumstantial evidence of an illegal agreement. In support of Plaintiffs argument that there is direct evidence of an agreement in the form of agreements, communications, admissions, and threats, Plaintiffs cite sections of chart attached as Exhibit A to the Response, which in turn cites paragraphs of the Complaint that supposedly contain relevant allegations. Not only are the cited allegations conclusory, but also, they are not direct evidence of a conspiracy. For example, Plaintiffs point to the existence of RIA referral agreements as direct evidence of a conspiracy, but that reasoning is flawed. The purported RIA Services Scheme involves the use of referral agreements in furtherance of the overall scheme, so the referral agreements themselves cannot constitute direct evidence of an agreement to collude. The alleged communications, admissions, and threats do not fare any better. None include statements that constitute "smoking gun" direct evidence of the existence of a conspiracy.

Plaintiffs' allegations of circumstantial evidence of a conspiracy are also insufficient. The first step in alleging circumstantial evidence of a conspiracy is to describe parallel conduct. Although Plaintiffs plausibly allege that Defendants all engaged in similar conduct with respect to the RIA Services Scheme and the Silencing and Retaliation Scheme, Plaintiffs fail to establish that such conduct was parallel. Specifically, Plaintiffs claims that in furtherance of the RIA Services Scheme, the Broker-Custodian Defendants engaged in simultaneous price cuts by dropping certain commissions to zero. At the same time, Plaintiffs allege that those cuts were actually made first by Schwab, then by AMTD, and eventually by Fidelity. Absent other evidence of collusion, it is not reasonable to infer that price cuts made close in time were effectively done in concert with each

other as opposed to being done in response to each other, as competitors do. Furthermore, although Plaintiffs now argue that the price cuts were made in connection with other changes that resulted in net increased costs, they have not cited any authority to show that consecutive price cuts may be indicative of a conspiracy. Similarly, with respect to the Silencing and Retaliation Scheme, Plaintiffs characterize the Broker-Custodian Defendants' respective decisions to cease doing business with Plaintiffs over the course of over a year as a parallel conduct in the form of a group boycott. This characterization ignores the fact that each Defendant cut ties with Plaintiffs at different times and for seemingly different reasons, which belies any suggestion of a group boycott or other conspiracy.

Even if Plaintiffs had sufficiently alleged parallel conduct in connection with the RIA Services Scheme and Silencing and Retaliation Scheme, the conspiracy-based claims would still fail because Plaintiffs do not plausibly allege sufficient plus factors. Plaintiffs' allegations in this regard are categorical and lacking in detail but also substantively deficient. Many of the purported motives to conspire (e.g., increased profits, competitive advantage, increase revenue, etc.), (Resp. at 30), boil down to their motivation to increase profits, which always exists and does not give rise to an inference of a conspiracy. *Musical Instruments*, 798 F.3d at 1195 n.8. The allegations regarding the other purported plus factors (e.g., information sharing, opportunities to meet, mergers and acquisitions, etc.) are insufficient because, again, although they are not brief, they are conclusory and lacking the requisite factual content. (*See* Compl. ¶¶ 296-315).

The bottom line is that the allegations of conspiracy are heavy on theories and labels and light on details. Furthermore, even reading the conspiracy-based claims in the light most favorable to Plaintiffs, they lack adequate factual content about Defendants' conduct to infer the existence

of any agreement to engage in the schemes alleged by Plaintiffs. Accordingly, Plaintiffs' conspiracy-based claims (Counts 2, 4, 6, and 13)[10] are dismissed.

## IV.    Antitrust Claims (Counts 2-4)

In Counts 2, 3, and 4 of the Complaint, Plaintiffs assert antitrust claims against Defendants under Sherman Act §§ 1 and 2, Clayton Act § 7, and the Cartwright Act,[11] respectively. As discussed above in Section III, Counts 2 and 4 fail because Plaintiffs failed to plausibly allege a conspiracy.[12] As such, the only antitrust claim remaining for discussion is Count 3, for violation of Section 7 of the Clayton Act.

### A.    Clayton Act § 7 (Count 3)

Section 7 of the Clayton Act prohibits the acquisition of a company where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. A plaintiff asserting a Section 7 claim must first "identify the relevant product and geographic markets." *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)). Second, a plaintiff must plausibly allege that the effect of the merger may be substantially to lessen competition in the relevant market. *FTC v. Advoc. Health Care*, 2017 WL 1022015, at *7 (N.D. Ill. Mar. 16, 2017).

---

[10] Defendants' Joint Memorandum refers to Counts 2, 4, 6, and 13 as the conspiracy-based claims, (Joint Mem. at 11-19), but Defendants' Joint Reply expands that category to include Count 5, (Joint Reply at 20). Because arguments may not be raised for the first time in a reply brief, the Court declines to extend this section to Count 5.

[11] The parties agree that the analysis under the Sherman Act and Cartwright Act is the same. (Joint Mem. at 23) (citing *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)); (Resp. at 35) (citing *In re Copper Antitrust Litig.*, 436 F.3d 782, 802 (7th Cir. 2006)).

[12] Even if Plaintiffs' Sherman Act and Cartwright Act claims were not dismissed for that reason, it is doubtful that they would survive. To state a claim under either law, a plaintiff must allege, among other things, antitrust injury and a restraint on trade resulting from the purported anticompetitive behavior. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Although the Court need not reach the issue for purposes of these claims, the allegations attempting to connect the alleged anticompetitive conduct to injuries suffered by Plaintiffs for the relevant markets lack sufficient facts to show a causal nexus. Because there are other reasons for dismissal, the Court also declines to address the parties' arguments regarding antitrust injury, restraint on trade, implied immunity, and exclusionary conduct.

Plaintiffs' Clayton Act claim challenges (1) Schwab's horizontal acquisition of AMTD; (2) Creative Planning's acquisitions of competitor RIAs[13]; and (3) Fidelity and Schwab's "acquisition" of small RIAs and IARs through their supportive independence programs. (Compl. ¶¶ 741-745). These claims fail because Plaintiffs have not sufficiently alleged a "reasonable probability, not mere possibility, of anticompetitive effect." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 274 (7th Cir. 1981).

With respect to the Schwab-AMTD acquisition, Plaintiffs' Complaint is both contradictory and conclusory. While claiming that the acquisition was monopolistic, Plaintiffs also allege Fidelity competes with Schwab, (Compl. ¶ 120), and other competitors are entering the market, albeit with limited offerings, (*id.* ¶ 193-194). Furthermore, Plaintiffs do not attempt to connect allegations about diminished competition with the acquisition on anything more than a superficial level. As a result of these deficiencies, Plaintiffs' Complaint fails to plausibly allege a connection between the Schwab-AMTD acquisition and any anticompetitive effect. CP's acquisition of independent RIAs does not fare any better. Put simply, Creative Planning takes up too small of a share of the RIA market to pose any real risk of monopolization. For the relevant time period, Plaintiffs claim that the relevant market consists of $5.7 trillion total AUM, (Resp. at 10 ) (citing Compl. ¶¶ 107-112), and CP's AUM was $133 billion. It is not plausible that acquisitions resulting in such a small market share could give rise to a reasonable probability of anticompetitive effect.

---

[13] Plaintiffs allege that General Atlantic's acquisition of a partnership interest in Creative Planning was in furtherance of Creative Planning's purported attempts to monopolize the independent RIA market. (Compl. ¶ 743). Defendants argue that it is unclear how the acquisition of a partnership interest alone supports the broader theory that Creative Planning's acquisition of competitors had anticompetitive effects, given that General Atlantic is alleged to be an investor only and not an RIA or a custodian. Plaintiffs insist that General Atlantic is subject to liability for Creative Planning's tortious conduct as a partner but do not otherwise respond to this argument. The Court agrees that General Atlantic's acquisition of a partnership interest in Creative Planning is distinct from Creative Planning's purported anticompetitive conduct. Therefore, the Clayton Act claim fails to the extent it is based on General Atlantic's acquisition of a partnership interest in Creative Planning.

*See, e.g., Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 297 (7th Cir. 1974) (3-percentage market share did not even lend colorable support for comparable Sherman Act § 2 monopoly claim). Last, Fidelity and Schwab's supported independence programs definitionally cannot support a Clayton Act § 7 claim. Section 7 is limited to direct or indirect *acquisitions*. *See* 15 U.S.C. § 18. Fidelity and Schwab's supported independence programs, as alleged in the Complaint, are in the nature of agreements and business relationships between custodians and the independent and/or small RIAs. Plaintiffs fail to allege and explain how such facts could be characterized as an acquisition. For these reasons, Plaintiffs' Clayton Act § 7 claims fail to plausibly allege that the effect of any of the purportedly monopolistic conduct "may be substantially to lessen competition in the relevant market" and are therefore dismissed.

## V.     California Claims (Counts 4 and 5)

In Counts 4 and 5 of the Complaint, Plaintiffs assert claims under California's Cartwright Act and UCL (the "California Claims"), respectively. To the extent the California Claims do not fail for the same reasons as other claims,[14] Defendants make the limited argument that the disgorgement sought by Plaintiffs, (*see* Compl. ¶ 759), is unavailable under the UCL. (Joint Mem. at 53-54) (citing *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 787 n.23 (N.D. Ill. 2020) ("plaintiffs generally cannot recover money damages on a UCL claim."); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144-1151 (2003)). As with many other arguments, Plaintiffs failed to address this one and have therefore forfeited the opportunity to respond and waived and abandoned their request for disgorgement.

In addition, the Fidelity Defendants argue that the California Claims against them fail because Plaintiffs did not allege any nexus between Fidelity's alleged conduct and California. The

---

[14] As discussed in Section VI, Count 5 for violation of the UCL is dismissed in its entirety.

Court is not persuaded by this argument. Plaintiffs allege that Greco is registered as an IAR in California, Spotlight does business throughout the United States, and the Fidelity Defendants provide a wide range of relevant services in the national investment advisory industry. (Compl. ¶¶ 27, 30, 31-42). It is reasonable to infer from these allegations that there is a nexus between the Fidelity Defendants' purported conduct, Plaintiffs' alleged injuries, and California. Accordingly, to the extent the California Claims are not dismissed for other reasons, the grounds raised by the Fidelity Defendants do not support dismissal.

## VI.   Fraud-Based Claims (Counts 1, 5, and 13-15)

Defendants argue that the following fraud-based claims should be dismissed because they are not pleaded with the level of particularity required by Rule 9(b): Counts 1 (Lanham Act false advertising), 5 (UCL), 13 (civil RICO), 14 (CFA), and 15 (DTPA). Indeed, such claims must be pleaded with particularity. *See Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 709 (N.D. Ill. 2006) (Lanham Act); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (UCL); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998) (RICO); *Nakajima All Co. v. SL Ventures Corp.*, No. 00 C 6594, 2001 WL 641415, at *4 (N.D. Ill. June 4, 2001) (CFA and DTPA). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P 9(b). In plain terms, this means that "a plaintiff must plead the 'who, what, when, where, and how' of the alleged fraud." *Calavan v. First Love Int'l Ministries*, 590 F. Supp. 3d 1131, 1139 (N.D. Ill. 2022) (quoting *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019)). Allegations of fraud may be plead on information and belief if the facts constituting the fraud are unavailable to the plaintiff, but the plaintiff must then plead the grounds for his suspicions. *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807 (N.D. Ill. 2013).

Defendants cite many instances throughout the Complaint where Plaintiffs generally allege that Defendants engaged in fraud and even quote various communications made by specific Defendants. (*See, e.g.*, Compl. ¶¶ 137, 229-234, 240, 281, 568, 613, 693). But according to Defendants, these allegations are insufficient under Rule 9(b) because they are too generalized and do not spell out the "who, what, when, where, and how" of the purported fraud. In response, Plaintiffs say that Defendant's argument is "simply wrong[,]" that their "well-plead, factually specific allegations speak for themselves[,]" and that it is perfectly acceptable to plead fraud on information and belief. (Resp. at 15-16). Ironically, Plaintiffs' conclusory and generalized argument suffers from the same deficiencies as their fraud allegations—lack of particularity.

In response to a motion to dismiss, it is not enough to tell the Court that the movant is "simply wrong" and the allegations "speak for themselves." Defendants are right—"[j]udges are not like pigs, hunting for truffles buried in briefs," *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and "[i]t is not the Court's responsibility to find arguments, facts, and supporting case law for the parties," *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *11 (N.D. Ill. July 26, 2016). (Reply at 13). That is especially true where the pleading is as lengthy, repetitive, and convoluted as Plaintiffs' Complaint here. Based on the Court's review of the Complaint and Defendants' citation to various instances of generalized fraud allegations, the Court has no trouble concluding that the allegations of fraud do not come close to meeting the heightened pleading standard set forth in Rule 9(b).

Indeed, many of the allegations do generally reference categories of statements and representations made by all the Defendants or sub-groups of Defendants; they are still insufficient to support fraud-based claims. (*See, e.g.,* Compl. ¶ 281) ("Defendants make intentionally false and misleading representations and omissions in their SEC Reports, and in other representations to

clients, about [listing generalized topics].”). Many other allegations quote and cite specific communications, which is better but not enough, because the statements themselves do not contain any actionable misrepresentations. (*See, e.g.*, Compl. ¶ 613) (citing a solicitation letter stating that Fidelity is “focused on helping your firm succeed” and thanks the recipient for its interest in Fidelity’s services “to help you grow your business.”). To the extent any of the fraud-based allegations were based on information and belief,[15] as Plaintiffs’ response suggests, Plaintiffs failed to provide any explanation as to the grounds for such belief, let alone cite to any allegations containing such grounds. For these reasons, Plaintiffs have not demonstrated that their fraud-based allegations are plead with the requisite level of particularity, and Counts 1, 5, 13, 14, and 15 are all dismissed for that reason.

VII.  **Statutes of Limitations (Counts 2, 4, 5, and 13-15)**

Defendants argue that the following claims, to the extent they are based on the RIA Services Scheme or the CP Fraudulent Growth Scheme, should be dismissed because they are barred by their respective statutes of limitations: Counts 2 (Sherman Act), 4 (Cartwright Act), 5 (UCL), 13 (RICO Act), 14 (FCA), and 15 (DTPA). Generally, the dismissal of claims “as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations.” *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). However, a court may dismiss a claim barred by the statute of limitations “when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint’s tardiness.” *Id.* at 674-675. Because that approach is “irregular,” it is appropriate “only where the allegations of the complaint itself set forth everything necessary to

---

[15] The Complaint generally states: “Plaintiffs . . . complain, upon information and belief, except as to allegations particularly pertaining to themselves, which are based on personal knowledge, against [Defendants].” (Compl. at 5).

satisfy the affirmative defense." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-614 (7th Cir. 2014); *see also see also Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("[W]hen the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous, the district judge need not wait for an answer before dismissing the suit."). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute of limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point [the Court] may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman Health Ctr. v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

Defendants contend that the above-referenced claims have statutes of limitations that expired before Plaintiffs filed the Complaint and that the allegations concerning them establish the tardiness of the claims to the extent that they are based on the RIA Services Scheme or the CP Fraudulent Growth Scheme. (Joint Mem. at 51-53). The relevant claims have 3 or 4-year limitations periods. *See* 15 U.S.C. § 15b (4-year limitations period for Sherman Act claims); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1062 (N.D. Cal. 2016) (4-year limitations period for Cartwright Act claims); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010) (4-year limitations period for civil RICO claims); *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016) (4-year limitations period for UCL claims); 815 ILCS 505/10a(e) (3-year limitations period for CFA claims); *Underground Sols., Inc. v. Palermo*, 2014 WL 4703925, at *2 (N.D. Ill. Sept. 22, 2014) (3-year limitations period for DTPA claims). Defendants thus insist that those claims are untimely because Plaintiffs filed the Complaint in 2022 but allege awareness of the purported wrongful conduct by at least 2017 and possibly as early as 2013 in some instances. (*See* Compl. ¶¶ 320, 323-324, 365-367, 382-386, 710, 750, 860, 876-886,

887-888, 890-893). Plaintiffs oppose dismissal of their claims as untimely on the basis that such a determination is premature at this stage in the case, causes of action or conspiracy to violate antitrust laws accrue each time a plaintiff is injured by a continuing violation, and allegations of events occurring outside the limitations period are relevant to provide context. (Resp. at 62) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (accrual for continuing violations); *Colorado ex rel. Woodard v. Ramsour Bros.*, No. 84 C 802, 1986 WL 7823, at *6 (D. Colo. July 9, 1986) (relevance of events outside limitations period)). Plaintiffs' response is silent as to the non-antitrust claims.

Considering the nature of the alleged wrongdoing in this case, the Court finds that it would be inappropriate to take the "unusual" and "irregular" step of dismissing Plaintiffs' claims as untimely at this stage in the case. As alleged, both the RIA Services Scheme and the CP Fraudulent Growth Scheme involve fluid and ongoing conduct Plaintiffs learned of as early as 2013 in some cases but continued to feel the effects of into the limitations periods for the relevant claims. Because claims accrue each time a plaintiff is injured by an act of the defendants in the context of a continuing conspiracy to violate the antitrust laws, *Zenith*, 401 U.S. at 338, the allegations that Plaintiffs continued to suffer harm after learning of Defendants' conduct are enough to avoid dismissal under the statutes of limitations for these claims. Accordingly, to the extent that the claims at issue in this section are not subject to dismissal for other reasons, the Court declines to dismiss them as untimely.

## VIII.  Compulsory Counterclaims (Counts 8, 10, 11, and 12)

The CP Defendants argue that the following claims should be dismissed because they are compulsory counterclaims that should have been brought in earlier litigation in Kansas between the parties: Counts 8 (tortious interference with economic advantage), 10 (breach of contract), 11

(defamation), and 12 (unjust enrichment). (CP Supp. Mem. at 7-9, Dkt. 60). Under Rule 13, a counterclaim is compulsory in federal court if it "(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a). The relevant Kansas statute mirrors the language of Rule 13. *See* K.S.A. § 60-213(a). "In this circuit, whether a claim is a compulsory counterclaim hinges on whether the claim of the defendant—whether asserted in the same case or in a subsequent action—is 'logically related' to the claim asserted by the plaintiff." *Inforizons, Inc. v. VED Software Servs., Inc.*, 204 F.R.D. 116, 119 (N.D. Ill. 2001) (citing *Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs, Inc.,* 31 F.3d 445, 448 (7th Cir. 1994)). "[T]he test is to be applied flexibly in order to further the policies of Rule 13(a)." *Inforizons*, 204 F.R.D. at 119 ("The purpose of Rule 13(a) is judicial economy: 'to avoid a multiplicity of actions by resolving in a single lawsuit all disputes that ensue from a common factual background.'") (quoting *In re Price,* 42 F.3d 1068, 1073 (7th Cir.1994)). If a court finds that a claim before it is a compulsory counterclaim that should have been brought in earlier litigation, the second claim should be dismissed in favor of the first-filed case. *See Inforizons*, 204 F.R.D. at 120.

Creative Planning filed suit against Plaintiffs in Kansas state court on June 11, 2020. (Compl. ¶ 605) (citing *Creative Planning, LLC f/k/a Creative Planning, Inc. v. Stephen A. Greco, et. al.,* 20 CV 02465 (Johnson Cnty., Kan.). The Kansas suit relates to the breakdown of the relationship between Plaintiffs and the CP Defendants and a 2017 settlement agreement, and raises claims for breach of contract, tortious interference, defamation, and civil conspiracy. (CP Supp. Mem., Ex. A to the Decl. of Melissa Sherman, Dkt. 60-2).[16] Defendants argue that Plaintiffs' state-

---

[16] The Court takes judicial notice of the Kansas suit. *See Daniel v. Cook Cty.*, 833 F.3d 728, 742 (7th Cir. 2016); *World Water Works Holdings, Inc. v. Continental Cas. Co.*, 392 F. Supp. 3d 923, 932 (N.D. Ill. 2019).

law claims "in this action stem from the same transactions and facts at issue in the Kansas Action—including, *e.g.*, Greco's departure, the parties' Settlement Agreement, and Greco's SEC Complaint—they are "logically related" and therefore constitute compulsory counterclaims." (CP Supp. Mem. at 8). Plaintiffs respond by trying to differentiate the cases on the basis that 12 of the 13 Defendants present in this action are not parties to the Kansas suit, but that is not persuasive given that not all parties to this suit are involved in the common facts underlying the two cases. Plaintiffs also argue that the facts, law, and evidence are different because this case involves a larger and more complex conspiracy, essentially making the Kansas suit peripheral. The Court disagrees. The Kansas case was filed two years before the instant suit and involves the exact same failed business relationship, allegedly breached 2017 settlement agreement, and set of events that give rise to the state-law claims against the CP Defendants in this case.

Despite the connection between those underlying transactions and facts and the larger conspiracy that Plaintiffs allege here, it seems that the purpose of Rule 13—to promote judicial economy—would best be served by Plaintiffs' state-law claims against the CP Defendants being litigated in the first-filed Kansas suit. Accordingly, Counts 8 (tortious interference with economic advantage), 10 (breach of contract), 11 (defamation), and 12 (unjust enrichment) are dismissed without prejudice to being filed as compulsory counterclaims in the Kansas case as to the CP Defendants.

## IX.    Breach of Contract Against Broker-Custodian Defendants (Count 7)

In Count 7 of the Complaint, Spotlight asserts claims for breach of contract against the Broker-Custodian Defendants. Essentially, Spotlight alleges that the Broker-Custodian Defendants breached RIA Custodial Agreements with Spotlight by violating the duty of good faith and fair dealing owed to Spotlight, and that Schwab and AMTD coordinated termination of their respective

RIA Custodial Agreements with Spotlight to amplify harm to Spotlight. The Broker-Custodian Defendants argue that Spotlight's breach of contract claims should be dismissed because the RIA Custodial Agreements were subject to termination at-will by either party at any time for any reason[17] and violation of the covenant of good faith and fair dealing is not a stand-alone obligation that can form the basis of a breach of contract claim. Without citing relevant authority, Spotlight responds that there are still limitations to termination of an at-will contract and maintains that the Broker-Custodian Defendants terminated in bad faith for illegal reasons is sufficient.

Under state law applicable to the RIA Custodial Agreements, termination of an at-will contract under the terms of the agreement cannot form the basis of a stand-alone claim for violation of the implied covenant of good faith and fair dealing. *See Mill-Bern Assocs., Inc. v. Dallas Semiconductor Corp.*, 2002 WL 1340853, at *10 (Mass. Super. Ct. June 13, 2002) (holding that termination of an at-will contract generally cannot form the basis of a claim for breach of the covenant of good faith and fair dealing); *Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank*, 934 F.2d 976, 983 (8th Cir. 1991) (holding that "[a]cting according to express terms of a contract[, as opposed to exercising discretion granted by contract,] is not a breach of good faith and fair dealing."); *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992) ("We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement.").

The RIA Custodial Agreements are at-will, (*see* Fidelity Contract ¶ 18, Schwab Contract ¶ 18, AMTD Contract at 6), meaning that either party can terminate for at any time for any reason.

---

[17] Although the RIA Custodial Agreements attached to the Broker-Custodian Defendants' briefs (Fidelity Supp. Resp., Ex. A (Fidelity Contract), Dkt. 61-1; Schwab/AMTD Supp. Resp. Ex. A (Schwab Contract), Dkt. 62-1, & Ex. B (AMTD contract), Dkt. 62-2 ) were not attached to the Complaint, the Court may consider them because they are referred to in the Complaint and central to Plaintiffs' breach of contract claims. *See Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

Thus, Spotlight cannot assert claims for breach based on violation of the implied covenant of good faith and fair dealing for exercising an express term of the contracts. Accordingly, Spotlight's breach of contract claims against the Broker-Custodian Defendants (Count 7) are dismissed with prejudice.[18]

## X.      Tortious Interference with Contract (Count 8)

In Count 8 of the Complaint, Plaintiffs assert a claim for tortious interference with contract against Defendants. To state a claim for tortious interference with contract under Illinois law,[19] a plaintiff must allege: "(1) the existence of a valid contract between plaintiff and another; (2) the defendants' awareness of this contract; (3) defendants' intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendants' wrongful conduct; and (5) damages." *Von Der Ruhr v. Immtech Int'l, Inc.*, 326 F. Supp. 2d 922, 927 (N.D. Ill. 2004) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154-155 (1989)); *see also Nat'l Experiential, LLC v. City of Chicago*, 590 F. Supp. 3d 1116, 1129 (N.D. Ill. 2022) (dismissing a tortious interference claim based on the fourth element because "without a breach, there is no tortious interference claim"). In addition, it should go without saying, but a "party cannot tortiously interfere with his own contract; the tortfeasor must be a third party to the contractual relationship." *Douglas Theater Corp. v. Chi Title & Tr. Co., 288 Ill. App. 3d 880, 884 (1997*) (citing *Quist v. Bd. of Trustees*, 258 Ill. App. 3d 814, 821 (3d Dist. 1994)). Thus, "Illinois courts require that a tortious interference claim be supported by allegations that the defendant acted

[18] Spotlight did not respond to FMR's argument that a breach of contract claim cannot be asserted against a nonparty to the contract or allege that FMR was a party to any RIA Custodial Agreement. Accordingly, to the extent Count 7 includes a breach of contract claim against FMR, it is also dismissed.

[19] Although Plaintiffs do not specify the state law under which this claim is asserted, Illinois law applies under "most significant relationship" standard. *See Alea v. Wilson Sporting Goods Co.*, 2017 WL 5152344, at *3 (N.D. Ill. Nov. 7, 2017) ("the law of the State that has the most significant relationship to the occurrence and the parties applies.") (quoting Restatement (Second) of Conflict of Laws § 145(1) (1971)).

toward a third party." *Du Page Aviation Corp. v. Du Page Airport Auth.*, 229 Ill. App. 3d 793, 804 (2d Dist. 1992). In the same vein, a plaintiff must include allegations regarding "*specific third parties*." *Id.* at 803 (emphasis in original).

The central allegation of Plaintiffs' contract interference claim is "Defendants repeatedly, maliciously, willfully, and intentionally interfered with Plaintiffs' valid and existing contracts, including its valid and enforceable contracts for RIA Custodial Services, as well as with approximately 10 wealth adviser contracts, and over 200 advisory client contracts (collectively referred to as "Terminated Contracts"). (Compl. ¶ 790). Defendants argue that this allegation (and the others supporting the contract interference claim) are insufficient because, among other things, Plaintiffs do not allege that Defendants' purported interference caused any other party to *breach* a contract with Plaintiffs. In addition, Defendants fault Plaintiffs' lack of specificity with regard to the identities of the counterparties to the contracts. With respect to the RIA Custodial Agreements, the Broker-Custodian Defendants contend that their own alleged breach cannot serve as the basis for an interference claim and that Plaintiffs do not sufficiently allege the Broker-Custodian Defendants' interference with each other's agreements. In response, Plaintiffs claim that "Defendants' disparaging and defamatory statements about Plaintiffs led to the proverbial "slippery slope" of third-party interference with the various contracts." (Resp. at 56-57). As an example, Plaintiffs point to the communication of "misleading, disparaging, and defamatory" information between attorneys for Schwab and Fidelity in connection with earlier litigation and other disputes. (Compl. ¶¶ 623-625, 627-629).

Plaintiffs fail to state a claim for tortious interference with contract for several reasons. First, as observed by Defendants, Plaintiffs fail to allege the existence of valid contracts with others in sufficient detail. Conclusory allegations about the existence of "approximately 10 wealth adviser

contracts" and "over 200 advisory client contracts" are not enough to make out a claim for contract interference. Although it is likely not necessary to identify each and every counter party to a contract purportedly interfered with in a case like this, Plaintiffs must at least allege facts from which the Court can infer the existence of valid contracts—simply stating that they exist does not suffice. More importantly, Plaintiffs fail to include any allegations that these nonparty contracts were breached. The Complaint defines the contracts as the "Terminated Contracts" but nowhere is it actually alleged that the contracts were terminated, let alone *breached*—which is an essential element of a contract interference claim. *See Von Der Ruhr*, 326 F. Supp. 2d at 927. Furthermore, as discussed above in Section IX, Plaintiffs have not sufficiently alleged breach of the RIA Custodian Agreements. Without sufficient allegations of breach, Plaintiffs cannot also maintain contract interference claims based on the Broker-Custodian Defendants' purported interference with each other's contract. And, in any event, the allegations about misleading, disparaging, and defamatory statements are too broad and conclusory to support the inference that the Broker-Custodian Defendants intentionally and unjustifiably induced each other to breach their contracts with Plaintiffs. For these reasons, Plaintiffs tortious interference with contract claims (Count 8) are dismissed.

## XI.    Intentional Interference with Prospective Economic Advantage (Count 9)

In Count 9 of the Complaint, Plaintiffs assert claims for intentional interference with prospective economic advantage against Defendants. "To state a claim under Illinois law for intentional interference with prospective economic advantage 'a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from

the defendant's interference.'"[20] *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015) (quoting *Voyles v. Sandia Mort. Co.,* 196 Ill. 2d 288, 296 (2001)). In the context of interference claims, "'inducement' means 'some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.'" *Cohen v. Lewis*, No. 03 C 5454, 2004 WL 2481015, at \*6 (N.D. Ill. Nov. 3, 2004) (quoting *In re Estate of Albergo,* 275 Ill. App.3d 439, 446 (2d Dist. 1995)). Similar to the contract interference, to state a claim for intentional interference with prospective economic advantage, a plaintiff must identify specific third parties with whom plaintiff expected to do business and defendant wrongfully interfered. *See Du Page Aviation*, 229 Ill. App. 3d at 803-04; *see also Suhadolnik v. City of Springfield*, 184 Ill. App. 3d 155, 184 (4th Dist. 1989) (dismissing commercial disparagement claim for failure to identify third parties with whom plaintiff expected to do business).

Plaintiffs essentially claim that Defendants interfered with Spotlight's ability to procure RIA custodial services, employ IARs, effectively service clients, and merge or partner with or be acquired by interested parties. (Compl. ¶¶ 795-815). Because Greco is Spotlight's CEO and majority owner, he claims to have suffered from the interference as well. (*Id.*) By way of example, Plaintiffs describe an attempt to enter into a referral agreement with Madison Partners, which Plaintiffs claim to have failed because of Fidelity's refusal to provide services to any current or former Spotlight advisor. (*Id.* ¶¶ 639-648, 808). In addition, Plaintiffs allege that a potential partnership agreement with Strategic Wealth Partners failed due to Fidelity and Schwab's refusal to provide custodial services to Greco. (*Id.* ¶¶ 651-657). Last, Plaintiffs describe a similar failed

---

[20] As with the contract interference claims, although Plaintiffs do not identify the law under which their intentional interference with prospective economic advantage claims are asserted, Illinois law applies based on under "most significant relationship" standard.

attempt to enter a business relationship with Zoe Financial, although without specifics regarding interference by any Defendant. (*Id.* ¶¶ 658-659).

As to the CP Defendants, Plaintiffs' economic advantage interference claims fail because there is no allegation that they directly knew of or interfered with any specific prospective economic advantage. With respect to Fidelity and Schwab, although Plaintiffs allege interference with potential business relationships with Madison Partners and Strategic Wealth Partners, Fidelity and Schwab's alleged involvement appears to have been limited to providing information about their relationship (or lack thereof) with Plaintiffs in response to inquiries from the prospective partners. In doing so, neither Fidelity nor Schwab went beyond merely providing information in a passive way, which is not enough to support an economic advantage interference claim. The allegations concerning Zoe Financial are so lacking in detail that it is impossible for them to support the claim. Finally, to the extent that Plaintiffs rely on other allegations of the Complaint incorporated by reference into Count 9, the Court agrees with Schwab that Plaintiffs have engaged in the type of improper "shotgun pleading" that prevents the Court from reviewing the sufficiency of the claim and Defendants from reasonably being able to prepare a response (or makes the burden of doing so much more difficult). *See SEC v. Winemaster*, 529 F. Supp. 3d 880, 906-07 (N.D. Ill. 2021); S*EC v. Ustian*, 229 F. Supp. 3d 739, 778 (N.D. Ill. 2017); *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011). Accordingly, Plaintiffs' intentional interference with prospective economic advantage claims (Count 9) are dismissed.

## XII.   <u>Defamation (Count 11)</u>

In Count 11 of the Complaint, Greco asserts claims for defamation under Illinois law against all Defendants. According to Greco, Defendants made numerous false, disparaging, defamatory, and harmful statements about Greco to third parties. (Compl. ¶ 834). To state a claim

for defamation under Illinois law, a plaintiff must allege "that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *L. Offs. of David Freydin v. Chamara*, 24 F.4th 1122, 1129 (7th Cir. 2022) (quoting *Solaia Tech., LLC v. Specialty Publ. Co.*, 221 Ill.2d 558, 579 (2006)). "There are five categories of statements that are defamatory *per se*, where harm or damages are presumed without specific proof." *Freydin*, 24 F.4th at 1129 (listing categories). Greco claims that Defendants' statements fall into three of those categories: (1) commission of a criminal offense; (2) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; and (3) words that impute a person lacks ability or otherwise prejudices that person in her or his profession. (Compl. ¶ 835). "Like a common law fraud claim, a defamation *per se* claim must be pled with a heightened level of precision and particularity." *Green v. Rogers*, 234 Ill. 2d 478, 495 (2009). A plaintiff may also allege defamation *per quod*, where extrinsic facts are necessary to show the defamatory meaning of the statements and damages are not presumed.

The CP Defendants, Fidelity, and Schwab/AMTD each separately argue that Greco has failed to state a claim for defamation against them. (*See* CP Supp. Mem. at 9-12; Fidelity Supp. Mem. at 11-12, Dkt. 61; Schwab/AMTD Supp. Mem. at 13-15, Dkt. 62). Although Count 11 "repeats, realleges, and incorporates by reference each paragraph alleged in this Complaint as if fully set forth [t]herein[,]" (Compl. ¶ 832), Greco does not specifically identify which alleged statements found in the over 800 other paragraphs of the Complaint are the focus of this claim. Fortunately, Defendants point out in their briefs the Complaint paragraphs that contain allegations about statements purportedly made by them about Greco. (*See* CP Supp. Mem. at 10) (citing Compl. ¶¶ 261-264, 382, 384, 463, 467-469, 480, 508-509, 512, 597-600); Fidelity Supp. Mem. at

12) (citing Compl. ¶¶ 643, 655); Schwab/AMTD Supp. Mem. 13-15 (citing Compl. ¶¶ 560, 592, 623, 832-842). Among other things, Defendants argue that the relevant statements were not alleged to be false, made to third parties, or with an adequate degree of specificity. After reciting one page of black letter defamation law, Plaintiffs simply respond: "As alleged with specificity throughout the Complaint, Defendants each made numerous disparaging and defamatory statements about Plaintiffs, individually, and in combination, and as part of their conspiracy, through their Silencing and Retaliation Scheme and Group Boycott. Plaintiffs also alleged injury from the defamation. (Compl. ¶¶ 640[-]644, 646[-]648, 652, 841, 842)." (Resp. at 59-61).

For the same reasons discussed in Section II above with respect to the abandoned claims, Plaintiffs' cursory and conclusory response to Defendants' arguments for dismissal of the defamation claims operates as a forfeiture of any substantive argument in response and waiver and abandonment of the claims. *See, e.g., Kirksey*, 168 F.3d at 1041 ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning. An unresponsive response is no response. In effect the plaintiff was defaulted for refusing to respond to the motion to dismiss. And rightly so."); *see also Stransky*, 51 F.3d at 1335 ("The federal courts will not invent legal arguments for litigants."). Accordingly, Count 11 is dismissed because Defendants have offered plausible substantive grounds to dismiss Greco's defamation claims and Greco failed to offer any meaningful response.

## XIII.  Unjust Enrichment (Count 12)

In Count 12 of the Complaint, Plaintiffs assert a claim for unjust enrichment against all Defendants. Essentially, Plaintiffs claim that Defendants have benefited from receiving increased

revenue as a result of their alleged wrongful conduct, Plaintiffs have suffered by being charged anticompetitive prices, and it would be inequitable to allow Defendants to retain the benefit of their wrongful conduct. (Compl. ¶¶ 843-852). Although the unjust enrichment claim is pleaded in the alternative, (*id.* ¶ 845), it also "repeat[s], reallege[s], and incorporate[s] by reference each paragraph alleged in [the] Complaint[,]" (*id.* ¶ 843).

As Defendants contend, (Joint Mem. at 51), "recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). For this reason, even where unjust enrichment is pleaded as an alternative theory of recovery, "a party may not incorporate by reference allegations of the existence of a contract between the parties in the unjust enrichment count." *LKQ Corp. v. Rutledge*, 96 F.4th 977, 981 (7th Cir. 2024) (quoting *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 887 (7th Cir. 2022)). Because Plaintiffs' unjust enrichment claim incorporates allegations of the existence of express contracts with Defendants, (Compl. ¶ 843), "this pleading error prevents their unjust enrichment claim from going forward." *LKQ*, 96 F.4th at 981 (quoting *Gociman*, 41 F.4th at 887). Accordingly, Count 12 for unjust enrichment is dismissed.

## XIV.  **RICO (Count 13)**

In Count 13 of the Complaint, Plaintiffs assert RICO Act claims against all Defendants. As discussed in Sections III and VI above, Plaintiffs' RICO claims fail because they have failed to sufficiently allege the existence of an agreement or enterprise between Defendants and the allegations of fraud supporting the claims are not pleaded with the requisite level of particularity. Because these reasons provide two independent grounds for dismissal, the Court declines to decide whether Plaintiffs sufficiently alleged viable predicate acts; however, to the extent that Plaintiffs'

RICO claims are premised on antitrust violations, the analysis above in Section IV is equally applicable.

**<u>CONCLUSION</u>**

For all the reasons stated above, Defendants' joint motion to dismiss [58] is granted in part and denied in part. Plaintiffs may file a *proposed* amended complaint consistent with this Memorandum Opinion and Order, Rule 8, and Rule 11 by October 4, 2024. The Court will first review any proposed amended complaint filed by that date and enter an appropriate order.

**DATED**: September 9, 2024             **ENTERED**:

_____

LASHONDA A. HUNT
United States District Judge